**Slip Op. 11-**119

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

JINAN YIPIN CORPORATION, LTD., LINSHU      :
DADING PRIVATE AGRICULTURAL
PRODUCTS CO., LTD., and SUNNY IMPORT      :
& EXPORT LTD.,
                                          :

       *Plaintiffs*,      :

       v.      :

             :      Court No. 06-00189

UNITED STATES,
                                          :

       *Defendant*,      :

       and      :

FRESH GARLIC PRODUCERS ASSOCIATION,
CHRISTOPHER RANCH, L.L.C., THE      :
GARLIC COMPANY, VALLEY GARLIC,
and VESSEY AND COMPANY, INC.,      :

       *Defendant-Intervenors*.      :

[Sustaining in part U.S. Department of Commerce's remand determination in tenth administrative review of antidumping duty order covering fresh garlic from the People's Republic of China]

Dated: September 26, 2011

    Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (Mark E. Pardo and Jeffrey O. Frank), for Plaintiffs.

    Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Richard P. Schroeder); Reid Swayze, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

    Kelley Drye & Warren LLP (Michael J. Coursey and John M. Herrmann), for Defendant-Intervenors.

# OPINION

RIDGWAY, Judge:

In this action, the plaintiff Chinese producers and exporters of fresh garlic challenged the final results of the U.S. Department of Commerce's tenth administrative review of the antidumping duty order covering fresh garlic from the People's Republic of China.  *See generally* Zhengzhou Harmoni Spice Co. v. United States, 33 CIT ____, 617 F. Supp. 2d 1281 (2009) ("Zhengzhou Harmoni I").  Zhengzhou Harmoni I analyzed each of the seven issues that the Chinese producers raised, sustaining Commerce's determination as to two issues, and remanding the remaining five for further consideration by the agency.  *See generally id.*, 33 CIT at ____, ____, 617 F. Supp. 2d at 1289, 1334.

Now pending before the court is Commerce's Remand Determination, filed pursuant to Zhengzhou Harmoni I.  *See generally* Final Results of Redetermination Pursuant to Court Remand ("Remand Determination").  Plaintiffs Jinan Yipin Corporation, Ltd. ("Jinan Yipin"), Linshu Dading Private Agricultural Products Co., Ltd. ("Linshu Dading"), and Sunny Import & Export Ltd. ("Sunny") – collectively referred to as "the Chinese Producers" – continue to dispute the agency's treatment of four of the five issues addressed in the agency's Remand Determination.  *See generally* Plaintiffs' Comments Regarding the Department's Remand Redetermination ("Pls. Comments"); Plaintiffs' Reply to Defendant's Response Comments Regarding Remand Redetermination ("Pls. Reply Comments").

For its part, the Government seeks a voluntary remand to allow Commerce to recalculate the surrogate value for the Chinese Producers' labor costs, but contends that the Remand Determination

should be sustained in all other respects.  *See* Defendant's Response to Comments Upon the Remand

Redetermination ("Def. Response") at 1, 31.  Defendant-Intervenors the Fresh Garlic Producers

Association and its individual members (Christopher Ranch, L.L.C., The Garlic Company, Valley

Garlic, and Vessey and Company, Inc.) – collectively referred to as "the Domestic Producers" – do

not oppose the Government's request for a limited remand to allow the agency to recalculate labor

costs, but urge that the Remand Determination be sustained as to all other issues save one, on which

the Domestic Producers express no view.  *See* Defendant-Intervenors' Reply Regarding Agency

Remand Redetermination ("Def.-Ints. Reply Comments") at 1-3.

Jurisdiction lies under 28 U.S.C. § 1581(c) (2000).[1]  For the reasons detailed below,

Commerce's Remand Determination is sustained in part, and this matter is remanded to the agency

for further consideration not inconsistent with this opinion.

# I.  Background

Seven Chinese producers and exporters of fresh garlic brought this action to contest various

aspects of the Final Results of Commerce's tenth administrative review of the antidumping duty

order on fresh garlic from China, which covered the period from November 1, 2003 through October

31, 2004.  *See generally* Zhengzhou Harmoni I, 33 CIT ____, 617 F. Supp. 2d 1281; Fresh Garlic

from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty

Administrative Review and Final Results of New Shipper Reviews, 71 Fed. Reg. 26,329 (May 4,

---

[1] All citations to federal statutes are to the 2000 edition of the United States Code.  Similarly, all citations to federal regulations are to the 2003 edition of the Code of Federal Regulations.

2006) ("Final Results").[2]

Zhengzhou Harmoni I sustained Commerce's use of its "intermediate input methodology" to value the raw garlic bulb grown by the Chinese Producers, as well as the agency's inclusion of certain labor-related expenses as part of manufacturing overhead.  See Zhengzhou Harmoni I, 33 CIT at ____, ____, ____, 617 F. Supp. 2d at 1289, 1295, 1333-34.  In contrast, Zhengzhou Harmoni I remanded for further consideration Commerce's surrogate valuation of certain "factors of production" necessary for the cultivation and export of fresh garlic – specifically (1) raw garlic bulb, (2) labor, (3) ocean freight, (4) cardboard cartons, and (5) plastic jars and lids.  See id., 33 CIT at ____, ____, ____, ____, ____, ____, 617 F. Supp. 2d at 1289, 1301, 1311-12, 1321, 1327, 1334.

Following Zhengzhou Harmoni I but before issuance of Commerce's Remand Determination, four of the seven Chinese producers that filed the complaint in this action moved for voluntary dismissal.  See generally Zhengzhou Harmoni Spice Co. v. United States, 34 CIT ____, 675 F. Supp. 2d 1320 (2010) ("Zhengzhou Harmoni II").[3]  Zhengzhou Harmoni II granted the motion and dismissed the four Plaintiffs from this action with prejudice, leaving Jinan Yipin, Linshu Dading, and Sunny (collectively "the Chinese Producers") as the remaining Plaintiffs and the only subjects

---

[2]Although the complaint in this action was filed on behalf of seven Chinese producers/exporters, only four of the seven moved for judgment on the agency record.  See Zhengzhou Harmoni I, 33 CIT at ____ & n.2, 617 F. Supp. 2d at 1285 & n.2; see also Zhengzhou Harmoni Spice Co. v. United States, 34 CIT ____, ____, 675 F. Supp. 2d 1320, 1324 (2010) ("Zhengzhou Harmoni II").

[3]The Partial Consent Motion for Voluntary Dismissal with prejudice was filed on behalf of the three plaintiff Chinese producers that did not join in the Motion for Judgment on the Agency Record (i.e., Jining Trans-High Trading Co., Ltd., Jinxiang Shanyang Freezing Storage Co., Ltd., and Shanghai LJ International Trading Co., Ltd.), as well as Zhengzhou Harmoni Spice Co., Ltd. (which was a party to the Motion for the Judgment on the Agency Record).  See Zhengzhou Harmoni II, 34 CIT at ____, 675 F. Supp. 2d at 1324.

of Commerce's Remand Determination.  *See id.*, 34 CIT at _____, _____, 675 F. Supp. 2d at 1324, 1339-40.[4]

Commerce thereafter issued its Remand Determination.  In the Remand Determination, Commerce revalued raw garlic bulb, labor, and ocean freight.  *See* Remand Determination at 5-15, 15-38, 38-41, 51-59, 59-68.  On the other hand, Commerce continued to value cardboard cartons and plastic jars as it had in the Final Results.  *See id.* at 41-46, 46-50, 68-71, 71-74.  As a result of its reconsideration in the course of the remand, Commerce recalculated the weighted-average antidumping duty margin for Jinan Yipin as 55.18% (up from 29.52%), for Linshu Dading as 39.51% (up from 22.47%), and for Sunny as 26.67% (up from 10.52%).  *See id.* at 74-75; Final Results, 71 Fed. Reg. at 26,332.

The Chinese Producers contend that Commerce's wage rate calculation and its valuation of raw garlic bulb, cardboard cartons, and plastic jars do not comply with the instructions in Zhengzhou Harmoni I.  *See generally* Pls. Comments; Pls. Reply Comments.  The Chinese Producers maintain that these matters therefore should be remanded to the agency for further consideration.  *See* Pls. Comments at 1-2, 18-19, 26, 30, 31; Pls. Reply Comments at 12, 17.

The Government seeks a voluntary remand to allow Commerce to recalculate the surrogate value for the Chinese Producers' labor costs in light of the Court of Appeals' decision in Dorbest, but maintains that the Remand Determination should be otherwise sustained.  *See* Def.'s Response at 1, 31; Dorbest Ltd. v. United States, 604 F.3d 1363, 1366, 1369-73 (Fed. Cir. 2010).  The

---

[4]This action was thereafter re-styled as Jinan Yipin Corporation, Ltd., *et al.* v. United States, *et al.*, as captioned above.

Domestic Producers do not oppose the Government's request for a voluntary remand on labor costs, but contend that the Remand Determination should be sustained as to the surrogate valuation of garlic bulbs, cardboard cartons, and plastic jars and lids.  *See* Def.-Ints. Reply Comments at 1, 3. The Domestic Producers express no view concerning the Remand Determination on ocean freight expenses.  *See id*. at 1-3.

## II.  Standard of Review

In an action reviewing an antidumping determination by Commerce, the agency's determination must be upheld except to the extent that it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also* NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 477 (1951) (*quoting* Consol. Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938)); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (same).  Moreover, any evaluation of the substantiality of evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting* Universal Camera Corp., 340 U.S. at 487-88); *see also* Mittal Steel, 548 F.3d at 1380-81 (same).

That said, the mere fact that it may be possible to draw two inconsistent conclusions from the record does not prevent Commerce's determination from being supported by substantial

evidence.  Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also*

Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966).  Finally, while Commerce must

explain the bases for its decisions, "its explanations do not have to be perfect."  NMB Singapore,

557 F.3d at 1319.  Nevertheless, "the path of Commerce's decision must be reasonably discernable,"

to support judicial review.  *Id.* (*citing* Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,

463 U.S. 29, 43 (1983)); *see also* Timken U.S. Corp. v. United States, 421 F.3d 1350, 1355 (Fed.

Cir. 2005) (explaining that "it is well settled that an agency must explain its action with sufficient

clarity to permit 'effective judicial review,'" and that "[f]ailure to provide the necessary clarity

requires the agency action be vacated") (*quoting* Camp v. Pitts, 411 U.S. 138, 142-43 (1973)); *see*

*generally* 19 U.S.C. § 1677f(i)(3)(A) (requiring Commerce to "include in a final determination . .

. an explanation of the basis for its determination").

## III.  Analysis

Dumping occurs when goods are imported into the United States and sold at a price lower

than their "normal value," resulting in material injury (or the threat of material injury) to the U.S.

industry.  *See* 19 U.S.C. §§ 1673, 1677(34), 1677b(a).  The difference between the normal value of

the goods and the U.S. price is the "dumping margin."  *See* 19 U.S.C. § 1677(35).  When normal

value is compared to the U.S. price and dumping is found, antidumping duties equal to the dumping

margin are imposed to offset the dumping.  *See* 19 U.S.C. § 1673.

Normal value is typically calculated using either the price in the exporting market (*i.e.*, the

price in the "home market" where the goods are produced) or the cost of production of the goods,

when the exporting country is a market economy country.  *See generally* 19 U.S.C. § 1677b.[5]

However, where – as here – the exporting country has a non-market economy ("NME"), there is

often concern that the factors of production used to produce the goods at issue are under state

control, and that home market sales may not be reliable indicators of normal value.  *See* 19 U.S.C.

§ 1677(18)(A).

In cases such as this, where Commerce concludes that concerns about the sufficiency or

reliability of the available data do not permit the normal value of the goods to be determined in the

typical manner, Commerce "determine[s] the normal value of the subject merchandise on the basis

of the value of the factors of production," including "an amount for general expenses and profit plus

the cost of containers, coverings, and other expenses."  *See* 19 U.S.C. § 1677b(c)(1); *see generally*

Ningbo Dafa Chem. Fiber Co. v. United States, 580 F.3d 1247, 1250-51 (Fed. Cir. 2009) (briefly

summarizing "factors of production" methodology).[6]  The antidumping statute requires Commerce

to value factors of production "based on the *best available information* regarding the values of such

factors" in an appropriate surrogate market economy country – in this case, India.  *See* 19 U.S.C.

§ 1677b(c)(1) (emphasis added); *see also* Shakeproof Assembly Components v. United States,  268

F.3d 1376, 1382 (Fed. Cir. 2001); Ningbo, 580 F.3d at 1254 (emphasizing that statute mandates that

---

[5]In addition, in certain market economy cases, Commerce may calculate normal value using the price in a third country (*i.e.*, a country other than the exporting country or the United States). *See*, *e.g.*, RHP Bearings Ltd. v. United States, 288 F.3d 1334, 1338 (Fed. Cir. 2002) (*discussing* 19 U.S.C. §§ 1677b(a)(1)(B)(ii), 1677b(a)(1)(C)).

[6]Factors of production "include, but are not limited to . . . hours of labor required, . . . quantities of raw materials employed, . . . amounts of energy and other utilities consumed, and . . . representative capital cost, including depreciation." *See* 19 U.S.C. § 1677b(c)(3); *see also* Dorbest Ltd. v. United States, 604 F.3d 1363, 1367 (Fed. Cir. 2010) (discussing factors of production).

Commerce "shall" use "best available information" in valuing factors of production).

In determining which data constitute the "best available information," Commerce generally looks to the criteria set forth in its "Policy Bulletin 04.1," also known as the "NME Surrogate Country Policy Bulletin" and the "Surrogate Country Selection Bulletin."[7]   Policy Bulletin 04.1 explains:

> In assessing data and data sources, it is [Commerce's] stated practice to use investigation or review period-wide price averages, prices specific to the input in

---

[7]Commerce's reference to the document as the "Surrogate Country Selection Bulletin" is apt. *See*, *e.g.*, Remand Determination at 6; *see also id*. at 17-18; Issues and Decision Memorandum for the [Tenth] Administrative Review and New Shipper Reviews of the Antidumping Duty Order on Fresh Garlic from the People's Republic of China (April 26, 2006) (Admin. Record Pub. Doc. 462) ("Issues and Decision Memorandum") at 31 & n.79, 33, 35 & n.90, 36, 37, 47. The stated purpose of Policy Bulletin 04.1 is to "provide[] guidance regarding [Commerce's] selection of surrogate market economy countries in non-market economy ('NME') cases." *See* Import Administration Policy Bulletin 04.1, "Non-Market Economy Surrogate Country Selection Process," at "Statement of Issue" (March 1, 2004). The language on which Commerce relies in this and many other cases appears in a section captioned "Data Considerations." *See* Policy Bulletin 04.1, at "Data Considerations." The policy bulletin expressly states that the criteria outlined in that section are for Commerce's use in winnowing the agency's list of potential surrogate countries "if more than one country has survived the selection process to this point" (*i.e.*, if more than one country on the list of potential surrogates are economically comparable, produce comparable merchandise, and are "significant" producers of such merchandise). *Id*. Thus, the policy bulletin explains, "a country that perfectly meets the requirements of economic comparability and significant producer is not of much use of as a primary surrogate if crucial factor price data from that country are inadequate or unavailable." *Id*. Accordingly, pursuant to the policy bulletin, Commerce decides from among two or more countries that are economically comparable and significant producers of the merchandise by "assessing data and data sources" in the respective candidate countries in accordance with the criteria outlined in the section of the bulletin at issue. *Id*.

In short, the criteria outlined in the section of Policy Bulletin 04.1 captioned "Data Considerations" were developed to serve as a "tie-breaker," if necessary, in Commerce's identification of a surrogate country. The criteria were not promulgated for the purpose of guiding Commerce's selection of a surrogate value source from among alternative data sources *after* a surrogate country has been identified. Nevertheless, Commerce has used the criteria for that purpose here and in many other cases.

> question, prices that are net of taxes and import duties, prices that are
> contemporaneous with the period of investigation or review, and publicly available
> data.

*See* Import Administration Policy Bulletin 04.1, "Non-Market Economy Surrogate Country

Selection Process," at "Data Considerations" (March 1, 2004); *see also* Remand Determination at

42 (quoting Policy Bulletin 04.1, and stating that it reflects agency's "well-established practice for

determining the reliability and appropriateness of surrogate values under consideration"); *id*. at 6,

40, 47, 69-70, 73; Issues and Decision Memorandum for the [Tenth] Administrative Review and

New Shipper Reviews of the Antidumping Duty Order on Fresh Garlic from the People's Republic

of China (April 26, 2006) (Admin. Record Pub. Doc. 462) ("Issues and Decision Memorandum")

at 60-61, 63 & n.161, 66.[8]

Within this general framework, the statute "accords Commerce wide discretion in the

valuation of factors of production in the application of [the statute's] guidelines."  *See* Shakeproof,

268 F.3d at 1381 (internal quotation marks and citation omitted); *see also* Ad Hoc Shrimp Trade

Action Committee v. United States, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (same); Nation Ford

Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (same).  Commerce is recognized

---

[8]Because this action was previously remanded to Commerce in Zhengzhou Harmoni I, two
administrative records have been filed with the court: the initial administrative record (comprised
of the information on which the agency's Final Results were based), and the supplemental
administrative record compiled on remand (on which the Remand Determination is based).

Because confidential information is included in the administrative records, there are two
versions of each: a public version and a confidential version.  The public versions of the
administrative records consist of copies of all documents in the record, with confidential information
redacted.  The confidential versions consist of complete, unredacted copies of only those documents
that include confidential information.  All citations herein are to the public versions, which are cited
as "Admin. Record Pub. Doc. ____" and "Remand Pub. Doc. ____," respectively.

as the "master of antidumping law."  *See* <u>The Thai Pineapple Public Co. v. United States</u>, 187 F.3d 1362, 1365 (Fed. Cir. 1999); *see also* <u>Shakeproof</u>, 268 F.3d at 1381 (acknowledging "Commerce's special expertise").  And "[t]he process of constructing foreign market value for a producer in a non-market economy country is difficult and necessarily imprecise."  <u>Shakeproof</u>, 268 F.3d at 1381.

Nevertheless, Commerce's discretion is not boundless.  In exercising its discretion, Commerce is constrained by the purpose of the antidumping statute, which is "to determine antidumping margins 'as accurately as possible.'"  *See* <u>Shakeproof</u>, 268 F.3d at 1382 (*quoting* <u>Lasko Metal Products, Inc. v. United States</u>, 43 F.3d 1442, 1446 (Fed. Cir. 1994)).  And, Commerce's discretion notwithstanding, "a surrogate value must be as representative of the situation in the [non-market economy] country as is feasible."  *See* <u>Nation Ford</u>, 166 F.3d at 1377 (internal quotation marks and citation omitted).  Thus, "[i]n determining the valuation of . . . factors of production, the critical question is whether the methodology used by Commerce is based on *the best available information* and establishes antidumping margins *as accurately as possible*."  *See* <u>Ningbo</u>, 580 F.3d at 1257 (emphases added) (*quoting* <u>Shakeproof</u>, 268 F.3d at 1382) (internal quotation marks omitted).

In the present case, pursuant to the remand instructions in <u>Zhengzhou Harmoni I</u>, Commerce reconsidered various aspects of the agency's valuation of the factors of production in the final results of the tenth administrative review of the antidumping duty order covering fresh garlic from China.  As discussed in greater detail below, Commerce's determination on remand concerning the surrogate value for the Chinese Producers' ocean freight costs must be sustained.  On the other hand, Commerce's determinations as to garlic bulb, labor expenses, plastic jars and lids, and cardboard

packing cartons must be remanded to the agency once again, for further consideration.

## A.  Valuation of Garlic Bulb

In the administrative review at issue, rather than valuing the Chinese Producers' so-called

"growing" and "harvesting" factors of production (*i.e.*, the garlic seed, water, fertilizer, labor, and

other "inputs" (commodities) consumed by Chinese producers in cultivating and harvesting whole

raw garlic bulb), Commerce broke with its past practice and employed the agency's "intermediate

input methodology" to value the whole raw garlic bulb (the "intermediate input") itself.  *See*

Zhengzhou Harmoni I, 33 CIT at ____, ____, 617 F. Supp. 2d at 1288, 1291.[9]  Zhengzhou Harmoni

I rejected the Chinese Producers' objections to Commerce's use of its intermediate input

methodology here.  *See id.*, 33 CIT at ____, ____, ____, 617 F. Supp. 2d at 1289, 1295, 1334; *see*

---

[9]For a summary overview of Commerce's intermediate input methodology, *see* Jining Yongjia Trade Co. v. United States, 34 CIT ____, ____ & n.6, 2010 WL 5121964 * 2 & n.6 (2010) (explaining, *inter alia*, that, when Commerce employs its intermediate input methodolgy, "the cost (or value) of the whole garlic bulb [is] used as a substitute for the costs of the growing and harvesting [factors of production] ('upstream FOPs') actually reported by [the foreign producer at issue]").

In prior administrative reviews, Commerce used the agency's standard upstream factors of production methodology, rather than the intermediate input methodology employed here.  In those prior reviews, Commerce calculated separate surrogate values for garlic *seed* and other so-called "growing" and "harvesting" factors of production. *See* Zhengzhou Harmoni I, 33 CIT at ____, ____, ____ n.19, 617 F. Supp. 2d at 1287-88, 1290-91, 1296 n.19; *see also*, *e.g.*, Taian Ziyang Food Co. v. United States, 33 CIT ____, ____, 637 F. Supp. 2d 1093, 1124-27 (2009) ("Taian Ziyang I") (analyzing Commerce's valuation of garlic seed in ninth administrative review); Jinan Yipin Corp. v. United States, 31 CIT 1901, 1924-30, 526 F. Supp. 2d 1347, 1367-72 (2007) ("Jinan Yipin I") (same, in eighth review).  In the instant (tenth) administrative review (and in subsequent reviews), Commerce used the intermediate input methodology, due to problems with the data reported by the Chinese producers in past reviews for their "growing" and "harvesting" factors of production.  *See* Zhengzhou Harmoni I, 33 CIT at ____, ____, 617 F. Supp. 2d at 1287-88, 1290-91.

*generally id.*, 33 CIT at ____, 617 F. Supp. 2d at 1289-95 (reviewing the Chinese Producers'

objections to intermediate input methodology).  On the other hand, <u>Zhengzhou Harmoni I</u> sustained

the Chinese Producers' challenge to the surrogate value for raw garlic bulb that Commerce

calculated for use in the Final Results, principally on the grounds that the record evidence did not

establish that the data on which Commerce relied were sufficiently "product-specific."  *See id.*, 33

CIT at ____, ____, ____, ____, 617 F. Supp. 2d at 1289, 1298-99, 1301, 1334; *see generally id.*, 33

CIT at ____, 617 F. Supp. 2d at 1295-1301 (analyzing Chinese Producers' challenge to surrogate

valuation of raw garlic bulb).

        As <u>Zhengzhou Harmoni I</u> explained, the Chinese Producers' garlic "is a large, high yield,

high-quality type of garlic that is distinct from the overwhelming majority of garlic grown in India."

*See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1296; *see also* Issues and Decision

Memorandum at 42 (stating that "the primary characteristic that distinguishes the type of garlic

exported by [Chinese producers] from the majority of garlic sold in India" is the significantly larger

bulb size of Chinese garlic).  In the Final Results, Commerce calculated a surrogate value of 22.91

rupees per kilogram for garlic bulb, using data from the Indian Agricultural Marketing Information

Network ("Agmarknet") for a type of garlic referred to as "China" variety.  *See* <u>Zhengzhou Harmoni

I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1296-97; Issues and Decision Memorandum at 39-44, 47.  As

support for the finding that India's "China" variety garlic is sufficiently product-specific to the

Chinese Producers' large-bulb garlic, the Final Results relied on information drawn from "Market

Research on Fresh Whole Garlic in India," a June 2003 report prepared by consultants to the

Domestic Producers, which the Domestic Producers placed on the record of this administrative

review.  *See* Zhengzhou Harmoni I, 33 CIT ____, 617 F. Supp. 2d at 1297-98; *see also* Issues and

Decision Memorandum at 40-41; Domestic Producers' Surrogate Value Submission (Admin. Record

Pub. Doc. 417), Exh. 33 ("Market Research Report").[10]

Relying on the Market Research Report and additional information on the record, the Final

Results explained that Chinese garlic exported to the United States is characterized by its large bulb

size (with an average diameter of greater than 40 millimeters); that the bulb diameter of local, native

garlic typically grown and sold in the Indian market is a mere 20 to 40 millimeters; and that, in

India, cultivation of large-bulb garlic is generally confined to the country's "long-day" zone, which

enjoys longer periods of sunlight.  *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at

1297; Issues and Decision Memorandum at 41-44; Market Research Report at 4, 7, 11, 12, 17-18.

Based on this and other information, the Final Results concluded that the Agmarknet data for

"China" variety garlic must represent sales of large-bulb garlic from India's "long-day" zone.  *See*

Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1298; *see also* Issues and Decision

Memorandum at 40-42.

But the Agmarknet data provide no description of the physical characteristics of "China"

variety garlic (or any other variety of garlic reflected therein).  *See* Zhengzhou Harmoni I, 33 CIT

---

[10]The Market Research Report was first placed on the record of the eighth administrative review of the antidumping order on fresh garlic from China.  *See* Market Research Report; *see also* Jinan Yipin I, 31 CIT at 1926-29, 526 F. Supp. 2d at 1369-72 (discussing Market Research Report in context of eighth administrative review).  The same Market Research Report was later placed on the record of the second remand in litigation involving the ninth administrative review, as well as the record of the review here at issue.  *See* Market Research Report; Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1297-98; Taian Ziyang Food Co. v. United States, 35 CIT ____, ____ & n.11, 2011 WL 3024720 * 6 & n.11 (2011)  ("Taian Ziyang II") (reviewing second remand determination in ninth administrative review).

at ____, 617 F. Supp. 2d at 1297-99; *see also* Issues and Decision Memorandum at 42 (noting that Agmarknet data do not include descriptions of garlic varieties reflected in the data).  Noting that the Final Results apparently relied on the Agmarknet data "based on nothing more than perhaps the name of the variety, and the fact that [the "China" variety] had a higher weighted-average price," Zhengzhou Harmoni I held that the Final Results were therefore "largely speculative and conclusory" and "lack[ed] adequate support in the evidentiary record."  *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1297-98.  Zhengzhou Harmoni I concluded that, absent some proof of the physical characteristics of "China" variety garlic, Commerce's decision to use the Agmarknet data in the Final Results was not supported by substantial evidence and could not be sustained on the then-existing record.  *See id.*, 33 CIT at ____, 617 F. Supp. 2d at 1297-98.  The valuation of raw garlic bulb was thus remanded to the agency for further consideration.  *See id.*, 33 CIT at ____, ____, ____, 617 F. Supp. 2d at 1289, 1301, 1334.

In addition to the Chinese Producers' concerns about product specificity (discussed above), Zhengzhou Harmoni I addressed a number of other issues.  *See generally* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1299-1301.  Notably, the Chinese Producers argued that the Agmarknet data actually reflect a final product and not an intermediate input at all.  Specifically, the Chinese Producers asserted that, because the Agmarknet prices – by definition – represent fresh garlic sold at market, the prices do not reflect an intermediate product and inherently include post-harvest factors of production.  *See id.*, 33 CIT at ____, 617 F. Supp. 2d at 1300.  The Chinese Producers thus contended that the Final Results "impermissibly inflated the surrogate value of fresh garlic by adding additional post-harvest factors of production (*e.g.*, sales, packing, and transportation

costs) to a figure that already reflected such costs." *See id.*, 33 CIT at ____, 617 F. Supp. 2d at 1300. Zhengzhou Harmoni I instructed Commerce, on remand, to consider "the potential for double counting that may result when using data from the Agmarknet database, which presumably contains information regarding Indian market transactions and is representative of the *final* garlic product rather than an *intermediate* garlic product (*i.e.*, garlic bulb)." *See id.*, 33 CIT at ____, 617 F. Supp. 2d at 1300. Zhengzhou Harmoni I specifically cautioned that, "when valuing an intermediate product in [a non-market economy] country case, [Commerce] must find a surrogate representative of that intermediate product." *See id.*, 33 CIT at ____, 617 F. Supp. 2d at 1300.

On remand, Commerce reexamined the three sets of potential surrogate value data considered in the Final Results, including the Agmarknet prices, although the agency took no action to obtain information on the physical characteristics of the "China" variety garlic reflected in the Agmarknet data and used in the Final Results. *See* Remand Determination at 6-8, 15. Other than the Agmarknet data, the Remand Determination also reconsidered Indian import statistics derived from the World Trade Atlas[11] for Indian Harmonized Tariff Schedule subheading 0703.2000 ("garlic, fresh or chilled"), as well as Indian price data for garlic seed from the National Horticultural Research and Development Foundation ("NHRDF"), which were placed on the record by the Domestic Producers and relied on by the agency in previous administrative reviews. *See id.* at 6-7, 15. In the course of the remand, Commerce also placed on the record a fourth set of data, which the agency used to value

---

[11]The World Trade Atlas is "a database of commodities using all levels of the Harmonized Tariff Schedule," which "enables users to determine the value of a specific product and identify countries to or from which the product is being exported or imported." *See* Zhengzhou Harmoni I, 33 CIT at ____ n.20, 617 F. Supp. 2d at 1296 n.20 (internal quotation marks and citation omitted).

garlic bulb in the eleventh administrative review (as well as other subsequent reviews) – *i.e.*, information on garlic prices at the produce market near Delhi operated by the Azadpur Agricultural Produce Marketing Committee ("APMC"), as published in the Azapur APMC's "Market Information Bulletin," for the two-and-one-half-month period from May 1, 2006 through July 14, 2006. *See id.* at 2, 6, 10, 13, 15; Letter from Commerce to All Interested Parties (June 5, 2009) (Remand Pub. Doc. 1) (placing on the record Azadpur APMC's "Market Information Bulletins" for May 1, 2006-July 14, 2006) ("Azadpur APMC data"); n.44, *infra* (discussing use of Azadpur APMC data in subsequent reviews).

The Remand Determination emphasized the large bulb size of the Chinese Producers' garlic (50 mm and above), and the significant role that bulb size plays in garlic pricing. *See* Remand Determination at 10-11. Citing the concerns identified in <u>Zhengzhou Harmoni I</u> (particularly the lack of any physical description of the garlic reflected in the Agmarknet data), the Remand Determination declined to rely on the Agmarknet data to value garlic bulb. *See id.* at 5, 7-8, 15. Further, the Remand Determination again rejected the Indian import statistics as "insufficiently specific" due to the "basket" nature of the tariff subheading at issue. *See id.* at 7, 8, 15; *see also* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1296. The Remand Determination similarly rejected the NHRDF data on garlic *seed*, concluding that those data would "require a prohibitive level of adjustment" in order to calculate a value for garlic *bulb*. *See* Remand Determination at 15; *see also id.* at 7.

Much as Commerce has done in other recent reviews, the Remand Determination based the surrogate value for garlic bulb here on the Azadpur APMC data, averaging the values for "A"- and

"S.A."-grade garlic.  *See generally* Remand Determination at 9-15, 53-59.  Relying on the Azadpur

APMC data, the Remand Determination calculated a final value of 33.77 rupees per kilogram – a

significantly higher figure than the 22.91 rupees per kilogram established in the Final Results.  *See*

Analysis for the Redetermination of Remand in the Administrative Review of the Antidumping Duty

Order on Fresh Garlic from the People's Republic of China:  Jinan Yipin Corporation, Ltd. (Remand

Pub. Doc. 19) at 2; Issues and Decision Memorandum at 39, 44, 47.

The Remand Determination concluded that the Azadpur APMC data constitute "the best

information available with which to value [the Chinese Producers'] garlic bulb," even though –

much like the Agmarknet data – the Azadpur APMC data do not describe the physical characteristics

of the garlic to which they refer.  *See* Remand Determination at 14; Azadpur APMC data.  To

establish the "product specificity" of the Azadpur APMC data, the Remand Determination therefore

relied on the Market Research Report to find that grade "A" garlic has a bulb diameter of "[a]bove

40 mm (typically 40-55 mm)."  *See* Remand Determination at 11; Market Research Report at 21.

Similarly, the Remand Determination relied on information submitted by the Domestic Producers

to find that the bulb diameter of "S.A."-grade garlic is 55 mm or more.  *See* Remand Determination

at 11; Domestic Producers' Comments on New Surrogate Value Information (June 24, 2009)

(Remand Pub. Doc. 3) at 4 (explaining that "S.A."-grade garlic has bulb diameter "greater than 5.5

cm").[12]

Reiterating that a major determinant of the market price of garlic is bulb size, Commerce

---

[12]At one point, the Remand Determination mistakenly states that "S.A."-grade garlic has a
bulb diameter of "40 mm . . . and above."  *See* Remand Determination at 9; *but see id*. at 11 (noting
that bulb size of "S.A."-grade garlic is "greater than 55 mm").

gave greater weight to bulb size and "product specificity" in choosing the surrogate value on remand. *See* Def. Response at 7; Remand Determination at 8-9, 10-11, 14 (emphasizing significance of bulb size and garlic prices); *id*. at 10, 14 (discussing relationship among criteria set forth in Policy Bulletin 04.1). However, the Remand Determination also addressed other criteria set forth in Policy Bulletin 04.1, and concluded that the Azadpur APMC data satisfy those too.

For example, the Remand Determination found that the Azadpur APMC data are "publicly available," noting that – although the Azadpur APMC Bulletins are not available online – the data are "readily available to [the] intended audience," and "are published on each trading day (six days a week), [are] posted in the APMC's facilities for public viewing, are electronically archived and are available upon request." *See* Remand Determination at 13-14 (discussing public availability of Azadpur APMC data); *see also id*. at 58 (same).[13]

The Remand Determination further found that the Azadpur APMC data are sufficiently "contemporaneous," explaining that Commerce chose the data set beginning May 1, 2006 because that is the date on which the Azadpur APMC market began differentiating between "A"- and "S.A."- grade garlic. *See* Remand Determination at 14, 58. Because the Azadpur APMC data thus post-date the period of review by more than one-and-one-half years, Commerce deflated the Azadpur APMC value to be contemporaneous with the period of review, using the International Monetary Fund ("IMF") "Wholesale Price Index." *See* Remand Determination at 10, 14-15; Def. Response at 8; *see*

---

[13]The Remand Determination states at one point that "the APMC bulletins are available daily online at the Azadpur APMC's website," and that "historical bulletins are available upon request." *See* Remand Determination at 58. However, Commerce elsewhere states flatly that "the APMC Bulletin is not obtainable on the Internet." *See id*. at 13-14.

*generally* Remand Determination at 14, 58 (discussing contemporaneity of Azadpur APMC data).

In addition, Commerce also deducted a 6% "market fee" that is assertedly charged on all sales made

at the Azadpur APMC market.  *See* Remand Determination at 15, 59.[14]

Finally, while the Azadpur APMC data reflect only two-and-one-half months of information

(rather than the full year covered by the period of review), the Remand Determination nevertheless

found that the data "represent[] a broad market average of large-bulb garlic [prices]," reasoning,

among other things, that the Azadpur APMC market sells "agricultural products from all over

India," and asserting that the data reflect "a substantial quantity of garlic."  *See* Remand

Determination at 12-13, 57; *see generally id.* at 12-13, 57-58, 58-59 (discussing "representativeness"

of Azadpur APMC data).

As detailed below, the Chinese Producers challenge the Remand Determination's conclusion

that the Azadpur APMC data constitute the "best available information" for use in valuing garlic

bulb, highlighting this as Commerce's "most critical surrogate value decision," and attacking the

Azadpur APMC data on multiple fronts.  *See* Remand Determination at 14; Pls. Reply Comments

at 3; *see generally* Pls. Comments at 2-18 (challenging Remand Determination as to valuation of

garlic bulb); Pls. Reply Comments at 2-12 (same).  The Government defends Commerce's use of

the Azadpur APMC data, arguing that "they were the most product-specific information on the

record and also met Commerce's other preferred criteria for surrogate values," and asserting that the

---

[14]Although the Remand Determination refers to the 6% charge as a "market fee," the Azadpur APMC data on the record list the 6% charge as a "Commission," in addition to a "Market Fee" of 1%.  *See* Azadpur APMC data (section captioned "Information at A Glance").  There is no indication that the 1% charge has been accounted for, assuming that this information is correct.

Remand Determination as to valuation of garlic bulb should therefore be sustained.  *See* Def.
Response at 5, 9, 16; *see generally id*. at 4-16 (addressing Remand Determination as to valuation
of garlic bulb).  The Domestic Producers support the Remand Determination's use of the Azadpur
APMC data.  *See* Def.-Ints. Reply Comments at 1-2.

### 1.  "Contemporaneity" of Azadpur APMC Data

As discussed in the introduction to section III above, Policy Bulletin 04.1 sets forth
Commerce's "well-established criteria for determining the appropriateness of surrogate values under
consideration."  *See* Remand Determination at 6; Policy Bulletin 04.1; *see generally* section III,
*supra* (discussing, *inter alia*, Policy Bulletin 04.1).  According to that policy, "it is [Commerce's]
stated practice to use . . . *prices that are contemporaneous with the period of investigation or
review*."  *See* Policy Bulletin 04.1 (emphasis added) (*quoted in* Remand Determination at 6).  The
Remand Determination further states that "[i]n the selection of surrogate values for garlic bulbs,
[Commerce is] . . . seeking to select as a surrogate value a . . . price average that is . . .
contemporaneous with the period of review" (*i.e.*, November 1, 2003 through October 31, 2004).
*See* Remand Determination at 6.  Nevertheless, the Azadpur APMC data that Commerce ultimately
selected to value garlic bulbs on remand date from mid-2006.  *See* Remand Determination at 14.

The Chinese Producers criticize the Remand Determination's use of the Azadpur APMC
data, emphasizing that the data are "far from contemporaneous" and, indeed, are the least
contemporaneous of the four sets of data on this administrative record.  *See* Pls. Comments at 12;
*see generally* Pls. Comments at 2-3, 12-13; Pls. Reply Comments at 8; Remand Determination at

14, 53, 57-58; Def. Response at 13-14.  The Chinese Producers note that the Remand Determination candidly acknowledges that the APMC data are not contemporaneous, but that Commerce concludes that, as adjusted, the APMC prices are the best available information, because the Azadpur APMC data are – according to the Remand Determination – the most product-specific.  *See* Pls. Comments at 12; *see also* Pls. Reply Comments at 8; Remand Determination at 14.

Although the Chinese Producers stress that the Azadpur APMC data are from "approximately two years after the mid-point of the period of review," the Chinese Producers significantly do not contest any aspect of the methodology that Commerce used to deflate the value that Commerce derived based on the Azadpur APMC data from mid-2006 levels to be contemporaneous with the period of review.  *See* Pls. Comments at 2-3; *see also* Pls. Reply Comments at 8 (arguing that Azadpur APMC data are "two years removed" from the period of review) (emphasis omitted); *see generally* Pls. Comments at 12-13 (discussing contemporaneity of Azadpur APMC data, but raising no challenge to deflation methodology); Pls. Reply Comments at 8 (same); Def. Response at 8 (stating that Commerce deflated Azadpur APMC data using the IMF Wholesale Price Index).[15]

What the Chinese Producers *do* dispute – vigorously – is the Government's assertion that the Remand Determination "reasonably gave greater weight to product-specificity over

---

[15]*See also* Remand Determination at 10, 14 (stating that, when data selected for surrogate value post-date the period of review, Commerce's "normal practice" is to deflate the data to be contemporaneous); Letter from Commerce to All Interested Parties (July 6, 2009) (Remand Pub. Doc. 6) (summarizing deflation methodology; explaining that Commerce placed on the record "Indian price data obtained from the International Monetary Fund's ('IMF') online database . . . from November 1, 2003, to July 2006," and used the IMF data to deflate the value that Commerce calculated from the Azadpur APMC data to be contemporaneous with the period of review here).

contemporaneity." *See* Def. Response at 13-14 (*citing*, *inter alia*, Remand Determination at 14); *id.* at 7, 8 (same); Pls. Reply Comments at 8; *see also* Pls. Comments at 12 (arguing that "Commerce's repeated argument that it must use the non-contemporaneous APMC prices because they are 'more specific' . . . is unpersuasive"); Remand Determination at 14 (discussing trade-off between product specificity and contemporaneity, and stating that Commerce "does not automatically disregard surrogate value data which are the most specific . . . solely on the basis that they are post-[period of review] data").  In particular, the Chinese Producers insist that "it is clear that the [Azadpur] APMC prices are not specific to the intermediate input [garlic] bulb and are heavily inflated and distorted by other unknown factors.  A simple deflating of the [Azadpur APMC] prices does not remedy these serious [product specificity] deficiencies." *See* Pls. Comments at 12; *see also* Pls. Reply Comments at 8.[16]

       The Chinese Producers thus do not actually challenge the Remand Determination's use of the Azadpur APMC data on grounds of contemporaneity.  *But see* n.21, *infra* (questioning Remand Determination's use of *non-contemporaneous* Azadpur APMC data to value garlic with a bulb size of 40 mm or more, since the Remand Determination and the Market Research Report indicate that

_____

       [16]According to the Chinese Producers, "the Indian import statistics and the Agmarknet prices are fully contemporaneous with the [period of review] and provide a far more accurate representation of the true market price in India during the [period of review]." *See* Pls. Comments at 12.  The NHRDF data also reflect one full year and are contemporaneous with the period of review, except that they do not include data for October 2004 (the last month of the period of review). *See* Factors Valuations for the Preliminary Results of the Administrative Review and New Shipper Reviews  (Admin. Record Pub. Doc. 400) at 5 (indicating that NHRDF data include NHRDF quarterly newsletters for October-December 2003, January-March 2004, April-June 2004, and July-September 2004).

*contemporaneous* data were available).[17]  The Chinese Producers' true, underlying concerns go to

the product specificity of the Azadpur APMC data, and are discussed in section III.A.3**,** below.

## 2. "Representativeness" of Azadpur APMC Data

Policy Bulletin 04.1, which sets forth Commerce's "well-established criteria for determining

the appropriateness of surrogate values under consideration," explains that "it is [Commerce's]

stated practice to use . . . *review period-wide price averages*."  *See* Policy Bulletin 04.1 (emphasis

added)  (*quoted in* Remand Determination at 6).  Moreover, throughout the Remand Determination,

Commerce repeatedly reiterates that it has "historically chosen to use surrogate values that reflect

*broad market averages* and that cover *a substantial time period* over price data that are obtained

from so isolated a time frame as to be subject to *temporary market fluctuations*."  *See*, *e.g.*, Remand

Determination at 44 (emphases added); *id*. at 48 (same).[18]  It is thus Commerce's standard practice

---

[17]Although the Chinese Producers do not raise a "contemporaneity" challenge to Commerce's reliance on the Azadpur APMC data (which postdate the period of review by roughly two years), it is worth noting that the agency's position here stands in stark contrast to its position on the contemporaneity of the Chinese Producers' price quotes for plastic jars and lids and cardboard packing cartons (which are much more contemporaneous than the Azadpur APMC data).  *See generally* section III.D.4.b, *infra* (discussing the contemporaneity of the price quotes for plastic jars and lids); section III.E, *infra* (discussing the contemporaneity of the price quotes for cardboard packing cartons).

[18]*See also* Remand Determination at 40 (noting that, pursuant to Policy Bulletin 04.1, it is Commerce's general practice "to use investigation or review period-wide price averages") (internal quotation marks omitted); *id*. at 42 (same); *id*. at 43 (asserting that Commerce cannot confirm that price quotes for cardboard cartons are "representative of prices in the Indian market during the [period of review]"); *id*. at 45 (stating that, in Synthetic Indigo from the People's Republic of China, Commerce could not determine that price quotes "were representative of the range of prices for the input during the [period of review]"); *id*. at 46 (stating that Indian import statistics selected for use in valuing cardboard cartons are "representative of a range of prices throughout the [period of review]");  *id*. at 47 (criticizing price quotes for plastic jars and lids, asserting that they "are not

to seek out values that are both temporally and geographically "representative" of the particular

input (here, raw garlic bulb) at issue.  The Chinese Producers contend that, by using the Azadpur

AMPC data in the Remand Determination, Commerce failed on both counts.  *See* Pls. Comments

at 23 (emphasizing that, *inter alia*, the Azadpur APMC data "are from a single market" and are

"taken from a very limited window of time").[19]

### a.  Temporal Representativeness

Notwithstanding Commerce's "well-established criteria" and its stated desire to "select as

a surrogate value a *period-wide* price average," Commerce here elected on remand to calculate a

surrogate value for the Chinese Producers' raw garlic bulb using the Azadpur APMC data, which

are not only non-contemporaneous (*see* section III.A.1, above), but, in addition, represent less than

a quarter of a year's worth of data.  *See* Remand Determination at 6 (emphasis added); *see also id.*

at 9 (noting that Azadpur APMC data cover period May 1, 2006 through July 14, 2006); *id.* at 71,

74 (acknowledging that Azadpur APMC data "encompass a limited time span" and do not represent

_____

representative of prices throughout the [period of review]"); *id.* at 48 (stating that, on the existing
record, "it is impossible to confirm that the [price quotes for plastic jars and lids] are . . .
representative of prices in the Indian market during the [period of review]"); *id.* (asserting that "the
record does not demonstrate that the submitted price quotes [for plastic jars and lids] are
representative of . . . prices during the [period of review]"); *id.* at 49 (stating that, in Synthetic Indigo
from the People's Republic of China, Commerce could not determine that price quotes "were
representative of the range of prices for the input during the [period of review]"); *id.* at 50
(concluding that Indian import statistics are best available data for use in valuing plastic jars and lids
because, *inter alia*, they are "representative of a range of prices throughout the [period of review]").

[19]In litigation challenging the twelfth "new shipper" reviews, the "representativeness" of the
Azadpur APMC data was sustained against arguments generally similar to some of the arguments
raised by the Chinese Producers here.  *See generally* Jining Yongjia Trade Co., 34 CIT at ____,
2010 WL 5121964 * 13 (discussing "Broad Market Average of Super A Grade Garlic Values").

full year of data).[20]  To be sure, as the Remand Determination observes, "[t]here is no statutory or

regulatory requirement that [Commerce] use an entire year" of data.  *See id*. at 57-58.  However,

while the Remand Determination explains why Commerce selected non-contemporaneous data

(beginning May 1, 2006), and explains that the value that Commerce derived from the 2006 data was

deflated to be contemporaneous with the period of review at issue here, the Remand Determination

is silent as to why Commerce chose to use only two-and-one-half months of data, rather than

deflating and using data for an entire year.  *See  id*. at 58 (explaining that Azadpur APMC Bulletin

began listing prices for "S.A."-grade garlic as of May 1, 2006).[21]

---

[20]*See also* Remand Determination at 57 (noting Chinese Producers' arguments that Azadpur APMC data are "not sufficiently broad-based" because they "do[] not reflect an entire year" of data); *id*. at 53 (same); Pls. Comments at 23 (emphasizing that "[t]he APMC prices are . . . taken from a very limited window of time").                                                            .

In contrast to the Azadpur APMC data on which the Remand Determination relies, the other three data sets on the administrative record – *i.e.*, the Agmarknet price data, the Indian import statistics, and the NHRDF data – all reflect one full year of data, and all three are contemporaneous with the period of review (with one minor exception as to the NHRDF data).  *See* Factors Valuations for the Preliminary Results of the Administrative Review and New Shipper Reviews (Admin. Record Pub. Doc. 400) at 6 (stating that Agmarknet data on the record include India-wide data for garlic values "for each day of the period of this review"); *id*. (stating that Indian import statistics on the record cover "the period November 2003 through October 2004"); *id*. at 5 (stating that NHRDF data on the record consist of NHRDF quarterly newsletters for October-December 2003, January-March 2004, April-June 2004, and July-September 2004, thus covering one full year, and the entire period of review with the exception of October 2004, the last month of the period of review).

[21]The Remand Determination states that Commerce "chose to use price data from the Azadpur APMC starting on May 1, 2006, because that was the date at which the Azadpur APMC began denoting large size garlic bulb sales into 'A' and 'Super-A' values."  *See* Remand Determination at 58.  The Remand Determination thus makes it clear that May 1, 2006 was not the first day on which what is now known as "S.A."-grade garlic was sold at the Azadpur APMC, or the first day on which large-bulb garlic was sold at the Azadpur APMC, but – rather – that May 1, 2006 was the first day on which large-bulb garlic was *separated into* grade "A" and grade "S.A." garlic. The Market Research Report confirms that, before that date, all such large-bulb garlic was sold

The Remand Determination similarly fails to explain how Commerce has assured itself that data "obtained from so isolated a time frame as to be subject to temporary market fluctuations" in fact are not distorted by such "fluctuations." *See*, *e.g.*, Remand Determination at 44; *id*. at 48 (same). Indeed, the Market Research Report seems to indicate that garlic prices in India are subject to seasonal fluctuation:

> Being a seasonal crop, the price of garlic (at both the wholesale and retail level) is determined by demand-supply factors. Prices generally remain low during the peak supply period (February to May) when the new crop arrives and begin to rise thereafter peaking towards the end of the year (October-December).

Market Research Report at 19; *see also id*. at 26 (noting that "garlic is a seasonal crop," and that

---

simply as grade "A." *See*, *e.g.*, Market Research Report at 21 (indicating that, as of 2003, "Grade A" garlic was garlic with a bulb diameter of anything "Above 40 mm (typically 40-55 mm)"). As such, it is entirely unclear why the May 1, 2006 date has any significance for Commerce's selection of data for this review, since Commerce here decided to rely on data for grade "A" garlic, as well as garlic graded "S.A."

In other words, if (as the Remand Determination and the Market Research Report indicate) what was sold as grade "S.A." garlic on May 1, 2006 was being sold in 2003 (up through April 2006) as grade "A" garlic, and given Commerce's determination that both "A"- and "S.A."-grade garlic should be used in valuing the raw garlic bulb here, there would appear to be no reason for Commerce to use *non-contemporaneous* data from the Azadpur APMC market. All other things being equal, Commerce could (and should) have used *contemporaneous* Azadpur APMC data for grade "A" garlic for the actual period of review (November 1, 2003 through October 31, 2004), because – according to the Remand Determination and the Market Research Report – those contemporaneous data would include what (as of May 1, 2006) became known as grade "A" and grade "S.A." garlic. It is worth underscoring that, in support of its claims concerning the "public availability" of the Azadpur APMC data, the Remand Determination notes several times that Azadpur APMC data for past years are "electronically archived" and readily "available upon request." *See*, *e.g.*, Remand Determination at 13-14, 58.

For a variety of reasons discussed herein, Commerce's selection of a surrogate value for raw garlic bulb must be remanded for a second time. This particular issue obviously should be clarified and addressed by the agency on remand.

"domestic garlic prices tend to rise" from "August-December"); *id.* at 19-20, 22 (charting wholesale

and retail price trends); Pls. Reply Comments at 8 (referring to "drastic fluctuations of the available

'A' and 'S.A.' garlic prices from 1000 Rupees to 2425 within the span of just a few months").[22]

    The Remand Determination acknowledges that the Azadpur APMC data cover a mere two-

and-one-half months, but maintains that the data are nevertheless "broad-based" because the data

reflect "a substantial quantity of garlic."  *See* Remand Determination at 57; *see also id.* at 71, 74

(stating that Azadpur APMC data reflect "an extremely high volume of sales"); Def. Response at

---

    [22]Commerce's action in turning a blind eye to the problem of the temporal representativeness of garlic prices here is difficult to square with its position on the price quotes that the Chinese Producers have submitted for plastic jars and lids and for cardboard packing cartons.

    As noted above, there is affirmative record evidence of significant seasonal fluctuation in garlic prices; and – even if there were no such affirmative evidence – seasonal fluctuation in the prices of agricultural produce is the norm.  *See* Market Research Report at 19, 20, 22 (documenting seasonal fluctuations in Indian prices for fresh garlic); section III.D.4.b, *infra* (noting that not all commodities or factors of production are equally susceptible to price fluctuations, and that agricultural produce in particular is frequently subject to seasonal fluctuation).  Nevertheless, Commerce expressed no concern about distortion resulting from "temporary market fluctuations" in the price of garlic.

    On the other hand, Commerce has expressed major concerns about the temporal representativeness of the price quotes for plastic jars and lids and cardboard packing cartons.  *See, e.g.*, Remand Determination at 58-59 (asserting that prices of jars and lids and cardboard cartons are "substantially more vulnerable to abnormal market fluctuations" than garlic prices); *id.* at 57-58 (seeking to contrast "the volume of sales" reflected in the Azadpur APMC data with price quotes for cartons and jars); *id.* at 71, 74 (asserting that prices of cartons and jars and lids are "highly susceptible to market fluctuations").  Yet, unlike fresh garlic, there is no affirmative record evidence of fluctuation in the prices of plastic jars and lids and cardboard packing cartons.  Nor is there any obvious reason why, unlike fresh garlic, the prices of jars and lids and cardboard cartons would be subject to any significant fluctuation over the course of a year.  *See* section III.D.4.b, *infra* (analyzing Commerce's criticisms of the "representativeness" of price quotes for jars and lids); section III.E, *infra* (analyzing Commerce's criticisms of the "representativeness" of price quotes for cardboard cartons); *see also* Remand Determination at 57-58, 58-59, 71, 73-74; Pls. Comments at 23, 29; Def. Response at 26, 28-29.

26 (same).  The Remand Determination thus seeks to buttress Commerce's claims that the Azadpur

APMC data are temporally "representative" by asserting that a high volume of garlic sufficiently

compensates for the lack of temporal "representativeness."  As the Chinese Producers demonstrate,

however, the Remand Determination's claims as to the representativeness and significance of the

Azadpur APMC data cannot withstand scrutiny.  *See generally* Pls. Comments at 9-10; Pls. Reply

Comments at 5-6.

The Remand Determination's analysis of the representativeness of the Azadpur APMC data

(and, to some extent, the related sections of the Government's brief) are replete with both

fundamental errors in logic and flagrant mistakes of fact.  For example, as quoted above, the

Remand Determination states that, although the Azadpur APMC data cover only two-and-one-half

months, the data "contain a substantial quantity of garlic."  *See* Remand Determination at 57.  As

a matter of pure logic, however, the lack of temporal representativeness cannot be cured by the

quantity of the commodity or the number of data points reflected in the limited time period.

Assume, for example, that a party proffered to Commerce data from some source that reflected 5,000

sales of "S.A."-grade garlic, or data from some source that reflected 50 sales of "S.A."-grade garlic

of 100 pounds each, but those sales were on a single day.  In such a case, no matter how great the

total quantity of the commodity sold or the total number of sales reflected in the data, those data

logically could not reflect seasonal or other price fluctuations, and therefore could not "represent"

a full year of data.  The statement in the Remand Determination is thus illogical, because it equates

volume or number of sales with temporal representativeness.  This flaw in logic pervades and taints

the Remand Determination's entire analysis of representativeness.  Commerce's analysis of temporal

representativeness is built on quicksand.

The statement from the Remand Determination quoted above is illogical for a second, equally important reason. Even assuming (as the Remand Determination does) that the volume or number of sales compensates (in some fashion) for a lack of temporal representativeness (which it does not), the issue at hand is whether the Azadpur APMC data are sufficiently representative of prices for grades "A" and "S.A." garlic. However, the statement quoted above asserts simply that the Azadpur APMC data "contain a substantial quantity of garlic," without reference to grade. *See* Remand Determination at 57. Thus, as a matter of pure logic, the statement in the Remand Determination does nothing to support the Remand Determination's claims concerning the representativeness of the Azadpur APMC data as to the specific grades of garlic at issue here.

Other statements in the Remand Determination reflect egregious factual errors, and demonstrate that Commerce does not understand either the meaning of the Azadpur APMC data or their limitations. Careful review of the Azadpur APMC data reveals that those data tell Commerce absolutely nothing about the volumes of "*A*"- and "*S. A.*"-*grade garlic* that were delivered to the Azadpur APMC market during the two-and-one-half month period, because all Azadpur APMC data on volume are aggregate data for *all grades of garlic* as a whole. In other words, the Azadpur APMC data on volume are not broken down by grade of garlic. From the Azadpur APMC data on the existing record, it is therefore simply not possible to determine the quantity of grades "A" and "S.A." garlic that were delivered to the Azadpur APMC market during the two-and-one-half month period. *See* Azadpur APMC data; Remand Determination at 53, 58 (noting Chinese Producers' point that Azadpur APMC data specifies only total aggregate volume of garlic, and does not break

that figure down by grades of garlic); Pls. Comments at 5, 9-10; Pls. Reply Comments at 6.[23]

Moreover, even as to all grades of garlic as a whole, the Azadpur APMC data tell Commerce nothing whatsoever about actual garlic *sales* (except to the extent that one assumes that all garlic delivered to the Azadpur APMC market eventually sells, at some price), because the Azadpur APMC data provide no specific information on sales, and instead document only arrivals (deliveries) of garlic at the market.  *See* Azadpur APMC data; *see also* Remand Determination at 53, 58 (noting Chinese Producers' point that Azadpur APMC data does not document sales, and instead documents only volume of garlic delivered to market); Pls. Comments at 5, 9 (same).[24]  But, in any event, even

_____

[23]On each market day, the Azadpur APMC data report the total volume (in tons) of garlic of all grades that arrived at the market the preceding market day, in a column captioned "Arrival Variety in Tons."  *See* Azadpur APMC data; Letter from Commerce to All Interested Parties (June 5, 2009) (Remand Pub. Doc. 1) (stating that Azadpur APMC Bulletins include data from "the previous trading day").  Another column, captioned "Grade/Size," lists the grades of garlic offered for sale on that day.  *See* Azadpur APMC data.  However, the volume of garlic arriving at the market is not broken down by grade of garlic.  *See id.*  Thus, from the Azadpur APMC data on the record, it is impossible to determine the volume of grade "A" and/or "S.A." garlic delivered to the Azadpur APMC market on any given day, or even the aggregate volume of grades "A" and "S.A." garlic delivered during the entire two-and-one-half month period reflected in the data that Commerce placed on the record.

[24]As noted above, for each market day, the Azadpur APMC data report the total volume (in tons) of garlic of all grades that arrives at the Azadpur APMC market, in a column captioned "Arrival Variety in Tons."  *See* Azadpur APMC data.  Another column, captioned "Grade/Size," lists the grades of garlic offered for sale on that day.  *See id.*  And the day's offer prices for each grade are specified in columns captioned "Mini" (minimum), "Maxi" (maximum), and "Modal." *See id.*  However, the Azadpur APMC data include no data whatsoever on actual garlic sales – not even data on aggregate sales, and certainly no data on specific, individual sales.  *See id.*  Thus, from the Azadpur APMC data on the record, it is impossible to determine the volume of garlic sold on any particular day – or even the total volume of garlic sold during the two-and-one-half month period reflected in the data that Commerce placed on the record here.

The Remand Determination asserts (in essence) that it is reasonable to assume that all garlic delivered to the Azadpur APMC market was sold.  *See* Remand Determination at 58; Def. Response

the assumption that all garlic delivered to the market is eventually sold (at some price) does not

permit Commerce to derive any information whatsoever as to the volume of sales of "A"- and

"S.A."-grade garlic, because (as discussed immediately above) the Azadpur APMC data provide no

information on the volume of "A"- and "S.A."-grade garlic delivered to the market.  *See* Azadpur

APMC data; Pls. Comments at 5, 9-10; Pls. Reply Comments at 6.  Further, even the assumption that

all garlic delivered to the market is eventually sold (at some price) does not permit Commerce to

derive from the Azadpur APMC data any information about the actual dates on which any or all

sales were made, or the prices paid for those sales.   Numerous statements in the Remand

Determination indicate that Commerce fails to grasp even these most basic facts.

For example, the Remand Determination states that the Azadpur APMC data "contain[] a

list of all fruit and vegetable *sales* on any particular day at the [Azadpur] APMC [market]."  *See*

Remand Determination at 9 (emphasis added).  As discussed above, however, the Azadpur APMC

data in fact include no information whatsoever on any specific sales – much less "a list of all . . .

[individual] vegetable sales on any particular day," as the Remand Determination states.  *See*

Azadpur APMC data.  The statement in the Remand Determination is thus flatly incorrect – as is the

---

at 12-13.  However, even that assumption is of no real use to Commerce.  First, all garlic delivered
to the market on a particular date was not necessarily sold on that date.  As the Azadpur APMC data
indicate, garlic was offered for sale at the Azadpur market even on days when no garlic was
delivered.  *See* Azadpur APMC data (for example, data for May 8, 2006, listing offer prices for
garlic, but indicating that no garlic arrived at the market on that date); *see also* Pls. Comments at 9-
10 (noting that "some [Azadpur APMC] bulletins do not show any arrival amount for garlic but still
show [offer price] data").  There is thus no way to correlate garlic volume with daily sale prices,
since there is no way to ascertain the day on which any particular volume of garlic was sold.
Moreover, even more fundamentally, as discussed above, the volume of garlic delivered to the
market is not broken down by grade.  There is thus no way to correlate garlic volume with garlic
grade (much less the price for that grade on any assumed day of sale).

Government's claim that the Azadpur APMC data "included 'numerous specific garlic sales.'" *See* Def. Response at 7-8 (citation omitted).

The Remand Determination further states that the Azadpur APMC data "note[] *the weight* of each sale, *the region* from which the produce originates, and *the grade or size* of the product." *See* Remand Determination at 9 (emphases added).  But, again, the Azadpur APMC data provide absolutely no sales-specific information, much less information on "each [individual] sale."  The Azadpur APMC data emphatically do not provide information on "the weight," the "region" of origin, and the "grade or size" of "each sale."  *See* Azadpur APMC data; Pls. Comments at 9 (explaining that Azadpur APMC data "offer no sales-specific details regarding grades of garlic").[25]

---

[25]The Azadpur APMC data include two types of "weight" information for fresh garlic.  As discussed above, the data identify, for each market day, the aggregate volume of all grades of garlic delivered to the market, under a column captioned "Arrival Variety in Tons."  In addition, the data identify the unit of measure by which garlic is offered for sale at the market, under the column captioned "Weight in Kg."  As the Azadpur APMC data indicate, garlic is sold in "40 kg. katta[s]," or jute bags.  *See* Azadpur APMC data (under column, "Weight in Kg," for garlic); Market Research Report at 20 (noting that garlic is sold in jute bags).  Significantly, neither of these two types of "weight" data are sales data, much less data on specific, individual sales as the Remand Determination states.  Thus, contrary to the Remand Determination's claim, the Azadpur APMC data emphatically do not "note[] the weight of each sale."  *See* Remand Determination at 9.

Similarly, the Azadpur APMC data indicate where garlic that was delivered to the market arrived from, under a column captioned "Name of the Comm. & State."  *See* Azadpur APMC data (under column, "Name of the Comm. & State," for garlic).  Yet again, however, that information is not correlated in any way to sales, much less specific, individual sales.  Thus, contrary to the Remand Determination's claim, the Azadpur APMC data clearly do not specify for "each sale," "the region from which the produce originates."  *See* Remand Determination at 9.

As indicated above, the Azadpur APMC data also note the various grades of garlic offered for sale on each market day, under a column captioned "Grade/Size."  *See* Azadpur APMC data (under column captioned "Grade/Size," for garlic).  But, once again, that information is not correlated in any way with any information on sales, much less data on specific, individual sales.  Accordingly, contrary to the Remand Determination's claim, the Azadpur APMC data plainly do

The statement in the Remand Determination is thus demonstrably untrue.  Indeed, it is difficult to conceive that such statements could be made by anyone who gave the Azadpur APMC data even the most cursory review.

In addition, the Remand Determination states that the Azadpur APMC data "provide[] a minimum, maximum, and a modal price for each commodity sold."  *See* Remand Determination at 9.  As discussed above, however, the Azadpur APMC data provide no specific data at all concerning actual individual sales.  *See* Azadpur APMC data.  The Azadpur APMC data themselves do not establish (except by inference) that any garlic of any grade was actually sold at the Azadpur APMC market, much less the price that was actually paid for any particular sale.  Certainly the data say nothing about any actual sales (much less actual prices paid) for garlic graded "A" and "S.A." – the only grades of garlic that are at issue here.

Elsewhere, the Remand Determination asserts that the Azadpur APMC data are "*largely comprised* of numerous *specific garlic sales* from several of the northern long-day growing regions, including Himachal Pradesh, Punjab, and Haryana"[26] (*i.e.*, several of the regions where – according to the Market Research Report – larger-bulbed garlic is grown).  *See* Remand Determination at 12 (emphases added); Def. Response at 7-8; Market Research Report at 16 (stating that India's "'Long Day' Zone" includes "Himachal Pradesh, Jammu and Kashmir, Punjab, Haryana, Uttaranchal, [and]

_____

not indicate "the grade or size of the product" for "each sale."  *See* Remand Determination at 9.

[26]The Remand Determination similarly asserts that "the Azadpur APMC dataset . . . us[ed] to generate a surrogate value [in the Remand Determination] . . . is *overwhelmingly made up* of garlic grown in [the "long-day"] regions."  *See* Remand Determination at 54-55 (emphasis added). However, just as there is no basis on the record for concluding that the Azadpur APMC data are "largely comprised" of "garlic sales from several of the northern long-day growing regions" (*see id.* at 12), so too there is no basis on the record for reaching this related conclusion.

Northern Parts of Uttar Pradesh").[27]  Yet again, the Remand Determination refers to "sales," even though, as discussed above, the Azadpur APMC data provide no sales-specific information whatsoever – much less information on any "*specific* [individual] garlic sales," as the Remand Determination asserts.  *See* Remand Determination at 12 (emphasis added); Pls. Comments at 9 (noting that Azadpur APMC data "offer no sales-specific details regarding . . . the region in which the garlic was grown"); *see also id*. at 5.

Further, even the data on the aggregate total volume of garlic delivered to the Azadpur market are not broken down by the state from which that garlic arrived.  *See* Azadpur APMC data; Pls. Comments at 5 (explaining that the Azadpur APMC data do not indicate "the amount [of garlic] received [at the market] from each particular state"); Pls. Reply Comments at 6 (same).[28]  It thus goes without saying that there is also no basis whatsoever for the Remand Determination's claim that the Azadpur APMC data are "*largely* comprised" of sales from the states of Himachal Pradesh, Punjab, and Haryana.  *See* Remand Determination at 12 (emphasis added).

Moreover, to the extent that the Remand Determination seeks to suggest that any sales from the specified states (*i.e.*, Himachal Pradesh, Punjab, and Haryana) would be, by definition, sales of larger-bulbed garlic, that notion is dispelled by the Azadpur APMC data themselves.  One of the

---

[27]The Market Research Report makes it clear that the so-called "long-day" zone includes Himachal Pradesh, Jammu and Kashmir, Punjab, Haryana, Uttaranchal, and Uttar Pradesh.  *See* Market Research Report at 10-11, 16; *but see id*. at 17-18 (discussing "long-day" zone, but omitting reference to Uttar Pradesh).  The Remand Determination states that the "long-day" zone "primarily" includes Uttar Pradesh (as well as Himachal Pradesh, Punjab, Uttaranchal, and Haryan), but omits any reference to Jammu and Kashmir.  *See* Remand Determination at 54.

[28]In addition, as discussed below, the record does not establish that the state from which the garlic was delivered is in fact the state where the garlic was grown.  *See* section III.A.2.b, *infra*.

relatively few things that can be said with certainty based on the Azadpur APMC data is that they

clearly list prices for garlic from Himachal Pradesh, Punjab, and Haryana not only for higher, larger-

bulbed grades (*i.e.*, grades "A" and "S.A."), but also for garlic of lower grades as well.  *See* Azadpur

APMC data (garlic data for, *inter alia*, July 3, 2006, listing offer prices for grades "B" and "C," as

well as "A" and "S.A.," from Himachal Pradesh ("HP"), Punjab ("PUN"), and Haryana ("HAR"),

as well as other states).

        In addition, the Remand Determination states that the Azadpur APMC data "for super-A and

A grades of garlic contains 198 points of data, representing over one thousand tons of garlic sold

over a period of several months."  *See* Remand Determination at 13; *see also* Def. Response at 12

(same); Remand Determination at 71, 74 (asserting that Azadpur APMC data "include hundreds of

data points"); Def. Response at 26 (same).  This statement too is riddled with inaccuracies.[29]

_____

        [29]Elsewhere, the Remand Determination asserts that the Azadpur APMC data "represent[]
an extremely high volume of sales."  *See* Remand Determination at 71, 74; *see also* Def. Response
at 26 (same).  Quite apart from the fact that the Azadpur APMC data in fact include no "sales"-
specific data (as noted repeatedly herein), it is unclear whether the quoted statement is intended to
refer to "sales" of garlic in general, or to "sales" of garlic graded "A" and "S.A."  If the reference
is to garlic in general, the statement is not relevant to the issue of the "representativeness" of the
Azadpur APMC data.  On the other hand, if the reference is to garlic graded "A" and "S.A.," then
the statement lacks support in the administrative record, because the Azadpur APMC data do not
break down by grade the volume of garlic delivered to the Azadpur market.  Further, even if sales
figures for "A"- and "S.A."-grade garlic were available on the record, it would be difficult to credit
the Remand Determination's claim that the volume of such sales at the Azadpur market is
"extremely high" absent data on the total sales of such garlic nationwide, or at least at other markets,
to put the Azadpur figures in proper context.  *See generally* Jining Yongjia Trade Co., 34 CIT at
____, 2010 WL 5121964 * 13 (noting representation, in litigation challenging twelfth "new shipper"
reviews for period November 1, 2006 to April 30, 2007, that garlic sales at the Azadpur APMC
market "accounted for 5.583 percent of all garlic transactions across India in 2006").

        The Remand Determination makes the point that "the overall value [or volume] of the garlic
sold" at the Azadpur APMC market is "irrelevant" – because, the Remand Determination

As a threshold matter, the claimed "198 points of data" is virtually meaningless.  Although the Remand Determination offers no explanation of the provenance of the "198" figure, close review of the Azadpur APMC data reveals that it is nothing more than the total number of offer prices for "A"- and "S.A."-grade garlic listed (two, three, or four per day) for the two-and-one-half month period.  In other words, the Azadpur APMC Bulletin page for May 1, 2006 lists prices for "A"- and "S.A."-grade garlic for "UP/HAR" (*i.e.*, Uttar Pradesh and Haryana), which Commerce counts as two "points of data"; and, in addition, the same page of the APMC Bulletin also lists prices for "A"- and "S.A."-grade garlic for "MP/RAJ/KOTA (NC)" (*i.e.*, Madhya Pradesh, Rajasthan, and (apparently) the city of Kota), which Commerce counts as another two "points of data," for a total of four "points of data" for May 1, 2006.  Commerce continued this same counting process, reviewing the Azadpur APMC data for each market day in the two-and-one-half month period, and came up with the total of "198 points of data."[30]  As discussed above, however, these "points of data" correlate only to offer prices.  As such, the number of "points of data" – whether 198 or even 199,888 – says nothing whatsoever about how many (if any) sales of "A"- and "S.A."-grade garlic were actually made during the two-and-one-half month period, or the prices actually paid in any such sales.  Any implication that the figure reflects 198 sales of "A"- and "S.A."-grade garlic is

---

underscores, "what matters is the data with respect to the 'A' and 'Super-A' garlic grades."  *See* Remand Determination at 58; *see also* Def. Response at 13 (discussing same point).  The Remand Determination's assessment is spot-on; but it is precisely that information which is missing from the Azadpur APMC data on the record.

[30]Careful review of the Azadpur APMC data suggests that the Remand Determination may have missed several "points of data" (as the Remand Determination refers to them), and that the actual count should be not 198, but instead 205.  *See* Azadpur APMC data.

absurd.[31]

The Remand Determination's assertion that the "198 points of data" for "super-A and A grades of garlic" represent "over one thousand tons of garlic sold over a period of several months" is even more inaccurate. *See* Remand Determination at 13. First, the Remand Determination again suggests that the Azadpur APMC data include actual sales figures, which they do not. Moreover, the reference to "over one thousand tons" of "super-A and A grades of garlic" is a reference to the page of the Azadpur APMC data that is captioned "Prices of Garlic, S.A. Grade, May 1st-July 14th 2006," which lists at the bottom of the column "Tons" the total "1,032." *See* Remand Determination at 13; Azadpur APMC data. As the caption on the page itself indicates, the price data reflected there are limited solely to "S.A."-grade garlic – and to "S.A."-grade garlic *from the state of Himachal Pradesh*, at that. *See* Azadpur APMC data (page captioned "Prices of Garlic, S.A. Grade, May 1st-July 14th 2006," listing "HP" (Himachal Pradesh) under column captioned "State").

Thus, contrary to Commerce's representations in the Remand Determination, the page of Azadpur APMC data at issue includes no data whatsoever on grade "A" garlic; and, even as to grade

---

[31]The number in the Remand Determination would be no more meaningless if Commerce had *tripled* the number of "points of data" by counting each grade "A" and "S.A." listing *three* times (for a total of 615 "points of data") – to reflect the "Mini" (minimum) offer price, the "Maxi" (maximum) offer price, and the "Modal" offer price. *See* Azadpur APMC data. Whether the number of "points of data" is 198, 205, or 615, the figure is largely artificial and meaningless.

The actual number of garlic sales made at the Azadpur APMC market during the two-and-one-half month period could be either higher or lower than 198, 205, or 615; there is simply no way to ascertain the actual number of sales from the Azadpur APMC data on the record. The critical point is that the Azadpur APMC data include no specific sales information of any sort – no specific sales data whatsoever – and the "points of data" that Commerce is counting reflect nothing more than offer prices, not specific, individual sales.

"S.A." garlic, the page does not include *all* "S.A."-grade garlic, but, rather, only that "S.A."-grade garlic which came from one particular state.  Finally, and most importantly, the figure that the Remand Determination touts – "over one thousand tons" (or 1,032 tons, to be exact) – has no relationship to the grade "S.A." garlic from Himachal Pradesh that is the subject of the page, or to any other specific grade of garlic.  Instead, each of the figures in the "Tons" column represents the total tonnage of garlic *of all grades* that was delivered to the Azadpur APMC market on the 30 days listed on the page, which totals 1,032 tons.

In sum, while the Remand Determination claims that the referenced Azadpur APMC data document the sales of "over one thousand tons" of "super-A and A grades of garlic" over a period of two-and-one-half months (*see* Remand Determination at 13), the facts are that: (a) the Azadpur APMC volume figures are for *deliveries* of garlic to the Azadpur APMC market, not for *sales*; (b) the specific Azadpur APMC data to which the Remand Determination refers do not cover grade "A" garlic, but, rather, are limited to grade "S.A." – and, in fact, are confined to grade "S.A." garlic from the state of Himachal Pradesh; and (c) the "over one thousand tons" figure that Commerce trumpets is actually for *all grades* of garlic (*not* grades "S.A." and/or "A") *delivered* to the Azadpur APMC market and, moreover, reflects only those deliveries made on those days when grade "S.A." garlic from Himachal Pradesh was offered for sale.  The Remand Determination thus evidences shockingly little comprehension of the Azadpur APMC data.

### b.  Geographic Representativeness

As discussed above, the existing administrative record cannot support the Remand Determination's conclusion that the Azadpur APMC data are temporally representative of the

Chinese Producers' raw garlic bulb.   As to geographic representativeness, the Remand Determination emphasizes that it is Commerce's practice to use "country-wide data" rather than "regional data," whenever possible.  *See* Remand Determination at 12; *see also* Def. Response at 6 (stating that  Commerce seeks data that are "representative of broad market average prices in India").  But, much like its claims as to the temporal representativeness of the Azadpur APMC data, so too the Remand Determination's claims that the Azadpur APMC data are geographically representative lack adequate support in the existing record.  *See generally* Remand Determination at 12-13, 54-55, 58 (discussing representativeness of Azadpur APMC data); *see also* Def.-Ints. Reply Comments at 2 (asserting that Azadpur APMC data reflect "a broad market average in India").

A number of the Remand Determination's statements are simply not relevant to the issue of geographic representativeness.  The Remand Determination states, for example, that the Azadpur APMC market has been designated a "Market of National Importance."  *See* Remand Determination at 13.  Without more, however, that fact is meaningless.  There is no indication that designation as a "Market of National Importance" is anything other than some sort of honorary recognition of the market's historical significance. Certainly there is no indication that the designation is evidence of any fact that bears on the "representativeness" of the data on "A"- and "S.A."-grade garlic at issue here.

Similarly, the Remand Determination's representation that, as of 2003, the Azadpur APMC market was "not only the largest APMC [market] in India, but . . . also the largest in Asia" says nothing whatsoever that is specific to garlic, much less garlic of the particular grades at issue here.

*See* Remand Determination at 13 (*citing* Market Research Report at 21).  The same is true of the

Government's assertion that the Azadpur APMC market is "the largest fruit and vegetable market

in Asia."  *See* Def. Response at 12.  The statement says nothing about garlic, not to mention garlic

that is graded "A" or "S.A."

The Remand Determination's finding that the Azadpur APMC market is "India's 'National

Distribution Centre' for several agricultural products, including garlic" at least refers to garlic in

general; but, again, the statement is not specific to grades "A" and "S.A.," and thus is entitled to

little, if any, weight in evaluating the representativeness of the Azadpur APMC data.  *See* Remand

Determination at 13; *see also id*. at 71, 74 (asserting that Azadpur market is "major distribution

center" of unspecified types of produce).[32]

The Remand Determination further asserts that the Azadpur APMC market "covers broad

territory in India," and that "agricultural products from all over India are sold" at the Azadpur

market.  *See* Remand Determination at 13.  However, it is unclear what is meant by the claim that

the market "covers broad territory," and – in any event – the statement is in no way specific to garlic

as a whole, not to mention "A"- or "S.A."-grade garlic.  Similarly, even assuming (without

accepting) that the second quoted statement is true as phrased, "agricultural products" in general are

_____

[32]According to the Remand Determination, Commerce took both the statement that the Azadpur APMC market is a "National Distribution Centre" and the statement that it is a "Market of National Importance" from the Azadpur APMC's website.  *See* Remand Determination at 13 (internal quotation marks omitted).  But the Remand Determination does not indicate when Commerce consulted the website.  It seems unlikely that Commerce would have done so before the Azadpur APMC data were first placed on the record of the 2004-2005 review (in August or September 2006); and it may have been much later.  It is thus unclear whether the two statements were true at the time of the period of review (*i.e.*, November 1, 2003 through October 31, 2004).

not at issue in this action. Even if true, the statement says nothing about the sales of "A"- and "S.A."-grade garlic at the Azadpur APMC market.

Any implication that grade "A" and "S.A." *garlic* "from all over India [is] sold at the APMC [market]" is contradicted by another statement in the Remand Determination, which indicates that "the total data set for super-A and A grades of garlic" used on remand "comes from a broad array of seven Indian states." *See* Remand Determination at 13. But, despite the reference to "seven Indian states," the sentence actually lists only five states – specifically, "Uttar Pradesh, Rajasthan, Madhya Pradesh, Haryana, and Himachal Pradesh." *See id*. In any event, an independent review indicates that the Azadpur APMC data list six states as origins of grades "A" and/or "S.A." garlic – including the five states listed immediately above, as well as Punjab, plus "KOTA" (which appears to refer to a city). Given that India comprises no fewer than 28 states (as well as a number of official "territories," including the National Capital Territory of Delhi, where the Azadpur APMC market is located) and given that several major garlic-producing states are not reflected in the Azadpur APMC data, it is clear that "A"- and "S.A."-grade garlic "from all over India" is not sold at the Azadpur APMC market. *See* Market Research Report at 7, 9; Azadpur APMC data.[33]

---

[33]This same analysis disposes of the Government's claim that "garlic from a broad number of Indian states is sold at the Azadpur market." *See* Def. Response at 12. As discussed above, the Azadpur APMC data indicate that garlic is delivered to the Azadpur market from six states, as well as "KOTA." *See* Azadpur APMC data. And, even more to the point, garlic in general is not relevant; what matters is garlic that is graded "A" and "S.A."

The record does not specifically identify the number of Indian states that grow grade "A" and/or "S.A." garlic. However, the Market Research Report states that garlic production is concentrated in six states which are reflected in the Azadpur APMC data (*i.e.*, Madhya Pradesh, Rajasthan, Punjab, Haryana, Himachal Pradesh, and Uttar Pradesh), but also in four states that are not reflected in those data (*i.e.*, Gujarat, Maharashtra, Orissa, and Uttaranchal). *See* Market

Further, the Remand Determination seems to assume that the origin listed in the Azadpur APMC data is the place where the produce (including garlic) was grown.  As the Chinese Producers note, however, it does not appear that the location listed in the Azadpur APMC data is necessarily the place where the produce was grown.  *See* Pls. Comments at 9; Azadpur APMC data (column captioned "Name of the Comm. & State").  Certainly there is no record evidence to affirmatively establish that the origin listed in the Azadpur APMC data is the place where the produce was actually grown.  And, in fact, there is evidence that appears to indicate to the contrary.  For example, the Remand Determination notes that the Market Research Report states that garlic imported from China is sold at the Azadpur APMC market.  *See* Remand Determination at 55; Market Research Report at 21-22, 29.  But nowhere do the Azadpur APMC data show China as the origin of any of the garlic listed there.  *See* Azadpur APMC data (column captioned "Name of the Comm. & State").

More to the point, however, the proper focus of Commerce's geographic "representativeness" criterion is not on matters such as where the garlic was grown, where the garlic was located before it arrived at the Azadpur APMC market, or where the Azadpur APMC market

---

Research Report at 7; Azadpur APMC data.  The Market Research Report indicates that the four states of Madhya Pradesh, Gujarat, Maharashtra, and Rajasthan accounted for 68% of national garlic production.  *See* Market Research Report at 7; Azadpur APMC data.  But two of those states – Gujarat and Maharashtra – are not reflected in the Azadpur APMC data.  *See* Azadpur APMC data.  The Market Research Report further states that the "North Indian garlic belt" accounted for roughly 15% of the country's garlic production and is "the *only* garlic producing belt in India where garlic is grown under 'long-day' conditions."  *See* Market Research Report at 7.  The states in the "long-day" zone include Punjab, Haryana, Himachal Pradesh, and Uttar Pradesh (which are reflected in the Azadpur APMC data); but the zone also includes Jammu and Kashmir and Uttaranchal – states which are not reflected in the data.  *See id*. at 10-11, 16; Azadpur APMC data.  Finally, the Market Research Report also identifies "[k]ey garlic producing districts" in the states of Bihar, Tamil Nadu, and Karnataka, as well as a "pocket" in the state of Kerala, none of which are reflected in the Azadpur APMC data.  *See* Market Research Report at 6-9; Azadpur APMC data.

is located within India (or in relation to anything else).   The issue is not the geographic "representativeness" of the Azadpur APMC market itself or the geographic "representativeness" of the garlic or other produce marketed there.   Rather, the proper focus of geographic "representativeness" here is whether *the prices reflected in the Azadpur APMC data* are "representative" of *prices across India* (and are not, for example, aberrational or distorted local or regional prices).[34]

As the Chinese Producers point out, "Commerce itself acknowledges that Azadpur is just one of numerous APMC markets throughout India."   *See* Pls. Comments at 10; *see also id*. at 2, 23 (emphasizing that Azadpur APMC data reflect prices for only a single market);   Remand Determination at 53 (noting Chinese Producers' argument that data reflect prices for only a single market); Market Research Report at 1-2 (noting that Agricultural Produce Marketing Committees ("APMCs") have "wholesale markets spread across India," including markets in Maharashtra, Haryana, Chandigarh, and Himachal Pradesh); *id*. at 3 (referring to "wholesale garlic markets across the country"); *id*. at 21 (referring to APMC "wholesale markets across the country"); Jining Yongjia Trade Co. v. United States, 34 CIT ____, ____, 2010 WL 5121964 * 13 (2010) (noting representation, in litigation challenging twelfth "new shipper" reviews, that there are "7,000 APMCs throughout India").[35]   There is, however, no record evidence to indicate how the prices for "A"- and

---

[34]Of course, factors such as where the Azadpur APMC market is located and where the garlic sold there is grown may well affect prices at the market.   But the actual issue that Commerce must decide is whether the Azadpur APMC data are "representative" of prices across India.   The Remand Determination never directly addresses that issue.

[35]*See also* Taian Ziyang Food Company Ltd. and Taian Fook Huat Tong Kee Foodstuffs Co., Ltd. Surrogate Value Submission (Admin. Record Pub. Doc. 83), Exh. 1 (Agmarknet data, including India-wide garlic values for entire period of review, and listing locations of numerous markets

"S.A."-grade garlic listed in the Azadpur APMC data compare to prices for such garlic at the numerous other APMC markets "spread across India." *See* Market Research Report at 1. Nor is there any other record evidence to substantiate the geographic representativeness of the Azadpur APMC data on which Commerce relies in the Remand Determination.

### c. Conclusion

Despite Commerce's professed preference for a "period-wide price average" that reflects "country-wide" data, the Azadpur APMC data that the agency selected to value raw garlic bulb in the Remand Determination "encompass a limited time span" and are from "a single APMC market." *See* Remand Determination at 6 (*quoting* Policy Bulletin 04.1); *id*. at 12, 71, 74; Pls. Comments at 2. The Remand Determination fails to explain Commerce's reason for using a mere two-and-one-half months of data, rather than deflating and using data for an entire year.[36] Nor does the Remand Determination explain the basis for the agency's apparent confidence that such time-limited data are not distorted by seasonal or other "temporary market fluctuations." *See generally* Remand Determination at 44, 48. Similarly, the Remand Determination fails to demonstrate that the Azadpur APMC data are representative of prices throughout India, and do not reflect local or regional aberrations.

The Remand Determination is full of broad, sweeping, conclusory assertions concerning both the temporal and geographic "representativeness" of the Azadpur APMC data. As discussed above,

---

throughout India from which garlic values were obtained).

[36]Indeed, as discussed above, the Remand Determination fails to explain why Commerce did not use a *full year* of *contemporaneous* data. *See* section III.A.2.a, *supra*.

however, the data simply do not back them up.  Certainly the Remand Determination does not

support Commerce's hyperbolic claim that the Azadpur APMC data "represent[] a broad market

average of large-bulb garlic and [are] *inclusive of all possible data*."  *See* Remand Determination

at 12 (emphasis added).

The outlined concerns about the "representativeness" of the Azadpur APMC data alone

would warrant another remand of the surrogate value for raw garlic bulb.  There are, however,

additional problems with the Azadpur APMC data, as discussed elsewhere throughout this section.

*See generally* section III.A, *passim*.

### 3.  "Product Specificity" of Azadpur APMC Data

Commerce's "well-established criteria for determining the appropriateness of surrogate

values under consideration," set forth in Policy Bulletin 04.1, address not only the

"contemporaneity" and "representativeness" of potential data sources (both of which are discussed

above), but also the "product specificity" of those sources – a critical consideration.  *See generally*

section III.D.6, *infra* (explaining that other criteria (*e.g.*, contemporaneity, representativeness, and

public availability) are irrelevant if data are not sufficiently product-specific).  In particular, Policy

Bulletin 04.1 explains that "it is [Commerce's] stated practice to use . . . *prices specific to the input*

*in question*."  *See* Policy Bulletin 04.1 (emphasis added) (*quoted in* Remand Determination at 6).

In the case at bar, the Remand Determination emphasizes that, "[i]n the selection of surrogate

values for garlic bulbs, [Commerce is] . . . seeking to select as a surrogate value . . . [a price] that

is highly specific to the product in question" – specifically, garlic bulb with a diameter of between

50 mm and 65 mm.  *See* Remand Determination at 6, 11; *see also* Issues and Decision Memorandum

at 42-43 (noting that Chinese garlic exported to U.S. has "bulb diameter above 40 millimeters");

Remand Determination at 8-9 (same); Market Research Report at 29 (noting that bulb size of

Chinese garlic exported to India generally is "⟩ 40 mm (typically . . . ranges between 50-65 mm)").[37]

---

[37]Commerce and the Government repeatedly underscore both the importance of "product specificity" and the fact that, in this review, that translates to the diameter of the garlic bulb.

As to the importance of product specificity, *see*, *e.g.*, Remand Determination at 7 (noting that Commerce rejected Indian import statistics as surrogate value because "they were deemed insufficiently specific"); *id*. at 15 (same); *id*. at 8 (stating that "the quality and detail of any data used to obtain a surrogate value for garlic bulbs is of importance"); *id*. at 9 (stating that "any data that fail to identify the size and quality of the garlic [described in the data] are ultimately insufficient"); *id*. (stating that "[a]ny data used to represent Chinese garlic bulb prices must fit the particular characteristics of Chinese garlic, which is a large, high yield, high quality variety"); *id*. at 10 (stating that "in choosing the most appropriate surrogate value, [Commerce] considers several important attributes," including the "specificity" of the "source information"); *id*. at 12 (same); Def. Response at 9 (noting that Indian import data were rejected "as being insufficiently product-specific to the bulb size"); *id*. at 13 (stating that "what mattered for Commerce's determination was that the [Azadpur APMC data] were product-specific").

As to the significance of bulb diameter, *see*, *e.g.*, Remand Determination at 8 (stating that "the size of a garlic bulb is a factor in the ultimate price paid" and "a strong determinant of the grade and price of garlic"); *id*. at 9 (stating that "the size of a garlic bulb often drives garlic prices in the marketplace"); *id*. (stating that "[a]ny data used to represent Chinese garlic bulb prices must fit the particular characteristics of Chinese garlic, which is a large, high yield, high quality variety"); *id*. at 10 (stating that Commerce "has concluded in several recent reviews that the size of . . . garlic bulbs [is] given significant value in the marketplace"); *id*. at 11 (emphasizing importance of basing surrogate value on Indian sales of "garlic bulbs of similar diameter to that of [the Chinese Producers'] merchandise"); *id*. at 14 (stating that "bulb size significantly affects all [factors of production] and drives the selling price," such that "bulb size is a key element in valuing the raw garlic bulb input"); Def. Response at 7 (asserting that "bulb size is the most important factor concerning the ultimate market price"); *id*. at 9 (noting that Indian import data were rejected "as being insufficiently product-specific to the bulb size"); *id*. at 11 (stating that "[a]s Commerce explained, . . . the most important factor concerning product-specificity is garlic bulb size"); *id*. at 13 (stating that "garlic bulb size affects all factors of production and controls the ultimate sale price of the finished product").

The Government asserts that, in selecting the Azadpur APMC data from among the various sets of data on the record, Congress gave product specificity the greatest weight from among the

The Remand Determination similarly emphasizes that Commerce "is seeking a surrogate value that

is . . . as similar as possible to the *intermediate input*" that the agency is valuing – specifically, raw

garlic bulb as it exists at the "farm gate" (*i.e.*, the raw garlic bulb as it is harvested), with no further

processing or handling, and including no additional charges.  *See* Remand Determination at 56

(emphasis added); Issues and Decision Memorandum at 14 (noting need to value "the garlic [bulb]

that is pulled from the ground . . . [and] not the final product"); *id*. at 13 (noting need to value "the

raw garlic bulb that is harvested from the ground"); *see also*, *e.g.*, Remand Determination at 57

(stating that Azadpur APMC data for "A"- and "S.A."-grade garlic "best approximate the

intermediate input in India"); Issues and Decision Memorandum at 42 (stating that "[Commerce's]

objective here is to find the best available surrogate value to value garlic *bulb* (*i.e.*, the intermediate

product)").[38]

---

criteria set forth in Policy Bulletin 04.1.  *See*, *e.g.*, Def. Response at 7 (asserting that "[b]ecause .
. . bulb size is the most important factor concerning the ultimate market price . . . , Commerce
reasonably gave more weight to product-specificity when selecting a surrogate value for garlic
bulb"); *id*. at 8 (stating that, although Azadpur APMC data are not contemporaneous, "Commerce
concluded that these data were the best available information . . . because the benefit in product-
specificity outweighed the flaw in contemporaneity"); *id*. at 13 (arguing that "Commerce reasonably
determined that the product-specificity of the [Azadpur APMC data] made [those data] better
information" than other sources of data on the record); *id*. at 13-14 (arguing that "Commerce
reasonably gave greater weight to product-specificity over contemporaneity and determined that the
highly product-specific [Azadpur APMC data] were the best available information").

    As outlined herein, however, the claims of Commerce and the Government concerning the
product specificity of the Azadpur APMC data are not borne out by the existing administrative
record.

    [38]In the Remand Determination, "farmgate" prices are described as prices for produce that
goes "straight from the farm to the customer, without intermediary distributors."  *See* Remand
Determination at 52.

Commerce states that the "A"- and "S.A."-grade garlic reflected in the Azadpur APMC data used in the Remand Determination is "highly similar to [the Chinese Producers'] intermediate input." *See* Remand Determination at 56; *see also id*. at 10-11, 14, 15, 54-55, 56, 57, 59 (same); Def.-Ints. Reply Comments at 2 (asserting that Azadpur APMC data reflect "garlic bulbs of a size that correspond to the large-sized garlic bulbs grown by the [Chinese Producers]" and "are specific to the product being valued"). But the Chinese Producers contest Commerce's claims of product specificity.

Specifically, the Chinese Producers contend that there is no unbiased evidence to establish the bulb size of the "A"- and "S.A."-grade garlic reflected in the Azadpur APMC data. *See generally* Pls. Comments at 3-5; Pls. Reply Comments at 2-3. In addition, the Chinese Producers argue that there are unexplained disparities between the Azadpur APMC data and other prices for large-bulb garlic that are on the record; and, according to the Chinese Producers, those disparities illustrate that the Azadpur APMC data reflect costs that render the Azadpur APMC data insufficiently specific to the Chinese garlic at issue here. *See generally* Pls. Comments at 6-8; Pls. Reply Comments at 4-5.

In particular, the Chinese Producers suggest that the relatively high prices reflected in the Azadpur APMC data may be attributable to the cost of special seed used to grow large-bulb garlic in India. *See generally* Pls. Comments at 13-16; Pls. Reply Comments at 9-10. The Chinese Producers also suggest that the prices reflected in the Azadpur APMC data may be inflated due to transportation costs and commission payments and other similar expenses associated with the sales of garlic at the Azadpur APMC market. *See generally* Pls. Comments at 10-12; Pls. Reply

Comments at 6-8.  According to the Chinese Producers, the inclusion of such costs and expenses means that the Azadpur APMC data do not constitute "farm gate" prices and thus are not product-specific to the "intermediate product" that Commerce purportedly valued here.  *See generally* Pls. Comments at 10-12; Pls. Reply Comments at 6-8.[39]

### a.  Descriptions of "A"- and "S.A."-Grade Garlic

Two key facts underpinning the Remand Determination's findings that the Azadpur APMC data are product-specific to the Chinese Producers' garlic are Commerce's determinations that the Azadpur APMC data's references to grade "A" garlic and grade "S.A." garlic are to garlic with bulb diameters of 40 to 55 mm, and 55 mm or more, respectively.  *See* Pls. Comments at 3; Remand Determination at 11 (concluding that "the two larger Indian varieties – super-A ["S.A."], which is defined . . . as having bulbs greater than 55 mm in diameter . . . , and A, which is defined as having bulbs between 40 and 55 mm in diameter – [are] most similar to the garlic Chinese Respondents produce"); *see also* Pls. Comments at 4-5; Pls. Reply Comments at 2-3.

The Chinese Producers correctly note that the Azadpur APMC data themselves do not describe or define the various grades of garlic.  *See* Pls. Comments at 3; Azadpur APMC data.  According to the Chinese Producers, Commerce's two "critical findings" on the size of grades "A" and "S.A." garlic are "based merely on the unsupported claims of [the Domestic Producers] and their consultant rather than any objective evidence."  *See* Pls. Comments at 3-4; Pls. Reply Comments at 3; *see generally* Pls. Comments at 3-5; Pls. Reply Comments at 2-3; *see also* Def. Response at 10-

---

[39]Some of the issues addressed in the analysis of the "representativeness" of the Azadpur APMC data go to the product specificity of those data as well.  *See generally* section III.A.2, *supra*.

11; Remand Determination at 51, 53-54 (summarizing, and responding to, Chinese Producers'

arguments; noting that Chinese Producers "claim that the grades of garlic . . . are not described by

any unbiased sources on the record").

In particular, the Chinese Producers note that Commerce's finding on the size of grade "A"

garlic is based on a statement in the Market Research Report, which the Chinese Producers

characterize as "a statement by [the Domestic Producers'] paid consultant in a market research study

generated specifically for this case." *See* Pls. Reply Comments at 2-3;[40] *see also* Market Research

Report at 21 (stating that, in June 2003, garlic with bulb diameter of greater than 40 mm was

classified as grade "A").  The Chinese Producers dismiss the Market Research Report as a "private

market study commissioned by [the Domestic Producers], which is neither an official nor an

objective source."  *See* Pls. Comments at 3; *see also* Remand Determination at 51.  The Chinese

Producers further note that the Market Research Report makes no mention of garlic graded "S.A.,"[41]

and claim that the basis for Commerce's finding on the size of "S.A."-grade garlic "amounts to . .

. a statement by [the Domestic Producers] themselves in a letter to Commerce."  *See* Pls. Reply

---

[40]Contrary to the Chinese Producers' claim, the Market Research Report was not "generated specifically for this case."  *See* Pls. Reply Comments at 2-3.  As the Remand Determination notes, the Domestic Producers first submitted the Market Research Report on the record of the 2001-2002 (eighth) administrative review.  *See* Remand Determination; *see also* Domestic Producers' Surrogate Value Submission (Admin. Record Pub. Doc. 417), Exh. 33 ("Market Research Report") (indicating that Exh. 33 was "attached as Exhibit 7 to petitioners' June 30, 2003 submission in the [2001-2002 Administrative Review]").  The Market Research Report was also placed on the record in the ninth review – the review immediately preceding the review at issue here.  *See* Taian Ziyang II, 35 CIT at ____, 2011 WL 3024720 * 6 (*citing* Market Research Report).

[41]The Azadpur APMC market did not begin classifying garlic as grade "S.A." until May 1, 2006, but the Market Research Report is dated June 2003.  *See* Remand Determination at 58; Market Research Report.  The Market Research Report therefore does not refer to grade "S.A." garlic.

Comments at 3;  Domestic Producers' Comments on New Surrogate Value Information (June 24, 2009) (Remand Pub. Doc. 3) at 4 (explaining that the Azadpur APMC data "differentiate between prices for Grade A garlic (bulbs with a diameter of 4.0 to 5.5 cm) and Grade Super A garlic (bulbs with a diameter greater than 5.5 cm)").

The Chinese Producers conclude that there is a "serious *lack of evidence* to support the size and nature of 'A' and 'S.A.' garlic."  *See* Pls. Reply Comments at 3-4 (emphasis added).  However, the gravamen of the Chinese Producers' argument actually is not that there is an *absence* of evidence, but, rather, that the sources on which Commerce relies are not – for lack of a better word – "disinterested," and that Commerce's findings concerning the bulb sizes of "A"- and "S.A."-grade garlic are thus not supported by substantial evidence.  *See id.* at 3; Pls. Comments at 5.  There is no merit to this claim.[42]

As a threshold matter, it strains credulity to suggest (as the Chinese Producers implicitly do) that the Chinese Producers do not know the descriptions of grade "A" and "S.A." garlic.  *See generally* Pls. Comments at 3-5; Pls. Reply Comments at 2-3; *see also* Remand Determination at 51, 53-54 (summarizing, and responding to, Chinese Producers' arguments).  Chinese garlic producers are exporting significant quantities of garlic to India.  *See*, *e.g.*, Market Research Report at 28

---

[42]Similarly without merit is the Chinese Producers' claim that there is no evidence that "Super A"-grade and "S.A."-grade garlic are one and the same.  *See* Pls. Comments at 3-4; Pls. Reply Comments at 3; Remand Determination at 51 (referring to Chinese Producers' argument). It is of no moment whether or not "S.A." stands for "Super A."  The critical fact is the bulb size of grade "S.A." garlic as that grade is used in the Azadpur APMC data.  *See* Remand Determination at 53-54; Domestic Producers' Comments on New Surrogate Value Information (June 24, 2009) (Remand Pub. Doc. 3) at 4 (explaining that Azadpur APMC data differentiate between grade "A" garlic, with bulb diameter of 40 to 55 mm, and grade "S.A." garlic, with bulb diameter of greater than 55 mm).

(noting that, during a twelve-month period in 2001-2002 alone, approximately 34,200 metric tons of garlic were exported from China to India).  As such, the notion that Chinese producers lack even the most basic knowledge about how garlic is graded in India is somewhat difficult to swallow.

It is also worth noting that – although data from the Azadpur APMC market have been used to value garlic bulb in subsequent reviews – the Chinese producers have not questioned the size of the various grades of garlic in the more recent proceedings.  *See*, *e.g.*, Issues and Decision Memorandum for the Final Results of the 15th Administrative Review of Fresh Garlic from the People's Republic of China, 76 ITADOC 37,321 (June 20, 2011), at Comment 3 (no reference to any dispute over size of various grades of garlic); Fresh Garlic from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the New Shipper Review of Qingdao Sea-line Trading Co., Ltd., 75 ITADOC 61,130 (Sept. 24, 2010), at Issue 2 (same); Fresh Garlic from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the [Thirteenth] New Shipper Reviews and Rescission, In Part, of the [Thirteenth] New Shipper Reviews, 74 ITADOC 50,952 (Sept. 24, 2009) (same).

Moreover, to the extent that the Chinese Producers here harbor any real doubts about the sizes of "A"- and "S.A."-grade garlic as those grades are used in the Azadpur APMC data on the record of this proceeding, the Chinese Producers were obligated to raise their questions in a timely fashion in the course of the remand, to afford Commerce and the Domestic Producers a proper opportunity to address them before the evidentiary record closed.[43]  Although Commerce placed the

---

[43]The Chinese Producers bristle at Commerce's observation that the Chinese Producers should have come forward with their own evidence of the description of "S.A."-grade garlic if the Chinese Producers dispute the description (*i.e.*, garlic with a bulb diameter of greater than 55 mm)

Azadpur APMC data on the record and invited the parties' comments, the Chinese Producers'

submission did not question the sizes of "A"- and "S.A."-grade garlic. *See* Letter from Commerce

to All Interested Parties (June 5, 2009) (Remand Pub. Doc. 1) (placing on the record Azadpur

APMC data and inviting parties' comments); Respondents' Comments Regarding New Surrogate

Value Placed on the Record for the Remand (June 24, 2009) (Remand Pub. Doc. 4) (objecting to use

of Azadpur APMC data in remand results, but raising no issue as to size of garlic bulb grades "A"

and "S.A."); Remand Determination at 2-3 (summarizing Chinese Producers' comments on Azadpur

APMC data).[44] The Chinese Producers raised the issue of the descriptions of the various grades of

_____

provided in the Domestic Producers' June 24, 2009 submission. *See* Remand Determination at 54 (emphasizing that Chinese Producers "have . . . not provided any evidence to counter the descriptions of the size of 'S.A.' grade garlic"); Pls. Comments at 4; Domestic Producers' Comments on New Surrogate Value Information (June 24, 2009) (Remand Pub. Doc. 3) at 4.

The Chinese Producers insist that Commerce "misses the point," and asserts that it is the Chinese Producers' "position . . . that there is *no reliable evidence* about what 'S.A.' garlic is or is not." *See* Pls. Comments at 4. But the Chinese Producers' claim that there is no such "reliable evidence" cannot be credited. "S.A."-grade garlic is listed in the Azadpur APMC data; clearly, "S.A."-grade means *something*. If the Chinese Producers believe that the term "S.A."-grade (as it is used in the Azadpur APMC data) means something other than garlic with a bulb diameter of greater than 55 mm, then the Chinese Producers should have proffered proof to that effect. If, on the other hand, the Chinese Producers believe that the term does not have a consistent definition (or that the definition is somehow ambiguous), then they should have proffered proof to that effect.

[44]To be sure, Commerce's letter placing the Azadpur APMC data on the record on remand did not state that the Remand Determination would later use those data as the basis to calculate the surrogate value for garlic bulb. *See* Letter from Commerce to All Interested Parties (June 5, 2009) (Remand Pub. Doc. 1). However, at the time of Commerce's letter, data from the Azadpur APMC market already had been used to value garlic bulb in the eleventh administrative review, the twelfth administrative review, the twelfth new shipper reviews, and the preliminary results of the thirteenth administrative and new shipper reviews. *See, e.g.,* Fresh Garlic from the People's Republic of China: Final Results and Partial Rescission of the Eleventh Administrative Review and New Shipper Reviews, 72 Fed. Reg. 34,438, 34,440 (June 22, 2007); Issues and Decision Memorandum for the Final Results of the 12th Administrative Review: Fresh Garlic from the People's Republic of China,

garlic for the first time in their comments on the Draft Remand Determination.  *See* Remand

Determination at 51, 53-54 (summarizing, and responding to, Chinese Producers' comments on

Draft Remand Determination).  The Chinese Producers waived their arguments by failing to raise

them in a timely fashion.

To the extent that the Chinese Producers focus their attack on the Market Research Report

submitted by the Domestic Producers, the Chinese Producers disregard the fact that various types

of market studies, generally commissioned by the parties, are not unusual in international trade

proceedings.  *See*, *e.g.*, <u>Target Corp. v. United States</u>, 609 F.3d 1352, 1360-61 (Fed. Cir. 2010)

(referring to, *inter alia*, "independent marketing studies" submitted by domestic trade association);

<u>SKF USA, Inc. v. U.S. Customs and Border Protection</u>, 556 F.3d 1337, 1343 (Fed. Cir. 2009)

(referring to "detailed market analyses" submitted by domestic industry, in support of antidumping

---

73 ITADOC 24,042 (June 9, 2008), at Comment 2A; Antidumping Duty Order on Fresh Garlic from
the People's Republic of China: Issues and Decision Memorandum for the Twelfth New Shipper
Reviews, 73 ITADOC 56,550 (Sept. 19, 2008), at Comment 4; Fresh Garlic from the People's
Republic of China: Preliminary Results of the [Thirteenth] Antidumping Duty Administrative and
New Shipper Reviews and Intent to Rescind, In Part, the [Thirteenth] Antidumping Duty
Administrative and New Shipper Reviews, 73 Fed. Reg. 74,462, 74,468 (Dec. 8, 2008); *see also*
Remand Determination at 3 (noting that data from Azdapur APMC market were used to value garlic
bulb in, *inter alia*, eleventh, twelfth, and thirteenth administrative reviews).

Moreover, although they were not parties to the most recent reviews, two of the plaintiff
Chinese Producers here – Sunny and Linshu Dading – were parties to the eleventh administrative
review, and were represented by the same counsel in that proceeding as they are here.  *See* Fresh
Garlic from the People's Republic of China: Final Results and Partial Rescission of the Eleventh
Administrative Review and New Shipper Reviews, 72 Fed. Reg. at 34,438 & n.1 (June 22, 2007).
Accordingly, at least some, if not all, of the Chinese Producers were already well-acquainted with
data from the Azadpur APMC market by the time Commerce put the Azadpur APMC data on the
record in this proceeding, and – if they had any good-faith questions about how garlic was graded
in those data – the Chinese Producers should have raised the issue promptly.

petition); <u>Nevinnomysskiy Azot v. United States</u>, 31 CIT 1373, 1388 (2007) (referring to "industry

reports from two expert studies" (one commissioned, one non-commissioned) submitted by domestic

producers); <u>Tung Fong Indus. Co. v. United States</u>, 29 CIT 346, 351-52 & n.8, 366 F. Supp. 2d

1308, 1312-13 & n.8 (2005) (referring to "foreign market research report," on which domestic

manufacturers' antidumping petition was based).

Further, at various points in their own briefs, the Chinese Producers themselves cite and rely

on other information in the Domestic Producers' Market Research Report. *See*, *e.g.*, Pls. Comments

at 13-14 (quoting Market Research Report at length to establish that Indian garlic producers must

use more expensive special seed to grow large-bulb garlic, increasing Indian producers' cost of

production); Pls. Reply Comments at 9 (stating that, "as confirmed by the Market Research Report,

garlic bulbs grow larger in China because of the indigenous seed and natural climate conditions in

the primary garlic growing regions," unlike garlic grown in India).[45]   The Chinese Producers'

attempts to single out and discredit one specific statement in the Market Research Report – the

statement concerning the bulb size of grade "A" garlic – thus have a somewhat hollow ring. *See*

Market Research Report at 21 (indicating that, in June 2003, garlic with bulb diameter of greater

---

[45]The Chinese Producers' argument challenging the reliability of a single specific statement
in the Market Research Report is doubly ironic.  Not only do the Chinese Producers rely elsewhere
on other statements in the Market Research Report, but, in addition, at another point in their briefs,
the Chinese Producers themselves criticize Commerce for doing the same thing that the Chinese
Producers seek to do.  Specifically, the Chinese Producers charge Commerce with "cherry picking
. . . parts of [the Market Research Report] while ignoring other parts of that same document." *See*
Pls. Reply Comments at 5.  Of course, the fact that a party accepts as true *one* statement from a
particular source in no way obligates the party to accept as true *all* statements made in that source.

than 40 mm was classified as grade "A").[46]

---

[46]The analysis above similarly disposes of the Chinese Producers' subsidiary argument that the challenged statements – *i.e.*, the statement in the Market Research Report concerning the size of grade "A" garlic, and the statement in the Domestic Producers' June 24, 2009 submission concerning the size of grade "S.A." garlic – are not supported by citation to relevant primary sources. *See* Pls. Comments at 3, 4; Pls. Reply Comments at 3.

In addition to the subsidiary issue raised by the Chinese Producers (noted above) concerning the *absence of citations* to primary source material to support the statements concerning the bulb size of "A"- and "S.A."-grade garlic in the Market Research Report and the Domestic Producers' June 24, 2009 submissions, there is another, potentially even more fundamental issue that the Chinese Producers have not raised – the *absence from the record of the source material* that serves as back-up for the Market Research Report.

In the eighth administrative review, Commerce expressed concern that "[t]he Market Research Report contains a number of broad assertions regarding the domestic Indian garlic industry, which, if they were to be [accepted] on [their] face, would have significant implications for respondents' final dumping margins. The acceptance of this non-publicly available information as fact without corroborating source data would lessen the overall transparency of [Commerce's] final determination." *See* Final Results of Redetermination Pursuant to Court Remand, Court No. 04-00240 (Feb. 25, 2010) at 8-9. Commerce therefore requested that the domestic producers in that case place on the record of the eighth administrative review certain supporting data for the Market Research Report – the same Market Research Report that is on the record of this proceeding. *See generally id.* at 8-11; *see also* Jinan Yipin Corp. v. United States, 33 CIT ____, ____, 637 F. Supp. 2d 1183, 1190-91 (2009) ("Jinan Yipin II") (discussing Commerce's concerns about supporting data for Market Research Report and agency's request for submission of those data, and summarizing contents of the data). However, it does not appear that those supporting data were ever requested or placed on the record of this administrative review.

It is not clear whether the supporting data placed on the record in the eighth administrative review would address the bulb size of grade "A" garlic; and, because the Market Research Report is dated June 2003 but the Azadpur APMC market did not begin classifying garlic as grade "S.A." until May 2006, it seems highly improbable (if not impossible) that the supporting data would address the bulb size of grade "S.A." garlic. *See* Market Research Report; Remand Determination at 58. Nevertheless, particularly in light of the concerns about the reliability of information in the Market Research Report that the agency expressed in the eighth administrative review, Commerce would be well-advised to ensure that – on remand – all necessary supporting data is placed on the record of this proceeding, particularly if the agency plans to continue to rely on information in the Market Research Report (whether to support the agency's selection of the Azadpur APMC data, or for other purposes). *Cf.* Nakajima All Co. v. United States, 14 CIT 469, 744 F. Supp. 1168 (1990)

Finally, the Chinese Producers cite no authority to support their claim that Commerce erred in relying on the Market Research Report and the Domestic Producers' June 24, 2009 submission because those documents reflect the Domestic Producers' "self-interest."[47]  Nor could the Chinese Producers do so.  It is hoary black letter law that the "self-serving" nature of evidence goes (at most) to its weight, not its admissibility.  *See, e.g.*, Healey v. Chelsea Resources, Ltd., 947 F.2d 611, 620 (2d Cir. 1991); In re Dana Corp., 574 F.3d 129, 153 (2d Cir. 2009); AK Steel Corp. v. United States, 22 CIT 1070, 1091-93, 34 F. Supp. 2d 756, 772-73 (1998), *aff'd in part, rev'd in part, and remanded on other grounds*, 226 F.3d 1361 (Fed. Cir. 2000); *see generally* 3A J. Wigmore, Evidence § 940, p. 775 (J. Chadbourn rev. ed. 1970) (explaining that "[i]mpartiality of feeling . . . is no longer regarded as an essential preliminary to testimony," and that "partiality" is "always relevant as . . . affecting the weight of . . . testimony"); *id.*, § 966, p. 812 (stating that "[t]here is no doubt that the

─────────────────────

(holding that Commerce improperly relied on market research report that agency had discredited and disregarded in prior proceedings).

[47]The sole case that the Chinese Producers cite is Allied Pacific I.  *See* Pls. Reply Comments at 3 (*citing* Allied Pacific Food (Dalian) Co. v. United States, 30 CIT 736, 765-67, 435 F. Supp. 2d 1295, 1320-21 (2006) ("Allied Pacific I")).  But that case is inapposite.  Allied Pacific I criticized Commerce for "adopt[ing] by reference" a domestic producer's *argument* wholesale, without independently scrutinizing the argument and without "cit[ing] to record evidence and provid[ing] reasoning of its own" to support the agency's conclusion.  *See* Allied Pacific I, 30 CIT at 766, 435 F. Supp. 2d at 1321.  In other words, Allied Pacific I criticized Commerce for adopting by reference one party's *conclusion*.  In contrast, in the case at bar, Commerce is not adopting by reference the Domestic Producers' arguments, much less their conclusions.  Instead, Commerce is citing to evidence of *basic facts* that the Domestic Producers have placed on the record, and is relying on those facts to support the agency's own reasoning and conclusion.  It is no more improper for Commerce to rely on factual evidence that has been placed on the record by the Domestic Producers than it would be for Commerce to rely on such evidence placed on the record by the Chinese Producers.  The Chinese Producers' reliance on Allied Pacific I is therefore unavailing.

interest of a party . . . is a circumstance available to impeach him").[48] Thus, even accepting (for the

sake of argument) their claims that the statements at issue here were not made by an "objective"

source, the Chinese Producers' assertion that the record reflects a "serious *lack of evidence* to

support the size and nature of 'A' and 'S.A.' garlic" cannot be sustained. *See* Pls. Reply Comments

at 4 (emphasis added); *see also* <u>Jining Yongjia Trade Co.</u>, 34 CIT at ____, 2010 WL 5121964 * 11-

12 (in review of twelfth  new shipper review, rejecting Chinese producers' argument that

Commerce's decision to value garlic bulb based on particular grade of garlic "must have been based

on statements made by [the domestic producers' consultants], and, therefore, was not supported by

---

[48]The Chinese Producers' arguments concerning the Domestic Producers' June 24, 2009 submission, like the Chinese Producers' arguments concerning the Market Research Report, focused solely on the (assertedly) biased, self-serving, and non-"objective" nature of those statements, in light of the authorship of the documents in which they appeared. Significantly, the Chinese Producers did not argue that the Domestic Producers' June 24, 2009 submission constitutes argument, not evidence. Such a claim would have been a much more difficult call. The distinction between statements of counsel and evidence is well-established. *See, e.g.*, <u>Campania Mgmt. Co. v. Rooks, Pitts & Poust</u>, 290 F.3d 843, 852-53 (7th Cir. 2002) (explaining that "it is universally known that statements of attorneys are not evidence"); <u>Gemtron Corp. v. Saint-Gobain Corp.</u>, 572 F.3d 1371, 1380 (Fed. Cir. 2009) (holding that "unsworn attorney argument . . . is not evidence"); <u>EOTT Energy Operating Ltd. Partnership v. Winterthur Swiss Ins. Co.</u>, 257 F.3d 992, 999 (9th Cir. 2001) (stating that "[c]ounsel's assertions at oral argument . . . are not part of the factual record"); <u>Estrella v. Brandt</u>, 682 F.2d 814, 819-20 (9th Cir. 1982) (noting that "[l]egal memoranda and oral argument are not evidence"); *cf.* <u>Carlisle Tire & Rubber Co. v. United States</u>, 9 CIT 520, 533, 622 F. Supp. 1071, 1082-83 (1985) (stating that, where Commerce's verification report failed to indicate whether the agency verified a certain fact, statement in letter to agency from party's counsel who was present at verification (indicating in letter that fact was verified) "possesses none of the indicia of reliability commonly considered in determining probative value," and does not constitute substantial evidence that the fact was verified); *but see* <u>Shandong Huarong Gen'l Corp. v. United States</u>, 25 CIT 834, 839-42, 159 F. Supp. 2d 714, 720-23 (2001) (sustaining Commerce's determination that forged steel was used in production of subject merchandise, where Commerce relied on, *inter alia*, "statements made by [Chinese producers'] counsel at an administrative hearing as proof that forged steel likely was used by [Chinese producers] to produce subject merchandise," where no party argued that representations by counsel do not constitute evidence).

substantial evidence").

    b.  <u>Seed Value, "Farm Gate" Prices, and Valuation of "Intermediate Input"</u>

The Chinese Producers contrast the Azadpur APMC data for "A"- and "S.A."-grade garlic with certain other pricing data on the record, and assert that disparities demonstrate that the "extremely high prices" reflected in the Azadpur APMC data are attributable to factors other than bulb size.  *See* Pls. Comments at 6; *see generally id*. at 6-8; Pls. Reply Comments at 4-5; Remand Determination at 52 (summarizing Chinese Producers' concerns); *but see id*. at 55-56 (addressing Chinese Producers' concerns); Def. Response at 11-12.

In particular, the Chinese Producers opine that some of the apparent price disparities may be attributable to the use of special seed in growing the "A"- and "S.A."-grade garlic reflected in the Azadpur APMC data.  *See generally* Pls. Comments at 13-16; Pls. Reply Comments at 9-10; Remand Determination at 52 (summarizing Chinese Producers' concerns); *but see id*. at 56-57 (addressing Chinese Producers' concerns); Def. Response at 14-15.  Further, the Chinese Producers contend that the prices for "A"- and "S.A."-grade garlic reflected in the Azadpur APMC data do not "reflect[] anything close to 'farm gate' prices," but – instead – include additional costs such as the expenses associated with "middlemen" such as "commission agents and wholesalers," as well as "other transportation related costs, fees and commissions," rendering the Azadpur APMC data "entirely unreliable as an 'intermediate input' surrogate value."  *See* Pls. Comments at 11; *see generally id*. at 10-12; Pls. Reply Comments at 6-8; Remand Determination at 52 (summarizing Chinese Producers' concerns); *but see id*. at 55-56, 57 (addressing Chinese Producers' concerns); Def. Response at 14.  The Chinese Producers thus conclude that the Azadpur APMC data for "A"-

and "S.A."-grade garlic are not sufficiently specific to the product here at issue.

       i.  Disparities Between Azadpur APMC Data and Other Pricing Data

The Chinese Producers challenge as "unsupported" the Remand Determination's implicit assumption that the prices reflected in the Azadpur APMC data for "A"- and "S.A."-grade garlic are attributable solely to garlic bulb size, asserting that the data "are not an accurate representation of the cost of 40-65 mm garlic in India during the [period of review]." *See* Pls. Comments at 8; *see generally id.* at 6-8; Pls. Reply Comments at 4-5; Remand Determination at 52 (summarizing Chinese Producers' claims).

The Chinese Producers point to Indian import statistics on the record indicating that, during the period of review, 19,699 metric tons of garlic were imported into India from China, priced at 12.74 rupees per kilogram. *See* Pls. Comments at 6; Pls. Reply Comments at 4. Similarly, the Chinese Producers note that the average Agmarknet price during the period of review for garlic from the "long-day" growing zone of Himachal Pradesh, Jammu and Kashmir, and Uttranchal was 15.34 rupees per kilogram. *See* Pls. Comments at 6-7; Pls. Reply Comments at 4-5. Contrasting those prices with the deflated value of 33.77 rupees per kilogram that Commerce derived from the Azadpur APMC data for "A"- and "S.A."-grade garlic, the Chinese Producers emphasize that the value used in the Remand Determination is nearly three times higher than the price of Chinese garlic imported into India during the period of review, and roughly two times higher than the Agmarknet prices during the period of review for Indian (domestic) garlic from the specified "long-day" growing regions. *See* Pls. Comments at 8; Analysis for the Redetermination of Remand in the Administrative Review of the Antidumping Duty Order on Fresh Garlic from the People's Republic

of China:  Jinan Yipin Corporation, Ltd. (Remand Pub. Doc. 19) at 2 (establishing value of 33.77 rupees per kilogram).[49]

From the contrasting figures discussed above, the Chinese Producers argue that – assuming that the vast majority of the garlic imported into India, and the vast majority of the garlic grown in the "long-day" growing zone of Himachal Pradesh, Jammu and Kashmir, and Uttranchal, are essentially the same as the large-bulb Chinese garlic that Commerce is seeking to value here – the Azadpur APMC data used in the Remand Determination cannot accurately reflect the cost of Indian garlic bulb with a diameter of between 40 mm and 65 mm during the period of review.  *See* Pls. Comments at 8; Pls. Reply Comments at 5.  Given the magnitude of the apparent price disparities, the Chinese Producers maintain that there are thus "obviously other factors heavily influencing the [Azadpur APMC data] garlic prices . . . unrelated to [bulb] size that render the . . . Azadpur APMC [data] an unreliable and inaccurate surrogate value."  *See* Pls. Comments at 7; *see also id*. at 8.

The Remand Determination gives short shrift to the Chinese Producers' claims.  *See* Remand Determination at 55-56.  According to the Remand Determination, the rationale underpinning the Chinese Producers' argument disputing the Azapur APMC data is "quite literally, 'because the price is too high.'"  *See id*. at 56; *see also* Def. Response at 12.  Apart from that cavalier dismissal, the Remand Determination's sole response to the Chinese Producers' analysis is Commerce's

---

[49]The Chinese Producers seek to compare the price data from the Indian import statistics and the Agmarknet data for the three specified states not only to the deflated Azadpur APMC data, but also to the raw (non-deflated) Azadpur APMC data from 2006.  *See* Pls. Comments at 7-8; Pls. Reply Comments at 5.  As the Remand Determination notes, however, one "cannot presume that the [Azadpur APMC data are] inaccurate as a surrogate value source simply because [they do] not offer prices identical to those . . . three years earlier."  *See* Remand Determination at 55.

speculation that "there are a number of factors that *could* explain the difference in prices [between the Azadpur APMC data and the Indian import statistics], including increases or decreases in the volume of Chinese imports caused by distortions or market shocks in the domestic Chinese market." *See* Remand Determination at 55 (emphasis added).[50]   However, the Remand Determination cites no evidence to support Commerce's suggestion; and Commerce is required to support the surrogate value that it selects with substantial evidence.  *See generally* Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 29 CIT 288, 296, 366 F. Supp. 2d 1264, 1271 (2005) ("Hebei Metals II") (emphasizing Commerce's obligation "to obtain adequate evidence for the value [the agency] select[s]").

Moreover, even if the Remand Determination could explain away the discrepancy between the Azadpur APMC data and the Indian import statistics (which it does not), the Remand Determination is entirely silent as to the Agmarknet average price that the Chinese Producers cite for garlic from the "long-day" growing zones of Himachal Pradesh, Jammu and Kashmir, and Uttranchal.  *See* Pls. Comments at 6-8; Pls. Reply Comments at 4-5.  Accordingly, even if Commerce had established by substantial evidence that the disparity between the Azadpur APMC data and the price reflected in the Indian import statistics was attributable to factors such as those outlined in the Remand Determination (which it has not), Commerce still would not have established

---

[50]The Remand Determination asserts that the Chinese Producers' arguments "are based purely on supposition without any supporting evidence." *See* Remand Determination at 55; *see also* Def. Response at 12 (asserting that Chinese Producers' arguments are not based on "any record evidence").  Quite to the contrary, the Chinese Producers' points are thoroughly grounded in documents on which both Commerce and the Government rely (including the Market Research Report and the Agmarknet data which Commerce used in the Final Results), as well as other record evidence.  *See generally* Pls. Reply Comments at 5.

why the value derived from the Azadpur APMC data is "*two times* higher than the Agmarknet prices during the [period of review] [for domestic Indian garlic] from the long-day growing region." *See* Pls. Comments at 8.

In its brief, the Government advances an argument that is more nuanced than either of the points that Commerce raised in its Remand Determination. Specifically, the Government asserts that "because there is no record evidence demonstrating that either the basket category Indian import statistics or the Agmarknet data describe garlic with bulb diameters specific to the large garlic grown by [the Chinese Producers], it cannot be shown, through an 'apples-to-apples' comparison, that the [Azadpur APMC] data are in any way unrepresentative of India-wide prices." *See* Def. Response at 12.

As a threshold matter, however, the Government's argument constitutes impermissible *post hoc* rationale. Litigation counsel's attempts at "backfill" are no substitute for an agency's own reasoned decisionmaking on the record. And an agency's action may be upheld, if at all, only on the grounds articulated by the agency itself. *See* Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962); Abbott Laboratories v. United States, 573 F.3d 1327, 1332-33 & n.1 (Fed. Cir. 2009); NEC Home Elecs., Ltd. v. United States, 54 F.3d 736, 743 (Fed. Cir. 1995). As such, the substance of the Government's argument cannot be considered here.

But, even if the Government's argument were to be considered on its merits, it would not carry the day. As the Chinese Producers observe, the Market Research Report indicates that the Chinese garlic imported into India is "'large bulbed' with a diameter greater than 40 mm and mostly within the 50-65 mm size range." *See* Pls. Comments at 6 (*citing* Market Research Report at 3, 21);

*see also* Pls. Reply Comments at 4.  Similarly, Commerce itself relied on Agmarknet data to value

garlic bulb in the Final Results.  *See* Issues and Decision Memorandum at 47 (noting Commerce's

decision to value garlic bulb in Final Results using Agmarknet data for "China" variety garlic).  And

the Market Research Report states, *inter alia*, that approximately 43% of the garlic produced in India

in the period at issue was of the hybrid/clonal (large-bulb) varieties, and that the large-bulb garlic

grown in India is grown in the "long-day" regions of the country, which include Himachal Pradesh,

Jammu and Kashmir, and Uttranchal – the three states that the Chinese Producers list.  *See* Market

Research Report at 3-4, 6-11, 13-18.

     Taken together, the evidence summarized above more than suffices to call into question the

product specificity of the Azadpur APMC data on which the Remand Determination relied, and to

warrant further inquiry and explanation by Commerce.  *See generally* Dorbest Ltd. v. United States,

30 CIT 1671, 1698, 462 F. Supp. 2d 1262, 1286 (2006) ("Dorbest I"), *aff'd in part*, *vacated in part*,

*and remanded on other grounds*, 604 F.3d 1363 (Fed. Cir. 2010) (explaining that, even if it is not

appropriate to base surrogate value on data from a particular source, that same source nevertheless

can properly be considered for related purposes, including evaluation of other data).

     ii.  Use of Special Seed to Grow "A"- and "S.A."-Grade Garlic

     The Chinese Producers contend that some of the apparent price disparities discussed above

(in section III.A.3.b.i) are attributable at least in part to the use of special seed in growing the

domestic Indian "A"- and "S.A."-grade garlic reflected in the Azadpur APMC data.  *See generally*

Pls. Comments at 13-16; Pls. Reply Comments at 9-10.  Relying on the Market Research Report,

the Chinese Producers argue that Indian garlic growers must use special, more expensive

hybrid/clonal seed to produce large-bulb garlic comparable to that which Chinese producers are able to grow using only "indigenous seed." *See* Pls. Reply Comments at 9; *see also* Pls. Comments at 13-15; Remand Determination at 52 (summarizing Chinese Producers' concerns).

The Chinese Producers reason that "the[] specially designed seeds must increase the cost for Indian garlic growers seeking to grow larger bulb garlic," and that "this additional cost must be reflected in the sales price" of large-bulb garlic such as the "A"- and "S.A."-grade garlic sold at the Azadpur APMC market. *See* Pls. Comments at 14-15; *see also* Pls. Reply Comments at 9. The Chinese Producers conclude that "the domestic Indian value for large bulb garlic is distorted by additional costs that the Chinese producers would not incur were China a market economy," and, therefore, that "it is improper to use such [domestic Indian] prices [for large-bulb garlic] as surrogate values" here. *See* Pls. Comments at 15-16 (*citing*, *inter alia*, Nation Ford, 166 F.3d at 1377-78; Rhodia, Inc. v. United States, 25 CIT 1278, 1288-90, 185 F. Supp. 2d 1343, 1353-55 (2001)); *see also* Pls. Reply Comments at 9; Remand Determination at 52 (summarizing Chinese Producers' concerns).

Commerce and the Government assert that "there is no record information to indicate that the 'A' and 'Super-A' garlic grades sold at the Azadpur APMC [market] are the product of specially designed garlic seed." *See* Remand Determination at 57; *see also* Def. Response at 14-15; *see generally* Remand Determination at 55-57. To the contrary, however, the Market Research Report explains at some length that the large-bulb garlic that is cultivated in India is the product of special, hybrid/clonal seed, in contrast to the native, local varieties of Indian garlic (which are typically small- to medium-bulbed, with diameters of 10 mm to 40 mm). *See*, *e.g.*, Market Research Report

at 3-4 (highlighting use of hybrid/clonal varieties to produce large-bulb garlic in India's "long-day" zone); *id.* at 12 (noting that native, local Indian varieties of garlic "typically have [a] smaller bulb diameter varying from 10-40 mm"); *id.* at 12-17 (contrasting local Indian varieties of garlic with special, hybrid/clonal varieties).[51]

The record evidence that the Chinese Producers cite clearly indicates that the large-bulb garlic grown in India is the product of special, hybrid/clonal seed.  The record evidence further seems to indicate that such seed is more expensive than the "indigenous" seed used by the Chinese Producers.  Commerce cannot impute to the Chinese Producers the added expense of special seed if the Chinese Producers would not have to incur such an expense if China were a market economy country.  *Cf.* Taian Ziyang Food Co. v. United States, 35 CIT ____, ____, 2011 WL 3024720 * 7-9 (2011) ("Taian Ziyang II") (discussing Commerce's decision on second remand in ninth administrative review not to value irrigation water, in light of evidence indicating that, *inter alia*, Chinese producers did not pay for irrigation water because they drew water from nearby rivers or wells on the land that they farm).  To the extent that the cost of such special, more expensive seed is embedded in the value for "A"- and "S.A."-grade garlic that was used in the Remand Determination, that value is not sufficiently product-specific to the Chinese Producers' garlic.  The

---

[51]*See also* Market Research Report at 5, 7-9, 11, 17-18 (discussing use of special, hybrid/clonal seed to grow large-bulb garlic in India's "long-day" zone).  Commerce does not dispute the Chinese Producers' statement that the special, hybrid/clonal garlic seed used to grow large-bulb Indian garlic is more expensive than other seed – a statement that is supported by the record in this and other related proceedings.  *See generally* Remand Determination at 10-11 (noting that Commerce "has concluded in several recent reviews that the size of . . . *garlic seed* . . . [is] given significant value in the marketplace," and, *inter alia*, discussing Agrifound Parvati (a hybrid/clonal variety) as an example of large-bulb garlic that is "sold at a higher price") (emphasis added).

Remand Determination's findings and reasoning on this matter therefore cannot be sustained on the strength of the existing record.

iii.   Azadpur APMC Data and "Farm Gate" Prices for Garlic Bulb as "Intermediate Input"

The Chinese Producers suggest that – apart from the higher cost of special hybrid/clonal garlic seed – yet another potential cause of the apparent price disparities discussed above (in section III.A.3.b.i) are "transportation related costs, fees and commissions" associated with garlic sales at the Azadpur APMC market.  *See* Pls. Comments at 11; *see generally id.* at 10-12; Pls. Reply Comments at 6-8; Remand Determination at 52 (summarizing Chinese Producers' concerns). According to the Chinese Producers, although Commerce is supposed to be determining a surrogate value for garlic bulb as an "intermediate input," the Azadpur APMC market is "*far removed* from intermediate input level," and the prices for "A"- and "S.A."-grade garlic that Commerce used in the Remand Determination do not "reflect[] anything close to farm gate prices." *See* Pls. Comments at 10-11; *see also* Pls. Reply Comments at 6-8; Remand Determination at 52 (summarizing Chinese Producers' concerns); Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1300 (cautioning that, "on remand, Commerce should be mindful that, when valuing an intermediate product in [a non-market economy] case, it must find a surrogate value *representative of that intermediate product*") (emphasis added).

The Chinese Producers argue that the Azadpur APMC market is not simply a local market, but, instead, is a "National Distribution Centre" for garlic and a "Market of National Importance." *See* Pls. Comments at 11; Pls. Reply Comments at 7; Remand Determination at 13 (noting that Azadpur APMC website states that Azadpur APMC market is a "National Distribution Centre" for

garlic, as well as a "Market of National Importance"); Azadpur APMC data (paragraph captioned "Background Information") (same).  And the Chinese Producers assert that "the vendors selling produce at [the Azadpur APMC market] are commission agents and wholesalers," not local Indian garlic growers.  *See* Pls. Comments at 11; *see also* Pls. Reply Comments at 7, 8; Remand Determination at 52 (summarizing Chinese Producers' concerns).

In addition, the Chinese Producers highlight the fact that the Azadpur APMC data indicate that garlic was delivered to the market from a number of different Indian states – none of which was the territory in which the market is located.  *See* Pls. Comments at 11;[52] *see also* Pls. Reply Comments at 7, 8; Remand Determination at 52 (summarizing Chinese Producers' concerns); Azadpur APMC data.  The Chinese Producers further note that the Azadpur APMC market is not located within the "long-day" zone that is "cited by the Market Research Report as the source of India's large-bulbed garlic."  *See* Pls. Comments at 11; *see also* Pls. Reply Comments at 7, 8; Market Research Report at 3-4, 6-7, 10-11, 13-18 (indicating that large-bulb garlic is grown in "long-day" regions of specified Indian states).  The Chinese Producers thus emphasize that all garlic marketed at the Azadpur APMC market has been shipped from elsewhere across India, and has been transported for some significant distance.  *See* Pls. Comments at 11-12; *see also* Remand Determination at 52  (summarizing Chinese Producers' concerns).

The Chinese Producers also maintain that "[i]t is . . . impossible to determine how many

---

[52]The Chinese Producers repeat Commerce's statement from the Remand Determination that the deliveries of "A"- and "S.A."-grade garlic reflected in the Azadpur APMC data were from seven Indian states.  *See* Pls. Comments at 11; Remand Determination at 13.  As discussed above, however, it appears that the Azadpur APMC data actually reflect such deliveries from only six states, and from "KOTA" (which seems to refer to a city).  *See* Azadpur APMC data.

middlemen were involved in resales of garlic from other provinces before it reached the Azadpur

APMC [market] or how many other transportation related costs, fees and commissions were incurred

and reflected in the prices reported in [the Azadpur APMC data]." *See* Pls. Comments at 11; *see*

*also* Remand Determination at 52 (summarizing Chinese Producers' concerns). And the Chinese

Producers conclude that, while such expenses "would help explain the substantially higher prices

[reflected in the Azadpur APMC data] as compared to other Indian prices," such expenses also

"make the [Azadpur APMC data] entirely unreliable as an 'intermediate input' surrogate value."

*See* Pls. Comments at 11; *see also* Pls. Reply Comments at 6-8.

The Remand Determination rejects the Chinese Producers' concerns about the expenses

associated with agents and other intermediaries involved in the sale of garlic at the Azadpur APMC

market as "without merit." *See* Remand Determination at 57. The Remand Determination asserts

that "[t]here is no record evidence to suggest the pervasiveness of intermediate distributors of garlic

in India." *See id.* The Government, too, dismisses the Chinese Producers' concerns as "mere

speculation," and argues that there is "absolutely no record evidence" of commissions and fees paid

to middlemen. *See* Def. Response at 14.

Commerce and the Government fail even to acknowledge (much less seek to explain) the

explicit reference in the Azadpur APMC data to the existence of "about 3664 Commission

Agents/Wholesalers" affiliated with the market, with the purpose of "safeguard[ing] the interests of

both producers/sellers and consumers." *See* Azadpur APMC data (paragraph captioned

"Background Information"); *see also*, *e.g.*, Market Research Report at 20 (distinguishing between

"farm level," "wholesale" level, and "retail level"); *id.* at 21 (describing Azadpur APMC market as

a "wholesale market[]" offering "wholesale prices" for garlic); Remand Determination at 14 (referring to "wholesalers and buyers" at Azadpur APMC market). This record evidence lends credence to the Chinese Producers' concerns about the likelihood that fees and commissions may be reflected in the Azadpur APMC prices, warranting Commerce's thorough review and consideration.

Commerce and the Government are equally dismissive of the Chinese Producers' concerns about the expense of shipping garlic to the Azadpur APMC market, and the likelihood that such transportation costs are reflected in the Azadpur APMC prices. The Remand Determination asserts, for example, that "there is no evidence that all of the 'A' and 'S.A.' [garlic was] transported extremely long distances to be sold in the [Azadpur] APMC market." *See* Remand Determination at 55-56. The Remand Determination further asserts that "the [Chinese Producers'] claim that 'none' of the 'A' and 'S.A.' garlic was grown locally is . . . unsupported by any evidence on the record." *See id*. at 56. Similarly, the Government states that the Chinese Producers "*speculate* that [the Azadpur APMC] data *might* contain prices distorted by 'transportation related costs.'" *See* Def. Response at 14 (initial emphasis added).

Again, however, Commerce and the Government have turned a blind eye to the record in this matter. It is beyond cavil that none of the garlic (of any grade) reflected in the Azadpur APMC data was delivered to the market from the territory in which the market is located. *See* Azadpur APMC data. It is thus indisputable that – notwithstanding Commerce's assertion in the Remand Determination – *none* of the "A"- and "S.A."-grade garlic reflected in the Azadpur APMC data was delivered to the market "locally." *Compare* Remand Determination at 56. And review of the

Azadpur APMC data demonstrates that at least some of the garlic reflected in those data was transported for substantial distances to be delivered to the Azadpur APMC market.  *See* Azadpur APMC data (indicating, *e.g.*, receipt of garlic from state of Himachal Pradesh, whose closest border to the Azadpur APMC market is roughly 125 miles "as the crow flies" from that market).[53]

This record evidence of the transportation of the garlic sold at the Azadpur APMC market, and the apparent involvement of intermediaries in those sales, substantiates the Chinese Producers' concerns that the prices included in the Azadpur APMC data may include costs, fees, and commissions that hike up the prices.  As such, the evidence undermines Commerce's claims that the Azadpur APMC data reflect the price of large-bulb Indian garlic at the "farm gate" and that those data therefore are representative of the value of the "intermediate input" at issue here.[54]  The issues

---

[53]The Remand Determination's assertion is actually an attempt to refute a "claim that 'none' of the 'A' and 'S.A.' garlic was *grown* locally."  *See* Remand Determination at 56.  But, in making their point here, the Chinese Producers make no reference to where the garlic at issue was "grown." Nor could the Chinese Producers do so, since (as discussed above) it appears that the Azadpur APMC data may not necessarily indicate where garlic sold at the market was grown, but only where that garlic was located before it was transported to the Azadpur APMC market.  *See* Azadpur APMC data (column captioned "Name of the Comm. & State"); section III.A.2.b, *supra* (explaining that record does not establish that geographic location listed in the Azadpur APMC data is necessarily the place where the produce was grown).

The Chinese Producers' point here is simply that none of the garlic sold at the Azadpur APMC market was located in the territory where that market is located, such that all of the garlic sold at the market had to be transported some distance from the state in which it was located in order to be delivered to the market – and that the costs of such transportation logically would be reflected in the price at the Azadpur APMC market.  Moreover, if the garlic was actually grown somewhere other than where it was located before it was transported to the market, that can only mean that even more transportation was required (*i.e.*, transportation from where the garlic was actually grown to its location immediately prior to shipment), which would presumably further increase the transportation costs reflected in garlic prices at the Azadpur APMC market.

[54]As the Chinese Producers observe, it appears that the Remand Determination may have lost sight of the fact that what is assertedly being valued here is an "intermediate input," as a proxy for

raised by the Chinese Producers warrant Commerce's thorough review and reconsideration on

remand.[55]

### iv.  Conclusion

The Remand Determination asserts that Commerce here is "seeking to select as a surrogate

value . . . [a price] that is highly specific to the product in question," and a price that also represents

the "intermediate input" at issue – *i.e.*, raw garlic bulb as it is harvested, at the "farm gate," with no

_____

the Chinese Producers' "growing" and "harvesting" factors of production. *See* Pls. Reply Comments at 7-8.  Although it seems clear that the price of "A"- and "S.A."-garlic at the Azadpur APMC market must include at least some margin of profit, there is no indication in the Remand Determination that Commerce has accounted for that fact in any fashion.  To the extent that prices at the Azadpur APMC market reflect additional post-harvesting costs, they cannot be deemed prices for the "intermediate input" at issue.  On remand, Commerce must consider this matter and make any necessary adjustments.

[55]Emphasizing that "the record shows that the [prices reflected in the Azadpur APMC data] are significantly higher than prices for other large sized garlic," the Chinese Producers reiterate that "there are clearly other factors inflating and distorting [the Azadpur APMC] prices."  *See* Pls. Comments at 13.  The Chinese Producers further argue that, although Commerce adjusted the Azadpur APMC data to account for the 6% market fee, "the garlic sold at the Azadpur APMC [market] is sourced from throughout India," such that it is possible that "shipments could well [have been] subject to additional excises or local taxes prior to reaching the [Azadpur APMC market]." *See id.*; *see also* Remand Determination at 53 (summarizing Chinese Producers' concerns); *but see id.* at 59 (asserting that "there is . . . no indication that the Azadpur APMC prices are *not* tax exclusive," and arguing that – whether or not the Azadpur APMC data are tax exclusive – it "is certainly not a reason for wholesale rejection" of those data); Def. Response at 8, 14 (same).

The Remand Determination expressly notes that "[i]n selecting a surrogate value, 'it is [Commerce's] stated practice to use . . . prices that are net of taxes and import duties.'" *See* Remand Determination at 6 (*quoting* Policy Bulletin 04.1); *see also* Def. Response at 6 (same).  However, the Remand Determination fails to make any affirmative finding that the Azadpur APMC data used in the Remand Determination's calculations are net of charges such as those identified by the Chinese Producers and contemplated by Commerce's standard practice.  On remand, Commerce shall give careful consideration to this matter, and shall make an affirmative determination – supported by substantial evidence – as to whether whatever value the agency uses in its remand results is net of any such charges.

further processing or handling, and including no additional charges.  *See* Remand Determination at

6, 56.  However, a number of the points made by the Chinese Producers seriously undermine any

claim that the Azadpur APMC data are "highly product-specific" (or even sufficiently so).  *See* Def.

Response at 13.

     As discussed above, the Remand Determination never directly confronts the ample record

evidence indicating that the relatively high value derived from the Azadpur APMC data and used

in the Remand Determination is attributable to factors other than the large size of the garlic bulb,

including, for example, the cost of special, hybrid/clonal seed that is needed to grow large-bulb

garlic in India, and additional costs such as the expenses associated with agents and wholesalers, as

well as other transportation-related costs, fees, and commissions.[56]  For all the reasons outlined

above,  Commerce's determination that the Azadpur APMC data are "product specific" to the

Chinese Producers' raw garlic bulb at the "farm gate" is not supported by substantial record

evidence, and therefore cannot be sustained.[57]

---

    [56]At several points, the Remand Determination dismisses potential problems with the Azadpur APMC data with a conclusory assertion that the data are the "best available information" (or words to that general effect).  *See, e.g.*, Remand Determination at 56, 57.  The Remand Determination seems to suggest that any problems with the data will necessarily preclude its use. As a general matter, however, it is often the case that issues can be addressed by some sort of accounting and adjustment (rather than wholesale rejection of the data source), such that there is no need to "throw the baby out with the bath water."

    [57]Significantly, the Remand Determination misstates the holding of Zhengzhou Harmoni I. The Remand Determination suggests that Zhengzhou Harmoni I precludes Commerce from relying on the Agmarket data that the agency relied on in the Final Results.  *See, e.g.*, Remand Determination at 5 (asserting that Zhengzhou Harmoni I "found that the Agmarket data was unsuitable as a surrogate value source"); *id*. at 8 (asserting that Zhengzhou Harmoni I "determined that the Agmarket data were unrepresentative" of the Chinese Producers' garlic); *see also* Def. Response at 9 (same).  But, in fact, there is nothing whatsoever in Zhengzhou Harmoni I that prevents Commerce from relying on Agmarknet data, provided that the record is supplemented with

### 4.  Commerce's Continued Use of "Intermediate Input" Methodology

Acknowledging that Zhengzhou Harmoni I held that Commerce's "intermediate input" methodology *may* be used in this case, the Chinese Producers underscore that "[Commerce] is still obligated to calculate margins as accurately as possible," and that Commerce "is not *required* to use [the] intermediate input methodology."  *See* Pls. Comments at 17 (emphasis added); Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1289-95 (sustaining Commerce's use of intermediate input methodology).  The Chinese Producers note that Zhengzhou Harmoni I "specifically instructed Commerce to find a surrogate value representative of the intermediate input [garlic] garlic bulb," rather than a finished product. *See* Pls. Comments at 17; Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1300.  But, according to the Chinese Producers, Commerce has failed to do so.  *See* Pls. Comments at 17.  The Chinese Producers contend that "a greater distortion is being caused by the use of the [Azadpur APMC data] as a surrogate for intermediate input garlic than would result

_____

evidence to document the characteristics of the garlic variety (or varieties) reflected in the Agmarknet data that the agency chooses to use, and provided that the other issues identified in Zhengzhou Harmoni I are satisfactorily addressed.  *See generally* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1295-1301 (analyzing "Garlic Bulb Valuation").

Even more to the point, while Commerce asserts that it was precluded from using the Agmarknet data because those data do not describe the characteristics of the garlic varieties reflected in the data, the data that Commerce chose to use instead – the Azadpur APMC data – suffer from the exact same shortcoming.  As discussed above, the Azadpur APMC data do not themselves provide descriptions of the "A"- and "S.A."-grade garlic reflected therein. *See* Azadpur APMC data; section III.A.3.a, *supra*.  Accordingly, as discussed above, Commerce had to rely on the Market Research Report and a submission by the Domestic Producers for descriptions of the grades of garlic reflected in the Azadpur APMC data. *See id*., *supra*.  Just as Commerce, on remand, looked to other sources to compensate for the lack of descriptive information in the Azadpur APMC data, so too Commerce could look to other sources to establish the characteristics of garlic varieties reflected in the Agmarknet or other data.

from using [the Chinese Producers'] actual growing [and harvesting] factors [of production]."  *See* Pls. Comments at 17-18; *see also* Pls. Reply Comments at 11.  The Chinese Producers conclude that Commerce's use of the intermediate input methodology should be reconsidered in this instance.  *See generally* Pls. Comments at 16-18; Pls. Reply Comments at 10-11.

The Government's argument in response – that there is nothing to indicate that the Azadpur APMC data "do not bear a reasonable and rational relationship to the [intermediate input] garlic bulb being valued" – is belied by record evidence.  *See* Def. Response at 15-16; *see also*, *e.g.*, section III.A.3, *supra*.  As the Chinese Producers correctly observe, "[e]ven if Commerce believes that the growing factors reported by [the Chinese Producers] are not perfect, their use is preferable to the use of an improper surrogate value for intermediate input garlic [bulb] that creates an *even larger distortion*."  *See* Pls. Comments at 17.

At this time, it would be premature to prohibit Commerce from using the intermediate input methodology and to require it to use its standard factors of production methodology, as the Chinese Producers suggest.  *See* Pls. Comments at 17-18.  On the other hand, Commerce must use whatever methodology will result in the most accurate antidumping margin, consistent with its statutory obligation to "establishe[] antidumping margins as accurately as possible."  *See* Ningbo, 580 F.3d at 1257 (explaining that, "[i]n determining the valuation of . . . factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible" (*quoting* Shakeproof, 268 F.3d at 1382) (internal quotation marks omitted)).

If Commerce cannot establish an accurate surrogate value for garlic bulb as an intermediate

input, then Commerce must use its standard factors of production methodology to calculate surrogate values for the Chinese Producers' garlic seed and other growing and harvesting factors of production.   Commerce cannot reject the Chinese Producers' reported factors of production information as "imperfect" and use the intermediate input methodology instead "without considering the ultimate consequences of its alternative approach to the overall accuracy of the dumping margins."  *See* Pls. Comments at 17; *see also* Pls. Reply Comments at 10-11.

### 5.  Conclusion

As set forth above, Commerce has failed to adequately explain and support its determination that the Azadpur APMC data used in the Remand Determination to value garlic bulb as an "intermediate input" constitute the "best available information" for that purpose.  Serious issues exist as to the contemporaneity, representativeness, and product specificity of those data.  Indeed, as discussed above, record evidence suggests that Commerce may not have valued the intermediate input at all, and – instead – may have valued a final product.

Accordingly, this issue must be remanded for further consideration not inconsistent with the analysis herein.  On remand, Commerce shall reopen the record to evidence on the valuation of garlic bulb (as well as evidence on the valuation of garlic seed, should any party wish to make such a proffer in the context of an argument for application of Commerce's standard factors of production methodology).  Commerce shall accept further evidence from both parties, in addition to any information that the agency wishes to place on the record; and Commerce shall allow the parties sufficient time to submit further evidence and to respond to any further information that may be placed on the record by others.  Commerce shall ensure that, if it continues to employ its

intermediate input methodology, it is in fact valuing garlic bulb as an intermediate input, and that any necessary adjustments have been made to the data in order to account for, extract, and exclude any and all post-harvesting costs.[58]  Finally, Commerce shall allow the parties sufficient time to provide comments on the agency's draft results of the remand.

## B.  Labor Expenses

The antidumping statute provides that, in non-market economy cases such as this, the surrogate data used to calculate the value of factors of production must, to the extent possible, come from market economy countries that are at "a level of economic development comparable to that of the nonmarket economy country" at issue – in this case, China.  *See* 19 U.S.C. § 1677b(c)(4)(A). The antidumping statute further provides that, in such cases, the surrogate data must, to the extent possible, come from market economy countries that are "significant producers of comparable merchandise."  *See id.*

For most factors of production, Commerce typically uses values from a single market economy country (known as the "surrogate country" – here, India) that Commerce has determined to be both (a) economically comparable to the non-market economy country in question and (b) a significant producer of the goods at issue.  *See* 19 C.F.R. § 351.408(c)(2).  But Zhengzhou Harmoni I explained that Commerce treats the cost of labor quite differently than other factors of production. *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1301-02; *see generally* Dorbest Ltd.

---

[58]Nothing herein should be read to preclude Commerce from continuing to rely on Azadpur APMC data, provided that the record is supplemented to adequately address the concerns outlined herein.

v. United States, 604 F.3d 1363, 1368 (Fed. Cir. 2010).

Concerned about wide variances in wage rates between comparable economies, Commerce historically has valued the cost of labor in an NME country case by using a regression-based wage rate "reflective of the observed relationship between wages and national income in a variety of market economy countries." *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1302 (internal quotation marks and citations omitted). Thus, "unlike its valuation of other factors of production in [a non-market economy country] case, Commerce [has based] its surrogate wage rate on data from a broad 'basket' of countries, and [has] not limit[ed] itself to market economy countries at a level of economic development comparable to the [non-market country] in question." *See id.*, 33 CIT at ____, 617 F. Supp. 2d at 1302.

In the Final Results, Commerce calculated the respondent Chinese producers' labor costs using the agency's regression-based wage rate calculation methodology, as set forth in the agency's regulations, to establish a surrogate wage rate for China. *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1302-03; 19 C.F.R. § 351.408(c)(3). The Final Results calculated the appropriate surrogate value for the wage rate at $0.97/hour. *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1303; *see generally* Issues and Decision Memorandum at 47-51. The Chinese Producers challenged both the facial validity of Commerce's regression-based methodology and the agency's application of that methodology in the instant administrative review. *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1301-03.

Specifically, the Chinese Producers argued, *inter alia*, that Commerce designated India as the primary surrogate market economy in this case, but – rather than using the Indian surrogate wage

rate – Commerce used the regression-based methodology established in its regulations to calculate

a wage rate that is "400% higher than India's actual wage rate . . . and much higher than the wage

rates of other countries found to be economically comparable to China." *See* Zhengzhou Harmoni

I, 33 CIT at ____, 617 F. Supp. 2d at 1303 (internal quotation marks and citation omitted).  The

Chinese Producers asserted, *inter alia*, that Commerce's regulation and its application in this case

were in conflict with the statutory requirement that Commerce value factors of production using

surrogate values from market economy countries that are both economically comparable and

significant producers of the goods comparable to those at issue.  *See id.*, 33 CIT at ____, 617 F.

Supp. 2d at 1301-05; *see generally id.*, 33 CIT at ____, 617 F. Supp. 2d at 1301-07.

Relying heavily on Allied Pacific II (which held Commerce's regulation to be inconsistent

with the statute), Zhengzhou Harmoni I remanded the issue of the valuation of the labor factor of

production to Commerce for further consideration.  *See* Zhengzhou Harmoni I, 33 CIT at ____, ____

& n.30, ____, 617 F. Supp. 2d at 1301, 1305-07 & n.30, 1334; Allied Pacific Food (Dalian) Co. v.

United States, 32 CIT ____, ____, 587 F. Supp. 2d 1330, 1351-61 (2008) ("Allied Pacific II").  On

remand, Commerce nevertheless continued to use a regression-based methodology, albeit one that

was slightly revised.  *See generally* Remand Determination at 15-38, 59-68.[59]  According to

---

[59]On remand, Commerce used a somewhat updated version of the regression-based methodology that it had previously employed in this administrative review, pursuant to the agency's so-called "Revised Methodology Notice."  *See* Remand Determination at 24-25; Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, 71 Fed. Reg. 61,716, 61,719-23 ("Revised Methodology Notice").  Among other things, while the prior methodology considered a total of six years of wage data, the revised methodology considered only two years of data, in an effort to enhance the accuracy of Commerce's calculation of non-market economy wages. *See* Revised Methodology Notice, 71 Fed. Reg. at 61,721; *see also* Remand Determination at 26-27.

Commerce, the agency "analyzed all of the information on the administrative record, revised its

methodology to be consistent with its [then-]current practice, concluded that its revised

methodology [produced] the 'best available information' on the record," and sought to "explain[]

how its methodology [was] consistent with the requirements of [the statute]." *See id*. at 16.  Besides

limiting the data set to just two years of wage data (2002 and 2003), Commerce also modified the

data set on remand to include all countries for which suitable data are available, rather than limiting

the data to those countries utilized in the Final Results. *See id*. at 24-25, 26-27.  The resulting

calculation produced a regression-based surrogate wage rate of $0.80/hour for China. *See id*. at 68.

All told, Commerce devoted roughly 30 pages of the Remand Determination to attempts to

explain and defend the agency's regression-based methodology and its resulting determination in

this case.  *See generally* Remand Determination at 16-38, 59-68.  In the meantime, however, the

Court of Appeals handed down its decision in <u>Dorbest</u>, striking down Commerce's regulation as

inconsistent with the plain language of the statute. *See generally* <u>Dorbest</u>, 604 F.3d at 1366, 1369-

73.  The Court of Appeals concluded that the agency's regulation "improperly requires using data

from both economically comparable and economically dissimilar countries, and . . . improperly uses

data from both countries that produce comparable merchandise and countries that do not." *See id*.,

604 F.3d at 1372 (discussing 19 C.F.R. § 351.408(c)(3)).  The Court therefore held Commerce's

regulation to be invalid on its face:

> To the extent that 19 C.F.R. § 351.408(c)(3) requires or at least permits the use of
> labor value data from countries that are not economically comparable to the
> non-market economy country in question or are not significant producers of
> merchandise comparable to the merchandise in question when data from countries
> meeting both criteria are available, the regulation is facially invalid as noncompliant
> with [the statute].

Dorbest, 604 F.3d at 1377.[60]

Armed with Dorbest, the Chinese Producers have renewed their plea for the court to "reject Commerce's continued use of the invalidated regression-based wage rate calculation and remand this issue to Commerce with instructions to use available wage rate information that satisfies both requirements of 19 U.S.C. § 1677b(c)(4)." See Pls. Comments at 18-19. The Government generally concurs, requesting a voluntary remand to allow Commerce to recalculate the surrogate value for labor expenses in a manner consistent with Dorbest. See Def. Response at 30-31. The Domestic Producers "[do] not oppose a short remand." See Def.-Ints. Reply Comments at 3.

In light of the position of the Chinese Producers and the Government's request for a voluntary remand, this matter must be remanded. On remand, Commerce shall recalculate labor expenses in accordance with Dorbest and the plain language of the statute; and Commerce shall allow sufficient time for the submission of comments on the agency's draft results of the remand.

## C.  Valuation of Ocean Freight

Zhengzhou Harmoni I sustained the Chinese Producers' challenge to the surrogate value that Commerce calculated for the respondent Chinese producers' ocean freight costs, which was based

---

[60]Dorbest did not completely foreclose Commerce's use of data from countries that are not economically comparable and/or are not significant producers of the subject merchandise. The Court of Appeals explained that, if Commerce were to "show in an appropriate situation that using the data Congress has directed Commerce to use is impossible," then "Commerce would be free to use whatever data it felt were appropriate to use to determine labor rates, presuming that Commerce remained within the bounds of 19 U.S.C. § 1677b(c)(1), which requires Commerce to use the 'best available information regarding the values of' the factors of production." See Dorbest, 604 F.3d at 1372.

on rate quotes from Maersk Sealand for shipment in refrigerated containers.  Zhengzhou Harmoni I therefore remanded the matter to the agency, with instructions to reconsider the issue.  *See generally* Zhengzhou Harmoni I, 33 CIT at ____, ____, 617 F. Supp. 2d at 1307-12, 1334.

Zhengzhou Harmoni I noted that the Chinese Producers placed on the record four different sets of data on ocean freight costs.  *See* Zhengzhou Harmoni I, 33 CIT at ____ & n.32, 617 F. Supp. 2d at 1307 & n.32; *see generally* Issues and Decision Memorandum at 59-62.  One set of data consisted of Maersk rates for refrigerated containers on which Commerce relied in the Final Results.  *See id*. at 61-62; Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1307-08.  The Chinese Producers emphasized, however, that those rates were submitted for the sole purpose of demonstrating to Commerce that the Maersk "general cargo" rates used in the agency's Preliminary Results were aberrational, because they included additional charges that were not incurred by any of the Chinese producers.  *See id*., 33 CIT at ____, 617 F. Supp. 2d at 1307-08; *see also* Issues and Decision Memorandum at 59-60.

In addition to the Maersk rates for refrigerated containers, the Chinese Producers placed on the record three other sources of data.  The second data set submitted by the Chinese Producers consists of public versions of the actual ocean freight rates paid by certain of the Chinese producers, reflecting multiple shipments using a number of different market economy carriers throughout the period of review.  *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1307.  Because the exact prices that were paid are proprietary information, the publicly available prices on the record are ranged within (plus or minus) 10% of the exact prices.  *See id*., 33 CIT at ____, 617 F. Supp. 2d at 1307.  The third data set placed on the record by the Chinese Producers is taken from the

Descartes database (an online, fee-based subscription service), and reflects shipping rates for multiple carriers covering the entire period of review.  *See id.*, 33 CIT at ____, 617 F. Supp. 2d at 1307-08.[61]  The fourth and final data set proffered by the Chinese Producers consists of public price quotes from Evergreen Marine (another carrier) that do not include certain additional charges reflected in the Maersk rates.  *See id.*, 33 CIT at ____ & n.32, 617 F. Supp. 2d at 1307 & n.32.

In the Final Results, Commerce determined that the Maersk rates for refrigerated containers were the "best available information," reasoning that the rates are "publicly available" and that they were "more applicable" than the Maersk rates for "general cargo" that the agency had used in the Preliminary Results, since "garlic is generally shipped in refrigerated containers."  *See* Issues and Decision Memorandum at 61-62; Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1307.  In reaching that conclusion, the Final Results dismissed the publicly available ranged data on the actual shipping expenses of certain of the Chinese producers, invoking general agency policies favoring the use of public information and discouraging the use of ranged data.  *See* Issues and Decision Memorandum at 60-61; Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1307.  The Final Results also rejected the Descartes data, asserting that they could not be corroborated because Commerce does not subscribe to the Descartes service.  *See* Issues and Decision Memorandum at 61; Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1307-08.  And the Evergreen Marine rates were rejected on the grounds that they "are not as specific to the subject

---

[61]The Descartes Carrier Rate Retrieval database is a web-based service similar to the World Trade Atlas (another online, fee-based database), which publishes the ocean freight charges of numerous carriers to destinations worldwide.  *See* Zhengzhou Harmoni I, 33 CIT at ____,  617 F. Supp. 2d at 1307-08; Remand Determination at 39.

merchandise" as other sets of data.  *See* Issues and Decision Memorandum at 61; Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1308.

As Zhengzhou Harmoni I noted, however, the Chinese Producers objected to the Final Results' use of the Maersk rates for refrigerated containers.  In particular, the Chinese Producers explained that those rates are significantly inflated because they reflect (1) "a Qingdao-to-Hong Kong-to-U.S. shipping route that . . . no [Chinese producer] used" and (2) the "PRC arbitrary charge" – a charge of $1200 per container that is imposed on cargo that is transported through Hong Kong – that no respondent in this review actually incurred.  *See* Zhengzhou Harmoni I, 33 CIT at ____ & n.33, 617 F. Supp. 2d at 1308 & n.33; *see also* Issues and Decision Memorandum at 59-60, 61.  Zhengzhou Harmoni I further noted that, in addition to the Maersk rates for refrigerated containers, the record also included "ample alternative data that Commerce failed to adequately consider."  *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1308.

For example, Zhengzhou Harmoni I observed that, in the past, Commerce has frequently used publicly available ranged data to value relatively minor inputs, and, in fact, that Commerce had used the Chinese producers' actual ranged rate data to value ocean freight in the eighth administrative review of the antidumping duty order at issue here.  *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1309-10.  Zhengzhou Harmoni I similarly pointed out that, notwithstanding claims to the contrary, Commerce has relied on Descartes data in the past to value international freight expenses in non-market economy cases.  *See id.*, 33 CIT at ____ & n.36, 617 F. Supp. 2d at 1310-11 & n.36.  As to the last set of data, Zhengzhou Harmoni I noted that, unlike the Maersk data used in the Final Results, the Evergreen Marine rates avoided the circuitous

Qingdao-to-Hong Kong-to-U.S. shipping route that none of the Chinese producers actually used. *See id.*, 33 CIT at ____, 617 F. Supp. 2d at 1311. <u>Zhengzhou Harmoni I</u> concluded that, in selecting the Maersk rates for refrigerated containers, the Final Results both "failed to adequately explain why the Maersk data . . . [were] appropriately representative" and "failed to sufficiently analyze [the] alternative sources of data." *See id.*, 33 CIT at ____, 617 F. Supp. 2d at 1308; *see also id.*, 33 CIT at ____, 617 F. Supp. 2d at 1311-12.

On remand following <u>Zhengzhou Harmoni I</u>, Commerce re-evaluated all sets of data on the record – including the Maersk data, the Descartes data, and the publicly available ranged data on the prices paid by certain of the Chinese producers. *See* Remand Determination at 39. Based on that review, Commerce determined that "the best available information with which to value ocean freight is price data obtained from the Descartes database for routes between [China] and both the East and West coasts of the United States." *See id.*

In the course of the remand, Commerce learned that government agencies may access the Descartes database without charge, assuaging the agency's earlier concerns about the public availability of the service and the agency's ability to verify the Descartes data. *See* Remand Determination at 39-40. The Remand Determination explains that the Descartes data "are based on routes that more closely correspond to routes used by [the Chinese producers], avoiding Hong Kong altogether," and that they are "free of any additional fees or charges" that the Chinese producers did not incur. *See id.* at 39. The Remand Determination further notes that the Descartes data are "specific to the shipment of refrigerated garlic" and "reflect the rates of many carriers" for "every month throughout the [period of review]." *See id.*

The Remand Determination acknowledges that the Maersk data provide rates for only a single carrier, and, in addition, are "not specific to the shipment of fresh garlic." *See* Remand Determination at 38-39. The Remand Determination therefore concluded that the Descartes data are preferable to the Maersk data, because the Descartes data "present contemporaneous data that better match the product in question." *See id.* at 41. The Remand Determination further determined that the Maersk data are "less reflective of the [Chinese producers'] experience than the Descarta data." *See id.*

The Remand Determination also continues to decline to use the publicly available ranged versions of the actual market economy ocean freight rates paid by certain of the Chinese producers. *See generally* Remand Determination at 40-41. The Remand Determination reiterates that Commerce "prefers to draw its surrogate value sources from public information whenever possible," and that it is therefore the agency's "long-standing policy" to "use[] ranged data only when no better alternatives can be found." *See id.* at 40. In light of the availability of the Descartes data here, the Remand Determination concludes that "there is no need to resort to use of . . . ranged data." *See id.* at 41.

The Remand Determination decided against the data from Evergreen Marine as well, explaining that – although the Evergreen data also reflect prices for "refrigerated cargo" – the Descartes data specify that the "prices for refrigerated cargo include[] 'fresh fruits and vegetables.'" *See* Remand Determination at 41. The Remand Determination concludes that there is "no need to value ocean freight using less product-specific data." *See id.*

No party has filed comments on Commerce's Remand Determination on this issue. Because

Commerce's redetermination on remand is consistent with <u>Zhengzhou Harmoni I</u>, and is supported by substantial evidence and otherwise in accordance with law, the Remand Determination on the valuation of ocean freight costs must be sustained.

### D.   <u>Valuation of Plastic Jars and Lids</u>

In <u>Zhengzhou Harmoni I</u>, the Chinese Producers prevailed on their challenge to the Final Results' surrogate valuation of the plastic jars and lids used to pack garlic.  As <u>Zhengzhou Harmoni I</u> explained, the Final Results valued plastic jars and lids using a surrogate value derived from World Trade Atlas import statistics provided by the Domestic Producers for two broad  provisions of the Indian Harmonized Tariff Schedule ("HTS") – specifically, HTS subheading 3923.3090, a "basket" provision covering "[c]arboys, bottles, flasks and similar articles of plastics, [not either specified or included]," and HTS subheading 3923.5000, covering "[s]toppers, lids, caps and other closures of plastics."  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, ____, 617 F. Supp. 2d at 1322, 1324; Factors Valuations for the Preliminary Results of the Administrative Review and New Shipper Reviews (Admin. Record Pub. Doc. 400) at 14-16; *see also* Def. Response at 29  (acknowledging that Indian import statistics are for "a basket category"); *see generally* Issues and Decision Memorandum at 66-69.  In so doing, the Final Results rejected the other alternative source of data on the record – specifically, four domestic price quotes submitted by the Chinese Producers, which were obtained from three different Indian vendors in three different cities, and are for jars and lids like those used by the Chinese producers.  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1322; *see generally* Issues and Decision Memorandum at 66; Respondents' Surrogate Value Submission

(Admin. Record Pub. Doc. 81), Exh. 21 (domestic price quotes for jars and lids).[62]

The Final Results rejected the four domestic price quotes because they assertedly do not constitute "publicly available" information, because two of the four price quotes are not "contemporaneous" with the period of review, and because, according to Commerce, the four price quotes are not "representative" – that is, according to Commerce, the quotes do not "reflect broad market averages" and do not "cover a substantial time period throughout the [period of review]," and thus, Commerce suggests, may reflect "temporary market fluctuations." *See* Issues and Decision Memorandum at 67; *see also* <u>Zhengzhou Harmoni I</u>, 33 CIT at _____, 617 F. Supp. 2d at 1322-23 (discussing "public availability" of price quotes); *id.*, 33 CIT at _____ n.53, 617 F. Supp. 2d at 1323 n.53 (discussing "contemporaneity" and "representativeness" of price quotes).

As <u>Zhengzhou Harmoni I</u> noted, however, although the domestic price quotes may not have fully satisfied Commerce's criteria for use in evaluating potential surrogate values (as set forth in Policy Bulletin 04.1), the Final Results significantly "overstated [the] concerns as to the reliability of the [domestic price quotes] at the same time that [the Final Results] significantly understated the

---

[62]As explained in section III.D.4 below, there is some confusion concerning the number of price quotes for jars and lids on the administrative record of this action. *See* section III.D.4, *infra*.

As discussed herein, the administrative record in this action includes four domestic price quotes for jars and lids, from three different Indian vendors in three different cities. Those four price quotes are the exact same price quotes for jars and lids that are included in the administrative record of the prior (ninth) administrative review, which is the subject of <u>Taian Ziyang</u>. *See* Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 81), Exh. 21 (four domestic price quotes for jars and lids, dated October 8, 2004, November 6, 2004, and November 22, 2004); <u>Taian Ziyang II</u>, 35 CIT at _____ nn.45 & 46, 2011 WL 3024720 * 29 nn.45 & 46 (explaining that administrative record in <u>Taian Ziyang</u> includes four domestic price quotes for jars and lids, dated October 8, 2004, November 6, 2004, and November 22, 2004).

obvious infirmities in the Indian import statistics" on which the Final Results relied.  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at \_\_\_\_, 617 F. Supp. 2d at 1327.

### 1.  The Final Results' Treatment of the Domestic Price Quotes

<u>Zhengzhou Harmoni I</u> explained that Commerce's concerns about the lack of "public availability" of the price quotes are based on the potential for "manipulation."  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at \_\_\_\_, 617 F. Supp. 2d at 1322; Issues and Decision Memorandum at 66 (referring to "the possibility of . . . manipulation of documents prepared specifically for use in antidumping proceedings").  But, as <u>Zhengzhou Harmoni I</u> pointed out, the administrative record includes no affirmative evidence of distortion or manipulation, or evidence of any collusion or affiliation tainting the price quotes at issue here.  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at \_\_\_\_, 617 F. Supp. 2d at 1322.  Thus, in the Final Results, Commerce – in effect – presumed distortion and affiliation, based on nothing more than speculation and conjecture.  *See id.*, 33 CIT at \_\_\_\_, 617 F. Supp. 2d at 1322-23.  Moreover, most of the concerns that the Final Results raised vis-a-vis the price quotes in this case are inherent in price quotes, as well as other types of non-publicly available information.  Yet, as <u>Zhengzhou Harmoni I</u> observed, Commerce does not reject such information across the board.  To the contrary, Commerce has relied on non-publicly available information – including price quotes – in numerous other cases in the past.  *See id.*, 33 CIT at \_\_\_\_, 617 F. Supp. 2d at 1315.

<u>Zhengzhou Harmoni I</u> was equally skeptical about the second basis for rejecting the price quotes.  <u>Zhengzhou Harmoni I</u> noted that the Final Results emphasized that "two of the four price quotes . . . fall outside of the [period of review]."  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at \_\_\_\_ n.53,

617 F. Supp. 2d at 1323 n.53 (*quoting* Issues and Decision Memorandum at 67) (internal quotation marks omitted; alteration in original).   However, as <u>Zhengzhou Harmoni I</u> explained, the "contemporaneity" of data is not necessarily as critical as the Final Results suggested.   *See* Issues and Decision Memorandum at 67 (stating that Commerce "values contemporaneity highly").

<u>Zhengzhou Harmoni I</u> pointed to <u>Hebei Metals II</u>, which held that contemporaneity is "insufficient to explain why an import price is the best available information."   *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____ n.53, 617 F. Supp. 2d at 1323 n.53 (internal quotation marks omitted) (*quoting* <u>Hebei Metals II</u>, 29 CIT at 301, 366 F. Supp. 2d at 1275).   And, to the same general effect, <u>Zhengzhou Harmoni I</u> quoted <u>Dorbest I</u>, which observed that "contemporaneity, in and of itself[,] should not be viewed as the sole reason to discard data; rather the quality of the data needs to be viewed in its totality."   *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____ n.53, 617 F. Supp. 2d at 1323 n.53 (internal quotation marks omitted; alteration in original) (*quoting* <u>Dorbest I</u>, 30 CIT at 1695 n.14, 462 F. Supp. 2d at 1284 n.14).

<u>Zhengzhou Harmoni I</u> similarly questioned the Final Results' emphasis on the "representativeness" of the domestic price quotes.   *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____ n.53, 617 F. Supp. 2d at 1323 n.53.   The Final Results asserted that "even the [two] contemporaneous price quotes on the record . . . do not represent a broad market average," and that "[f]our price quotes . . . obtained within two months could easily be subject to temporary market conditions."   *See* Issues and Decision Memorandum at 67; *see also id.* (referring to potential "temporary market fluctuations").   However, <u>Zhengzhou Harmoni I</u> explained that, as with the partial lack of contemporaneity, the fact that the price quotes were not dated from throughout the period of review

"does not necessarily warrant the rejection (in whole or in part) of those data." *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at _____ n.53, 617 F. Supp. 2d at 1323 n.53.  <u>Zhengzhou Harmoni I</u> noted that, while a preference for price data reflecting a substantial period of time (rather than data from a shorter period of time) may be reasonable where Commerce is deciding between two equally accurate surrogate values, the overall "calculus" is different where – as here – the data that are assertedly more "representative" are plagued with other infirmities.  *See id.*, 33 CIT at _____ n.53, 617 F. Supp. 2d at 1323 n.53.

### 2.  <u>The Final Results' Treatment of the Indian Import Statistics</u>

<u>Zhengzhou Harmoni I</u> observed that the Final Results not only sought to emphasize the potential shortcomings of the domestic price quotes (as discussed above), but, in addition, sought to minimize the evident and admitted flaws in the Indian import statistics on which the Final Results relied.

As a threshold matter, <u>Zhengzhou Harmoni I</u> highlighted Commerce's longstanding policy favoring the use of domestic data, rather than import statistics (all other things being equal) – a general policy that the agency did not honor here.  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at _____, 617 F. Supp. 2d at 1324; *see also id.*, 33 CIT at _____ & nn.44-45, 617 F. Supp. 2d at 1316 & nn.44-45.  And <u>Zhengzhou Harmoni I</u> also took note of two basic problems specific to the Indian import statistics that Commerce used, which have the effect of distorting the surrogate value for jars and lids in this case.

<u>Zhengzhou Harmoni I</u> first noted that it is "irrefutable" that the domestic price quotes are more "product specific" than the Indian import statistics on which the Final Results relied.  *See*

Zhengzhou Harmoni I, 33 CIT at _____, 617 F. Supp. 2d at 1324 (internal quotation marks omitted).

As Zhengzhou Harmoni I explained, HTS subheading 3923.3090 – the subheading that Commerce is using for import statistics on plastic jars – covers "an extraordinarily wide range of plastic products, above and beyond the very basic plastic jars that [the Chinese producers] used to pack garlic." *See id.*, 33 CIT at _____, 617 F. Supp. 2d at 1324.  Zhengzhou Harmoni I recognized that the inclusion of the "myriad specialty imports" alleged by the Chinese Producers would be to "inevitably inflate the average unit values [of the merchandise reflected in the Indian import statistics]" on which the Final Results were based. *See id.*, 33 CIT at _____, 617 F. Supp. 2d at 1324 (internal quotation marks omitted; alteration in original).

          To illustrate the distortion in the Indian import statistics, the Chinese Producers submitted "trade intelligence data" from Infodrive India.  *See* Zhengzhou Harmoni I, 33 CIT at _____, 617 F. Supp. 2d at 1324.[63]  The Final Results broadly dismissed the Infodrive India data as "meaningless" and "flawed."  *See* Issues and Decision Memorandum at 68; *see also* Zhengzhou Harmoni I, 33 CIT at _____, 617 F. Supp. 2d at 1324-25.  But Zhengzhou Harmoni I noted that information used for purposes of corroboration or impeachment – like the Infodrive India data here – need not meet the same exacting standards that apply to information on which Commerce relies to support its determination.  *See* Zhengzhou Harmoni I, 33 CIT at _____, 617 F. Supp. 2d at 1325.  And Zhengzhou Harmoni I noted that, even more fundamentally, "the fact remains that neither

_____

          [63]As Zhengzhou Harmoni I explained, "Infodrive India is a service that 'compile[s] and disseminate[s] official import statistics.'" Zhengzhou Harmoni I, 33 CIT at _____ n.52, 617 F. Supp. 2d at 1322 n.52 (*quoting* Zhejiang Native Produce and Animal By-Products Import & Export Group Corp. v. United States, 32 CIT _____, _____ n.7, 2008 WL 2410210 * 6 n.7 (2008) (alteration in original)).

Commerce nor the Government have even attempted to deny that the Indian import statistics . . .

included a very broad spectrum of other products, in addition to basic plastic jars." *See id.*, 33 CIT

at _____, 617 F. Supp. 2d at 1325.  As <u>Zhengzhou Harmoni I</u> summed it up: "[D]istilled to its

essence," Commerce's attack on the Infodrive India data "amounts to little more than a claim that

[the agency] cannot accurately ascertain from the existing record the full *extent* of the distortion

attributable to the broad scope of the tariff subheading." *See id.*, 33 CIT at _____, 617 F. Supp. 2d

at 1325.

Quite apart from the distortive impact of the "myriad of specialty products" that are clearly

more expensive than the basic plastic jars that the Chinese garlic producers used, <u>Zhengzhou

Harmoni I</u> explained that the Indian import statistics are even further distorted by the inclusion of

air freight charges associated with entries of merchandise that were shipped by air.  *See generally*

<u>Zhengzhou Harmoni I</u>, 33 CIT at _____, 617 F. Supp. 2d at 1326-27; *see also id.*, 33 CIT at _____, 617

F. Supp. 2d at 1323-24.  As <u>Zhengzhou Harmoni I</u> noted, the Final Results failed to directly confront

this issue.  *See  id.*, 33 CIT at _____, 617 F. Supp. 2d at 1326.  The analysis in the Final Results

totaled a single brief paragraph, which was silent on the substantive merits of the effect of the

inclusion of air freight charges in the Indian import statistics on which Commerce relied:

> Some companies import jars and lids into the PRC by air, others do not . . . .  This
> point alone, however, does not supersede the fact that [the Indian import statistics
> are] the most contemporaneous and accurate surrogate on the record.  Furthermore,
> the respondents have not submitted any documents on the record of this review
> demonstrating that their own domestic plastic jar and lid suppliers did not import the
> products into the PRC by air.

*See* Issues and Decision Memorandum at 68-69 (*quoted in* <u>Zhengzhou Harmoni I</u>, 33 CIT at _____,

617 F. Supp. 2d at 1326).

Zhengzhou Harmoni I observed that, "rather than squarely responding to the merits of the Chinese Producers' concerns about the distortive effects of air freight charges," the Final Results simply dismissed them, stating that "[m]ere allegations of facts, absent any record evidence for support of such claims, cannot be a basis for undermining the use of publicly available, contemporaneous valuation data from [Indian] HTS categories in this case."  *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1326 (*quoting* Issues and Decision Memorandum at 69).   But, as Zhengzhou Harmoni I noted, nothing in the record supports the Final Results' suggestion that the Chinese garlic producers or their Indian counterparts "used plastic jars that were *imported*, much less imported *by air*."  *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1326-27.[64]

---

[64]Zhengzhou Harmoni I explained that, as in Yantai Oriental, it is difficult to fathom (and the Final Results failed to explain) "why the [Chinese producers] would have used imported plastic jars (much less jars imported by air), when such a basic product was available domestically."  *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1327 (*citing* Yantai Oriental Juice Co. v. United States, 26 CIT 605, 617 (2002)) (emphases omitted).  And Zhengzhou Harmoni I noted that, indeed, the Chinese Producers have stated that they source their plastic jars and lids domestically, and that, by the same token, Indian garlic producers similarly have no reason to buy more expensive imported plastic jars and lids since such jars and lids can be supplied domestically. *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1326-27.

Relying on Hebei Metals II, Zhengzhou Harmoni I explained that Commerce's policy favoring the use of domestic data (rather than import statistics) is "'most appropriate where [– as here – ] the circumstances indicate that a producer in a hypothetical market would be unlikely to use an imported factor in its production process.'"  *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1327 (*quoting* Hebei Metals II, 29 CIT at 300, 366 F. Supp. 2d at 1274) (alteration in original); *see also* Zhengzhou Harmoni I, 33 CIT at ____ & nn.44-45, ____, 617 F. Supp. 2d at 1316 & nn.44-45, 1324 (discussing Commerce policy favoring use of domestic data, rather than import statistics).

### 3.  The Remand in *Zhengzhou Harmoni I*

Zhengzhou Harmoni I concluded that the Final Results "failed to explain how [the

seemingly] nonrepresentative import data is the 'best available information,' when domestic data

on the record represent[] the exact type of product used by the [Chinese producers] and actual

domestic market prices for that input."  *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d

at 1327 (*quoting* Chinese Producers' brief) (internal quotation marks omitted; first two alterations

in original); *see also id.*, 33 CIT at ____, 617 F. Supp. 2d at 1321.  In addition, Zhengzhou Harmoni

I concluded that the Final Results failed to support the "selection of the Indian import statistics by

reference to substantial evidence in the record."  *See id.*, 33 CIT at ____, 617 F. Supp. 2d at 1327;

*see also id.*, 33 CIT at ____, 617 F. Supp. 2d at 1321.  Zhengzhou Harmoni I therefore remanded

this issue to Commerce for further consideration.  *See id.*, 33 CIT at ____, ____, 617 F. Supp. 2d

at 1327, 1334.

Regrettably, Commerce's Remand Determination is wholly unresponsive to Zhengzhou

Harmoni I.

### 4.  The Remand Determination's Treatment of the Domestic Price Quotes

On remand, Commerce reaffirmed its selection of the Indian import statistics over the

domestic price quotes, asserting that the price quotes "are not publicly available, not

contemporaneous, and . . . not representative of prices throughout the [period of review]."  *See*

Remand Determination at 47; *see also* Def. Response at 27.  But the Remand Determination adds

virtually nothing to this case; and, in fact, it misstates the record as to several key facts.

Specifically, the Remand Determination states (in four different places) that there are three price quotes on the administrative record – a statement that is simply untrue. *See* Remand Determination at 47 (referring to "three price quotes for plastic jars"); *id*. at 48 (stating that "[o]ne of the . . . price quotes falls at the end of the [period of review], while the other two price quotes are dated after the end"); *id*. (asserting that "only three price quotes were provided"); *id*. at 74 (referring to "the product specificity of the three price quotes"). The Government makes the same mistake in its brief. *See* Def. Response at 27 (referring to "three Indian price quotes"); *but see id*. at 30 (referring to "the four [price] quotes").[65]

In the Final Results, Commerce correctly noted – no fewer than five times – that there are a total of four price quotes for jars and lids on the administrative record. *See* Issues and Decision Memorandum at 66 (referring to "four price quotes"); *id*. at 67 (referring to "two of the four price quotes"); *id*. (referring to "the four price quotes submitted by the respondents"); *id*. (referring to "[f]our price quotes from three different companies"); *id*. at 68 (referring to "the four price quotes"); *see also* Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 81), Exh. 21 (four domestic price quotes for jars and lids).[66]

Just as the Remand Determination errs as to the number of domestic price quotes, so too the Remand Determination errs concerning the timing of the price quotes. In the Remand

---

[65]The Chinese Producers themselves misstate the facts on this point. *See*, *e.g.*, Pls. Comments at 26 (referring to "three price quotes which are specific to the jars and lids" used by the Chinese producers).

[66]*See also* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1322 (referring to "four price quotes"); *id*., 33 CIT at ____ n.53, 617 F. Supp. 2d at 1323 n.53 (referring to "the four price quotes") (*quoting* Issues and Decision Memorandum at 68).

Determination, Commerce states flatly that the price quotes are "not contemporaneous."   *See* Remand Determination at 47.  In fact, however, two of the price quotes indisputably fall squarely within the period of review.   *See* Pls. Comments at 26-27; Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 81), Exh. 21 (including two domestic price quotes from Sunrise Containers Ltd., dated October 8, 2004); *see also* Remand Determination at 48 (stating that one price quote falls within period of review).  And the remaining two price quotes are dated a mere one week and three weeks after the period of review ended.  *See* Pls. Comments at 27; Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 81), Exh. 21 (including domestic price quotes dated November 6, 2004, and November 22, 2004).   Thus, contrary to the Remand Determination's implication, two of the four price quotes in fact are contemporaneous with the period of review, and the other two are essentially contemporaneous.

Commerce's misstatements in the Remand Determination raise questions about the degree of care exercised in the preparation of the Remand Determination, and – even more importantly – the extent of the independence of the agency's review of individual issues both within this proceeding and vis-a-vis other related cases.[67]

---

[67]In the case at bar, for example, Commerce's determination of a surrogate value for cardboard packing cartons (like its determination of a surrogate value for plastic jars and lids) involves a choice between domestic price quotes and Indian import statistics.  However, unlike the four price quotes for plastic jars and lids, the four price quotes for cardboard cartons are all roughly four-and-one-half months outside the period of review.  *See* Remand Determination at 43-44 (noting that the four price quotes for cardboard cartons "were all dated June 19-20, 2003"); Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 81), Exh. 17 (four domestic price quotes for cardboard packing cartons, dated June 19-20, 2003).  Similarly, in Taian Ziyang – which involves the ninth administrative review (*i.e.*, the administrative review immediately preceding this one) – the surrogate valuation of plastic jars and lids was also disputed.  As noted above, the record in that review includes the same price quotes that are at issue here.  *See* n.62, *supra*.  However, as

As to Commerce's asserted concerns about the "public availability" and the "contemporaneity" and "representativeness" of the domestic price quotes, the Remand Determination does little more than rehash the exact same points that were made in the Final Results (and found wanting in <u>Zhengzhou Harmoni I</u>).  *Compare* Remand Determination at 46-50, 71-74

---

to the administrative review at issue in <u>Taian Ziyang</u>, all of the price quotes for jars and lids are at least 11 months beyond the period of review.  *See* <u>Taian Ziyang I</u>, 33 CIT at ____, ____ n.64, 637 F. Supp. 2d at 1103, 1153 n.64 (noting that period of review in <u>Taian Ziyang</u> is November 1, 2002 through October 31, 2003, and that price quotes for jars and lids are dated October 8, 2004, November 6, 2004, and November 22, 2004).

The Remand Determination also includes other careless errors that indicate that Commerce simply copied language from one section for use in another section, and thus suggest that the agency may not have given adequate (re)consideration to its positions on remand.  For example, in characterizing the Chinese Producers' arguments concerning the valuation of jars and lids, the Remand Determination mistakenly refers to "cartons" rather than "plastic jars and lids": "The Respondents also maintain that the Court specifically considered the arguments the Department included in its Draft Redetermination . . . and found that the [import statistics], although broad-based, contemporaneous, and publicly available, could not overcome the lack of specificity when compared with the more specific price quotes *for cartons*."  *See* Remand Determination at 72 (emphasis added).  Significantly, this same sentence appears virtually *verbatim* in the section of the Remand Determination that addresses the valuation of cardboard packing cartons.  *See id*. at 69. Similarly, in addressing the public availability of the price quotes for jars and lids, the Remand Determination mistakenly refers to "boxes" rather than "plastic jars and lids": "The fact that the Respondents have stated that they purchase jars and lids from domestic sources (*i.e.*, Chinese) leads the Department to believe that these price quotes . . . may not represent actual arm's-length prices for a completed order of *these boxes* between unaffiliated parties."  *See id*. at 73 (emphasis added). And, once again, this same sentence appears virtually *verbatim* in the section of the Remand Determination that addresses the surrogate valuation of cardboard cartons.  *See id*. at 70.

Commerce's errors in the Remand Determination here raise the possibility that the agency may not be exercising sufficient care to consider each issue and each case separately and independently, on its unique facts.  To be sure, the rule of law requires predictability, consistency, and uniformity in decisionmaking, and that similar cases be decided similarly.  However, the rule of law also requires that Commerce take pains to ensure that each issue in each case is decided on the specific facts on the record of that case.  *See* <u>Taian Ziyang II</u>, 35 CIT at ____ n.22, 2011 WL 3024720 * 18 n.22 (stating that "[c]ut-and-paste' decisionmaking and 'cookie cutter' justice are not permissible").

*with* Issues and Decision Memorandum at 66-69.  As the Chinese Producers aptly observe, the

Remand Determination largely "ignores the Court's instructions and simply repeats the same

reasoning . . . [that <u>Zhengzhou Harmoni I</u>] found to be unpersuasive."  *See* Pls. Comments at 26; *see*

*also id*. at 30.[68]

As discussed below, in the course of the remand, notwithstanding the questions raised in

<u>Zhengzhou Harmoni I</u>, Commerce apparently took no action to attempt to substantiate its assumption

that the domestic price quotes are not accurate or to otherwise obtain any further information to try

to verify their reliability, in order to address the agency's concerns about the potential for

"manipulation" which is the basis for the agency's preference for publicly available data.  Similarly,

in the course of the remand, notwithstanding the questions raised in <u>Zhengzhou Harmoni I</u>,

Commerce apparently took no action to obtain any further information to clarify the extent to which

the domestic price quotes in fact reflect "broad market averages" and are sufficiently representative

of prices over "a substantial period of time."  As such, Commerce apparently took no action during

---

[68]As <u>Zhengzhou Harmoni I</u> noted, in addition to raising concerns about the public availability, contemporaneity, and representativeness of the domestic price quotes, the Final Results also indicated that the price quotes did not clearly distinguish between the price of jars and the price of lids.  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____ n.53, 617 F. Supp. 2d at 1323 n.53 (discussing Issues and Decision Memorandum at 68).  However, it appears that Commerce now has resolved whatever concerns it might have had.  Reference to the issue is conspicuously missing from the Remand Determination.  *See* Remand Determination at 46-50, 71-74; *see also* Def. Response at 27-30 (similarly silent on the matter); <u>Taian Ziyang I</u>, 33 CIT at ____, 637 F. Supp. 2d at 1154 (summarizing Chinese producers' proposal to address agency questions as to price of jars *versus* price of lids, in context of administrative review immediately preceding the review at issue here).

In any event, as discussed below, the issue of the valuation of plastic jars and lids is being remanded to Commerce yet again.  To the extent that any further price information is placed on the record on remand, the parties should ensure that the record is clear as to whether the stated prices are for jars or lids, or for both.

the remand to clarify the "representativeness" of the four domestic price quotes on the record.[69]

     a.  <u>"Public Availability" and Potential "Manipulation" of Price Quotes</u>

In the Remand Determination, Commerce reiterates its preference for "publicly available information," explaining once again that the purpose underlying that preference is "to reduce the possibility of manipulation." *See* Remand Determination at 47; *see also* Def. Response at 19 (referring to "the possibility that . . . data has been manipulated"); Remand Determination at 48 (asserting that "price quotes are easily manipulated"); *id*. at 50 (referring to "the potential for

---

[69]Like the Final Results, the Remand Determination fails to adequately address Commerce's general preference for the use of domestic data, rather than import statistics, which was discussed in <u>Zhengzhou Harmoni I</u>. *See* Issues and Decision Memorandum at 66 (noting Chinese Producers' argument that use of domestic price quotes is "consistent with [Commerce's] general preference for domestic surrogate prices"); <u>Zhengzhou Harmoni I</u>, 33 CIT at ____ & nn.44-45, ____, 617 F. Supp. 2d at 1316 & nn.44-45, 1324 (discussing preference for domestic data); *see also* Pls. Comments at 28. The Remand Determination dismisses the agency's established preference for domestic data with a facile two sentences:

> With regard to the preference for domestic prices, the Court qualified that preference by stating "all other things being equal – there is a preference for Commerce's use of domestic data, rather than import statistics such as those that the agency relied on in this case." As discussed above, however, the price quotes for jars and lids are not equal to the [Indian import statistics]; therefore the preference for use of domestic data is not applicable here.

Remand Determination at 74 (citation omitted). The Government seeks to remedy Commerce's omission by discussing the agency's preference for the use of domestic data more substantively in its brief. *See* Def. Response at 21, 28-29. But the Government's analysis constitutes impermissible *post hoc* rationalization. *See, e.g.*, <u>Burlington Truck Lines</u>, 371 U.S. at 168-69 (explaining that "courts may not accept appellate counsel's *post hoc* rationalizations for agency action"); <u>State Farm</u>, 463 U.S. at 50 (stating that "[i]t is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself"). In weighing the merits of the domestic price quotes (particularly as compared to the Indian import data), Commerce must acknowledge and address the agency's stated preference for domestic data and its implications for this case.

manipulation"); *id.* at 73 (same); Def.-Ints. Reply Comments at 2 (same).[70]  However, the Remand

Determination ignores <u>Zhengzhou Harmoni I</u>'s observation that no party – not even the Domestic

Producers – has even alleged, much less adduced any evidence to seek to prove, that the price quotes

at issue here are distorted or are the product of any manipulation, or are tainted by any affiliation

between the requester of the price quotes and the supplier, or any other potential conflict of interest

or collusion.  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1322-23; *see also* Pls.

Comments at 27-28 (arguing that Commerce's concerns about "public availability" and potential

for manipulation of price quotes at issue here constitute "unsubstantiated, highly speculative theory"

and are based on "nothing more than unfounded speculation"); Pls. Reply Comments at 16 n.13.[71]

_____

[70]As a practical matter, public data simply may not be available for all factors of production. In <u>Vinh Quang</u>, for example, the domestic producers submitted two price quotes, stating that they were "unable to obtain public prices for [the input at issue] because that item is not widely traded in commercial markets." *See* <u>Vinh Quang Fisheries Corp. v. United States</u>, 33 CIT ____, ____, 637 F. Supp. 2d 1352, 1355 (2009).

[71]It is, of course, the Domestic Producers that have the incentive to challenge the domestic price quotes if they are not accurate.  Presumably, if the price quotes submitted by the Chinese Producers did not fairly reflect the price of plastic jars and lids throughout the period of review, the Domestic Producers would be the first to say so.

Significantly, however, although the Domestic Producers placed the Indian import statistics on the record of this proceeding, they have not sought to present any evidence suggesting that the domestic price quotes on the record were manipulated in any way.  Nor have the Domestic Producers sought to present any evidence directly challenging the accuracy of the four domestic price quotes.  They have never even claimed that the domestic price quotes do not accurately reflect the actual, correct price of jars and lids throughout the period of review.

In their comments on the remand results, the Domestic Producers raise no criticisms specific to the four domestic price quotes at issue here.  Instead, the Domestic Producers make the generic argument that "Commerce's long-standing practice reflects its preference not to use price quotes, due to the narrow scope of such information relative to [other] sources such as import statistics or broad pricing data and due to the potential for manipulation by the party submitting the quote(s)." *See* Def.-Ints. Reply Comments at 2-3.  It is similarly telling that the Domestic Producers did not

In addition, the Remand Determination fails even to acknowledge, much less address, the fact that two of the domestic price quotes here – specifically, the price quotes dated October 8, 2004 – actually are "taken directly from a price list," and thus are, in that sense, publicly available information, and, contrary to the Remand Determination, were not "prepared specifically upon request." *See* Remand Determination at 47 (asserting that price quotes were "prepared specifically upon request"); Factors Valuations for the Preliminary Results of the Administrative Review and New Shipper Reviews (Admin. Record Pub. Doc. 400) at 14 (noting that "two [of the four] quotes are taken directly from a price list from a third Indian company"); *see also* Issues and Decision Memorandum for the Administrative Review of the Antidumping Duty Order on Fresh Garlic from the People's Republic China, 70 ITADOC 34,082 (June 13, 2005) ("Issues and Decision Memorandum for Ninth Administrative Review"), at Comment 8 (using exact same language in administrative review immediately preceding review at issue here, involving the same four price quotes for jars and lids at issue here).[72]  As underlying documentation makes clear, Commerce's

brief this issue in the prior stage of this action.  Nor did the Domestic Producers file comments on the valuation of jars and lids in the course of the remand proceeding.  *See* Remand Determination at 2-5 (summarizing parties' participation in course of remand proceeding).  The Domestic Producers' participation on this issue was also limited in the underlying administrative review.  *See* Issues and Decision Memorandum at 66 (noting that Domestic Producers filed no comments on issue of plastic jars and lids).

Finally, the very nature of the four domestic price quotes at issue here should serve to assuage, at least to some degree, Commerce's concerns about "manipulation."  If one were inclined to forge or manipulate price data, presumably one would produce data that were more clearly decisive – in other words, one would generate a greater number of price quotes, all of which would fall within the period of review and span the full duration of that period.  Viewed through this lens, the imperfections that Commerce sees in the price quotes are actually indicia of authenticity.

[72]Much like the Remand Determination, the Final Results too omitted reference to the fact that two of the price quotes were taken from a price list, and mistakenly asserted that all four quotes

concerns about whether the price quotes "reflect an objective, market-based value" are limited to only the two price quotes that are not taken from a price list.  *See* Factors Valuations for the Preliminary Results of the Administrative Review and New Shipper Reviews (Admin. Record Pub. Doc. 400) at 14 (stating that "[t]wo of the four price quotes appear to be obtained from two Indian companies in direct response to a request for such prices, which mean[s] they do not necessarily reflect an objective, market-based value"); *see also* Issues and Decision Memorandum for Ninth Administrative Review, 70 ITADOC 34,082 (June 13, 2005), at Comment 8 (using exact same language in administrative review immediately preceding review at issue here, involving the same four price quotes for jars and lids at issue here).

Moreover, as discussed above, much of the concern about price quotes expressed in the Final Results (and in the Remand Determination) is not specific to the price quotes in this case, but, rather, is inherent in the nature of price quotes in general (and even inherent in other types of information that is not publicly available).[73]  Nevertheless, as <u>Zhengzhou Harmoni I</u> observed, Commerce does not reject price quotes (and other information that is not publicly available) in all instances.  To the contrary, Commerce has relied on non-publicly available information – including price quotes – in numerous other cases in the past.  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1315.  Depending on the state of the record, "price quotes may reasonably be the best available information . . . for surrogate valuation purposes."  *See* <u>Vinh Quang Fisheries Corp. v. United States</u>,

---

"appear to [have been] obtained . . . in direct response to a request for such prices."  *See* Issues and Decision Memorandum at 66; *see also id*. at 67 (same).

[73]*See* Remand Determination at 50 (referring to "the problems inherent with price quotes" in general); *see also* Def. Response at 27, 30 (same).

33 CIT ____, ____, 637 F. Supp. 2d 1352, 1358 (2009) (rejecting respondent's argument that "a price quote never meets [Commerce's] standards and cannot be used because price quotes are inherently flawed and unreliable privately sourced data," in case where Commerce relied on a mere two price quotes submitted by domestic producers, which were dated on two sequential days (rather than import statistics advocated by respondent)).

Yet, notwithstanding the points raised in <u>Zhengzhou Harmoni I</u>, the Remand Determination fails to articulate a satisfactory explanation as to why the agency relies on price quotes and other information that is not publicly available in some cases, but not in others (and not in this case). Commerce has pointed to nothing that sets forth – for the benefit of domestic producers and respondents, as well as agency personnel, the courts, and the public at large – clear, established criteria that the agency consistently, uniformly, and systematically applies in determining when price quotes and other information that is not publicly available are acceptable for use in determining surrogate values in NME cases, and when they are not.[74]

_____

[74]Commerce's determination as to whether information is "publicly available" is necessarily somewhat fact-specific; but it also seems to be occasionally arbitrary, and arguably even result-oriented. However, the degree of emphasis that Commerce places on the public availability criterion fluctuates from one case to another. And Commerce's view as to what constitutes publicly available information in cases where public access to the data is not readily apparent has been somewhat less than consistent.

For example, in most cases involving price quotes (such as this case), Commerce rejects the use of domestic price quotes – which the agency generally considers not to be publicly available information – asserting the agency's strong preference for publicly available data. *See*, *e.g.*, Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Wooden Bedroom Furniture from the People's Republic of China, 75 ITADOC 50,992 (Aug. 18, 2010), at Comment 22 (stating that "[Commerce's] general practice is to not use price quote information if other publicly available data is on the record, because [quotes] do not represent actual prices or broad ranges of data, and [Commerce] does not know the conditions under

which these were solicited and whether or not these were self-selected from a broader range of quotes") (internal quotation marks and citation omitted; alteration in original); Issues and Decision Memorandum for the Final Results of 5th Administrative Review and 4th New Shipper Review: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 74 ITADOC 48,908 (Sept. 25, 2009), at Comment 2C (stating that "[Commerce's] general practice is to not use price quote information if other publicly available data is on the record").

In contrast, in those cases where Commerce elects to rely on price quotes, the agency's analysis is often silent on the issue of the price quotes' public availability (or lack thereof) – even though Commerce generally cites price quotes' *lack* of public availability as a deal-breaker in cases where Commerce decides *not* to rely on proffered quotes. *See*, *e.g.*, Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Issues and Decision Memorandum for the Final Results of the First Antidumping Administrative Review and First New Shipper Review, 72 ITADOC 52,052 (September 12, 2007), at Comment 6 (using price quote to value by-product without discussing whether quote was publicly available, despite statement that "[Commerce's] criteria for selecting [surrogate value] information are based on the use of publicly available information"); Issues and Decision Memorandum for the 2nd Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam (Mar. 21, 2007), at Comment 8A (relying on Indian price quote to value fish waste without discussing public availability); Issues and Decision Memorandum for the Antidumping Investigation of Polyvinyl Alcohol from the People's Republic of China, 68 ITADOC 47,538 (Aug. 11, 2003), at Comment 5 (valuing factor of production using price quote, but without discussing price quote's public availability, or even listing "public availability" when outlining the agency's surrogate value selection criteria).

Moreover, on at least two occasions, Commerce has deemed price quotes to be publicly available information, without detailing what made those price quotes in particular "publicly available" or explaining how those price quotes differed from the price quotes at issue in cases where the quotes were rejected as non-publicly available information. *See* Vinh Quang Fisheries Corp. v. United States, 33 CIT ____, ____, 637 F. Supp. 2d 1352, 1358 (2009) (sustaining agency's use of price quotes, which agency considered "publicly available," in Certain Frozen Fish Fillets from Socialist Republic of Vietnam: Final Results and Partial Rescission of New Shipper Reviews); Issues and Decision Memorandum for the Final Results and Partial Rescission of the First New Shipper Reviews: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam (June 20, 2008), at Comment 3 (determining that "Indian price quotes are publicly available information that identify the terms of delivery and payment for the fish waste, the identity of the offered party, and the identity of the party offering the price"); Issues and Decision Memorandum for the Antidumping Duty Administrative Review of Sebacic Acid from the People's Republic of China, 2004 WL 3524469 (Dec. 16, 2004), at Comment 2 (valuing factor of production with price quote that agency referred to as "public," without explanation as to why Commerce considered  price quote public).

In sum, notwithstanding the numerous concerns set forth in <u>Zhengzhou Harmoni I</u>, Commerce apparently took no action in the course of the remand proceeding to attempt to substantiate its assumption that the domestic price quotes are not accurate or to otherwise obtain any further information to try to verify their reliability, in order to address the agency's concerns about the potential for "manipulation" – the sole asserted basis for the agency's preference for publicly

---

Not only does the agency's focus on public availability vary, but so does its definition of what constitutes "publicly available" information. For instance, despite the fact that Commerce generally considers data such as price quotes not to be publicly available, in one extreme example to the contrary, the agency deemed information relayed in a phone conversation between an Indian freight company and Commerce officials to constitute publicly available information. *See* Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China; Final Results of Antidumping Duty Administrative Reviews, 63 Fed. Reg. 16,758, 16,763 (Apr. 6, 1998) (stating that information on ocean freight rates "is public information derived from phone conversations with company officials at [the international freight company]"). In that case, Commerce seemed to consider the information to be "publicly available" simply because it was not proprietary. *See* Heavy Forged Hand Tools from the PRC, 63 Fed. Reg. at 16,763. But such a standard in the surrogate value context would clearly render a wide range of data (including run-of-the-mill price quotes) to be publicly available.

The present Remand Determination offers further evidence of Commerce's fluid approach to the public availability of surrogate data. As discussed above, in relying on the Azadpur APMC data to value garlic bulb, Commerce deemed the APMC Bulletin data to be publicly available because, *inter alia*, the data "are available upon request." *See* Remand Determination at 13. But by treating such availability as evidence of "*public* availability," the agency fails to recognize that a wide variety of information is "available upon request" (like price quotes, for instance). Moreover, the agency has specifically cited such limited availability as evidence of *non*-public availability in past cases, stating that "[Commerce] cannot consider [a certain data set] publicly available, [because] it is *not available to the public without making a specific request* to the [data source], who ultimately determine[s] whether to provide the data to the public." *See* Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Frozen and Canned Warmwater Shrimp from the People's Republic of China, 69 ITADOC 70,997 (Nov. 29, 2004), at Comment 1 (declining to rely on data from Ecuadorean Central Bank) (emphasis added).

available data.[75]

_____

[75]Like the Final Results, the Remand Determination includes a laundry list of documentation that Commerce purports to require to establish the reliability of price quotes – documentation that apparently is missing from the record here. *Compare* Issues and Decision Memorandum at 67 *with* Remand Determination at 47-48 (faulting lack of information indicating whether the price quotes were "prepared specifically upon request and not generated . . . in response to a request made in the normal course of business," lack of information "as to the relationship between the [Chinese Producers] and the providers of the price quotes," lack of "information about who requested the [price] quotes and under what circumstances the price quotes were obtained," lack of information "to indicate where the price quotes fall in the spectrum of price quotes . . . offered by the[] companies," lack of information indicating whether the price quotes were "manipulated" in any way, lack of information indicating whether the Chinese Producers "selectively decide[d] to submit only those price quotes that are favorable . . . while not submitting all price quotes [they] received," lack of "information on how the [price quotes] were obtained (including the sources and any adjustments that may have been made)," and lack of information establishing that the price quotes are "complete and/or representative of prices in the Indian market during the [period of review]"); *see also id.* at 73 (faulting lack of information indicating whether the price quotes were "requested solely for the purpose of obtaining a surrogate value for this review and may not represent actual arm's-length prices for a completed order . . . between unaffiliated parties"); Def. Response at 29 (emphasizing that Chinese Producers have not "provide[d] any record evidence regarding the relationship between [them] and the three Indian companies offering the [price] quotes or the circumstances under which the quotes were obtained," or "any record evidence demonstrating that the price quotes represented actual completed transactions or prices that were within the spectrum of prices that the Indian companies would offer to any customer").                                   .

There are at least two salient points to be made.  First, a cursory review of cases in which Commerce has relied on price quotes and other non-publicly available information suggests that Commerce's practice has not been as consistent as the agency here suggests, and that – contrary to its representations in this case – Commerce has not necessarily required documentation such as that outlined above in other cases in the past.  As but one example, in Vinh Quang, Commerce deemed the two price quotes submitted by the domestic producers to be publicly available information, despite the respondent's claims to the contrary, and although the basis for Commerce's characterization is not clear from the record.  *See, e.g.*, Vinh Quang, 33 CIT at ____, ____, 637 F. Supp. 2d at 1355, 1357.  Even the domestic producers in that case did not claim that the price quotes were publicly available information.  *See id.*, 33 CIT at ____, 637 F. Supp. 2d at 1355 (noting that, in submitting price quotes, domestic producers explained that they were "unable to obtain public prices").

And, second, Commerce apparently made no effort in the course of the remand to seek to obtain any of the information outlined above – information which, according to Commerce, would

b.  "Contemporaneity" and "Representativeness" of Price Quotes
and Potential "Temporary Market Fluctuations"

The Remand Determination's treatment of the "contemporaneity" and "representativeness"

of the four domestic price quotes is no more satisfying than its discussion of "public availability."

*See generally* Remand Determination at 47-48, 73-74; Pls. Comments at 26-27.[76]

Once again, Commerce simply repeats the Final Results' broad, generalized pronouncements

about the virtues of "surrogate values that reflect broad market averages" and are

"contemporaneous" and "cover a substantial time period," and then reiterates its position that the

price quotes here are "not contemporaneous," "do not represent broad market averages," and "do

not reflect prices during the [period of review]" – without even acknowledging the points and

questions raised in <u>Zhengzhou Harmoni I</u>.  *See* Remand Determination at 47-48, 73; *compare* Issues

and Decision Memorandum at 66-68 (same); *see generally* <u>Zhengzhou Harmoni I</u>, 33 CIT at _____

---

enable it to "assess the accuracy [and] completeness" of the price quotes, and to "confirm that the
[price quotes] are complete and/or representative of prices in the Indian market during the [period
of review]," and thus would help resolve both the agency's concerns about the "contemporaneity"
and "representativeness" of the price quotes and the agency's reservations concerning the fact that
price quotes in general – including some of the price quotes at issue here – are not information that
is typically "publicly available."  *See* Remand Determination at 48.

[76]As a threshold matter, it bears underscoring that Commerce's "contemporaneity" and
"representativeness" criteria have no inherent value in and of themselves.  Rather, determining
whether price data are from within the period of review (*i.e.*, "contemporaneity") and whether they
represent the entire period of review (*i.e.*, "representativeness") are simply *one means* of establishing
whether the data accurately reflect prices throughout the period of review.  However, price data that
are not contemporaneous and/or not representative are by no means *per se* inaccurate.  The ultimate
question to be determined is:  Do the price data accurately reflect prices throughout the period of
review (whether or not those data are "contemporaneous" and "representative," as Commerce
defines those terms)?

n.53, 617 F. Supp. 2d at 1323  n.53 (analyzing Final Results' discussion of "contemporaneity" and "representativeness" of four domestic price quotes).[77]

As discussed above, the Remand Determination is simply incorrect in stating that the price quotes are "not contemporaneous." *See* Remand Determination at 47.  In fact, two of the four price quotes are fully contemporaneous, and the other two are essentially contemporaneous. *See* Pls. Comments at 26-27; Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 81), Exh. 21 (including two domestic price quotes from Sunrise Containers Ltd., dated October 8, 2004, and two additional price quotes dated November 6, 2004, and November 22, 2004).  Moreover, as established by longstanding authority and as the Remand Determination itself elsewhere

_____

[77]The Remand Determination expresses concern about the temporal representativeness of the domestic price quotes for jars and lids (and the potential for "temporary price fluctuations"), which is also the focus of the analyses in most other judicial decisions and administrative determinations in which representativeness has been an issue. *See, e.g.*, Remand Determination at 47 (stating that domestic price quotes were rejected because, *inter alia*, they are assertedly "not representative of prices throughout the [period of review]"); *id.* at 48 (stating that "the record does not demonstrate that the submitted price quotes are representative of plastic jar and lid prices during the [period of review]"); *id.* (stating that agency "has historically chosen to use surrogate values that reflect broad market averages and that cover a substantial time period over price data that are obtained from so isolated a time frame as to be subject to temporary market fluctuations"); *id.* at 50 (asserting that Indian import statistics are preferable to domestic price quotes because import statistics are "representative of a range of prices throughout the [period of review]"); *id.* at 73 (stating that price quotes "do not represent broad market averages and do not reflect prices during the [period of review]").

Neither the Remand Determination nor the Final Results indicate that geographic representativeness is at issue.  Indeed, the four domestic price quotes are from three different vendors located in three different cities across the country – Delhi, Bangalore, and Mumbai. *See* Remand Determination at 47; *see generally id.* at 46-50, 71-74 (expressing no concern about geographic representativeness); Issues and Decision Memorandum at 66-69 (same); Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 81), Exh. 21 (domestic price quotes for jars and lids).

acknowledges, contemporaneity is not as critical as Commerce here suggests.  *See*, *e.g.*, Zhengzhou Harmoni I, 33 CIT at _____ n.53, 617 F. Supp. 2d at 1323 n.53 (discussing contemporaneity of price quotes for jars and lids); Taian Ziyang Food Co. v. United States, 33 CIT _____, _____, 637 F. Supp. 2d 1093, 1153 (2009) ("Taian Ziyang I") (same, in context of ninth administrative review).[78]

As to Commerce's asserted concerns about "representativeness," the Remand Determination makes the claim that the price quotes are "*highly susceptible* to market fluctuations."  *See* Remand Determination at 74 (emphasis added); *see also id.* at 48 (referring to "temporary market fluctuations"); Def. Response at 29 (same); Issues and Decision Memorandum at 67 (expressing concern that price quotes might be "subject to temporary market conditions" or "temporary market fluctuations").[79]  In support of Commerce's position on the agency's preference for "surrogate values

_____

[78]Further, as the Remand Determination itself explains (in the context of the Azadpur APMC data used in the Remand Determination to value garlic bulb), Commerce "does not automatically disregard surrogate value data which are the most specific to the input in question solely on the basis that they are *post*-[*period of review*] *data*."  *See* Remand Determination at 14 (emphasis added).  If, in fact, inflation is an issue here (which is not clear), there is no apparent reason why the price quotes submitted by the Chinese Producers could not be deflated to be contemporaneous, using the same methodology that Commerce used to deflate the Azadpur APMC data for use in valuing garlic bulb.  *See* section III.A.1, *supra*.

[79]In the Remand Determination, Commerce has turned up the volume on its rhetoric.  In the Final Results, Commerce stated simply that the price quotes "could easily be subject to temporary market conditions."  *See* Issues and Decision Memorandum at 67.  Now, in the Remand Determination, Commerce maintains that the price quotes in this case are "*highly susceptible* to market fluctuations."  *See* Remand Determination at 74 (emphasis added).  As discussed herein, however, there is no apparent basis in logic – and clearly no basis in the evidentiary record – to support either of Commerce's assertions.

Commerce added nothing to the record in the course of the remand to substantiate even its original assertion that the price of basic plastic jars and lids "could easily be subject to temporary market conditions" or "temporary market fluctuations."  *See* Issues and Decision Memorandum at 67.  Certainly there is no evidence to support the Remand Determination's statement that the price

that reflect broad market averages and that cover a substantial period of time" over price quotes that

may be "subject to temporary market fluctuations," the Remand Determination and the Government

once again cite Shrimp from Vietnam.  *See* Remand Determination at 48 (discussing Notice of

Preliminary Determination of Sales at Less Than Fair Value, Negative Preliminary Determination

of Critical Circumstances and Postponement of Final Determination: Certain Frozen and Canned

Warmwater Shrimp From the Socialist Republic of Vietnam, 69 Fed. Reg. 42,672, 42,684 (July 16,

2004), *unchanged in* Final Determination of Sales at Less Than Fair Value: Certain Frozen and

Canned Warmwater Shrimp From the Socialist Republic of Vietnam, 69 Fed. Reg. 71,005 (Dec. 8,

2004)); Def. Response at 29 (same); *see also* Issues and Decision Memorandum at 67 & n.170

(same).  But the record in Shrimp from Vietnam included affirmative evidence of price fluctuations.

*See* Shrimp from Vietnam, 69 Fed. Reg. at 42,684 (discussing evidence of price fluctuations).  Here,

in stark contrast, there is not even a shred of record evidence that the price of basic plastic jars and

lids was subject to any fluctuation whatsoever over the course of the period of review – much less

evidence that prices were (as Commerce now asserts) "highly susceptible" to such fluctuation.  *See*

Remand Determination at 74; Pls. Comments at 27 (arguing that "Commerce simply cannot claim

the price quotes are not representative of prices throughout the [period of review] when there is no

basis for such a claim"); Pls. Reply Comments at 16 (noting that mere fact that all price quotes are

dated October or November 2004 "does not show in any way that the price quotes are not

representative of market prices").

      The Remand Determination's implication that the prices of jars and lids are highly volatile

---

quotes are "highly susceptible" to such fluctuation.

does not even necessarily comport with common sense.  In other words, it seems reasonable to

assume that some commodities (or factors of production) fluctuate in price, seasonally and/or in

response to established market forces such as supply and demand.  It is common knowledge, for

example, that agricultural produce prices generally tend to fluctuate based on seasonal availability,

and that mineral prices may fluctuate in accordance with supply and demand.  On the other hand,

it is not at all obvious why the price of basic plastic jars and lids would be subject to appreciable

fluctuation over the course of a single year (*i.e.*, the period of review).   And, contrary to

Commerce's assertions in the Remand Determination, it is certainly not obvious why the price of

basic plastic jars and lids would be "*highly* susceptible" to fluctuation.  *See* Remand Determination

at 74 (emphasis added).

As the "master of antidumping law" and the nation's institutional repository of expertise in

the economics of trade, Commerce cannot here turn a blind eye to the realities of the business world,

and make the unreasonable, wooden assumption that the prices of all commodities or factors of

production are subject to significant fluctuation over the period of review.   Such a blanket

presumption defies logic and common sense, and is at odds with the agency's fundamental

obligation "to determine antidumping margins 'as accurately as possible.'"  *See*, *e.g.*, Jinan Yipin

Corp. v. United States, 31 CIT 1901, 1937, 526 F. Supp. 2d 1347, 1379 (2007) ("Jinan Yipin I")

(holding that, "absent evidence of significant price fluctuation in a short time," Commerce not

permitted to reject price quotes for cardboard cartons used to pack garlic as not sufficiently

"representative," even though price quotes not only were all dated within a single month, but also

post-dated period of review by more than eight months)[80]; Thai Pineapple, 187 F.3d at 1365;

Shakeproof, 268 F.3d at 1382 (citation omitted).

Where, as here, Commerce admits that there are distortions in the price data that the agency

seeks to use, Commerce cannot reasonably rely on mere assumptions alone (*i.e.*, the assumption that

non-public price information is the product of manipulation, and the assumption that prices fluctuate

significantly over the period of review) to establish that the alternative data are also distorted. In

such cases, actual proof of distortion is required.

Notwithstanding the numerous questions raised in Zhengzhou Harmoni I, Commerce

apparently took no action in the course of the remand proceeding to obtain any further information

to clarify the extent to which the four domestic price quotes in fact reflect "broad market averages"

and are sufficiently representative of prices over "a substantial period of time" – that is, sufficiently

reflective of prices over the one-year period that constitutes the period of review. In addition,

Commerce apparently took no action to attempt to ascertain the extent to which the prices of basic

plastic jars and lids fluctuated during the period of review at issue here, or even the extent to which

prices historically have fluctuated over time. Commerce thus apparently took no action whatsoever

---

[80]*See also*, *e.g.*, Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1159 (explaining that "Commerce is not free to predicate its surrogate value determinations on unexplained and seemingly unreasonable assumptions"; remanding issue of surrogate value for ocean freight charges with instructions requiring agency to explain and provide record support for its "questionable assumption that the respondents used such a long, circuitous, and more expensive route to ship their garlic to the United States"); Jinan Yipin I, 31 CIT at 1933, 526 F. Supp. 2d at 1375 (holding that, absent record evidence to support the fact, Commerce cannot presume that Indian garlic producers "typically irrigate their garlic crops using water supplied by municipal utilities, at costs associated with such utilities"); Yantai Oriental, 26 CIT at 617 (holding that, absent supporting evidence and explanation, Commerce cannot presume that producers would use more expensive imported coal when domestic coal is available).

during the remand to seek to clarify the "representativeness" of the four domestic price quotes on the record in this action in response to the instructions set forth in <u>Zhengzhou Harmoni I</u>.

### 5. The Remand Determination's Treatment of the Indian Import Statistics

As outlined above, the Remand Determination's response to <u>Zhengzhou Harmoni I</u>'s analysis of the Final Results' treatment of the domestic price quotes is far from satisfactory. But, by comparison, the Remand Determination's response to <u>Zhengzhou Harmoni I</u>'s criticisms of the Indian import statistics is all but non-existent. The Remand Determination is almost entirely silent on the concerns that <u>Zhengzhou Harmoni I</u> raised as to the serious problems that plague the Indian import statistics on which Commerce relied in the Final Results, and on which the agency continues to rely in the Remand Determination. *Compare* Remand Determination at 46-47, 49-50, 73-74 *with* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1321-27.

As the Chinese Producers correctly point out, the Remand Determination "acknowledges that [Commerce] is simply relying upon the same reasoning that it previously enunciated and that was rejected" in <u>Zhengzhou Harmoni I</u>. *See* Pls. Comments at 30. Nothing in the Remand Determination responds to the concerns expressed in <u>Zhengzhou Harmoni I</u> about the Indian import statistics' lack of product specificity. *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, ____, 617 F. Supp. 2d at 1321-25, 1327.[81]

---

[81]At several points, the Remand Determination appears to quarrel with the conclusion that the Indian import statistics are distorted by the inclusion of specialty products that bear no resemblance to the basic plastic jars and lids at issue here, and that the four domestic price quotes therefore are more product-specific. For example, the Remand Determination states that the Chinese Producers "argued that [the Indian import statistics] included a broad range of materials, notably 'specialty jars' and other products that, [the Chinese Producers] *claim*, are substantially different

The Remand Determination largely ignores the fact that the Indian import statistics used by Commerce are based on import data for a broad, "basket" tariff provision (although the Government recognizes the point, and Commerce implicit acknowledged it in the Final Results).  *See* Def. Response at 29 (acknowledging that Indian import statistics are for "a basket category"); Issues and Decision Memorandum at 66 (summarizing Chinese Producers' arguments, including observation that Indian import statistics are for "a basket category"); *see also* Zhengzhou Harmoni I, 33 CIT at _____, 617 F. Supp. 2d at 1324 (stating that "it is 'irrefutable' that [the Indian import statistics are based on] a 'broad, basket' tariff provision") (*quoting* Chinese Producers' brief).  Commerce has repeatedly stated that it is "inappropriate" to rely on import statistics based on a broad, "basket"

_____

from the plastic jars used to pack garlic."  *See* Remand Determination at 46-47 (emphasis added). The Remand Determination also states that "the . . . Indian import statistics *may not* perfectly represent" the plastic jars and lids used by the Chinese producers.  *See id.* at 50 (emphasis added); *see also id.* at 74 (characterizing price quotes as "*possibly* specific") (emphasis added).  Similarly, the Government asserts that "the price quotes *may be* more product-specific" than the Indian import statistics.  *See* Def. Response at 30 (emphasis added); *but see id.* at 29 (noting that Commerce recognized that the import statistics "[*do*] *not* perfectly represent the plastic jars used by [the Chinese Producers]") (emphasis added).

That ship has sailed.  It is far too late for Commerce and the Government to equivocate on whether the Indian import statistics are distorted by the inclusion of specialty plastic jars and other more expensive products that bear no resemblance to the jars and lids that the Chinese producers used to pack their garlic.  That distortion is an undisputed record fact.  The open questions that remain to be addressed are the extent and the significance of the distortion.

Indeed, in the Remand Determination, Commerce itself concedes that "the Indian import data include a broad range of products that are different from the plastic jars used to pack garlic," and thus are "less specific" than the domestic price quotes that the Chinese Producers placed on the record.  *See* Remand Determination at 49-50, 73; *see also id.* at 73 (referring to "the product specificity of the price quotes"); *id.* at 74 (acknowledging "the product specificity of the . . . price quotes"); Def. Response at 27, 29 (acknowledging that Indian import statistics do not "perfectly represent" the plastic jars and lids used by the Chinese producers).  Commerce cannot be heard to argue to the contrary.

tariff provision when more representative surrogate data are available.  *See* Arch Chemicals, Inc. v. United States, 33 CIT ____, ____, 2009 WL 2018014 * 14 (2009) (*quoting* Polyethylene Retail Carrier Bag Comm. v. United States, 29 CIT 1418, 1443-44 (2005)).[82]  The Remand Determination nevertheless fails to meaningfully examine whether it is appropriate here to rely on data based on such a basket provision when there is much more product-specific surrogate data available on the record (*i.e.*, the four domestic price quotes).

The Remand Determination also makes no attempt to address the trade intelligence data placed on the record by the Chinese Producers, or to otherwise ascertain the extent to which the values reflected in the Indian import statistics are inflated by the inclusion of more expensive specialty products that bear no resemblance to the basic plastic jars and lids used by the Chinese producers here.  *See* Pls. Comments at 28 (noting that the Remand Determination "fail[s] to cite any new record evidence indicating that the import statistics are representative of the jars" used by the Chinese producers).[83]

---

[82]*See also* Issues and Decision Memorandum for the Final Results of the 2007-2008 Administrative Review of the Antidumping Duty Order on Carbazole Violet Pigment 23 from the People's Republic of China, 75 ITADOC 36,630 (June 21, 2010), at Comment 3 (stating that Commerce "has found in past cases that [import data based on basket provisions] were unsuitable for valuation purposes where a more representative surrogate existed"); Freshwater Crawfish Tail Meat from the People's Republic of China; Final Results of New Shipper Review, 64 Fed. Reg. 27,961, 27,962 (May 24, 1999) (stating that "import data from basket categories can be too broad to be reliable").

[83]The Chinese Producers also assert that Commerce's rejection of the much more "product specific" price quotes for plastic jars and lids is undermined by the agency's emphasis on the importance of product specificity in its valuation of garlic bulbs.  *See* Pls. Comments at 23, 29; *see also* Remand Determination at 5-15, 51-59 (discussing valuation of garlic bulbs); Issues and Decision Memorandum at 22-47 (same).  According to the Chinese Producers, "the two conflicting positions Commerce takes with garlic bulbs and [plastic jars and lids] cannot be reconciled and

Similarly, nothing in the Remand Determination responds to the concerns expressed in

Zhengzhou Harmoni I about the air freight costs reflected in the values derived from the Indian

import statistics on which Commerce relies.  *See* Zhengzhou Harmoni I, 33 CIT at ____, ____, ____,

617 F. Supp. 2d at 1321, 1323-24, 1326-27.[84]  Commerce now clearly concedes that the Indian

import data are distorted by the inclusion of air freight costs.  *See* Remand Determination at 73

---

demonstrate that its findings [as to the valuation of jars and lids] . . . are arbitrary."  *See* Pls. Comments at 23; *id.* at 29; *but see* Remand Determination at 72, 73-74 (noting and responding to Chinese Producers' claims that Commerce is arbitrary in its application of product specificity criterion).  The Government seeks to explain away Commerce's emphasis on product specificity in the valuation of garlic bulbs, and argues that – in any event – Commerce is entitled "to place more weight upon a particular criterion for selecting the surrogate value for one input while using a different method for selecting the surrogate value for another input."  *See* Def. Response at 26.

The Government is correct that the antidumping statute "merely requires the use of the 'best available information' with respect to the valuation of a given factor of production; it does not require that a uniform methodology be used in the valuation of all relevant factors."  *See* Nation Ford, 166 F.3d at 1378 (rejecting claim that, because Commerce used Indian domestic prices in its valuation of one factor of production, the agency was required to use Indian domestic prices for other values in the case).  There is therefore no merit to the suggestion that Commerce's emphasis on product specificity in the valuation of garlic bulbs necessarily controls the agency's valuation of plastic jars and lids.  On the other hand, as discussed in greater detail below, product specificity is clearly a key criterion in determining the "best available information" for use in valuing factors of production, including the plastic jars and lids at issue here.

[84]As the Final Results noted:

The [Chinese Producers] . . . contend that the air freight charges included in the Indian import statistics further distort the surrogate values.  Citing Final Results of Antidumping Administrative Review: Sulfanilic Acid from the People's Republic of China, [61 Fed. Reg. 53,711] (October 15, 1996), the [Chinese Producers] argue that [Commerce] determined that Indian import statistics reflect a CIF price (cost, insurance, and freight).  Therefore, the [Chinese Producers] argue that the AUV [average unit value] for jars, if based on the Indian import statistics, [is] distorted by any inclusion of prices that reflect air freight charges.

Issues and Decision Memorandum at 66.

(noting that the agency "acknowledges the fact that the [import statistics] do not perfectly represent

the inputs of the [Chinese producers] because the Indian import data . . . include[] products that . .

. were shipped by air"); *see also* Def. Response at 27, 29.[85]   Nevertheless, Commerce made no

attempt on remand to ascertain the volume of merchandise reflected in the Indian import statistics

that was imported by air, or to otherwise demonstrate that the values reflected in the Indian import

statistics are not significantly inflated by the inclusion of air freight costs.

Apparently in an effort to buttress its reliance on the Indian import statistics, Commerce

reopened the administrative record on remand to include import data from Indonesia, Sri Lanka, the

Philippines, and Morocco for plastic jars.  According to the Remand Determination, the new data

"demonstrate[] that the Indian import statistics [for jars] are non-aberrational, despite the inclusion

of air freight, and fall within the range of prices obtained from other comparable countries."  *See*

Remand Determination at 50; *see also id*. at 2-4; Def. Response at 29-30.  But this is a *non sequitur*,

and fails to address the fundamental problems with the Indian import statistics identified in

Zhengzhou Harmoni I.

As the Chinese Producers observe, "[t]he fact that import data from other countries may

---

[85]In the Final Results, Commerce appeared to quibble about whether the plastic jars and lids used by the Chinese producers were imported by air.  *See*, *e.g.*, Issues and Decision Memorandum at 69 (asserting that Chinese Producers had not "demonstrate[d] that their own domestic plastic jar and lid suppliers did not import the products into the PRC by air").  And, even though (in the statement quoted above) Commerce has now clearly conceded that air freight charges inflate the values derived from the import statistics (*see* Remand Determination at 73), the Remand Determination elsewhere seems to try to continue to hedge.  *See id*. at 50  (stating that "the data obtained through Indian import statistics *may not* perfectly represent the inputs used by [the Chinese producers] because the Indian import data include . . . [jars and lids] shipped by air") (emphasis added).

show prices similar to the Indian import data does not support the accuracy of the Indian import data." *See* Pls. Comments at 28-29; *see also* Pls. Reply Comments at 16-17.   Instead, the comparability of the prices reflected in the import data from the four additional countries and the prices reflected in the Indian import statistics would appear to indicate that the new import data – like the Indian import statistics – include many different types of more expensive plastic products (in addition to basic plastic jars), and also include products imported by air.  *See* Pls. Comments at 28-29; Pls. Reply Comments at 16-17.  In other words, nothing about the new data suggests that the Indian import statistics on plastic jars are not distorted by non-comparable products and air freight charges; nor do the new data shed any light on the extent of the distortion.

In sum and substance, the Remand Determination's defense of the Indian import statistics amounts – in essence – to a series of conclusory assertions (discussed in greater detail below), coupled with Commerce's broad claim that "it is within [the agency's] discretion to choose Indian import data . . . over domestic, respondent-submitted price quotes."  *See* Remand Determination at 48.  To be sure, Commerce enjoys broad discretion in valuing factors of production and ascertaining the "best available information."  *See*, *e.g.*, <u>Shakeproof</u>, 268 F.3d at 1381.  However, it does not follow that the agency's choice between Indian import data and domestic price quotes is immune from judicial review.  Commerce's discretion notwithstanding, "a surrogate value must be as representative of the situation in the [non-market economy] country as is feasible."  *See* <u>Nation Ford</u>, 166 F.3d at 1377 (internal quotation marks and citation omitted).  The role of the courts in a case such as this is to ask – and to answer – what the Court of Appeals has termed "the critical question" – that is, whether Commerce's valuation of the factors of production is "based on the *best available*

*information* and establishes antidumping margins *as accurately as possible*." *See* Ningbo, 580 F.3d at 1257 (emphases added) (internal quotation marks and citation omitted).   Thus, contrary to Commerce's implication in the Remand Determination, the agency's discretion here is by no means unfettered.

In an attempt to support its claim that "it is within [Commerce's] discretion to choose Indian import data . . . over domestic, respondent-submitted price quotes," the Remand Determination cites two authorities – Synthetic Indigo from the PRC, and Jinan Yipin II.  *See* Remand Determination at 48-49 (discussing Synthetic Indigo From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 68 Fed. Reg. 53,711 (Sept. 12, 2003), and Jinan Yipin Corp. v. United States, 33 CIT ____, ____, 637 F. Supp. 2d 1183, 1196 (2009) ("Jinan Yipin II")); *see also* Def. Response at 17, 21-22, 24 (discussing Synthetic Indigo from the PRC and Jinan Yipin II, in context of valuation of cardboard cartons).   But those authorities are inapposite.

The Remand Determination's citation of Synthetic Indigo from the PRC – which was discussed in the Final Results – brings nothing new to the analysis in this case.  *See* Issues and Decision Memorandum at 68; *id*. at 67 n.169.  Moreover, the Remand Determination's discussion of Synthetic Indigo misrepresents the facts of that case.  Specifically, in the Remand Determination, Commerce states that the price quotes in Synthetic Indigo "suffered from the same flaws as the price quotes in this review."  *See* Remand Determination at 49.  However, the price quotes in Synthetic Indigo were all dated at least seven months after the end of the period of review – while two of the price quotes at issue here are fully contemporaneous with the period of review, and the other two are nearly contemporaneous.  *See* Issues and Decision Memorandum at 68 (noting that price quotes

in Synthetic Indigo "were dated following the completion of the [period of review]"); *id*. at 65

(stating that price quotes in Synthetic Indigo "were dated anywhere from seven to ten months after

the end of the [period of review]"); Issues and Decision Memorandum for Final Results of the

Antidumping Duty Administrative Review on Synthetic Indigo from the People's Republic of China

– June 1, 2001, through May 31, 2002, 68 ITADOC 53,711 (Sept. 12, 2003), at Comment 11

(explaining that price quotes in that case were "dated from seven to ten months after the end of the

[period of review]"); Pls. Comments at 26-27 (discussing dates of price quotes for jars and lids);

Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 81), Exh. 21 (four domestic

price quotes for plastic jars and lids).[86]

The Remand Determination's invocation of <u>Jinan Yipin II</u> is similarly misleading.  In the

Remand Determination, Commerce suggests that this case and <u>Jinan Yipin II</u> are close parallels, and

intimates that the price quotes in that case were rejected in favor of Indian import statistics for the

same reasons that Commerce has given in this case.  *See* Remand Determination at 48-49.  But what

---

[86]Inexplicably, the Government states in its brief that, in Synthetic Indigo from the PRC, "Commerce rejected the price quotes [in that case] because it was unable to determine whether [the price quotes] were representative of the range of prices . . . during the period of review."  *See* Def. Response at 22.  The Government argues that "[s]imilarly, in this case, Commerce rejected the price quotes in part[] because [the Chinese Producers] did not demonstrate on the record that the price quotes represented a broad market average during the period of review."  *See id*.

Either the Government did not read Synthetic Indigo from the PRC, or the Government is being less than fully candid with the court.  The Issues and Decision Memorandum in Synthetic Indigo makes it clear that Commerce's foremost concern about the price quotes there was that the price quotes were "dated from seven to ten months after the end of the [period of review]" – a key fact that the Government failed to note in its brief here.  *See* Issues and Decision Memorandum for Synthetic Indigo from the PRC, 68 ITADOC 53,711 (Sept. 12, 2003), at Comment 11.  Thus, contrary to the Government's claims, this case is readily distinguished from Synthetic Indigo from the PRC.

Commerce strategically fails to disclose is that the price quotes in <u>Jinan Yipin II</u> – like the price

quotes in Synthetic Indigo from the PRC, but unlike the price quotes at issue here – were from well

outside the period of review.  *See* <u>Jinan Yipin II</u>, 33 CIT at ____, 637 F. Supp. 2d at 1195 (noting

that price quotes in that case "were eight months after the close of the period of review") (internal

quotation marks and citation omitted); *see also* Pls. Comments at 26-27; Respondents' Surrogate

Value Submission (Admin. Record Pub. Doc. 81), Exh. 21 (four domestic price quotes).[87]  In other

words, without regard to the numerous other facts distinguishing the three cases from one another,

the price quotes in Synthetic Indigo from the PRC and <u>Jinan Yipin II</u> differ from the four price

quotes at issue here in at least one respect – two of the price quotes in this case are fully

---

[87]While the decision may be somewhat (as the Government puts it) "instructive," the significance of <u>Jinan Yipin II</u> for this case is limited for other reasons as well, in addition to those outlined above.  *See* Def. Response at 24-25.  As the Chinese Producers emphasize, for example, "[e]ach proceeding has its own record," and Commerce's determination in this case must be judged solely on the record compiled here.  *See* Pls. Comments at 29; *see also id.* at 23.  In addition, the Chinese Producers further note that "the import data and the trade intelligence data from <u>Jinan Yipin</u> <u>II</u> corresponds to a different time period and, therefore, is based upon entirely different entries. Consequently, the degree to which the trade intelligence data demonstrates that the import data does not consist of the type of cartons [and jars] used by [the] garlic producers for each case is entirely unrelated.  For example, unlike this case, the trade intelligence data in <u>Jinan Yipin II</u> overlapped but did not correspond with the [period of review] exactly."  *See* Pls. Comments at 23-24.

Finally, the Government contends that the "most serious flaw" shared by the domestic price quotes in this case and the price quotes in <u>Jinan Yipin II</u> is "the lack of publicly available information on the record demonstrating reliability."  *See* Def. Response at 25.  As discussed above, however, Commerce's definition of "publicly available" information, and noting that some of the price quotes at issue here were taken from price lists); <u>Jinan Yipin I</u>, 31 CIT at 1934-38, 526 F. Supp. 2d at 1376-79 (discussing price quotes for cardboard cartons, with no reference to a price list); <u>Jinan Yipin II</u>, 33 CIT at ____, 637 F. Supp. 2d at 1194-96 (same).

contemporaneous with the period of review and the other two quotes are nearly contemporaneous,

while the price quotes in the two cases that Commerce cites clearly were not.

In an effort to defend the agency's reliance on the Indian import statistics, Commerce and

the Government seek to cast the case at bar as a case where the agency is confronted with a choice

between two imperfect sets of data. *See*, *e.g.*, Remand Determination at 48-49 (arguing that "it is

within [Commerce's] discretion to choose between two imperfect data sources").[88] But that is not

an accurate portrayal of the current state of the administrative record here.

Commerce candidly admits that the Indian import statistics are "imperfect" – that is, that the

import statistics reflect inflated values as a surrogate for the input in question here – both because

the import statistics include "specialty jars" and a very wide array of other plastic products that do

not remotely resemble the basic plastic jars used by the Chinese garlic producers in this case (such

that the import statistics are not "product specific") and because, although garlic producers use

domestic jars and lids, the import statistics include air freight charges for jars and lids imported by

air. *See* Remand Determination at 73.[89]  On the other hand, based on the record as it currently

stands, the domestic price quotes are "imperfect" only in the sense that it has not been established

to Commerce's satisfaction that the price quotes were not manipulated and that the price quotes

---

[88]*See also* Def. Response at 24-25 (analogizing instant case to <u>Jinan Yipin II</u>, and asserting that Commerce has discretion to choose between "two imperfect data sets," in context of valuation of cardboard cartons) (internal quotation marks and citation omitted).

[89]As discussed above, the Remand Determination "acknowledges the fact that the [import statistics] do not perfectly represent the inputs of the [Chinese producers] because the Indian import data [1] include a broad range of products that are different from the plastic jars used to pack garlic and [2] include[] products that, unlike those the [Chinese producers] used, were shipped by air." *See* Remand Determination at 73.

accurately reflect prices throughout the period of review.  In other words, in contrast to the Indian

import statistics (which are admittedly "imperfect"), there is no affirmative record evidence that the

domestic price quotes are in any way "imperfect."

Simply stated, Commerce here has chosen *admittedly* distorted data over data that the agency

speculates may be *potentially* distorted.  Or, to state it a little differently, Commerce here has chosen

*admittedly distorted* Indian import statistics over *potentially "perfect"* price quotes.  And Commerce

apparently has done so without conducting any analysis (not even a qualitative analysis, much less

a quantitative one) to determine the extent of the *actual* distortion of the import statistics, for

comparison to the extent to which (according to Commerce) the domestic price quotes might

*potentially* be distorted.[90]   As such, Commerce's choice of the Indian import statistics over the

domestic price quotes is not rational and lacks any basis in the record.

Other than Commerce's claim that the choice between import statistics and domestic price

quotes is a matter of agency discretion, all that remains of the Remand Determination's defense of

its decision to rely on the Indian import statistics in this case is a series of unsupported, conclusory

assertions about the shortcomings of the domestic price quotes, and the relative merits of the two

sets of data.  The Remand Determination states, for example, that Commerce "considers the

problems inherent with price quotes, and the specific deficiencies of the price quotes submitted for

this review, to be *far more problematic*" than the Indian import data.  *See* Remand Determination

---

[90]Analyzing Commerce's criticisms of the Infodrive India data that the Chinese Producers relied on to illustrate the Indian import statistics' lack of product specificity, <u>Zhengzhou Harmoni I</u> observed that Commerce's criticisms in the Final Results "amount[] to little more than a claim that Commerce cannot accurately ascertain from the existing record the full *extent* of the distortion" in the import statistics.  <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1325.

at 50 (emphasis added); *see also* Def. Response at 27, 30 (same).  To the same effect, elsewhere in

the Remand Determination Commerce states that, "[a]s long as there are other potential data sources

on the record that, overall, *better meet* [*Commerce's*] *criteria* . . . , [Commerce] is obliged to use *the*

*better data source* over price quotes as a surrogate value."  *See id*. at 49 (emphases added).  The two

statements, on their face, purport to be comparisons of the relative merits of the domestic price

quotes *versus* the Indian import statistics.  However, as discussed above, the record is devoid of any

true comparative analysis of the two sets of data.  Indeed, a line-by-line review of both the Remand

Determination and the Final Results reveals that there is no basis whatsoever in the record for

Commerce's statements.

The Remand Determination similarly reiterates the Final Results' determination that the

Indian import statistics "are the *best available information* with which to value . . . plastic jars and

lids in this proceeding."  *See* Remand Determination at 74 (emphasis added); *see also id*. at 50

(stating that Commerce "continues to find the import statistics to be the *best available information*")

(emphasis added).  But, again, such statements are inherently relative assessments – conclusions that

reflect a comparative analysis of the domestic price quotes and the Indian import statistics.  As

outlined above, however, Commerce has failed to conduct any true comparative assessment of the

two sets of data.  As such, Commerce's determination that the Indian import statistics constitute the

"best available information" remains unexplained, and finds no support in the existing administrative

record.[91]

_____

[91]The Remand Determination's discussion of the valuation of plastic jars and lids is replete
with unsupported conclusory assertions.  As yet another example, the Remand Determination states
that "the product specificity of the price quotes does not overcome the problems with this data

Finally, as outlined above, Commerce's assertion that the situation here involves a choice between two "imperfect" sets of data does not fairly depict the administrative record as it currently stands; and it is more accurate at present to describe the two competing sources of information as *admittedly distorted* Indian import statistics versus *potentially accurate* domestic price quotes. But even if the record established conclusively that the price quotes were "imperfect," Commerce's Remand Determination nevertheless still could not be sustained.

Commerce is not permitted to select a surrogate value by default. In other words, the agency cannot justify its selection of one data source (*i.e.*, the Indian import statistics) merely by pointing to asserted problems with the other data source (*i.e.*, the domestic price quotes). "Commerce's analysis must do more than simply identify flaws in the data sets it rejects." Guangdong Chems. Imp. & Exp. Corp. v. United States, 30 CIT 1412, 1417, 460 F. Supp. 2d 1365, 1369 (2006). "Even where a party opposing Commerce's position has submitted information that ultimately proves inadequate, Commerce is not relieved of the requirement that it support its antidumping duty calculation with substantial evidence." Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 28 CIT 1185, 1193 & n.3 (2004) ("Hebei Metals I") (*citing* 19 U.S.C. § 1516a(b)(1)(B)).[92]

---

source [*i.e.*, the price quotes]." *See* Remand Determination at 73. The Government's brief is full of similar unsupported and conclusory statements. For example, the Government asserts that "the four price quotes on the record of this proceeding[] presented far more serious problems with respect to . . . *reliability* than the less product-specific [Indian import statistics]." *See* Def. Response at 30 (emphasis added). But nowhere does the Government explain how Commerce could possibly conclude on the existing record that *admittedly* distorted data (*i.e.*, the import statistics) are more reliable than the alternative data (*i.e.*, the domestic price quotes), which are (at worst) *potentially* distorted.

[92]*See also* Hebei Metals II, 29 CIT at 295 n.3, 366 F. Supp. 2d at 1270 n.3 (same); Taian Ziyang I, 33 CIT at ____, 637 F. Supp. 2d at 1154-55 (explaining that, "as the case law amply demonstrates, the mere fact that domestic data provided by a respondent are less than perfect does

Thus, contrary to the implications of Commerce and the Government, the agency is not free to simply choose at will between imperfect sets of data.  *See* Remand Determination at 48-49; *see also* Def. Response at 24, 27-28.[93]  Even in situations where all potential sources of data on the record have flaws (a not uncommon occurrence), the law requires Commerce to make a reasoned decision as to the source on which it chooses to rely, and to both adequately explain its rationale and support its decision by reference to substantial evidence in the record.[94]

### 6. Additional Issues

As explained above in the introduction to section III, Policy Bulletin 04.1 outlines certain criteria that Commerce considers in determining the "best available information" to use in determining surrogate values.  *See*, *e.g.*, Remand Determination at 42, 47; section III, *supra*. Specifically, Policy Bulletin 04.1 reflects Commerce's preference for the use of "investigation or

---

not necessarily warrant their rejection (in whole or in part).  Nor do flaws in such data automatically justify resort to import statistics which are plagued by other infirmities which are equally, if not more, serious") (emphasis omitted); Zhengzhou Harmoni I, 33 CIT at ____ n.53, 617 F. Supp. 2d at 1323 n.53 (same).

[93]Moreover, "Commerce has certain core investigatory duties, which cannot be avoided." *See* Hebei Metals II, 29 CIT at 295, 366 F. Supp. 2d at 1270.  Thus, if the record in a case is such that none of the data sources on record is sufficient to permit Commerce to *reasonably* rely on it, Commerce is not permitted to choose "the lesser of the evils."   The statute "does not permit Commerce to choose between two *unreasonable* choices, *i.e.*, two surrogate . . . values that have an unexplained relation" to the input that the agency is valuing.  *See id.* (emphasis added).  Instead, in such a situation, Commerce is required to further develop the record – by, for example, supplementing the record with data from another source, if necessary.

[94]*See also*, *e.g.*, Jinan Yipin II, 33 CIT at ____, 637 F. Supp. 2d at 1196 (explaining that "it is for Commerce to decide between two imperfect data sets, *provided that decision is supported by valid findings and adequate reasoning*") (emphasis added); Allied Pacific I, 30 CIT at 757, 435 F. Supp. 2d at 1313-14 (stating that Commerce is required to "conduct a fair comparison of the data sets on the record" to select surrogate value data that yield most accurate dumping margin).

review period-wide price averages ['representativeness'], prices specific to the input in question ['product specificity'], prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review ['contemporaneity'], and publicly available data." *See* Policy Bulletin 04.1.   There are, however, several flaws in the way that Commerce and the Government have applied the criteria set forth in Policy 04.1 in determining a surrogate value for plastic jars and lids in this case.

For example, the Government argues that Commerce reasonably determined that the Indian import statistics are the "best available information" for use in valuing plastic jars and lids because the import statistics "met more of Commerce's . . . surrogate value selection criteria." *See* Def. Response at 27-28, 30.   The Government thus seems to suggest that the Indian import statistics constitute the "best available information" because – according to Commerce – the import statistics are "publicly available, contemporaneous with the [period of review], representative of a range of prices throughout the [period of review], and sufficiently specific to the product" (and therefore, according to Commerce, satisfy *four* criteria), while the domestic price quotes (although more "product specific" than the import statistics) are – according to Commerce – "not publicly available," "not [fully] contemporaneous,"[95] and "not representative of prices throughout the [period

---

[95]As explained above, Commerce's statement in the Remand Determination that the price quotes are "not contemporaneous" is clearly erroneous.   *See* Remand Determination at 47.   Two of the four price quotes are in fact contemporaneous with the period of review, while the other two are virtually contemporaneous.   *See* Pls. Comments at 26-27; Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 81), Exh. 21 (including two domestic price quotes from Sunrise Containers Ltd., dated October 8, 2001; and two domestic price quotes dated November 6, 2004, and November 22, 2004, respectively; *see also* Remand Determination at 48 (stating that one price quote falls within period of review).

of review]" (and thus, according to Commerce, satisfy only *one* criterion).  *See* Remand Determination at 47, 50.  Contrary to the Government's implication, however, determining the "best available information" is not a straightforward exercise in basic arithmetic.  The analysis is considerably more nuanced than simply tallying up the number of criteria satisfied by each potential data source, and then declaring the data source with the higher number the "best available information."

An even more serious flaw seems to pervade the Remand Determination, as well as the Final Results.  Just as the Government errs to the extent that it suggests that the "best available information" in a case is necessarily the data source that satisfies the most criteria, it appears that Commerce errs in according equal weight to each of the criteria – or, at least, in giving far too little weight to "product specificity."  All of the criteria outlined in Policy Bulletin 04.1 may be important.  But they are not equally important.  As a matter of pure logic, first among them must be "product specificity" (or, in the parlance of the Policy Bulletin, "prices specific to the input in question").

To illustrate the point with an extreme example, Commerce here could not reasonably base its surrogate value for basic plastic jars on Indian import statistics for umbrellas (for instance),[96] even if those import statistics – in the words of Policy Bulletin 04.1 – unquestionably reflected "review period-wide price averages" and were indisputably "publicly available data" that were fully "contemporaneous with the period of . . . review" and "net of taxes and import duties."  Commerce could not do so because, even if the Indian import statistics for umbrellas were perfect in every other way, the import statistics would not be sufficiently "product specific."  On the other hand,

---

[96]Indian HTS heading 6601 covers "umbrellas" and similar merchandise.

Commerce in the past has, on occasion, relied on data that were, for example, not "contemporaneous with the period of . . . review," or that did not satisfy some other criterion set forth in Policy Bulletin 04.1.  *See*, *e.g.*, Sichuan Changhong Elec. Co. v. United States, 30 CIT 1481, 1503-04, 460 F. Supp. 2d 1338, 1358-59 (2006) (sustaining Commerce's selection of  non-contemporaneous data, in lieu of contemporaneous data from another source, where non-contemporaneous data were more accurate than contemporaneous data).

In sum, "product specificity" logically must be the foremost consideration in determining "best available information."  If a set of data is not sufficiently "product specific," it is of no relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1.  *See*, *e.g.*, Hebei Metals II, 29 CIT at 300, 366 F. Supp. 2d at 1273-74 (explaining that, where agency failed to demonstrate Indian import statistics were sufficiently "product specific," it was irrelevant whether statistics satisfied other criteria, such as "contemporaneity").

As noted above, the Remand Determination asserts that the Indian import statistics here are "sufficiently specific to the product" – that is, "sufficiently product-specific" to the basic plastic jars and lids used by the Chinese producers.  *See* Remand Determination at 50; *see also* Issues and Decision Memorandum at 68 (same); Def. Response at 27, 30.  However, neither the Remand Determination nor the Final Results offers any explanation for that conclusory assertion.  *See* Pls. Comments at 28.  Nor is the assertion supported by the administrative record as it presently exists.

Another significant underlying issue in this case is the parties' respective burdens of proof. The Government argues that the Chinese Producers bear the burden of providing "record evidence establishing that the price quotes satisfy Commerce's selection criteria for surrogate values."  *See*

Def. Response at 28-29; *see also id.* at 17-18 (*citing* <u>NTN Bearing Corp. v. United States</u>, 997 F.2d

1453, 1458 (Fed. Cir. 1993)).   It is true that, as a general principle, "[t]he burden of creating an

adequate record lies with respondents and not with Commerce."   *See*, *e.g.*, <u>Longkou Haimeng Mach.</u>

<u>Co. v. United States</u>, 33 CIT ____, ____, 617 F. Supp. 2d 1363, 1372 (2009).   However, what

Commerce and the Government do not acknowledge is that the general principle that the respondent

bears the burden of proof is somewhat in tension with (and must be interpreted so as to be consistent

with) the obligations imposed on Commerce by the antidumping statute.

The general principle that the respondent bears the burden of proof in no way relieves

Commerce of the requirements that it value factors of production based on the "best available

information" and that it establish antidumping margins "as accurately as possible."   *See* <u>Ningbo</u>, 580

F.3d at 1257 (internal quotation marks and citation omitted).   Further, while Commerce may not be

obligated to help a respondent obtain information to support the surrogate value that the respondent

advocates, "Commerce [is] required to obtain adequate evidence for the value it select[s]."   *See*

<u>Hebei Metals II</u>, 29 CIT at 296, 366 F. Supp. 2d at 1271.   And Commerce cannot select a surrogate

value by default.   *See*, *e.g.*, <u>Guangdong Chems.</u>, 30 CIT at 1417, 460 F. Supp. 2d at 1369; <u>Hebei</u>

<u>Metals I</u>, 28 CIT at 1193 & n.3.

In sum, a respondent is not absolved of the responsibility to make the case for the set of data

that it favors.   Thus, the Chinese Producers here cannot wash their hands of all responsibility to

adduce evidence showing that the domestic price quotes are not the product of manipulation and that

they accurately reflect prices throughout the period of review.   But, at the same time, Commerce's

"core investigatory duties" require the agency to demonstrate affirmatively that each   surrogate

value that it selects satisfies the agency's statutory obligations to value factors of production based on the "best available information" and to establish antidumping margins "as accurately as possible," by providing a reasoned explanation for the agency's determination, anchored by substantial evidence in the administrative record. *See* <u>Hebei Metals II</u>, 29 CIT at 295-96, 366 F. Supp. 2d at 1270.

Here, it is not at all clear how Commerce can establish that the Indian import statistics are the "best available information" if there are serious unanswered questions about the extent to which the import statistics are distorted by the inclusion of "specialty jars" and a wide range of other plastic products that are not comparable to the basic plastic jars and lids at issue, and about the extent to which the import statistics are distorted by the inclusion of charges for air freight. Similarly, depending on the extent of the distortion reflected in the Indian import statistics, Commerce may or may not be able to establish that the Indian import statistics are the "best available information" without determining whether, in fact, the domestic price quotes were the product of manipulation and the extent to which the price quotes accurately reflect prices throughout the period of review.[97]

---

[97]Just as Commerce and the Government have failed to confront the agency's obligation "to obtain adequate evidence for the value [the agency] select[s]," so too the Chinese Producers have failed to respond directly to the Government's argument on burden of proof. *See* <u>Hebei Metals II</u>, 29 CIT at 296, 366 F. Supp. 2d at 1271; Def. Response at 28-29 (criticizing Chinese Producers for failure to provide "record evidence establishing that the price quotes satisfy Commerce's selection criteria for surrogate values"); *see generally id.* at 17-18 (discussing burden of proof). Nothing in <u>Zhengzhou Harmoni I</u> (and, for that matter, nothing herein) should be read as relieving the Chinese Producers of their burden of proof.

Optimally, the record as supplemented by the parties on remand will allow all issues to be resolved on the merits and based on affirmative evidence (rather than sorting out the issues of

### 7.  Conclusion

As detailed above, and as discussed at greater length in <u>Zhengzhou Harmoni I</u>,  Commerce has failed to adequately explain the agency's determination that the Indian import statistics constitute the "best available information" for use in calculating the surrogate value of basic plastic jars and lids, in light of the admitted infirmities in the import statistics.   Nor has Commerce adequately explained why the Indian import statistics are preferable to the domestic price quotes, the other source of information on the existing record.   *See generally* <u>State Farm</u>, 463 U.S. at 43 (explaining that agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'") (citation omitted); *see also* <u>Timken</u>, 421 F.3d at 1355 (stating that agency "must explain its action with sufficient clarity to permit 'effective judicial review'") (citation omitted); <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1321 (concluding that "Commerce failed to

---

assumptions and burdens of proof).  However, if that is not possible, the Chinese Producers, as well as Commerce and the Government, will have to address the state of the record as it then exists, including any potential issues such as the legitimacy of assumptions, and the parties' respective burdens of proof.

If Commerce could establish on remand that the inclusion of the more expensive products and the air freight charges have no significant distortive effect on the Indian import statistics, it might be possible to sustain the agency's determination that the import statistics constitute the "best available information" even without evidence on the potential for manipulation of the price quotes and the extent to which the price quotes accurately reflect prices throughout the period of review. Based on the breadth of the Indian HTS subheading and the existing record evidence on the Indian import statistics, that prospect seems unlikely at this time.  It is nevertheless worth underscoring that, on remand, both Commerce and the Chinese Producers have incentives to develop the record on the domestic price quotes, as well as on the import statistics.  Any party that ignores its burden of proof does so at its peril.

adequately explain . . . its determination that the Indian import statistics were the best available information").  The Remand Determination has done nothing to remedy the flaws in the Final Results outlined in <u>Zhengzhou Harmoni I</u>.  Similarly, as detailed above and as discussed at greater length in <u>Zhengzhou Harmoni I</u>, Commerce's determination that the Indian import statistics constitute the "best available information" (as compared to the domestic price quotes) is not supported by substantial evidence in the administrative record.  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1327 (concluding that Commerce failed to "support its selection of the Indian import statistics by reference to substantial evidence in the record").  Thus, as to this issue, Commerce's Remand Determination cannot be sustained.

Because the Remand Determination's treatment of the valuation of plastic jars and lids simply recycles the arguments that Commerce made in its Final Results, the Chinese Producers urge "that this issue . . . be remanded . . . to Commerce with instructions to use the domestic price quotes" for the valuation of plastic jars and lids.  *See* Pls. Comments at 30; *see also* Pls. Reply Comments at 17.  Instead, the issue is remanded for further consideration not inconsistent with the analysis herein and in <u>Zhengzhou Harmoni I</u>.  Commerce is forewarned, however, that – having squandered this remand – it is unlikely to get another bite at the apple on this issue.

On remand, Commerce shall reopen the record to evidence concerning the domestic price quotes and the Indian import statistics (as well as alternative sets of data, if any, that may be appropriate).  Commerce shall accept further evidence from the parties, in addition to any information that the agency wishes to place on the record; and Commerce shall allow the parties sufficient time to submit further evidence, to respond to any information that the agency may place

on the record, and to provide comments on the agency's draft results of the remand.

### E.   Valuation of Cardboard Cartons

In <u>Zhengzhou Harmoni I</u>, the Chinese Producers prevailed on their challenge to the Final

Results' surrogate valuation of the cardboard cartons used to pack and ship garlic, on grounds that

parallel in certain key respects the rationale on which the Chinese Producers prevailed on plastic jars

and lids (discussed above).  *See generally* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, ____, 617 F.

Supp. 2d at 1312-21, 1334 (discussing surrogate valuation of cardboard packing cartons in Final

Results); *see also* sections III.D.1, III.D.2, & III.D.3, *supra* (summarizing treatment of plastic jars

and lids in the Final Results and in <u>Zhengzhou Harmoni I</u>).

<u>Zhengzhou Harmoni I</u> explained that the Final Results valued cardboard packing cartons

using a surrogate value derived from WTA import statistics submitted by the Domestic Producers

for Indian HTS subheading 4819.1010 (covering "[b]oxes of corrugated paper and paperboard").

*See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1312-13; *see generally* Issues and

Decision Memorandum at 62-65; Factors Valuations for the Preliminary Results of the

Administrative Review and New Shipper Reviews (Admin. Record Pub. Doc. 400) at 11-12, Exh.

6.  Much like the Final Results on plastic jars and lids, the Final Results on cardboard packing

cartons found the Indian import statistics preferable to domestic price quotes submitted by the

Chinese Producers, which were obtained from four different Indian vendors in four different cities

and are for basic cardboard packing cartons like those actually used by the Chinese producers here.

*See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1312-13; *see generally* Issues and

Decision Memorandum at 62-65; Respondents' Surrogate Value Submission (Admin. Record Pub.

Doc. 81), Exh. 17 (domestic price quotes for cardboard cartons).

The Final Results rejected the domestic price quotes based on Commerce's conclusion that the price quotes do not constitute "publicly available information."  *See* Issues and Decision Memorandum at 64; *see also* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1313-15. The Final Results explained that Commerce's preference for the use of publicly available information is intended "to lessen the possibility of *manipulation* of . . . values based on documents prepared specifically for use in trade remedy cases."  *See* Issues and Decision Memorandum at 64 (emphasis added); *see also* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1313.

<u>Zhengzhou Harmoni I</u> pointed out, however, that – as with the administrative record on plastic jars and lids – the administrative record on cardboard packing cartons here is devoid of any evidence of distortion or manipulation, or of any affiliation or collusion tainting the price quotes at issue here.  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at ____, 617 F. Supp. 2d at 1313-14.  Thus, in the Final Results, Commerce (in effect) presumed distortion and affiliation, based on nothing more than surmise and speculation.  *See id.*, 33 CIT at ____, 617 F. Supp. 2d at 1314-15.  Moreover, most of the concerns that the Final Results raised vis-a-vis the price quotes in this case are inherent in price quotes in general, as well as other types of non-publicly available information.  Yet, as <u>Zhengzhou Harmoni I</u> observed, Commerce does not reject such information across the board.  To the contrary, Commerce has relied on non-publicly available information – including price quotes – in numerous other cases in the past.  *See id.*, 33 CIT at ____, 617 F. Supp. 2d at 1315.

<u>Zhengzhou Harmoni I</u> weighed Commerce's concerns about public availability and the inherent potential for manipulation of price quotes (discussed above) against the Chinese Producers'

evidence of distortion in the Indian import statistics used in the Final Results.  *See generally*
*Zhengzhou Harmoni I*, 33 CIT at ____, 617 F. Supp. 2d at 1315-21.  *Zhengzhou Harmoni I*
concluded that the Final Results failed to adequately analyze the relative merits of the domestic price
quotes and the seemingly much more seriously flawed Indian import statistics on which Commerce
relied.  *See id.*, 33 CIT at ____, ____, 617 F. Supp. 2d at 1312, 1321.

Specifically, *Zhengzhou Harmoni I* noted that, besides failing to acknowledge Commerce's
well-established general preference for domestic data over import statistics, the Final Results on
cardboard packing cartons (much like the Final Results on plastic jars and lids) similarly failed to
adequately address the fact that the Indian import statistics for cardboard cartons not only are not
"product specific," but, moreover, capture products that are imported by air.  *See generally*
*Zhengzhou Harmoni I*, 33 CIT at ____, 617 F. Supp. 2d at 1315-21; *see also* Issues and Decision
Memorandum at 62-65.  As such, *Zhengzhou Harmoni I* explained, the Indian import statistics are
distorted by air freight charges, as well as by "gift, specialty, and other non-packing boxes," as
demonstrated by trade intelligence data from Eximkey.com that the Chinese Producers submitted
for Commerce's consideration.  *See* *Zhengzhou Harmoni I*, 33 CIT at ____, 617 F. Supp. 2d at 1317;
Issues and Decision Memorandum at 62-65.[98]

*Zhengzhou Harmoni I* concluded that the Final Results both failed to adequately explain how
the admittedly non-representative Indian import statistics constituted the "best available

_____

[98]Much like Infodrive India, Eximkey.com is a source of trade intelligence data.  *See*
*Zhengzhou Harmoni I*, 33 CIT at ____ n.38, 617 F. Supp. 2d at 1312 n.38.  Eximkey.com compiles
customs data from select Indian ports for both imports and exports.  *See* European Commission Joint
Research Centre Institute for the Protection and Security of the Citizen, *JRC Scientific and
Technical Reports*:  *Catalogue of WEB Data Services on Global Trade* (2010) at 27-29.

information," particularly in light of the availability of product-specific, domestic Indian price quotes for cardboard packing cartons comparable to those used by the Chinese producers in this case, and, in addition, failed to "support [Commerce's] selection of the Indian import statistics by reference to substantial evidence in the record."  *See* Zhengzhou Harmoni I, 33 CIT at ____, 617 F. Supp. 2d at 1321; *see also id.*, 33 CIT at ____, 617 F. Supp. 2d at 1312.  The valuation of cardboard packing cartons was therefore remanded to the agency for further consideration.  *See id.*, 33 CIT at ____, ____, ____, 617 F. Supp. 2d at 1312, 1321, 1334.

Regrettably, however, the Remand Determination is wholly unresponsive to Zhengzhou Harmoni I.  Much like the Remand Determination's treatment of plastic jars and lids (discussed above), the Remand Determination's treatment of cardboard packing cartons does virtually nothing to advance the ball.  *See generally* Remand Determination at 41-46, 68-71; Pls. Comments at 19-26; Pls. Reply Comments at 12-16; *see also* sections III.D.4, III.D.5, & III.D.6, *supra* (analyzing Remand Determination on plastic jars and lids); Taian Ziyang II, 35 CIT at _____, 2011 WL 3024720 * 13-29 (analyzing remand determination on cardboard cartons in administrative review immediately preceding review at issue here).

On remand, Commerce reiterated its determination that the Indian import statistics are the "best available information" for use in valuing the Chinese Producers' cardboard packing cartons.  *See* Remand Determination at 46, 71.  However, as the Chinese Producers correctly observe, the Remand Determination on cardboard packing cartons "largely ignore[s] the Court's criticisms of the Indian import statistic[s]" in Zhengzhou Harmoni I and instead "continue[s] to rely upon the same reasoning and arguments . . . previously found to be unsatisfactory."  *See* Pls. Comments at 19; *see*

*also id*. at 21, 25-26 (same); Pls. Reply Comments at 12-13 (same).  Indeed, rather than confronting

the issues raised in <u>Zhengzhou Harmoni I</u>, the Remand Determination raises – for the first time –

two new grounds for rejecting the domestic price quotes that Commerce did not raise in the Final

Results.

    In particular, the Remand Determination adds little or nothing to the record on the issue of

Commerce's concerns about the "public availability" of the domestic price quotes and the potential

for "manipulation" – the sole basis cited in the Final Results for Commerce's decision to reject the

price quotes in favor of the Indian import statistics.  *Compare* Remand Determination at 42-43, 46,

70 (discussing "public availability" and potential for manipulation) *with* Issues and Decision

Memorandum at 64 (same); *see also* Def. Response at 19 (same).  On the other hand, the Remand

Determination adds "contemporaneity" and "representativeness" to Commerce's list of grounds for

rejecting the price quotes.  *See* Remand Determination at 42 (noting lack of "contemporaneity" of

price quotes); *id*. at 42-44, 70-71 (addressing "representativeness" of price quotes).[99]

    There is no need to here restate in full the critique of the Remand Determination's treatment

of the "public availability" of plastic jars and lids that is set forth above, which applies to the

Remand Determination's treatment of cardboard packing cartons with equal force.  *See generally*

section III.D.4.a, *supra* (discussing potential for manipulation and "public availability" of domestic

price quotes for jars and lids); *see also* <u>Taian Ziyang II</u>, 35 CIT at _____, 2011 WL 3024720 * 17-19

(analyzing potential for manipulation and "public availability" of domestic price quotes for

_____

    [99]Notably, neither the Chinese Producers nor the Domestic Producers raised any objection
to the fact that Commerce raised the contemporaneity and representativeness of the domestic price
quotes for the first time in the course of the remand proceeding.

cardboard cartons, in context of administrative review immediately preceding review at issue here).[100]  It is enough, first, to reiterate that no party has even alleged (much less offered any proof) that the domestic price quotes are the product of manipulation or collusion, or that they are inaccurate in any way, and, second, to note that, notwithstanding the detailed analysis in Zhengzhou Harmoni I, the Remand Determination indicates that Commerce took no action on remand to seek information to clarify the accuracy of the domestic price quotes, in order to address the agency's concerns about potential  "manipulation" – the stated basis for the agency's preference for "publicly available" data.  *See* Pls. Comments at 19-20, 25; Remand Determination at 46 (discussing public availability and referring to "the potential for manipulation inherent in accepting . . . price quotes"); *id*. at 42-43 (same; referring to "the possibility of manipulation," and asserting that "price quotes are easily manipulated"); *id*. at 70 (same; referring to the "potential for manipulation").[101]

---

[100]Similarly, the critique of the Remand Determination's treatment of the "contemporaneity" and "representativeness" of plastic jars and lids that is set forth above also applies with equal force to the Remand Determination's treatment of cardboard packing cartons.  *See generally* section III.D.4.b, *supra* (discussing accuracy of domestic price quotes for jars and lids, and Commerce's claims of volatility in prices of jars and lids).

[101]It is, of course, the Domestic Producers that have the incentive to come forward to affirmatively challenge the domestic price quotes if they are not accurate.  Presumably, if the price quotes submitted by the Chinese Producers did not fairly reflect the price of cardboard packing cartons throughout the period of review, the Domestic Producers would be the first to say so.

Significantly, however, although the Domestic Producers placed the Indian import statistics on the record of this proceeding, they have not sought to present any evidence suggesting that the domestic price quotes on the record were manipulated in any way.  Nor have the Domestic Producers otherwise sought to present any evidence challenging the accuracy of the four domestic price quotes.  They have never even claimed that the domestic price quotes do not accurately reflect the actual, correct price of cardboard cartons throughout the period of review.

In their comments on the remand results, the Domestic Producers raise no criticisms specific

Similarly, although Commerce raised the "contemporaneity" of the four domestic price quotes for the first time in the course of the remand, the Remand Determination observes simply that the price quotes – which predate the period of review by roughly four and one-half months[102] – are "not contemporaneous," and does not elaborate further.  *See* Remand Determination at 42, 43-44; *see also* Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 81), Exh. 17 (domestic price quotes for cardboard cartons); Def. Response at 18.[103]  Moreover, as discussed above

to the four domestic price quotes at issue here.  Instead, the Domestic Producers make the generic argument that "Commerce's long-standing practice reflects its preference not to use price quotes, due to the narrow scope of such information relative to [other] sources such as import statistics or broad pricing data and due to the potential for manipulation by the party submitting the quote(s)." *See* Def.-Ints. Reply Comments at 2-3.  It is similarly telling that the Domestic Producers did not brief this issue in the prior stage of this action.  Nor did the Domestic Producers file comments on the valuation of cardboard cartons in the course of the remand proceeding.  *See* Remand Determination at 2-5 (summarizing parties' participation in course of remand proceeding).  The Domestic Producers' participation on this issue was also limited in the underlying administrative review.  *See* Issues and Decision Memorandum at 63 (noting that Domestic Producers filed no comments on issue of cardboard cartons).

Finally, the very nature of the four domestic price quotes at issue here should serve to assuage, at least to some degree, Commerce's concerns about "manipulation."  If one were inclined to forge or manipulate price data, presumably one would produce data that were more clearly decisive – in other words, one would generate a greater number of price quotes, all of which would fall within the period of review and span the full duration of that period.  Viewed through this lens, the problems that Commerce sees in these price quotes are actually indicia of authenticity.

[102]All four price quotes are dated either June 19, 2003 or June 20, 2003.  *See* Remand Determination at 43-44; Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 81), Exh. 17 (domestic price quotes for cardboard cartons).

[103]The Final Results were silent on the "representativeness" of the four domestic price quotes for cardboard packing cartons.  *See* Issues and Decision Memorandum at 62-65.  But, incredibly, the Final Results actually stated that "the four price quotes . . . *are contemporaneous*." *See id*. at 64 (emphasis added).  (It is worth noting that the Chinese Producers themselves make the same mistake in one of their most recent briefs.  *See* Pls. Reply Comments at 15-16 (asserting that, rather than relying on Indian import statistics, Commerce should use the Chinese Producers' "*contemporaneous* domestic Indian price quotes") (emphasis added); *but see* Pls. Comments at 23 (noting that price

(and as the Remand Determination itself elsewhere concedes), contemporaneity is not as critical as Commerce intimates. *See*, *e.g.*, Remand Determination at 14 (explaining that Commerce "does not automatically disregard surrogate value data which are the most specific to the input in question solely on the basis that they are *post*-[*period of review*] *data*") (emphasis added); <u>Zhengzhou Harmoni I</u>, 33 CIT at ____ n.53, 617 F. Supp. 2d at 1323 n.53 (discussing contemporaneity of price quotes for jars and lids); <u>Taian Ziyang II</u>, 35 CIT at ____, ____, 2011 WL 3024720 * 30, 37 (same, in context of administrative review immediately preceding review at issue here); *see also*, *e.g.*, <u>Sichuan Changhong Elec. Co.</u>, 30 CIT at 1503-04, 460 F. Supp. 2d at 1358-59 (sustaining Commerce's reliance on non-contemporaneous data).[104]

As to "representativeness" (another issue that Commerce raised for the first time during remand), the Remand Determination states flatly that the price quotes "do not represent broad market averages and do not reflect prices throughout the [period of review]," and, further, that the price of basic cardboard packing cartons is "highly susceptible" to fluctuation. *See* Remand Determination at 70-71.[105] Significantly, however, the administrative record is devoid of evidence

---

quotes are "only four and a half months outside of the [period of review]").)

[104]Indeed, if necessary (and it is not clear that it is), there is no apparent reason why the price quotes submitted by the Chinese Producers could not be deflated to be contemporaneous, using the same methodology that Commerce itself used to deflate the Azadpur APMC data for use in valuing garlic bulb. *See* section III.A.1, *supra*.

[105]*See also* Remand Determination at 43 (asserting that "the record does not demonstrate that the . . . price quotes are representative of carton prices during the [period of review]," and that the price quotes at issue are "highly susceptible to temporary market conditions"); *id*. at 44 (expressing concern about "temporary market fluctuations"); *id*. at 45 (asserting that the price quotes at issue "do not represent broad market averages").

to support either of those conclusions.[106]  And – just as Commerce apparently made no attempt on

remand to elicit information which might cast light on the accuracy of the domestic price quotes, in

order to resolve the agency's previously-expressed concerns about potential "manipulation" – so too

the agency apparently took no action on remand to seek information to resolve its newly-identified

concerns about the "contemporaneity" and "representativeness" of the domestic price quotes, by (for

example) attempting to clarify whether or not the price of basic cardboard packing cartons in India

in fact does fluctuate significantly over relatively brief periods of time (or, more specifically,

whether it did so during the period of review, and in the four or five months thereafter), or even the

extent to which prices have historically fluctuated over time.  *Compare* Remand Determination at

42, 43-44, 70-71 (discussing "contemporaneity" and "representativeness" of domestic price quotes,

and referring to agency's concern about potential "temporary market fluctuations") *with* section

III.D.4.b, *supra* (discussing potential for manipulation and "public availability" of domestic price

quotes for jars and lids); *see also* <u>Taian Ziyang II</u>, 35 CIT at ____, ____, 2011 WL 3024720 * 17-18,

20-21 (analyzing "representativeness" of domestic price quotes for cardboard cartons, in context of

_____

[106]Although the Remand Determination expresses concern about the temporal "representativeness" of the domestic price quotes for cardboard packing cartons (*i.e.*, concern that the price quotes "are obtained from so isolated a time frame as to be subject to temporary market fluctuations"), nothing in the Remand Determination or the Final Results indicates a concern about the geographic representativeness of the price quotes, which are from vendors in four different cities. *See* Remand Determination at 42-44, 70-71; *see generally id.* at 41-46, 68-71 (expressing no concern about geographic representativeness); Issues and Decision Memorandum at 62-65 (same); Respondents' Surrogate Value Submission (Admin. Record Pub. Doc. 81), Exh. 17 (domestic price quotes for cardboard cartons).

administrative review immediately preceding review at issue here).[107]  It is not clear why the price

of basic cardboard packing cartons would be subject to any significant fluctuation – much less be

"highly susceptible" to such fluctuation, as the Remand Determination now asserts.  *See* Remand

Determination at 43, 70-71; Pls. Comments at 20; <u>Taian Ziyang II</u>, 35 CIT at ____, 2011 WL

3024720 * 21 (questioning Commerce's claims of high volatility in price of basic cardboard packing

cartons, in context of administrative review immediately preceding review at issue here).

     The great majority of the Remand Determination's discussion of cardboard packing cartons

is devoted to criticism of the domestic price quotes.  By comparison, the Remand Determination

essentially ignores the serious problems with the Indian import statistics that were detailed in

<u>Zhengzhou Harmoni I</u>.  *Compare* Remand Determination at 41-46, 68-71 *with* <u>Zhengzhou Harmoni</u>

<u>I</u>, 33 CIT at ____, ____, 617 F. Supp. 2d at 1312, 1315-21; *see* Pls. Comments at 19, 21.  Thus,

nothing in the Remand Determination responds to the concerns expressed in <u>Zhengzhou Harmoni</u>

<u>I</u> about the Indian import statistics' lack of product specificity.  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT

---

     [107]In the Remand Determination, Commerce asserts that the notation on one of the four price quotes indicating that the quote is "only valid for a limited time" constitutes evidence that the price of basic cardboard packing cartons is subject to fluctuation.  *See* Remand Determination at 43; *see also* Def. Response at 18.  However, there is nothing to indicate that the notation is anything more than standard contract "boilerplate."  In any event, the notation is far too flimsy and far too little to constitute the "substantial evidence" required to support a Commerce finding that the price of cardboard cartons was subject to significant fluctuation.

     The Remand Determination also asserts for the first time that only two of the four price quotes are "legible."  *See* Remand Determination at 43; *see also* Def. Response at 18.  However, it is much, much too late in the day for Commerce to raise that concern.  At this advanced stage of the proceeding, Commerce simply cannot now be heard to raise such a complaint, which, in any event, presents interesting questions as to exactly how the agency analyzed, and then rejected, evidence that it now claims it cannot read.

at _____, _____, 617 F. Supp. 2d at 1312, 1315-21; Pls. Comments at 21, 25; Pls. Reply Comments

at 13-14; *see also* <u>Taian Ziyang II</u>, 35 CIT at _____, 2011 WL 3024720 * 21-25 (analyzing remand

determination's treatment of Indian import statistics for cardboard cartons in administrative review

immediately preceding review at issue here).

Commerce made no attempt on remand to address the trade intelligence data placed on the

record by the Chinese Producers, or to otherwise ascertain the extent to which the values reflected

in the Indian import statistics on cardboard packing cartons are inflated by the inclusion of "myriad

. . . specialty products" that in no way resemble the simple, basic cardboard packing cartons at issue

in this case.  *See* <u>Zhengzhou Harmoni I</u>, 33 CIT at _____, 617 F. Supp. 2d at 1317 (quoting Chinese

Producers' brief) (internal quotation marks omitted); *see also id*., 33 CIT at _____ n.48, 617 F. Supp.

2d at 1318 n.48 (listing a sampling of the gift and specialty boxes and other products reflected in the

Indian import statistics); *id*., 33 CIT at _____ n.50, 617 F. Supp. 2d at 1319 n.50 (same); Remand

Determination at 45-46, 70 (acknowledging, without analyzing, Indian import statistics' lack of

product specificity, and distortive effect of inclusion of products unlike cardboard cartons at issue

here); Pls. Comments at 19, 21-22, 23, 24, 25-26; Pls. Reply Comments at 13; *see generally* <u>Taian</u>

<u>Ziyang II</u>, 35 CIT at _____, 2011 WL 3024720 * 22 (criticizing remand determination's treatment

of inclusion of "specialty" boxes and other more expensive products in Indian import statistics for

cardboard cartons, in administrative review immediately preceding review at issue here).[108]

---

[108]Commerce has now clearly acknowledged that the Indian import statistics are distorted by the inclusion of gift and specialty boxes and other more expensive products that are unlike the basic cardboard packing cartons at issue here.  *See* Remand Determination at 70 (conceding that the Indian import statistics are distorted because, *inter alia*, they "include specialty boxes"); *id*. at 45 (acknowledging that "the Indian import data in this case are less specific" than the four domestic

Similarly, nothing in the Remand Determination responds to the concerns expressed in Zhengzhou Harmoni I about the air freight costs reflected in the Indian import statistics on which Commerce relies.  See Zhengzhou Harmoni I, 33 CIT at ____, ____, 617 F. Supp. 2d at 1312, 1319-20; Pls. Comments at 21, 25; Pls. Reply Comments at 13.[109]  Commerce apparently made no attempt on remand to determine the volume of merchandise reflected in the Indian import statistics that was imported by air, or to otherwise demonstrate that the values reflected in the Indian import statistics are not significantly inflated by the inclusion of air freight costs.  See Remand Determination at 45-46, 70 (acknowledging, without analyzing, inclusion of air freight charges in Indian import statistics and the distortive effect of those charges); see also Pls. Comments at 21-22, 24, 25-26; Pls. Reply

_____

price quotes); see also Def. Response at 20.  Nevertheless, at several points, the Remand Determination seems to equivocate on this point.  See Remand Determination at 41 (referring to "certain specialty packing products [the] Chinese producers claim not to have used") (emphasis added); id. at 46 ("acknowledg[ing] the fact that . . . the Indian import data include specialty boxes," which "can have a distortive effect") (emphasis added); see also id. at 71 (asserting that the domestic price quotes are "possibly specific") (emphasis added).

[109]Just as it now clearly concedes the distortive effect of the Indian import statistics' inclusion of gift and specialty boxes and other more expensive products, so too Commerce now has unequivocally acknowledged that the Indian import statistics are distorted by the inclusion of air freight charges.  See Remand Determination at 70 (conceding that the Indian import statistics are distorted because, inter alia, they "include . . . boxes transported by air"); see also Def. Response at 20.  However, the Final Results did not concede that fact.  See Issues and Decision Memorandum at 65 (arguing that "[s]ome companies may import cartons into the PRC by air, while others may not" and that "the respondents have not submitted any documents . . . demonstrating that their own domestic carton suppliers did not import the products into the PRC by air").  Indeed, at several points, even the Remand Determination appears to waffle a bit.  See Remand Determination at 41 (stating that the Chinese Producers "claim that [the Indian import statistics] include[] products that, unlike those [the Chinese producers] used, were shipped by air") (emphasis added); id. at 45-46 (asserting that "the Indian import data may include airfreight") (emphasis added); id. at 46 ("acknowledg[ing] the fact that . . . the Indian import data include . . . boxes transported by air," which "can have a distortive effect") (emphasis added).

Comments at 13-14; *see generally* <u>Taian Ziyang II</u>, 35 CIT at _____, 2011 WL 3024720 * 22 (criticizing remand determination's treatment of inclusion of air freight charges in Indian import statistics for cardboard cartons, in administrative review immediately preceding review at issue here).

Much as it did with plastic jars (*see* section III.D.5, above), Commerce reopened the administrative record on remand to include import data from Indonesia, Sri Lanka, the Philippines, and Morocco for a number of tariff provisions. *See generally* Remand Determination at 2-4, 45-46. According to the Remand Determination, these new data "demonstrate[] that the Indian import statistics fall within the range of prices obtained from other comparable countries." *See id.* at 45-46; *see also* Def. Response at 20-21.  However, the new data do nothing to address the fundamental problems with the use of the Indian import statistics to value cardboard packing cartons, as outlined in <u>Zhengzhou Harmoni I</u>.

Neither the Remand Determination nor the Government seeks to explain how the new data serve to demonstrate that the Indian import statistics on which Commerce relies are not flawed.  And neither the Remand Determination nor the Government seeks to demonstrate that the new data do not suffer from the exact same flaws as the Indian import statics on which Commerce relies.  As the Chinese Producers observe, the fact that import data from other countries may show prices similar to the Indian import data does not support the accuracy of the Indian import data.  *See* Pls. Comments at 21-22.  The comparability of the prices reflected in the import data from the four additional countries and the prices reflected in the Indian import statistics instead suggests that the new import data – like the Indian import statistics – include many different types of more expensive

gift and specialty products (in addition to basic cardboard packing cartons), and also include

products imported by air.  *See id.*  In other words, nothing about the new data suggests that the

Indian import statistics that Commerce used to value cardboard cartons are not distorted by non-

comparable products and air freight charges; nor do the new data shed any light on the extent of the

distortion.  *See* section III.D.5, *supra* (critiquing Remand Determination's reliance on new import

data, in context of valuation of plastic jars and lids).

   The Remand Determination candidly concedes (as it must) that – like the Indian import

statistics for plastic jars and lids – the Indian import statistics on cardboard packing cartons are

"imperfect."  *See* Remand Determination at 46 (acknowledging that the Indian import statistics "do

not perfectly represent" the cardboard packing cartons actually used by the Chinese producers, due

to distortive effect of inclusion of gift and specialty boxes as well as air freight charges); *id.* at 70

(same); *see also* Def. Response at 24.  In other words, Commerce admits that the Indian import

statistics reflect inflated values as a surrogate for the cardboard cartons at issue here – both because

the import statistics include "many different types of boxes" in addition to the basic cardboard

cartons used to pack garlic, and because the import statistics include "boxes transported by air."  *See*

Issues and Decision Memorandum at 64; Remand Determination at 46, 70; *see also* Def. Response

at 20.  On the other hand, the domestic price quotes for cardboard packing cartons are "imperfect"

only in the sense that it has not been established to Commerce's satisfaction that the price quotes

were not manipulated and that the price quotes (which are not "contemporaneous," and, according

to Commerce, may not be "representative") fairly reflect prices throughout the period of review.

   In sum, here – as with plastic jars and lids – Commerce continues to choose *admittedly*

distorted data over data that the agency speculates may be *potentially* distorted.  *See generally* Pls.

Comments at 19; *id*. at 21.  Or, to make the point slightly differently, Commerce continues to choose

*admittedly distorted* Indian import statistics over *potentially "perfect"* price quotes.  And, as with

plastic jars and lids, Commerce apparently made its decision on cardboard packing cartons without

conducting any analysis (not even a qualitative analysis, much less a quantitative one) to ascertain

the extent of the *actual* distortion of the import statistics, for comparison to the extent to which

(according to Commerce) the domestic price quotes might *potentially* be distorted.  *See generally*

section III.D.5, *supra* (criticizing Remand Determination's selection of admittedly distorted Indian

import statistics over potentially distorted price quotes for valuation of jars and lids); *see also* Taian

Ziyang II, 35 CIT at _____, 2011 WL 3024720 * 24 (same, in context of administrative review

immediately preceding review at issue here).  As such, the Remand Determination's conclusions that

the Indian import statistics are "sufficiently specific" and constitute the "best available information"

for use in valuing cardboard cartons are unexplained, are not rational, and lack any sound basis in

the existing administrative record, and therefore cannot be sustained.  *See* Remand Determination

at 46, 71.

        The Chinese Producers contend that this issue should be "remanded . . . to Commerce with

instructions to use the domestic price quotes for cartons."  *See* Pls. Comments at 26.  Instead, much

like plastic jars and lids, the issue of the valuation of cardboard packing cartons will be remanded

for further consideration not inconsistent with the analysis herein and in Zhengzhou Harmoni I, and

with the caution that no further remands are likely.

        On remand, Commerce shall reopen the record to evidence concerning the domestic price

quotes and the Indian import statistics (as well as alternative sets of data, if any, that may be appropriate).   Commerce shall accept further evidence from the parties, in addition to any information that the agency wishes to place on the record; and Commerce shall allow the parties sufficient time to submit further evidence, to respond to any information that the agency may place on the record, and to provide comments on the agency's draft results of the remand.

## IV.  <u>Conclusion</u>

For all the reasons set forth above, Commerce's Remand Determination must be sustained as to the agency's surrogate value for the Chinese Producers' ocean freight costs.   However, the issues of the surrogate values for garlic bulb, labor, plastic jars and lids, and cardboard cartons must be remanded to the agency once again, for further action not inconsistent with this opinion.

A separate order will enter accordingly.


                                                        _____/s/ Delissa A. Ridgway_____
                                                               Delissa A. Ridgway
                                                                     Judge

Dated:  September 26, 2011
            New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

| | |
|---|---|
| JINAN YIPIN CORPORATION, LTD., LINSHU DADING PRIVATE AGRICULTURAL PRODUCTS CO., LTD., and SUNNY IMPORT & EXPORT LTD., | : |
| | : |
| | : |
| *Plaintiffs*, | : |
| | : |
| v. | : |
| | :    Court No. 06-00189 |
| UNITED STATES, | |
| | : |
| *Defendant*, | : |
| and | |
| | : |
| FRESH GARLIC PRODUCERS ASSOCIATION, CHRISTOPHER RANCH, L.L.C., THE GARLIC COMPANY, VALLEY GARLIC, and VESSEY AND COMPANY, INC., | : |
| | : |
| | : |
| *Defendant-Intervenors*. | : |

_____

## ORDER

In accordance with the opinion of the Court issued this date in this matter, it is hereby

ORDERED that this matter is remanded to the U.S. Department of Commerce for further proceedings not inconsistent with that opinion; and it is further

ORDERED that the Commerce Department shall file the results of this remand with the Court no later than December 30, 2011; and it is further

ORDERED that any comments on those results shall be filed no later than February 13, 2012; and it is further

ORDERED that Defendant's response to comments shall be filed no later than February 28, 2012; and it is further

ORDERED that any replies to Defendant's response to comments shall be filed no later than March 14, 2012.


_____/s/ Delissa A. Ridgway_____
Delissa A. Ridgway, Judge


Dated: September 26, 2011
       New York, New York