**Slip Op. 14-34**

UNITED STATES COURT OF INTERNATIONAL TRADE

---

JINAN YIPIN CORPORATION, LTD., LINSHU   :
DADING PRIVATE AGRICULTURAL
PRODUCTS CO., LTD., and SUNNY IMPORT   :
AND EXPORT CO., LTD.,

  :

*Plaintiffs*,   :

v.   :

  :    Court No. 06-00189

UNITED STATES,

  :

*Defendant*,   :

and   :

  :

FRESH GARLIC PRODUCERS ASSOCIATION,
CHRISTOPHER RANCH, L.L.C., THE   :
GARLIC COMPANY, VALLEY GARLIC,
and VESSEY AND COMPANY, INC.,   :

*Defendant-Intervenors*.   :

---

[Sustaining U.S. Department of Commerce's second remand determination in tenth administrative review of antidumping duty order covering fresh garlic from the People's Republic of China]

Dated: March 28, 2014

Mark E. Pardo, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., argued for Plaintiffs.

Richard P. Schroeder, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant. With him on the brief were Stuart F. Delery, Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch. Of counsel on the brief was George Kivork, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

Michael J. Coursey, Kelley Drye & Warren, LLP, of Washington, D.C., argued for Defendant-Intervenors . With him on the brief was John M. Herrmann.

# OPINION

RIDGWAY, Judge:

Seven plaintiff Chinese producers and exporters of fresh garlic commenced this action to challenge the final results of the U.S. Department of Commerce's tenth administrative review of the antidumping duty order covering fresh garlic from the People's Republic of China.  *See generally* Fresh Garlic from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review and Final Results of New Shipper Review, 71 Fed. Reg. 26,329 (May 4, 2006) ("Final Results"); *see also* Issues and Decision Memorandum for the Administrative Review and New Shipper Reviews of the Antidumping Duty Order on Fresh Garlic from the People's Republic of China (April 26, 2006) (Pub. Doc. No. 462) ("Issues and Decision Memorandum"); <u>Zhengzhou Harmoni Spice Co. v. United States</u>, 33 CIT 453, 617 F. Supp. 2d 1281 (2009) ("<u>Jinan Yipin I</u>"); <u>Jinan Yipin Corp. v. United States</u>, 35 CIT ____, 800 F. Supp. 2d 1226 (2011) ("<u>Jinan Yipin II</u>").

<u>Jinan Yipin I</u> analyzed the seven issues raised by the plaintiff Chinese producers/exporters, sustaining Commerce's determination as to two of the issues and remanding the remaining five to the agency.  *See generally* <u>Jinan Yipin I</u>, 33 CIT at 458, 514-15, 617 F. Supp. 2d at 1289, 1334. <u>Jinan Yipin II</u> reviewed Commerce's First Remand Determination, filed pursuant to <u>Jinan Yipin I</u>. *See generally* Final Results of Redetermination Pursuant to Court Remand ("First Remand Determination").  As to one of the five issues addressed therein, there were no objections.  <u>Jinan Yipin II</u> sustained the First Remand Determination as to that issue, and, upon analysis, remanded the other four to Commerce for further consideration. *See generally* <u>Jinan Yipin II</u>, 35 CIT at ____,

____, 800 F. Supp. 2d at 1235, 1315-16.

Now pending before the court is Commerce's Second Remand Determination, filed pursuant to Jinan Yipin II.  *See generally* Final Remand Results of Redetermination Pursuant to Second Remand ("Second Remand Determination").  The Domestic Producers (*i.e.*, the Fresh Garlic Producers Association and its four constituent members),[1] Defendant-Intervenors in this action, challenge the Second Remand Determination as to one of the four issues addressed therein.  *See generally* Defendant-Intervenors' Comments Regarding Second Remand Redetermination ("Def.-Ints.' Brief"); Defendant-Intervenors' Reply Comments Regarding Second Remand Redetermination ("Def.-Ints.' Reply Brief").  For their part, the Government and the three Plaintiff Chinese producers/exporters – *i.e.*, Jinan Yipin Corporation, Ltd. ("Jinan Yipin"), Linshu Dading Private Agricultural Products Co., Ltd. ("Linshu Dading"), and Sunny Import and Export Co., Ltd. ("Sunny") (collectively, the "Chinese Producers") – urge that the Second Remand Determination be sustained in all respects.  *See* Defendant's Response to Comments Regarding Redetermination Pursuant to Court Remand ("Def.'s Response Brief") at 1-2, 16; Plaintiffs' Response to Defendant-Intervenors' Comments Regarding Second Remand Redetermination ("Pls.' Response Brief") at 6.

Jurisdiction lies under 28 U.S.C. § 1581(c) (2000).[2]  For the reasons detailed below, Commerce's Second Remand Determination is sustained.

---

[1]The four constituent members of the Fresh Garlic Producers Association are Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc.

[2]All citations to federal statutes are to the 2000 edition of the United States Code.  Similarly, all citations to federal regulations are to the 2003 edition of the Code of Federal Regulations.

# I. <u>Background</u>

Seven Chinese producers and exporters of fresh garlic brought this action to contest various aspects of the Final Results of Commerce's tenth administrative review of the antidumping duty order on fresh garlic from China, which covered the period from November 1, 2003 through October 31, 2004. *See generally* <u>Jinan Yipin I</u>, 33 CIT 453, 617 F. Supp. 2d 1281; Final Results, 71 Fed. Reg. 26,329.

<u>Jinan Yipin I</u> analyzed each of the seven issues that the plaintiff Chinese producers/exporters raised, sustaining Commerce's determination as to two issues and remanding the other five for further consideration. *See generally* <u>Jinan Yipin I</u>, 33 CIT at 458, 514-15, 617 F. Supp. 2d at 1289, 1334.[3] Specifically, <u>Jinan Yipin I</u> sustained Commerce's use of the agency's intermediate input methodology to value raw garlic bulbs. *See id.*, 33 CIT at 458, 458-66, 514, 617 F. Supp. 2d at 1289, 1289-95, 1334. <u>Jinan Yipin I</u> similarly sustained Commerce's surrogate financial ratios against the Chinese producers' allegations of "double-counting" of certain labor-related expenses (*i.e.*, "provident fund" and "gratuity" expenses). *See id.*, 33 CIT at 458, 506-14, 514, 617 F. Supp. 2d at 1289, 1327-34, 1334. In contrast, <u>Jinan Yipin I</u> remanded for further consideration Commerce's valuation of certain "factors of production" necessary for the cultivation and export

---

[3]Only four of the seven original Plaintiffs moved for judgment on the agency record, *i.e.*, Zhengzhou Harmoni Spice Co., Ltd., Jinan Yipin Corporation, Ltd., Linshu Dading Private Agricultural Products Co., Ltd., and Sunny Import and Export Co., Ltd. The other three – Jining Trans-High Trading Co., Ltd., Jinxiang Shanyang Freezing Storage Co., Ltd., and Shanghai LJ Trading Co., Ltd. – played no role in the briefing or oral argument, and were later voluntarily dismissed from this action, together with Zhengzhou Harmoni Spice Co., Ltd. *See* <u>Jinan Yipin I</u>, 33 CIT at 454 & n.2, 617 F. Supp. 2d at 1285 & n.2; n.4, *infra* (summarizing proceedings leading to voluntarily dismissal of four of original seven Plaintiffs).

of fresh garlic – in particular, (1) raw garlic bulbs, (2) labor, (3) ocean freight, (4) cardboard packing

cartons, and (5) plastic jars and lids.  *See id.*, 33 CIT at 458, 466-73, 473-80, 481-87, 487-98, 498-

506, 514-15, 617 F. Supp. 2d at 1289, 1295-1301, 1301-07, 1307-12, 1312-21, 1321-1327, 1334.[4]

In its First Remand Determination, Commerce revalued raw garlic bulbs, labor, and ocean

freight.  *See* First Remand Determination at 5-15, 15-38, 38-41.  On the other hand, Commerce

continued to value cardboard packing cartons and plastic jars and lids as it had in the Final Results.

*See id.* at 41-46, 46-50, 68-71, 71-74.  As a result of its reconsideration in the course of the first

remand, Commerce recalculated the weighted-average antidumping duty margin for  Jinan Yipin

as 55.18% (up from 29.52%), for Linshu Dading as 39.51% (up from 22.47%), and for Sunny as

26.67% (up from 10.52%).  *See id.* at 74-75; Final Results, 71 Fed. Reg. at 26,332.

Commerce's First Remand Determination was the subject of Jinan Yipin II.  *See generally*

Jinan Yipin II, 35 CIT at _____, 800 F. Supp. 2d at 1226.  In the absence of any objections to the First

Remand  Determination's  treatment  of  the  surrogate  value  for  ocean  freight,  Commerce's

determination on that issue was sustained.  *See generally id.*, 35 CIT at _____, _____, _____, 800 F.

Supp. 2d at 1235-36, 1276-79, 1315 (sustaining First Remand Determination as to ocean freight

---

[4]Following Jinan Yipin I but before Commerce issued its First Remand Determination, four
of the seven Chinese producers that filed the Complaint in this action moved for voluntary dismissal
with prejudice, which was granted.  *See generally* Zhengzhou Harmoni Spice Co. v. United States,
34 CIT _____, 675 F. Supp. 2d 1320 (2010) (dismissing action as to Zhengzhou Harmoni Spice Co.,
Ltd., Jining Trans-High Trading Co., Ltd., Jinxiang Shanyang Freezing Storage Co., Ltd., and
Shanghai LJ International Trading Co., Ltd.).  The antidumping duty margins for those four Chinese
producers therefore remain unchanged from the Final Results.  *See* First Remand Determination at
4; Final Results, 71 Fed. Reg. at 26,332 (0.27% for Zhengzhou Harmoni Spice Co., Ltd.; 0.00% for
Jining Trans-High Trading Co., Ltd.; 14.79% for Jinxiang Shanyang Freezing Storage Co., Ltd.;
0.00% for Shanghai LJ International Trading Co., Ltd.).

expenses).  However, the agency's treatment of the four remaining issues – *i.e.*, the surrogate values

for raw garlic bulbs, labor expenses, cardboard packing cartons, and plastic jars and lids – remained

in dispute.   In light of the Chinese Producers' arguments and the Government's request for a

voluntary remand, Jinan Yipin II once again remanded to Commerce the issue of labor expenses.

*See generally id.*, 35 CIT at ____, ____, ____, 800 F. Supp. 2d at 1236, 1274-76, 1315-16.

Similarly, the issues of the valuation of raw garlic bulbs, cardboard packing cartons, and plastic jars

and lids also were remanded to Commerce yet again.  *See generally id.*, 35 CIT at ____, ____, ____,

____, ____, 800 F. Supp. 2d at 1236, 1236-74, 1279-1307, 1307-15, 1315-16.

       In its Second Remand Determination, Commerce has revalued raw garlic bulbs, using data

from the Indian Agricultural Marketing Information Network ("Agmarknet") for garlic grown in the

five "long-day zone" states of India.  *See* Second Remand Determination at 1, 10, 12-17, 31, 36.

Commerce also has now recalculated the surrogate labor rate in accordance with the agency's

revised methodology.   *See id.* at 1, 24-31, 38 (relying on Antidumping Methodologies in

Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 Fed.

Reg. 36,092 (June 21, 2011); also reconsidering valuation of labor data reflected in surrogate

financial ratios, and revising average surrogate financial ratios accordingly).  In addition, to value

cardboard packing cartons as well as plastic jars and lids for purposes of the Second Remand

Determination, Commerce has implicitly adopted the fundamental reasoning of Jinan Yipin II and

has therefore relied on the domestic Indian price quotes that the Chinese Producers had placed on

the administrative record, in lieu of the Indian import statistics that the agency relied on in its prior

determinations in this case.  *See* Second Remand Determination at 1, 23-24, 38.[5]  As a result of these

changes, the Second Remand Determination calculates the margins for both Jinan Yipin and Linshu

Dading to be 0.00%, and 0.04% for Sunny.  *See id*. at 1-2.

Although they do not dispute Commerce's revised surrogate values for labor, cardboard

packing cartons, and plastic jars and lids,[6] the Domestic Producers contest the Second Remand

Determination as to the surrogate value for raw garlic bulbs.  *See generally* Def.-Ints.' Brief; Def.-

Ints.' Reply Brief.  Specifically, the Domestic Producers contend that this matter must be remanded

to Commerce yet again "to select a surrogate value that is specific to the fresh garlic exported to the

United States by the [Chinese Producers]."  Def.-Ints.' Brief at 2; *see also id*. at 21-22; Def.-Ints.'

Reply Brief at 2, 10-11.  In contrast, the Government and the Chinese Producers urge that the

Second Remand Determination be sustained in all respects.  *See* Def.'s Response Brief at 1-2, 16;

Pls.' Response Brief at 6.

---

[5]The Second Remand Determination states that Commerce used the domestic price quotes "under protest."  *See* Second Remand Determination at 1, 24.  As explained below, however, Jinan Yipin II did not impose any outcome or result on Commerce.  *See* nn.32, 47, *infra*.

[6]Notably, the Domestic Producers have not objected to Commerce's use of domestic Indian price quotes in valuing cardboard packing cartons and plastic jars and lids in this Second Remand Determination in the tenth administrative review, although they did object to such price quotes in Taian Ziyang, a companion case involving the ninth administrative review of the same antidumping duty order that is at issue in this action.  *See* Second Remand Determination at 6 (noting that Domestic Producers' comments on draft Second Remand Determination addressed only valuation of raw garlic bulbs); Def.-Ints.' Brief, *passim* (objecting only to agency's valuation of raw garlic bulbs); Def.-Ints.' Reply Brief, *passim* (same); *cf*. Taian Ziyang Food Co. v. United States, 37 CIT ____, ____, ____, 918 F. Supp. 2d 1345, 1358-69, 1369-76 (2013) ("Taian Ziyang III") (analyzing and rejecting Domestic Producers' objections to agency's use of domestic Indian price quotes in valuing cardboard packing cartons and plastic jars and lids in ninth administrative review).

## II.  Standard of Review

In an action reviewing an antidumping determination by Commerce, the agency's

determination must be upheld except to the extent that it is found to be "unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i);

*see also* NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  Substantial

evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  Universal Camera Corp. v. Nat'l Labor

Relations Bd., 340 U.S. 474, 477 (1951) (*quoting* Consol. Edison Co. v. Nat'l Labor Relations Bd.,

305 U.S. 197, 229 (1938)); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375,

1380 (Fed. Cir. 2008) (same).  Moreover, any evaluation of the substantiality of evidence "must take

into account whatever in the record fairly detracts from its weight," including "contradictory

evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones

Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting* Universal Camera

Corp., 340 U.S. at 487-88); *see also* Mittal Steel, 548 F.3d at 1380-81 (same).  That said, the mere

fact that it may be possible to draw two inconsistent conclusions from the record does not prevent

Commerce's determination from being supported by substantial evidence.  Am. Silicon Techs. v.

United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also* Consolo v. Federal Maritime Comm'n,

383 U.S. 607, 620 (1966).

Finally, while Commerce must explain the bases for its decisions, "its explanations do not

have to be perfect."  NMB Singapore, 557 F.3d at 1319-20.  Nevertheless, "the path of Commerce's

decision must be reasonably discernable," to support judicial review.  *Id*. (*citing* Motor Vehicle

Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); *see generally* 19 U.S.C. §

1677f(i)(3)(A) (requiring Commerce to "include in a final determination . . . an explanation of the

basis for its determination").

### III.  Analysis

As Jinan Yipin II explained, dumping occurs when goods are imported into the United States

and sold at a price lower than their "normal value," resulting in material injury (or the threat of

material injury) to the U.S. industry.  *See* Jinan Yipin II, 35 CIT at _____, 800 F. Supp. 2d at 1233

(*citing* 19 U.S.C. §§ 1673, 1677(34), 1677b(a)); *see generally* Jinan Yipin II, 35 CIT at _____, 800

F. Supp. 2d at 1233-35.  The difference between the normal value of the goods and the U.S. price

is the "dumping margin."  *See* 19 U.S.C. § 1677(35).  When normal value is compared to the U.S.

price and dumping is found, antidumping duties equal to the dumping margin are imposed to offset

the dumping.  *See* 19 U.S.C. § 1673.

Normal value is typically calculated using either the price in the exporting market (*i.e.*, the

price in the "home market" where the goods are produced) or the cost of production of the goods,

when the exporting country is a market economy country.  *See generally* 19 U.S.C. § 1677b.[7]

However, where – as here – the exporting country has a non-market economy ("NME"), there is

often concern that the factors of production used to produce the goods at issue are under state

control, and that home market sales may not be reliable indicators of normal value.  *See* 19 U.S.C.

_____

[7]In addition, in certain market economy cases, Commerce may calculate normal value using the price in a third country (*i.e.*, a country other than the exporting country or the United States). *See*, *e.g.*, RHP Bearings Ltd. v. United States, 288 F.3d 1334, 1338 (Fed. Cir. 2002) (discussing 19 U.S.C. §§ 1677b(a)(1)(B)(ii), 1677b(a)(1)(C)); *see also* Ningbo Dafa Chem. Fiber Co. v. United States, 580 F.3d 1247, 1251 n.1 (Fed. Cir. 2009) (explaining exception).

§ 1677(18)(A).

In cases such as this, where the subject merchandise is exported from an NME country and Commerce concludes that concerns about the sufficiency or reliability of the available data do not permit the normal value of the goods to be determined in the typical manner, Commerce "determine[s] the normal value of the subject merchandise on the basis of the value of the factors of production," including "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *See* 19 U.S.C. § 1677b(c)(1); *see generally* Ningbo Dafa Chem. Fiber Co. v. United States, 580 F.3d 1247, 1250-51 (Fed. Cir. 2009) (briefly summarizing "factors of production" methodology).[8]  The antidumping statute requires Commerce to value factors of production "based on the *best available information* regarding the values of such factors" in an appropriate surrogate market economy country – in this case, India.  *See* 19 U.S.C. § 1677b(c)(1) (emphasis added); *see also* Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001); Ningbo, 580 F.3d at 1254 (emphasizing that statute mandates that Commerce "shall" use "best available information" in valuing factors of production).

In determining which data constitute the "best available information," Commerce generally looks to the criteria set forth in its "Policy Bulletin 04.1," also known as the "NME Surrogate Country Policy Bulletin."  Policy Bulletin 04.1 explains:

> In assessing data and data sources, it is [Commerce's] stated practice to use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are

---

[8]Factors of production "include, but are not limited to . . . hours of labor required, . . . quantities of raw materials employed, . . . amounts of energy and other utilities consumed, and . . . representative capital cost, including depreciation." *See* 19 U.S.C. § 1677b(c)(3); *see also* Dorbest Ltd. v. United States, 604 F.3d 1363, 1367 (Fed. Cir. 2010) (discussing factors of production).

contemporaneous with the period of investigation or review, and publicly available data.

*See* Import Administration Policy Bulletin 04.1, "Non-Market Economy Surrogate Country Selection Process," at "Data Considerations" (March 1, 2004) ("Policy Bulletin 04.1")[9]; *see also* First Remand Determination at 42 (quoting Policy Bulletin and stating that it reflects agency's "well-established practice for determining the reliability and appropriateness of surrogate values").

Within this general framework, the statute "accords Commerce wide discretion in the valuation of factors of production in the application of [the statute's] guidelines." *See* Shakeproof, 268 F.3d at 1381 (internal quotation marks and citation omitted); *see also* Ad Hoc Shrimp Trade Action Committee v. United States, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (same); Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (same).  Commerce is recognized as the "master of antidumping law." *See* Thai Pineapple Public Co. v. United States, 187 F.3d 1362, 1365 (Fed. Cir. 1999); *see also* Shakeproof, 268 F.3d at 1381 (acknowledging "Commerce's special expertise").  And "[t]he process of constructing foreign market value for a producer in a non-market economy country is difficult and necessarily imprecise." *Id.*

Nevertheless, Commerce's discretion is not boundless.   In exercising its discretion,

---

[9]As Jinan Yipin II explained, Policy Bulletin 04.1 clearly states that the five specified criteria – *i.e.*, "investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data" – were developed to serve as a "tie-breaker," if necessary, in Commerce's identification of a surrogate country.  *See* Jinan Yipin II, 35 CIT at ____ n.7, 800 F. Supp. 2d at 1234 n.7.  The criteria were not promulgated for the purpose of guiding Commerce's selection from among alternative data sources *after* a surrogate country has been identified.  *Id.*  Nevertheless, Commerce has used the criteria for that purpose here and in many other cases.  *Id.*

Commerce is constrained by the purpose of the antidumping statute, which is "to determine antidumping margins 'as accurately as possible.'" *See* Shakeproof, 268 F.3d at 1382 (*quoting* Lasko Metal Products, Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994)).  And, Commerce's discretion notwithstanding, "a surrogate value must be as representative of the situation in the [non-market economy] country as is feasible."  *See* Nation Ford, 166 F.3d at 1377 (internal quotation marks and citation omitted).  Thus, "[i]n determining the valuation of . . . factors of production, the critical question is whether the methodology used by Commerce is based on *the best available information* and establishes antidumping margins *as accurately as possible*."  *See* Ningbo, 580 F.3d at 1257 (emphases added) (*quoting* Shakeproof, 268 F.3d at 1382) (internal quotation marks omitted).

In the present case, pursuant to the instructions in Jinan Yipin II, Commerce's Second Remand Determination reconsidered and revised the surrogate value for raw garlic bulbs, as well as the surrogate values for labor, cardboard packing cartons, and plastic jars and lids.  As discussed in greater detail below, that determination is sustained in all respects.

## A.  Surrogate Value for Raw Garlic Bulbs

In the administrative review at issue, rather than valuing the Chinese Producers' so-called "growing" and "harvesting" factors of production (*i.e.*, the garlic seed, water, pesticides, herbicides, fertilizer, plastic film, labor, and other "inputs" (commodities) consumed by Chinese producers in cultivating and harvesting whole raw garlic bulbs), Commerce broke with its past practice and employed the agency's "intermediate input methodology" to value the whole raw garlic bulb (the "intermediate input") itself.  *See* Jinan Yipin I, 33 CIT at 456-57, 460-61, 617 F. Supp. 2d at 1288,

1291; *see also* Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1236.[10]  Jinan Yipin I rejected the

Chinese Producers' objections to Commerce's use of its intermediate input methodology here.  *See*

Jinan Yipin I, 33 CIT at 458, 466, 514, 617 F. Supp. 2d at 1289, 1295, 1334; *see generally id.*, 33

CIT at 458-66, 617 F. Supp. 2d at 1289-95 (reviewing the Chinese Producers' objections to

intermediate input methodology).  On the other hand, Jinan Yipin I sustained the Chinese Producers'

challenge to the surrogate value for raw garlic bulbs that Commerce calculated for use in the Final

Results, principally on the grounds that the record evidence did not establish that the data on which

Commerce relied were sufficiently "product-specific."  *See id.*, 33 CIT at 458, 469-71, 473, 514-15,

617 F. Supp. 2d at 1289, 1298-99, 1301, 1334; *see generally id.*, 33 CIT at 466-73, 617 F. Supp. 2d

at 1295-1301 (analyzing Chinese Producers' challenge to surrogate valuation of raw garlic bulbs).

     As Jinan Yipin I explained, the Chinese Producers' garlic "is a large, high yield, high-quality

---

[10]For a summary overview of Commerce's intermediate input methodology, *see* Jining
Yongjia Trade Co. v. United States, 34 CIT ____, ____ & n.6, 2010 WL 5121964 * 2 & n.6 (2010)
(explaining, *inter alia*, that, when Commerce employs its intermediate input methodolgy, "the cost
(or value) of the whole garlic bulb [is] used as a substitute for the costs of the growing and
harvesting [factors of production] ('upstream FOPs') actually reported by [the foreign producer at
issue]").

     In prior administrative reviews, Commerce used the agency's standard upstream "factors of
production" methodology, rather than the intermediate input methodology employed here.  In those
prior reviews, Commerce calculated separate surrogate values for garlic *seed* and other so-called
"growing" and "harvesting" factors of production.  *See* Jinan Yipin I, 33 CIT at 456-57, 460, 467
n.19, 617 F. Supp. 2d at 1287-88, 1290-91, 1296 n.19; *see also, e.g.*, Taian Ziyang Food Co. v.
United States, 33 CIT 828, 860-64, 637 F. Supp. 2d 1093, 1124-27 (2009) ("Taian Ziyang I")
(analyzing Commerce's valuation of garlic seed in ninth administrative review); Jinan Yipin Corp.
v. United States, 31 CIT 1901, 1924-30, 526 F. Supp. 2d 1347, 1367-72 (2007) (same, in eighth
review).  In the instant (tenth) administrative review (and in subsequent reviews), Commerce has
used the intermediate input methodology, due to problems with the data reported by the Chinese
producers in past reviews for their "growing" and "harvesting" factors of production.  *See* Jinan
Yipin I, 33 CIT at 455-57, 460-61, 617 F. Supp. 2d at 1287-88, 1290-91.

type of garlic that is distinct from the overwhelming majority of garlic grown in India." *See* Jinan

Yipin I, 33 CIT at 467, 617 F. Supp. 2d at 1296; *see also* Issues and Decision Memorandum at 42

(same). In the Final Results, Commerce calculated a surrogate value for raw garlic bulbs using data

from the Indian Agricultural Marketing Information Network ("Agmarknet") for a category of garlic

referred to as "China" garlic. *See* Jinan Yipin I, 33 CIT at 467-68, 617 F. Supp. 2d at 1296-97;

Issues and Decision Memorandum at 39-44, 47; *see also* Jinan Yipin II, 35 CIT at ____, 800 F.

Supp. 2d at 1236-37. As support for Commerce's finding that the "China" category of garlic is

sufficiently product-specific to the Chinese Producers' large-bulb garlic, the Final Results relied on

information drawn from "Market Research on Fresh Whole Garlic in India," a June 2003 report

prepared by consultants to the Domestic Producers, which the Domestic Producers placed on the

record of this administrative review. *See* Jinan Yipin I, 33 CIT at 469, 617 F. Supp. 2d at 1297-98;

*see also* Issues and Decision Memorandum at 40-41; Domestic Producers' Surrogate Value

Submission (Pub. Doc. No. 417), Exh. 33 ("Market Research Report").[11]

Relying on the Market Research Report and additional information on the record, the Final

Results explained that Chinese garlic exported to the United States is characterized by its relatively

large bulb size; that the bulb size of local, native garlic typically grown and sold in the Indian market

---

[11]The Market Research Report was first placed on the record of the eighth administrative review of the antidumping order on fresh garlic from China. *See* Second Remand Determination at 8 n.30 (explaining that Market Research Report "was originally submitted on the record of the 2001-2002 administrative review"). The same Market Research Report was later placed on the record of the second remand in litigation involving the ninth administrative review, as well as the record of the review here at issue. *See* Jinan Yipin I, 33 CIT at 469, 617 F. Supp. 2d at 1297-98; Taian Ziyang Food Co. v. United States, 35 CIT ____, ____ & nn.11-12, 783 F. Supp. 2d 1292, 1303-04 & nn.11-12 (2011) ("Taian Ziyang II") (reviewing second remand determination in ninth administrative review).

is significantly smaller; and that, in India, cultivation of large-bulb garlic is generally confined to the country's "long-day zone," which enjoys longer periods of sunlight.  *See* Jinan Yipin I, 33 CIT at 468-69, 617 F. Supp. 2d at 1297; Issues and Decision Memorandum at 41-44.  Based on this and other information, the Final Results concluded that the Agmarknet data for "China" category garlic must represent sales of large-bulb garlic from India's long-day zone.  *See* Jinan Yipin I, 33 CIT at 469, 617 F. Supp. 2d at 1298; *see also* Issues and Decision Memorandum at 40-42.

However, as Jinan Yipin I emphasized, the Agmarknet data provide no description of the physical characteristics of "China" garlic (or any other category of garlic reflected therein).  *See* Jinan Yipin I, 33 CIT at 468-71, 617 F. Supp. 2d at 1297-99; *see also* Issues and Decision Memorandum at 42 (noting that Agmarknet data do not include descriptions of categories of garlic reflected in the data).  Noting that the Final Results apparently relied on the Agmarknet data "based on nothing more than perhaps the name of the variety, and the fact that [the "China" category] had a higher weighted-average price," Jinan Yipin I held that the Final Results were therefore "largely speculative and conclusory" and "lack[ed] adequate support in the evidentiary record."  *See* Jinan Yipin I, 33 CIT at 468-70, 617 F. Supp. 2d at 1297-98.  Jinan Yipin I concluded that, absent some proof of the physical characteristics of "China" garlic, the Final Results' calculation of a surrogate value based on Agmarknet data for that category of garlic was not supported by substantial evidence and could not be sustained on the then-existing record.  *See id.*  The valuation of raw garlic bulbs was thus remanded to the agency for further consideration.  *See id.*, 33 CIT at 458, 473, 514-15, 617 F. Supp. 2d at 1289, 1301, 1334.

In addition to the Chinese Producers' concerns about product specificity (discussed above),

Jinan Yipin I addressed a number of other issues.  *See generally* Jinan Yipin I, 33 CIT at 471-73, 617 F. Supp. 2d at 1299-1301.  Among other things, the Chinese Producers argued that the Agmarknet data actually reflect a final product and not an intermediate input at all.  Specifically, the Chinese Producers asserted that, because the Agmarknet prices – by definition – represent garlic sold at market, the prices do not reflect an intermediate product and inherently include post-harvest factors of production.  *See id*., 33 CIT at 472, 617 F. Supp. 2d at 1300.  The Chinese Producers thus contended that the Final Results "impermissibly inflated the surrogate value of fresh garlic by adding additional post-harvest factors of production (*e.g.*, sales, packing, and transportation costs) to a figure that already reflected such costs."  *See id*.  Jinan Yipin I instructed Commerce, on remand, to consider "the potential for double counting that may result when using data from the Agmarknet database, which presumably contains information regarding Indian market transactions and is representative of the *final* garlic product rather than an *intermediate* garlic product (*i.e.*, garlic bulb)."  *See id*.  Jinan Yipin I specifically cautioned that, "when valuing an intermediate product in [a non-market economy] country case, [Commerce] must find a surrogate representative of that intermediate product."  *See id*., 33 CIT at 472-73, 617 F. Supp. 2d at 1300.

Citing the concerns identified in Jinan Yipin I (particularly the lack of any physical description of "China" garlic and the various other categories of garlic reflected in the Agmarknet data), the First Remand Determination declined to rely on the Agmarknet data.  *See* First Remand Determination at 5, 7-8, 15.  Instead, the First Remand Determination relied on an additional set of data, which Commerce placed on the record in the course of the first remand proceeding – *i.e.*, information on garlic prices at the produce market near Delhi operated by the Azadpur Agricultural

Produce Marketing Committee ("APMC"), as published in the Azadpur APMC's "Market Information Bulletin," for the two-and-one-half-month period from May 1, 2006 through July 14, 2006.  *See id.* at 2, 6, 10, 13, 15; *see also* <u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp. 2d at 1238.[12] The First Remand Determination concluded that the Azadpur APMC data constituted "the best information available with which to value [the Chinese Producers'] garlic bulb," even though – much like the Agmarknet data – the Azadpur APMC data do not describe the physical characteristics of the garlic to which they refer.  *See* First Remand Determination at 14; Azadpur APMC data; *see also* <u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp. 2d at 1239.  Accordingly, to establish the "product specificity" of the Azadpur APMC data, Commerce had to rely on the Domestic Producers' Market Research Report.  *See* First Remand Determination at 11; Market Research Report at 21.

Jinan Yipin II closely critiqued – and roundly rejected – the First Remand Determination's use of the Azadpur APMC data,[13] concluding that "[s]erious issues exist as to the contemporaneity, representativeness, and product specificity of those data."  <u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp. 2d at 1273; *see generally id.*, 35 CIT at ____, 800 F. Supp. 2d at 1236-74.  <u>Jinan Yipin II</u> went so far as to note the existence of "record evidence suggest[ing] that [the First Remand Determination] may not have valued the intermediate input at all, and – instead – may have valued

---

[12]Specifically, the First Remand Determination calculated the surrogate value for raw garlic bulbs using the Azadpur APMC data, averaging the values for "A"- and "S.A."-grade garlic.  *See generally* First Remand Determination at 9-15, 53-59; *see also* <u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp. 2d at 1239.

[13]Jinan Yipin II found, for example, that "statements in the [First] Remand Determination reflect egregious factual errors, and demonstrate that Commerce does not understand either the meaning of the Azadpur APMC data or their limitations."  <u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp. 2d at 1246.

a final product." *Id.*, 35 CIT at ____, 800 F. Supp. 2d at 1273. The issue of the calculation of a surrogate value for raw garlic bulbs therefore was remanded to Commerce yet again. *See id.*, 35 CIT at ____, 800 F. Supp. 2d at 1273-74.

In the course of the most recent remand proceeding, Commerce reopened the administrative record to allow the parties to submit additional information concerning the valuation of raw garlic bulbs, as well as garlic seed. *See* Second Remand Determination at 4-5, 7-9. In the resulting Second Remand Determination, Commerce reaffirmed its conclusion that the agency's intermediate input methodology "results in a more accurate dumping margin than the use of the traditional [factors of production] methodology." *Id.* at 9-10; *see also id.* at 10-12. Commerce further determined, based on a comprehensive review of the strengths and weaknesses of all data on the record,[14] that the Agmarknet data (on which the Final Results were based) constitute the best available information for use in calculating a surrogate value for raw garlic bulbs. *See id.* at 1, 9-10, 12-23, 31-37. However, rather than relying on data for a single category of garlic (*i.e.*, the "China" category) as Commerce did in the Final Results, the Second Remand Determination instead uses the average for the six specific Agmarknet categories of garlic grown in the five "long-day zone" states in India (*i.e.*,

---

[14]The Second Remand Determination explains that Commerce determined that the numerous concerns about the Azadpur APMC data which were identified in <u>Jinan Yipin II</u> could not "be adequately remedied" in the course of the second remand proceeding. *See* Second Remand Determination at 23; *see also id.* at 7. In addition, Commerce has a practice in remand proceedings of relying only on data that were available at the time of the underlying administrative review. Here, the agency determined during the second remand proceeding that the Azadpur APMC data were not available when the agency conducted the administrative review at issue. *See id.* at 7-8; *see also id.* at 23. For both of these reasons, Commerce decided not to consider use of the Azadpur APMC data in the Second Remand Determination. *See id.* at 7, 23. The Azadpur APMC data have been used in subsequent administrative reviews. Of course, those proceedings have involved different arguments and different administrative records.

Punjab, Haryana, Himachal Pradesh, Jammu and Kashmir, and Uttaranchal) – the regions where longer periods of sunlight result in large-bulb garlic similar to the Chinese garlic at issue here. *See id.* at 1, 10, 12, 13, 15, 31-32. In addition, Commerce also made certain adjustments, which are not at issue here, to address the Chinese Producers' concerns about "captur[ing] the farm gate prices." *See id.* at 10, 17-19.[15] Using these "filtered" Agmarknet data, Commerce calculated a final weighted-average price of 8.35 rupees per kilogram to value raw garlic bulbs for purposes of the Second Remand Determination. *See id.* at 36-37; *compare id.* at 12 (specifying 8.3471 rupees per kilogram).

Neither the Chinese Producers nor the Domestic Producers contest the Second Remand Determination's use of the Agmarknet database in calculating a surrogate value for raw garlic bulbs. Similarly, neither party contests Commerce's decision to "filter" the Agmarknet data set so as to use only data for garlic grown in India's five long-day zone states.[16] Indeed, like the Government, the

---

[15]For example, "[b]ecause the record . . . support[s] the claim that transportation costs could be double counted," Commerce "remov[ed] freight costs from . . . Linshu Dading's input calculation in the SAS program in order to exclude transportation costs from the garlic bulb supplier to Linshu Dading's factory in the normal value calculation." *See* Second Remand Determination at 19. Because Jinan Yipin and Sunny grow their own garlic, they did not incur such freight costs. Accordingly, Commerce made no such adjustment for them. *Id.*

It is not clear whether (and, if so, how) the Second Remand Determination considered the Chinese Producers' previously-expressed concerns that the Agmarknet data reflect prices that include, for example, the expense of transporting garlic bulbs from "farm gate" to market. *See, e.g.*, Jinan Yipin I, 33 CIT at 472, 617 F. Supp. 2d at 1300 (discussing the Chinese Producers' concerns that the Agmarknet data "impermissibly inflated the surrogate value . . . by adding additional *post-harvest* factors of production (*e.g.*, sales, packing, and transportation costs) to a figure that already reflected such costs") (emphasis added). In any event, the Chinese Producers do not challenge the Second Remand Determination's "farm gate" adjustments.

[16]The Domestic Producers point out that, contrary to statements in Jinan Yipin I, the state of Haryana is considered to be part of India's "long-day zone." *See* Def.-Ints.' Brief at 6 n.9; *id.* at

Chinese Producers maintain that the surrogate value calculated in the Second Remand Determination based on that "filtered" data set should be sustained. *See* Def.'s Response Brief at 1-2, 7, 15, 16; Pls.' Response Brief at 1, 6. However, the Domestic Producers contend that the data should be further filtered, such that Commerce should use data for only three of the six Agmarknet categories of garlic that are reflected in the Second Remand Determination's calculations. *See generally* Def.-Ints.' Brief at 2-3, 11-16, 21-22; Def.-Ints.' Reply Brief at 2, 10.

Specifically, the Domestic Producers emphasize that the Chinese garlic at issue here has a bulb diameter of 50 millimeters ("mm") or greater, and that not all of the garlic that is grown in India's long-day zone states has a comparable bulb size. *See* Def.-Ints.' Brief at 8-16; Def.-Ints.' Reply Brief at 3, 4, 9-10. The Domestic Producers argue that the data set used in the Second Remand Determination thus is overly broad and not sufficiently "product-specific" to the Chinese Producers' garlic, and that the data set should be further limited to exclude data on categories of garlic that – according to the Domestic Producers – do not have a bulb diameter comparable to the Chinese Producers' garlic. *See* Def.-Ints.' Brief at 11-16, 21-22; Def.-Ints.' Reply Brief at 2, 10.

There is no dispute that the subject Chinese garlic bulbs have a diameter of 50 mm or greater. *See*, *e.g.*, Second Remand Determination at 13; Def.'s Response Brief at 5. Similarly, there is no dispute that not all garlic grown in India's long-day zone states has a bulb diameter of 50 mm or more. *See*, *e.g.*, Second Remand Determination at 32; Pls.' Response Brief at 2. Moreover, in principle, there is no question but that it would be optimal to exclude from Commerce's calculations all data on garlic bulbs with a diameter of less than 50 mm, to render the surrogate value data

17 n.35.

perfectly "product-specific" to the subject Chinese garlic bulbs.  *See*, *e.g.*, Policy Bulletin 04.1

(expressing Commerce preference for data "specific to the input in question"); Jinan Yipin II, 35

CIT at ____, 800 F. Supp. 2d at 1304 (explaining that "'product specificity' logically must be the

foremost consideration in determining 'best available information,'" because – if data is not

sufficiently product-specific – it is irrelevant whether data satisfies other criteria set forth in Policy

Bulletin 04.1).

However, perfect data is virtually non-existent in the real world.  *See generally* Second

Remand Determination at 9 ("acknowledg[ing] that all of the surrogate value sources placed on the

record to value garlic bulb are imperfect"); *id*. at 20 (same); Def.-Ints.' Brief at 11 (quoting and

concurring in the Second Remand Determination's observation); Def.'s Response Brief at 13, 14.

Here, after careful consideration, Commerce concluded in its Second Remand Determination that

(notwithstanding the Domestic Producers' claims) the evidence simply does not establish that further

filtering the Agmarknet data set would in fact render the data more product-specific, and that – based

on the existing record – any attempt to further filter the data would be fraught with the potential for

distortion.  *See* Second Remand Determination at 32, 36.[17]  Commerce therefore determined that

"the subset of the Agmarknet data that reflects values for Indian domestic garlic grown in the [long-

_____

[17]Specifically, Commerce concluded that – because "the record does not contain definitions for the six [categories] of garlic identified in the Agmarknet data" – "further filtering the [long-day zone] dataset to exclude certain [categories], in an attempt to be more accurate, . . . could potentially introduce unintended distortions in the surrogate value calculation."  *See* Second Remand Determination at 32; *see also id*. at 36 (rejecting Domestic Producers' argument for further filtering the data set, explaining that "because the Agmarknet data do not provide definitions of the Agmarknet designated [categories of garlic], attempting to filter this dataset further by excluding three of the six [categories], based on unfounded assumptions[,] could lead to unintended distortions in the remaining data").

day zone states] is the best available information to value garlic bulb," "results in the most [product-]

specific surrogate value," and "is far superior to the other data sources on the record" for use in

calculating an appropriate surrogate value. *See id.* at 12, 17, 20.[18]  As discussed below, under the

circumstances of this case, that determination was a reasonable one. *See generally* Def.'s Response

Brief at 5, 14; Pls.' Response Brief at 1, 6.

The Domestic Producers maintain that, of the six Agmarknet categories of garlic included

in the data set used in the Second Remand Determination's calculations, three of those categories

– denominated "Desi," "Average," and "Other" – have bulb diameters that are not comparable to

the Chinese Producers' garlic and should be excluded from Commerce's surrogate value calculation.

*See* Def.-Ints.' Brief at 12-16, 21-22; Def.-Ints.' Reply Brief at 5-8, 10 (reiterating arguments

---

[18]*See also* Second Remand Determination at 32 (explaining that "of all the potential data sources on the record, the garlic grown in the [long-day zone] states as identified in the Agmarknet data[] . . . reflect[s] the large-bulb garlic most representative of the [Chinese Producers'] sales of garlic," and that "filtering for the [long-day zone] states in the Agmarknet dataset yields the most reliable surrogate value for garlic bulb"); *id.* at 23 (concluding that "the Agmarknet's [long-day zone] data constitute the best available information on the record to value . . . garlic bulb"); *id.* at 14-15 (stating that the Agmarknet data for the long-day zone states "reflect an average as broad as is available for the specific input in question because the values represent an average across the five Indian states that are known for cultivating the larger bulbs of garlic similar to the bulbs of the Chinese garlic producers"); *id.* at 15 (explaining that "[f]iltering the Agmarknet data for the [long-day zone] states results in a surrogate value for large-bulbed . . . garlic grown in India, which is more specific to the Chinese garlic bulb"); *id.* at 21 (noting that "Agmarknet's [long-day zone] data are more specific to the [Chinese Producers'] garlic bulb because [the long-day zone] garlic prices are for the majority of India's large-bulbed . . . garlic, which is similar to the garlic produced by the [Chinese Producers]"); *id.* at 10 (stating that "the [Agmarknet] data for [long-day zone] states . . . represent the best available information on the record for valuing garlic bulb to establish dumping margins as accurately as possible"); *id.* at 13 (concluding that "the Agmarknet's [long-day zone] data are the best available information on the record based on contemporaneity, representativeness, and specificity"); *id.* at 19 (noting that "the Agmarknet [long-day zone] data represent a reliable surrogate value for garlic bulb"); *id.* at 20 (stating that "the Agmarknet data filtered for the [long-day zone] are more specific to the garlic input" at issue).

concerning "Desi," "Average," and "Other" categories).  In other words, the Domestic Producers

contend that the Agmarknet data set for the five long-day zone states used in Commerce's surrogate

value calculation should be limited to include only data for the three categories of garlic that

Agmarknet denominates as "China," "New Medium," and "Garlic."  *See generally* Def.-Ints.' Brief

at 11-21 (captioned "The Department Should Rely on Values for 'China,' 'Garlic,' and 'New

Medium' Varieties to Calculate a Surrogate Value").[19]  Commerce rejected the Domestic Producers'

argument, concluding that – contrary to their claims – "the record does not support filtering the data

for the undefined Agmarknet designations 'Desi,' 'Average,' and 'Other.'"  *See* Second Remand

Determination at 32.

_____

[19]Language in their Reply Brief suggests that – rather than seeking to limit the data set to the "China," "Garlic," and "New Medium" categories (the relief sought in their opening brief, as most clearly indicated by the caption on page 11 of that brief) – the Domestic Producers instead now favor limiting the data set to data from fewer than five states.  *See, e.g.*, Def.-Ints.' Reply Brief at 4 (arguing that "[Commerce's] reliance on Agmarknet pricing data for all five of India's long-day states is overbroad," that "[Commerce's] reliance on Agmarknet pricing from all five of the long-day states does not result in the selection of a surrogate that is product-specific," and that "[Commerce's] reliance on Agmarknet pricing data from all five of India's long-day states to calculate a surrogate for input garlic bulbs is overbroad and is not supported by substantial evidence or in accordance with law").

But it is much too late for the Domestic Producers to change their tune (if, in fact, that is what they were trying to do).  To the extent that the Domestic Producers now assert claims and seek relief that may differ from what they advocated to Commerce in the course of the remand proceeding, their efforts are quite likely barred by the doctrine of exhaustion of administrative remedies.  *See, e.g.*, Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1380-81 (Fed. Cir. 2013) (holding that doctrine of exhaustion barred party from raising in litigation an argument which was not raised before agency).  And, in any event, the Domestic Producers waived any possible right to raise such arguments when they failed to make them in their opening brief in this forum.  *See, e.g.*, SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319-20 (Fed. Cir. 2006) (explaining, *inter alia*, that it is "well established that arguments not raised in the opening brief are waived"); Novosteel SA v. United States, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002) (same).

In an effort to support their claim that the "Desi," "Average," and "Other" categories of garlic are characterized by small bulb size, the Domestic Producers argue that the Agmarknet data set used in the Second Remand Determination includes more data points for those three categories than for the other three categories (*i.e.*, "China," "New Medium," and "Garlic") and that the prices for the "Desi," "Average," and "Other" categories are lower than the prices for the "China," "New Medium," and "Garlic" categories. *See* Def.-Ints.' Brief at 14, 16; Def.-Ints.' Reply Brief at 7-8. The Domestic Producers further argue that this is consistent with the Market Research Report, which indicates generally that garlic production in India is dominated by local varieties with smaller bulb sizes and a lower value. *See* Def.-Ints.' Brief at 16; Def.-Ints.' Reply Brief at 6-8. The Domestic Producers maintain that it therefore follows inexorably that the lower-priced categories of garlic reflected in the Agmarknet data, by definition, have a bulb size smaller than the Chinese Producers' garlic at issue here. *See, e.g.*, Def.-Ints.' Brief at 16; Def.-Ints.' Reply Brief at 7, 8. However, as noted in Jinan Yipin I and quoted in the Second Remand Determination, the implication that "higher price" necessarily "equals[] bigger-bulb" is overly simplistic,[20] and is not alone sufficient to compel Commerce to reach the conclusion that the Domestic Producers urge. *See generally* Jinan Yipin I, 33 CIT at 468, 470-71, 617 F. Supp. 2d at 1297, 1299; *see also* Second Remand Determination at 16, 35; Def.'s Response Brief at 10-11; Pls.' Response Brief at 5-6.[21]

---

[20]It is axiomatic that correlation does not necessarily imply causation.

[21]The Domestic Producers offer no explanation as to why, for example, the "Average Price" for "Other" category garlic (which the Domestic Producers seek to exclude from Commerce's calculations) so closely approximates the "Average Price" for "Garlic" category garlic (which the Domestic Producers contend is large-bulb garlic and should be included in Commerce's calculations). *See* Def.-Ints.' Response Brief at 12 (table listing "Average Value[s]" of "Other"

The Domestic Producers also cite certain evidence which they claim proves that the "Desi"

category of garlic is limited to local varieties with a smaller bulb size and a lower value.   The

Domestic Producers note that the Issues and Decision Memorandum that accompanied the Final

Results in this matter states that "[t]he term 'Desi' is a general term referring to the Indian

subcontinent.  Thus, 'Desi' garlic refers to a variety of garlic which, as the respondents have argued,

may be more pungent than Chinese varieties, *but is also mostly smaller in size*."  *See* Def.-Ints.'

Brief at 14-15 (*quoting* Issues and Decision Memorandum at 44 (emphasis added by Domestic

---

category garlic as "1,171.35" and "Garlic" category garlic as "1,462.06"); *cf.* Def.-Ints.' Brief at 8 (acknowledging that even the Market Research Report – which was prepared by consultants to the Domestic Producers – does not indicate that larger-sized garlic bulbs uniformly command a higher price than smaller bulbs); *id*. at 7 (same, acknowledging existence of "exception" reflected in "average prices for 16 months from Nov. 2001-Feb. 2003 for sales of each grade at the Azadpur APMC near Delhi").

As Commerce has elsewhere explained, bulb size is not the sole determining factor in valuing garlic.  Indeed, the Azadpur APMC Market Information Bulletin indicated that garlic bulbs with a diameter of between 40 mm and 55 mm could be classified as either "grade A" or "grade super-A" (presumably with corresponding differences in price).  *See* Antidumping Duty Order on Fresh Garlic from the People's Republic of China: Issues and Decision Memorandum for the Eleventh Administrative Review and New Shipper Reviews (June 11, 2007) at 12 (comment 2); *see also*, *e.g.*, Issues and Decision Memorandum for the Final Results of the 15th Administrative Review of Fresh Garlic from the People's Republic of China (June 20, 2011) at 11 (comment 3) (explaining that, "[d]uring the course of past reviews, it has become clear that *size and quality* are important characteristics of the [fresh garlic] exported from the PRC to the United States") (emphasis added); Fresh Garlic from the People's Republic of China:  Issues and Decision Memorandum for the Final Results of the 13th Antidumping Duty Administrative and New Shipper Reviews and Rescission, In Part, [of] the Antidumping Duty Administrative and New Shipper Reviews (June 8, 2009) at 15 (comment 2) (stating that, in addition to "the size of a garlic bulb," factors that "noticeably influence price" include the "number of cloves" as well as "possibly . . . a specialty garlic variety (single bulb garlic)"); *cf.* Issues and Decision Memorandum for the Final Results of the 12th Administrative Review: Fresh Garlic from the People's Republic of China ("PRC") (June 9, 2008) at 19 (comment 2) (stating that "size is not the only characteristic that should be considered in selecting the appropriate surrogate value" for garlic bulbs).

Producers))[22]; *see also* Def.-Ints.' Reply Brief at 5-6.  *But see* Def.'s Response Brief at 9-10, 11.

Similarly, in the course of the most recent remand, the Domestic Producers placed on the

administrative record an entry from the Oxford Dictionary defining the term "desi" to mean "local"

or "indigenous."  *See* Def.-Ints.' Brief at 15 & n.28; Def.-Ints.' Reply Brief at 5, 8.  *But see* Def.'s

Response Brief at 9-10, 11; Second Remand Determination at 33.

But the evidence that the Domestic Producers cite is not nearly as potent as they suggest.

The meaning of "desi" in common parlance is not at issue.  The open question is the precise

definition of the term as it is used by Agmarknet to categorize garlic.[23]  As the Second Remand

--------

[22]In their brief, the Domestic Producers actually misquote the Issues and Decision Memorandum, critically omitting the qualifying term "mostly" (with no ellipses or other indication that the quotation had been altered).  *Compare* Def.-Ints.' Brief at 14-15 (asserting that Issues and Decision Memorandum states that "'Desi' garlic refers to a variety of garlic which . . . may be more pungent than Chinese varieties, *but is also smaller in size*") (omitting the word "mostly") *and* Issues and Decision Memorandum at 44 (stating that "'Desi' garlic refers to a variety of garlic which . . . may be more pungent than Chinese varieties, but is also *mostly* smaller in size") (emphasis added)).

Properly quoted, the Issues and Decision Memorandum thus does not support the Domestic Producers' assertion that garlic categorized as "Desi" is – uniformly, and by definition – smaller than the Chinese Producers' garlic here.

[23]Contrary to the Domestic Producers' implications, the names of the Agmarknet categories do not appear to be particularly descriptive.  It may be tempting, at first blush, to attribute significance to the category titles "China" (which the Domestic Producers agree should be included in Commerce's calculations) and "Desi" (which the Domestic Producers contend should be excluded).  But what of the titles of the other four Agmarknet categories at issue – *i.e.*, the "Average" and "Other" categories (which the Domestic Producers maintain should be excluded) and the "New Medium" and – the least illuminating – "Garlic" categories (both of which the Domestic Producers agree should be included in Commerce's calculations).  There is nothing inherent in the title "Average" to suggest that garlic so categorized is smaller than garlic categorized as "New Medium," which is what the Domestic Producers contend.  And is garlic categorized simply as "Garlic" larger or smaller than "Other" garlic?  (According to the Domestic Producers, garlic of the "Garlic" category is large-bulb garlic, and "Other" garlic is not.)  In short, on the basis of the existing record, it would be folly to read much into the titles of the various Agmarknet categories

Determination explains, there is simply no evidence that speaks to how the Agmarknet database

itself defines "Desi" as the term is used to denominate one of the six categories of garlic at issue.

The record is devoid of any evidence documenting the physical characteristics of the garlic that

Agmarknet categorizes as "Desi." *See* Second Remand Determination at 16, 32, 33, 36.[24]

The Domestic Producers' claim concerning the definition of "Desi" (disposed of above) is

the linchpin for the Domestic Producers' next argument, which seeks to exclude from Commerce's

surrogate value calculations the data concerning the "Average" and "Other" categories of garlic.

Beginning from the premise that garlic categorized by Agmarknet as "Desi" garlic is "local" and

"indigenous" and thus has smaller-sized bulbs (*i.e.*, the proposition addressed immediately above),

the Domestic Producers argue that – "because the volume and value for Desi variety transactions

are similar to those reported for the 'Average' and 'Other' varieties, and because . . . smaller-sized

garlic bulbs in India are sold at lower prices than larger-sized bulbs" – "the only reasonable

conclusion" that Commerce could possibly have drawn is that "the transactions involving 'Average'

and 'Other' varieties are comparable to the transactions involving the local, indigenous, small-sized

Desi variety garlic bulbs." *See* Def.-Ints.' Brief at 15-16; Def.-Ints.' Reply Brief at 7. *But see*

Second Remand Determination at 34-36; Def.'s Response Brief at 9-10.

---

of garlic.  What is missing from the record – what the Domestic Producers lack – is evidence
documenting the distinguishing physical characteristics of each of the six categories.

[24]Notably, the Domestic Producers make no attempt to hazard an explanation differentiating
garlic categorized as "Desi" from the garlic classified in other categories, including "Average" and
"Other."  In other words, the Domestic Producers offer no explanation as to how, for example, garlic
that is categorized by Agmarknet as "Average" or "Other" differs from that which is categorized as
"Desi."  In fact, the Domestic Producers do not even make any specific claim as to the defining
physical characteristics of the "Desi" category.

The Domestic Producers significantly overstate their case.  To the extent that this argument is predicated on, and analogizes from, the Domestic Producers' assertions concerning the characteristics of garlic categorized by Agmarknet as "Desi," this argument too must fail.  Again, as the Second Remand Determination explains, there is no record evidence documenting the characteristics of any of the six Agmarknet categories of garlic at issue, including not only the "Desi" category, but also "Average" and "Other," as well as "China," New Medium," and "Garlic." *See* Second Remand Determination at 16, 32, 33, 34, 36.

The gravamen of the Domestic Producers' remaining arguments is that the Agmarknet data for garlic categorized as "China" garlic should be included in Commerce's calculation of a surrogate value for raw garlic bulbs.  *See generally* Def.-Ints.' Brief at 16-21.[25]  There is no need to discuss these arguments in any detail,[26] because the data set used in the Second Remand Determination includes the "China" data (in addition to the five other specific categories of garlic included in the Agmarknet data base for India's five long-day zone states).  *See* Second Remand Determination at 31.[27]

---

[25]The Domestic Producers note that, contrary to a statement in Jinan Yipin I, "China" category garlic is grown in more than one long-day zone state.  *See* Def.-Ints.' Brief at 17 n.35.

[26]*See generally* Second Remand Determination at 9, 16-17 (addressing, *inter alia*, Domestic Producers' submission of documents concerning use of term "China" by Indian tea industry in attempt to prove meaning of term as used in garlic industry, and dismissing the claim as "speculative"); Def.'s Response Brief at 10, 12 (same); Pls.' Response Brief at 5 (characterizing as "speculative" the Domestic Producers' claims based on tea industry usage of the term "China," and arguing that Agmarknet's "China" category likely "reflects prices for garlic that was actually *imported from China* and is now being sold in an Indian wholesale market").

[27]Significantly, the Domestic Producers do not now contend that Commerce should base its surrogate value calculation on the "China" category data alone.  *See*, *e.g.*, Def.-Ints.' Brief at 11-21 (captioned "The Department Should Rely on Values for 'China,' 'Garlic,' and 'New Medium'

Jinan Yipin II explicitly stated that nothing in Jinan Yipin I precluded Commerce from relying on the Agmarknet database, provided that Commerce adequately justified its selection of the specific data that it used.  See Jinan Yipin II, 35 CIT at ____ n.57, 800 F. Supp. 2d at 1272 n.57. Accordingly, in its Second Remand Determination, Commerce has explained that – rather than confining its data set to the "China" category (as it did in the Final Results) – the agency has calculated surrogate value using the Agmarknet data on all six specific categories of garlic reported for India's five long-day zone states, including the "China" category.  No party has objected to Commerce's inclusion of the data for "China" category garlic in the agency's calculations.  The Domestic Producers therefore prevail on their claim that the "China" category data is properly included in the Second Remand Determination's surrogate value calculations.

In sum, Commerce's calculation of a surrogate value for raw garlic bulbs using Agmarknet data for the six categories of garlic reported for India's five long-day zone states must be sustained. To be sure, the Domestic Producers' challenges to the specificity of those data are not wholly lacking in substance.  Had Commerce made the extrapolations that the Domestic Producers advocate and drawn the inferences that the Domestic Producers urge – and thus excluded from the agency's surrogate value calculations the Agmarknet data for garlic categorized as "Desi," "Average," and "Other" – it is possible that the agency's determination might have been sustained.  But an agency determination cannot be overturned merely because the agency could have reached the opposite

Varieties to Calculate a Surrogate Value").  To the extent that the Domestic Producers argued in the course of the most recent remand proceeding that the agency should use only the data for the Agmarknet "China" category garlic, that claim has since been abandoned.  See Second Remand Determination at 9 (noting that Domestic Producers "advocate relying on the 'China' variety subset of Agmarknet data"); id. at 22 (same).

result based on the same record. *See generally* Def.'s Response Brief at 13 (noting that "a reasonable mind could decline to draw the inferences [that the Domestic Producers] urged Commerce to draw in this case").

The evidence that the Domestic Producers cite is neither so clear nor so strong as to *require* Commerce to reach a result other than that which the agency reached here. As discussed above, "[t]he process of constructing foreign market value for a producer in a non-market economy country is difficult and necessarily imprecise." Shakeproof, 268 F.3d at 1381. As the "master of antidumping law," Commerce is entitled to "wide discretion in the valuation of factors of production," in recognition of the agency's "special expertise." *See id.* (internal quotation marks and citation omitted); Thai Pineapple, 187 F.3d at 1365.

Moreover, as the Government underscores, it is the parties to a proceeding that bear the burden of building an adequate record. *See* Def.'s Response Brief at 13-14 (*citing* QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011)). In the instant case, the parties had multiple opportunities to augment the record with relevant information, even as late as the most recent remand proceeding before the agency. The Domestic Producers have proffered no evidence to directly and definitively establish the specific characteristics of the "Desi," "Average," and "Other" categories of garlic as those terms are used in the Agmarknet database. Particularly in the absence of such evidence, and in light of all other circumstances, Commerce's concerns that – *on this record* – any further "filtering" of the data set could potentially distort the agency's surrogate value calculation cannot be said to be unreasonable. *See* Second Remand Determination at 32, 36. Nor is the Second Remand Determination's calculation of a surrogate value for raw garlic bulbs

unsupported by substantial evidence.  The Domestic Producers' arguments to the contrary therefore must fail.

### B.  Surrogate Value for Labor

The antidumping statute provides that, in non-market economy cases such as this, the surrogate data used to calculate the value of factors of production must, to the extent possible, come from market economy countries that are at "a level of economic development comparable to that of the nonmarket economy country" at issue – in this case, China.  *See* 19 U.S.C. § 1677b(c)(4)(A).  The antidumping statute further provides that, in such cases, the surrogate data must, to the extent possible, come from market economy countries that are "significant producers of comparable merchandise."  *See* 19 U.S.C. § 1677b(c)(4)(B).

For most factors of production, Commerce typically uses values from a single market economy country (known as the "surrogate country" – here, India) that Commerce has determined to be both (a) economically comparable to the non-market economy country in question and (b) a significant producer of the goods at issue.  *See* 19 C.F.R. § 351.408(c)(2).  However, as Jinan Yipin I and Jinan Yipin II explained, Commerce in the past treated the cost of labor quite differently than other factors of production.  *See* Jinan Yipin I, 33 CIT at 474, 617 F. Supp. 2d at 1301-02; Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1274; *see generally* Dorbest Ltd. v. United States, 604 F.3d 1363, 1368 (Fed. Cir. 2010).

Concerned about "wide variances in wage rates between comparable economies," Commerce historically valued the cost of labor in a non-market economy ("NME") country case by using a regression-based wage rate "reflective of the observed relationship between wages and national

income in a variety of market economy countries." *See* <u>Jinan Yipin I</u>, 33 CIT at 474-75, 617 F.

Supp. 2d at 1302 (internal quotation marks and citations omitted). Thus, in the past, "unlike its

valuation of other factors of production in an NME case, Commerce [has based] its surrogate wage

rate on data from a broad 'basket' of countries, and [has] not limit[ed] itself to market economy

countries at a level of economic development comparable to the NME country in question." *See id*.,

33 CIT at 475, 617 F. Supp. 2d at 1302.

In the Final Results in this case, Commerce calculated the Chinese Producers' labor costs

using the agency's standard regression-based wage rate calculation methodology, as set forth in the

agency's regulations. *See* <u>Jinan Yipin I</u>, 33 CIT at 475-76, 617 F. Supp. 2d at 1302-03; 19 C.F.R.

§ 351.408(c)(3). Using that methodology, the agency calculated a surrogate wage rate of $0.97/hour

in the Final Results. *See* <u>Jinan Yipin I</u>, 33 CIT at 476, 617 F. Supp. 2d at 1303.

Relying heavily on <u>Allied Pacific</u> (which held Commerce's regulation to be inconsistent with

the statute), <u>Jinan Yipin I</u> remanded the issue of the surrogate value for labor to Commerce for

further consideration. *See* <u>Jinan Yipin I</u>, 33 CIT at 458, 473-80, 514-15, 617 F. Supp. 2d at 1289,

1301-07, 1334; <u>Allied Pacific Food (Dalian) Co. v. United States</u>, 32 CIT 1328, 1351-65, 587 F.

Supp. 2d 1330, 1351-61 (2008). On remand, Commerce nevertheless continued to use a regression-

based methodology, albeit one that was slightly revised. *See generally* First Remand Determination

at 15-38, 59-68. The resulting calculation produced a surrogate wage rate of $0.80/hour for China.

*See id*. at 68; <u>Jinan Yipin II</u>, 35 CIT at _____, 800 F. Supp. 2d at 1275.

In the meantime, however, the Court of Appeals handed down its decision in <u>Dorbest</u>,

striking down Commerce's regulation as inconsistent with the plain language of the statute. *See*

*generally* Dorbest, 604 F.3d at 1366, 1369-73.  The Court of Appeals concluded that the agency's

regulation "improperly require[d] using data from both economically comparable and economically

dissimilar countries, and . . . improperly use[d] data from both countries that produce comparable

merchandise and countries that do not."  *See id*., 604 F.3d at 1372 (discussing 19 C.F.R. §

351.408(c)(3)).  The Government therefore sought a voluntary remand in this action to allow

Commerce to recalculate the surrogate value for labor expenses in a manner consistent with Dorbest,

which Jinan Yipin II granted.  *See generally* Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1274-

76.

In the course of the most recent remand, Commerce reconsidered its approach to the

calculation of surrogate values for labor expenses, in light of the Court of Appeals' decision in

Dorbest, as well as the decision in Shandong Rongxin.  *See generally* Second Remand

Determination at 24-31; Dorbest, 604 F.3d at 1369-73; Shandong Rongxin Import & Export Co. v.

United States, 35 CIT ____, ____, 774 F. Supp. 2d 1307, 1315-16 (2011); Def.'s Response Brief

at 15 (advising that "[c]onsistent with Dorbest . . . , Commerce no longer is relying upon its

regression-based methodology for wage rates").  Concluding that "relying on multiple countries to

calculate the wage rate is no longer the best approach," Commerce altered its methodology, to rely

on industry-specific labor cost data from the primary surrogate country – in this case, India.  *See*

Second Remand Determination at 26; Antidumping Methodologies in Proceedings Involving Non-

Market Economies: Valuing the Factor of Production:  Labor, 76 Fed. Reg. 36,092 (June 21, 2011);

*see also* Def.'s Response Brief at 15 (explaining that, in Second Remand Determination, "pursuant

to [its new methodology], Commerce valued labor by using industry-specific data from India").  As

the Second Remand Determination observes, such an approach "is fully consistent with how [Commerce] values all other [factors of production], and results in the use of a uniform basis for [factor of production] valuation – a single surrogate country." Second Remand Determination at 26.

For purposes of the Second Remand Determination here, Commerce relied on 2004 data (as reported in a 2005 publication of the International Labour Organization ("ILO")), because those data were "the most contemporaneous data that were available" between November 1, 2003 and May 4, 2006 – *i.e.*, "during the conduct of the underlying administrative review." *See* Second Remand Determination at 26-27 (explaining, *inter alia*, that, on remand, agency used labor cost data for India "reported in the ILO Chapter 6A data").

Specifically, Commerce selected "the industry-specific Indian data provided under Sub-Classification 15 'Manufacture of food products and beverages' of the International Standard Industrial Classification – Revision 3-D standard." *See* Second Remand Determination at 27. Based on those data, the Second Remand Determination calculated a revised labor rate of 24.50 rupees per hour. *Id*.

As noted above, neither the Chinese Producers nor the Domestic Producers have objected to Commerce's revised wage rate calculation as set forth in the Second Remand Determination. *See* Def.'s Response Brief at 15 (noting that "[n]o party objects to the Second Remand Results with respect to Commerce's valuation of labor expenses," and urging that "the Court should sustain Commerce's Second Remand Results" on the issue); *id*. at 2 (same); *see also* Def.-Ints.' Brief (offering no comments on any issue other than valuation of raw garlic bulbs); Def.-Ints.' Reply Brief (same); Pls.' Response Brief (same).  Commerce's determination on this issue is accordingly

sustained.

### C.  Surrogate Value for Cardboard Packing Cartons

In the Final Results in this case, Commerce valued the cardboard cartons that are used to

pack and ship garlic based on Indian import statistics taken from the World Trade Atlas[28] for the

Indian tariff subheading 4819.1010, which covers, among other things, cartons, boxes, and cases

made of corrugated paper and paperboard (which were formerly covered by subheading 4819.1001).

*See* Jinan Yipin I, 33 CIT at 488, 617 F. Supp. 2d at 1312-13; Jinan Yipin II, 35 CIT at ____, 800

F. Supp. 2d at 1307.  In so doing, the Final Results rejected the other alternative source of data on

the record – specifically, four domestic Indian price quotes submitted by the Chinese Producers,

which predate the period of review by several months and were obtained from four different Indian

box vendors in four different cities, for basic cardboard packing cartons virtually identical to those

that the Chinese Producers actually used.  *See* Jinan Yipin I, 33 CIT at 488, 498, 617 F. Supp. 2d

at 1312, 1321; Jinan Yipin II, 35 CIT at ____, ____, ____ & n.102, 800 F. Supp. 2d at 1307, 1308,

1310-11 & n.102.[29]  The Final Results rejected the domestic price quotes because they are not

---

[28]The World Trade Atlas is "a database of commodities using all levels of the Harmonized
Tariff Schedule," which "enables users to determine the value of a specific product and identify
countries to or from which the product is being exported or imported."  *See* Jinan Yipin I, 33 CIT
at 467 n.20, 617 F. Supp. 2d at 1296 n.20 (internal quotation marks and citation omitted).

[29]The price quotes for cardboard packing cartons on the record of this tenth administrative
review are the same price quotes that are on the record of the ninth administrative review.  *See* Jinan
Yipin II, 35 CIT at ____ & n.102, 800 F. Supp. 2d at 1310-11 & n.102 (explaining that four price
quotes for cardboard packing cartons on record of tenth administrative review "are dated either June
19, 2003 or June 20, 2003"); Taian Ziyang III, 37 CIT at ____, 918 F. Supp. 2d at 1358 (noting that
record in ninth administrative review includes "four domestic Indian price quotes . . . which were
obtained within the period of review (and within one week of one another) from four different Indian

considered "publicly available information."  *See* Jinan Yipin I, 33 CIT at 489, 617 F. Supp. 2d at

1313; Jinan Yipin II, 35 CIT at ____, ____, 800 F. Supp. 2d at 1307-08, 1309; Policy Bulletin 04.1.[30]

As Jinan Yipin I observed, however, the Final Results significantly "overstated any potential

concerns as to the reliability of the domestic Indian box prices that the agency rejected, . . . [and]

significantly understated the patent flaws and defects in the Indian import statistics on which the

agency relied."  Jinan Yipin I, 33 CIT at 498, 617 F. Supp. 2d at 1321 (emphases omitted).

Detailing the numerous problems with Commerce's calculus, Jinan Yipin I remanded the issue to

the agency for further consideration.  *See generally id.*, 33 CIT at 487-98, 617 F. Supp. 2d at 1312-

21; *see also* Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1307-09.

Commerce's First Remand Determination was "wholly unresponsive" to Jinan Yipin I on

the issue of the use of Indian import statistics *versus* domestic price quotes for purposes of

calculating the surrogate value for cardboard packing cartons.  *See* Jinan Yipin II, 35 CIT at ____,

800 F. Supp. 2d at 1309; *see generally id.*, 35 CIT at ____, 800 F. Supp. 2d at 1307-15.  As Jinan

Yipin II summed up the situation, the First Remand Determination "add[ed] little or nothing to the

record on the issue of Commerce's concerns about the 'public availability' of the domestic price

---

box vendors in four different cities"); Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1321
(noting that four price quotes for cardboard packing cartons on record of ninth administrative review
are "dated within two days of one another").

[30]The sole concern that the Final Results raised as to the price quotes for cardboard packing
cartons was the issue of "public availability."  Only in the First Remand Determination did
Commerce – for the first time – raise concerns about the "contemporaneity" and
"representativeness" of the price quotes.  As Jinan Yipin II noted, however, no party objected to
Commerce's failure to raise those concerns earlier.  Jinan Yipin II, 35 CIT at ____ & n.99, ____,
800 F. Supp. 2d at 1309 & n.99, 1310-11.

quotes and the potential for 'manipulation' – the sole basis cited in the Final Results for Commerce's decision to reject the price quotes in favor of the Indian import statistics," and instead added "'contemporaneity' and 'representativeness' to Commerce's list of grounds for rejecting the price quotes." *See id.*, 35 CIT at ____, 800 F. Supp. 2d at 1309. Commerce yet again sought to exaggerate the alleged shortcomings of the domestic price quotes, while simultaneously ignoring the obvious (and admitted) problems inherent in the Indian import statistics on which the agency continued to rely. *See generally id.*, 35 CIT at ____, 800 F. Supp. 2d at 1309-15.

Noting that Commerce had seemingly chosen "*admittedly distorted* Indian import statistics over *potentially* '*perfect*' price quotes," Jinan Yipin II held that the First Remand Determination failed to adequately explain and justify by reference to substantial record evidence the agency's determination that the Indian import statistics constituted the "best available information" for use in calculating the surrogate value of basic cardboard packing cartons, in light of the acknowledged infirmities in the import statistics. Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1315; *see generally id.*, 35 CIT at ____, 800 F. Supp. 2d at 1309-15. In particular, Jinan Yipin II stated that "[Commerce's] conclusions that the Indian import statistics [ – as compared to the domestic price quotes – ] are 'sufficiently specific' and constitute the 'best available information' for use in valuing cardboard cartons" were "unexplained," "not rational," and "lack[ed] any sound basis in the administrative record," and therefore could not be sustained. *See id.*, 35 CIT at ____, 800 F. Supp. 2d at 1315. The issue was therefore remanded once again, and the agency was cautioned not to simply recycle its earlier arguments, because "no further remands [were] likely." *See id.*, 35 CIT

at ____, 800 F. Supp. 2d at 1315.[31]

Commerce's Second Remand Determination followed.    In the Second Remand Determination, as a surrogate value for cardboard packing cartons, Commerce relied on the four domestic price quotes on the record, implicitly adopting the fundamental reasoning of Jinan Yipin II (and, in turn, Jinan Yipin I).  The Second Remand Determination states:

> The Court found [in Jinan Yipin II] that Commerce had chosen "*admittedly distorted* Indian import statistics over *potentially 'perfect'* price quotes."  While [Commerce] disagrees with this conclusion, [Commerce] is cognizant of the Court's admonition that the [agency] is not likely to "get another bite of the apple on this issue." . . . .
>
> . . . .
>
> Accordingly, . . . [Commerce] has determined, under protest, to use the price quote surrogate values provided on the record by the plaintiffs during the underlying proceeding for this final remand redetermination.  Using these price quotes, the surrogate value for cardboard cartons is 32.3750 Rupees per box . . . .

Second Remand Determination at 23-24 (footnotes omitted); *see also id*. at 1 (stating that Commerce "has applied, under protest, the price quotes on the record of the underlying review as surrogates to value . . . cardboard cartons")[32]; *cf.* Defendant's Response to Comments Regarding Redetermination

---

[31]Among other things, Jinan Yipin II instructed Commerce to reopen the administrative record on remand, to allow the submission of further "evidence concerning the domestic price quotes and the Indian import statistics (as well as alternative sets of data, if any, that may be appropriate)." *See* Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1315; *see also id*., 35 CIT at ____, 800 F. Supp. 2d at 1307 (directing agency to reopen record on plastic jars and lids).  It is, however, undisputed that Commerce did not reopen the record on either issue.  *See* Second Remand Determination at 24 (stating that "rather than reopen the record, [Commerce] has determined, under protest, to use the price quote[s]").

[32]The quoted language from the Second Remand Determination – particularly the phrase "under protest" – can be read as suggesting that Jinan Yipin II imposed an outcome or result on Commerce, and ordered the agency to use the domestic price quotes in valuing cardboard packing cartons for purposes of the Second Remand Determination.  Nothing could be further from the truth.

_____

*See, e.g.*, Jinan Yipin II, 35 CIT at _____, 800 F. Supp. 2d at 1310 (suggesting action on remand "to seek information to clarify the accuracy of the domestic price quotes, in order to address the agency's concerns about potential 'manipulation'" of price quotes); *see also id.*, 35 CIT at _____, 800 F. Supp. 2d at 1311-12 (same); *id.*, 35 CIT at _____, 800 F. Supp. 2d at 1311-12 (suggesting action on remand to seek information concerning the volatility of prices for cardboard packing cartons in India); *id.*, 35 CIT at _____, 800 F. Supp. 2d at 1313 (suggesting action on remand to ascertain extent of distortion attributable to inclusion in import statistics of "specialty" and "gift" boxes unlike basic cardboard packing cartons); *id.*, 35 CIT at _____, 800 F. Supp. 2d at 1313-14 (suggesting action on remand "to determine the volume of merchandise reflected in the Indian import statistics that was imported by air, or to otherwise demonstrate that the values reflected in the Indian import statistics are not significantly inflated by the inclusion of air freight costs"); *cf.* Taian Ziyang II, 35 CIT at _____, 783 F. Supp. 2d at 1331 (in context of companion case challenging agency determinations in administrative review immediately preceding review at issue here, suggesting that, on remand, Commerce address the "serious unanswered questions about the extent to which the import statistics are distorted by the inclusion of gift and speciality boxes . . . and about the extent to which the import statistics are distorted by the inclusion of charges for air freight"; suggesting that Commerce also consider obtaining evidence concerning the accuracy of the price quotes); *id.*, 35 CIT at _____ n.43, 783 F. Supp. 2d at 1332 n.43 (in context of companion case challenging agency determinations in administrative review immediately preceding review at issue here, noting that "[i]f Commerce could establish on remand that the inclusion of the more expensive products and the air freight charges have no significant distortive effect on the Indian import statistics, it might be possible to sustain the agency's determination that the import statistics constitute the 'best available information'").

In short, in the course of the second remand, Commerce here was free to use either the import statistics or the price quotes (or even some other data), provided that the agency properly articulated its rationale and supported its determination with substantial evidence. *See, e.g.*, Tung Mung Development Co. v. United States, 354 F.3d 1371, 1379 (Fed. Cir. 2004) (noting that "the Court of International Trade's remand orders did not compel Commerce to adopt a new policy," where agency was free to "either explain its deviation from 'prior practice' or 'apply a combination rate, consistent with its prior practice'").

The quoted language from the Second Remand Determination also reflects a fundamental flaw in logic. In the excerpt, Commerce first acknowledges that Jinan Yipin II cautioned that a *third remand* was unlikely; but then – rather than putting the *second remand* to good use through further analysis and/or eliciting additional evidence for the record – Commerce elected to adopt the domestic price quotes (in lieu of the Indian import statistics). *See* Second Remand Determination at 23-24. This is classic *non sequitur*. As a matter of logic, there is nothing about the low probability of a *third remand* that counsels a litigant not to avail himself of a *second remand*; indeed, one would reasonably expect the opposite. In other words, one would reasonably expect that a

Pursuant to Court Remand at 9-11 (April 20, 2012), *filed in* <u>Taian Ziyang Food Co. v. United States</u>,

Court No. 05-00399 (in companion case contesting Commerce's determinations in administrative

review immediately preceding review at issue in this action, which included parallel challenge to

agency's reliance on import statistics *versus* price quotes in surrogate valuation of cardboard

packing cartons, agency ultimately decided to rely on price quotes (as the agency has done here),

explaining that "the Remand Results are consistent with the Court's holding" in <u>Taian Ziyang II</u>, and

that "[i]n light of the Court's concerns about the import statistics, . . . Commerce reasonably adopted

plaintiffs' approach and used the domestic price quotes").

As summarized below, and as set forth at length and in exhaustive detail in <u>Jinan Yipin I</u> and

<u>Jinan Yipin II</u>, the record evidence – viewed through the lens of Commerce's criteria in Policy

Bulletin 04.1 – weighs solidly in favor of the price quotes. *See* <u>Jinan Yipin I</u>, 33 CIT at 487-98, 617

F. Supp. 2d at 1312-21 (analyzing merits of domestic price quotes *versus* Indian import statistics for

valuation of cardboard packing cartons); <u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp. 2d at 1307-15

(same); section III, *supra* (in the introductory text, discussing criteria established in Policy Bulletin

04.1, including "product specificity," "contemporaneity," "representativeness," and "public

availability," in addition to whether prices are "net of taxes and import duties").

As <u>Jinan Yipin II</u> explained, of the five criteria set forth in Policy Bulletin 04.1, "product

specificity" logically must be the most important. *See* <u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp.

---

litigant who understands that he may have just "one *last* shot" to give it his "*best* shot."

2d at 1304.[33]  And it is undisputed that, as discussed in Jinan Yipin I and Jinan Yipin II, the four

domestic price quotes on the record of this proceeding are highly "specific to the input in question"

– that is, the cardboard packing cartons actually used by the Chinese Producers.  *See* Jinan Yipin I,

33 CIT at 488, 498, 617 F. Supp. 2d at 1312, 1321; Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d

at 1307-08.

    Moreover, although the four domestic price quotes are not "contemporaneous" within the

meaning of Policy Bulletin 04.1, the price quotes are just a few months outside the period of review.

*See* Jinan Yipin II, 35 CIT at ____ & n.102, 800 F. Supp. 2d at 1310-11 & n.102.[34]  And, as Jinan

_____

    [33]To underscore the necessary primacy of "product specificity," Jinan Yipin II took the point
to its logical extreme vis-a-vis the surrogate valuation of plastic jar and lids:

>     To illustrate . . . , Commerce here could not reasonably base its surrogate value for
>     basic plastic jars on Indian import statistics for umbrellas (for instance), even if those
>     import statistics – in the words of Policy Bulletin 04.1 – unquestionably reflected
>     "review period-wide price averages" and were indisputably "publicly available data"
>     that were fully "contemporaneous with the period of . . . review" and "net of taxes
>     and import duties."  Commerce could not do so because, even if the Indian import
>     statistics for umbrellas were perfect in every other way, the import statistics would
>     not be sufficiently "product specific."

Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1304 (footnote omitted); *see also* Taian Ziyang
II, 35 CIT at ____, 783 F. Supp. 2d at 1330 (in challenge to administrative review immediately
preceding review at issue here, similarly observing that Commerce could not base surrogate value
for cardboard packing cartons on import statistics for fishing rods, even if those import statistics
were otherwise perfect, because import statistics would not be sufficiently "product specific").  If
a set of data is not sufficiently "product specific," it is of no import whether or not the data satisfy
the other criteria set forth in Policy Bulletin 04.1.  *See*, *e.g.*, Hebei Metals & Minerals Import &
Export Corp. v. United States, 29 CIT 288, 300, 366 F. Supp. 2d 1264, 1273-74 (2005) (explaining
that, where agency failed to demonstrate that import statistics were sufficiently "product specific,"
it was irrelevant whether statistics satisfied other criteria).

    [34]Although there was some confusion concerning the contemporaneity of the domestic price
quotes, the record establishes that all four quotes predate the period of review by roughly four and

Yipin II explained (and as the First Remand Determination itself conceded), contemporaneity is not

necessarily a critical factor.  *See id.*, 35 CIT at ____, 800 F. Supp. 2d at 1311 (and authorities cited

there).  Thus, for example, as discussed immediately below, absent concrete evidence (or even some

credible basis to suggest) that prices for basic cardboard packing cartons fluctuate to any significant

degree over relatively brief periods of time, the contemporaneity (like the "representativeness") of

the price quotes is of little moment.[35]

Like "contemporaneity," Commerce's "representativeness" criterion relates to the timing of

price information.  In contrast to the contemporaneity criterion (which concerns whether the price

information is from within the review period at issue), the focus of the representativeness criterion

---

one-half months.  *See* Jinan Yipin II, 35 CIT at ____ & nn.102-03, 800 F. Supp. 2d at 1310-11 &
nn.102-03.

[35]Jinan Yipin II highlighted the fact that – although Commerce raised concerns about the
contemporaneity and representativeness for the first time in the course of the first remand –
Commerce nevertheless "took no action . . . to seek information to resolve its newly-identified
concerns . . . , by (for example) attempting to clarify whether or not the price of basic cardboard
packing cartons in India in fact does fluctuate significantly over relatively brief periods of time (or,
more specifically, whether it did so during the period of review, and in the four or five months
thereafter), or even the extent to which prices have historically fluctuated over time."  Jinan Yipin
II, 35 CIT at ____, 800 F. Supp. 2d at 1311-12.

And it is telling that, as discussed below, although the Domestic Producers placed the Indian
import statistics on the record of this proceeding, the Domestic Producers have never affirmatively
claimed that the domestic price quotes do not accurately reflect the actual, correct price of cardboard
packing cartons throughout the period of review.  *See* Jinan Yipin II, 35 CIT at ____ n.101, 800 F.
Supp. 2d at 1310 n.101.  Moreover, even if the record evidence did establish that prices were subject
to some degree of fluctuation, the record is devoid of analysis to indicate that any such price
fluctuation would justify resort to the Indian import statistics (in light of the admitted flaws in the
import data).  It might also be possible to adjust the price quotes to be contemporaneous, using a
methodology comparable to that which Commerce used to deflate certain data for use in valuing raw
garlic bulbs in the First Remand Determination.  *See id.*, 35 CIT at ____ n.104, 800 F. Supp. 2d at
1311 n.104.

is on whether the price information reflects "review period-wide price averages," rather than prices

for a more limited period of time.  *See* <u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp. 2d at 1311-12;

*id*., 35 CIT at ____, 800 F. Supp. 2d at 1292-94 (explaining "representativeness," in context of

surrogate valuation of plastic jars and lids).[36]  Commerce's concern about price quotes for a more

limited period of time – like the four price quotes at issue here, all of which are dated either on one

day or the very next – is the possibility that the pricing information may not accurately reflect prices

throughout the period of review, due to "temporary market fluctuations."  *Id*., 35 CIT at ____ &

n.102, 800 F. Supp. 2d at 1311-12 & n.102 (noting that representativeness reflects concern about

potential "temporary market fluctuations," and specifying dates of price quotes for cardboard

packing cartons).  However, as <u>Jinan Yipin II</u> noted, the administrative record in this proceeding is

barren of any evidence whatsoever that might suggest that prices for cardboard packing cartons are

subject to any significant volatility.  *See id*., 35 CIT at ____, 800 F. Supp. 2d at 1311-12.[37]

---

[36]As <u>Jinan Yipin II</u> emphasized, "Commerce's 'contemporaneity' and 'representativeness' criteria have no inherent value in and of themselves. . . . [P]rice data that are not contemporaneous and/or are not representative [– as Commerce uses those terms –] are by no means *per se* inaccurate. The ultimate question to be determined is: Do the price data accurately reflect prices throughout the period of review (whether or not those data are 'contemporaneous' and 'representative,' as Commerce defines those terms)?"  <u>Jinan Yipin II</u>, 35 CIT at ____ n.76, 800 F. Supp. 2d at 1292 n.76.

[37]As <u>Jinan Yipin II</u> noted, the suggestion that prices for cardboard packing cartons are subject to any significant fluctuation does not necessarily comport with common sense.  <u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp. 2d at 1311-12 (emphasizing, *inter alia*, that "[i]t is not clear why the price of basic cardboard packing cartons would be subject to any significant fluctuation"); *see also* <u>Taian Ziyang III</u>, 37 CIT at ____ & n.23, 918 F. Supp. 2d at 1366-67 & n.23 (in companion case challenging agency determinations in administrative review immediately preceding review at issue here, analyzing "representativeness" of domestic price quotes for cardboard packing cartons, and observing, *inter alia*, that "it is not at all obvious why the price of basic cardboard packing cartons would be subject to appreciable fluctuation over the course of a single year (*i.e.*, the period of

The record is equally definitive on "public availability."  As <u>Jinan Yipin I</u> observed, there

is room for debate as to the precise meaning of "public availability."  *See generally* <u>Jinan Yipin I</u>,

33 CIT at 489-91, 617 F. Supp. 2d at 1313-15.[38]  But there is no question that the focus of

---

review)").

 <u>Jinan Yipin II</u> similarly challenged Commerce's unsupported, broadbrush claims of volatility
in prices for plastic jars and lids:

> [I]t seems reasonable to assume that some commodities (or factors of production)
> fluctuate in price, seasonally and/or in response to established market forces such as
> supply and demand.  It is common knowledge, for example, that agricultural produce
> prices generally tend to fluctuate based on seasonal availability, and that mineral
> prices may fluctuate in accordance with supply and demand.  On the other hand, it
> is not at all obvious why the price of basic plastic jars and lids would be subject to
> appreciable fluctuation over the course of a single year (*i.e.*, the period of review).
> And, contrary to Commerce's assertions . . . , it is certainly not obvious why the price
> of basic plastic jars and lids would be "*highly* susceptible" to fluctuation.

<u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp. 2d at 1294; *see generally id.*, 35 CIT at ____, 800 F.
Supp. 2d at 1293-95 (questioning reasonableness of Commerce's claims of volatility in prices for
plastic jars and lids).  That rationale would seem to hold equal force for prices for basic cardboard
packing cartons and prices for basic plastic jars and lids.

 [38]*See also* <u>Jinan Yipin II</u>, 35 CIT at ____ & nn.74-75, 800 F. Supp. 2d at 1287-91 & nn.74-75
(characterizing Commerce's approach to public availability as "fluid"; analyzing, *inter alia*, agency
determinations involving price quotes and findings concerning "public availability" criterion, and
observing, *inter alia*, that "Commerce's determination as to whether information is 'publicly
available' is necessarily somewhat fact-specific," but also "occasionally arbitrary and even result-
oriented," that "the degree of emphasis that Commerce places on the public availability criterion
fluctuates from one case to another," and that Commerce's definition of "publicly available" has
been "somewhat less than consistent"; noting that Commerce has never "articulate[d] a satisfactory
explanation as to why the agency relies on price quotes and other information that is not publicly
available in some cases, but not in others," and criticizing Commerce for failing to set forth – "for
the benefit of domestic producers and respondents, as well as agency personnel, the courts, and the
public at large – clear, established criteria that the agency consistently, uniformly, and systematically
applies in determining when price quotes and other information that is not publicly available are
acceptable for use in determining surrogate values in NME cases, and when they are not").

Commerce's concern about information that is not publicly available is the potential for manipulation. *See* Jinan Yipin II, 35 CIT at ____, ____, ____, 800 F. Supp. 2d at 1287, 1307-08, 1310; Jinan Yipin I, 33 CIT at 489-90, 617 F. Supp. 2d at 1313-14. And it is undisputed that there is not even a scintilla of evidence on the record here to suggest that the four price quotes are in any way the product of manipulation or distortion, or are tainted by collusion. No evidence whatsoever. *See* Jinan Yipin II, 35 CIT at ____, ____, ____, 800 F. Supp. 2d at 1308, 1309-10, 1311-12; Jinan Yipin I, 33 CIT at 490, 617 F. Supp. 2d at 1314-15.[39]

The record evidence favoring use of the Indian import statistics pales by comparison to the evidence supporting the domestic price quotes. It is true that the import statistics are publicly available information. And it is similarly undisputed that the import statistics are both contemporaneous and representative as well. On the other hand, the record evidence on product

_____

[39]As Jinan Yipin II pointed out, the Domestic Producers had an obvious incentive to affirmatively challenge the price quotes if they believed the price quotes to be inaccurate. Presumably, if the price quotes did not fairly reflect the price of cardboard packing cartons throughout the period of review, or seemed to be in some way distorted, the Domestic Producers would have been the first to say so. Significantly, however, although the Domestic Producers placed the Indian import statistics on the record of this proceeding, they conspicuously never sought to present any evidence to suggest that the domestic price quotes on the record were manipulated or are in any way not representative of prices through the duration of the period of review. Nor did the Domestic Producers ever make any such claims. *See generally* Jinan Yipin II, 35 CIT at ____ n.101, 800 F. Supp. 2d at 1310 n.101.

Jinan Yipin II made the further point that the nature of the four domestic price quotes at issue here should serve to assuage, at least to some degree, any concerns about potential "manipulation." If one were inclined to forge or manipulate price data, presumably one would produce data that were more clearly decisive – in other words, one would generate a greater number of price quotes, and those price quotes would span the full duration of the period of review. As Jinan Yipin II put it, "[v]iewed through this lens, the problems that Commerce sees in the[] price quotes are actually indicia of authenticity." *See generally* Jinan Yipin II, 35 CIT at ____ n.101, 800 F. Supp. 2d at 1310 n.101.

specificity – the most important of Commerce's criteria – is damning.

In short, it is undisputed that the import statistics on the record are plagued by two serious infirmities. First, because the scope of the tariff heading on which the statistics are based is very broad,[40] the values reflected in the import statistics are inflated by the inclusion of (unknown, potentially vast) quantities of more expensive gift, specialty, and other types of non-packing boxes that bear no resemblance to the basic cardboard packing cartons that the Chinese Producers use to pack and ship garlic. *See* Jinan Yipin I, 33 CIT at 487-88, 493-96 & nn. 48, 50, 617 F. Supp. 2d at 1312-13, 1316-19 & nn. 48, 50; Jinan Yipin II, 35 CIT at ____, ____ & n.108, 800 F. Supp. 2d at 1308, 1313-15 & n.108.[41] And, second, although garlic producers source their packing cartons

---

[40]Indian tariff subheading 4819.1010 – the subheading for which Commerce has import statistics – covers gift, specialty, and many other types of non-packing boxes, in addition to the sort of plain cardboard packing cartons that the Chinese Producers use. *See* Jinan Yipin I, 33 CIT at 487-88, 493-96 & nn. 48, 50, 617 F. Supp. 2d at 1312-13, 1316-19 & nn.48, 50; Jinan Yipin II, 35 CIT at ____, ____ & n.108, 800 F. Supp. 2d at 1308, 1313-15 & n.108.

[41]That the values reflected in the import statistics are inflated by the inclusion of gift and specialty boxes is not in dispute. There is no question that the basic cardboard packing cartons that the Chinese Producers use are less expensive (and, in some instances, likely much less expensive) than the gift, specialty, and other non-packing boxes that are included in the import statistics. However, it is not possible to state with any precision the full extent of the distortion attributable to the more expensive boxes, because the record evidence on the quantity of such boxes reflected in the statistics (relative to the quantity of basic cardboard packing cartons) is simply inconclusive. *See, e.g.*, Jinan Yipin I, 33 CIT at 493-96, 617 F. Supp. 2d at 1317-19 (critiquing Commerce's efforts to minimize concerns about distortion); Jinan Yipin II, 35 CIT at ____ & n.108, 800 F. Supp. 2d at 1313 & n.108 (noting that "Commerce made no attempt on remand to . . . ascertain the extent to which the values reflected in the Indian import statistics . . . are inflated by the inclusion of 'myriad . . . specialty products'" unlike basic cardboard packing cartons); *id.*, 35 CIT at ____, 800 F. Supp. 2d at 1314-15 (faulting agency for failing to "conduct[] any analysis (not even a qualitative analysis, much less a quantitative one) to ascertain the extent of the actual distortion of the import statistics"; noting that import data from Indonesia, Sri Lanka, the Philippines, and Morocco placed on the record by agency in course of first remand fails to "shed any light on the extent of the distortion" attributable to non-comparable products included in import statistics).

domestically, the import statistics include freight charges; and such charges – particularly charges

for transportation by air – only further distort (*i.e.*, inflate) the values reflected in the import

statistics.  *See* Jinan Yipin I, 33 CIT at 487, 493, 496-97 & n.51, 617 F. Supp. 2d at 1312, 1317,

1319-20 & n.51; Jinan Yipin II, 35 CIT at ____, ____ & n.109, 800 F. Supp. 2d at 1308, 1313-15

& n.109.[42]

Surveying the state of the administrative record (as outlined above), Jinan Yipin II put it

bluntly: On the strength of the administrative record before the agency in the Final Results and the

First Remand Determination, and given the agency's candid concessions as to the existing, patent

flaws in the import statistics (as well as the absence of any affirmative evidence that the price quotes

were not representative and reliable), Commerce's prior decisions to rely on the import statistics

over the price quotes constituted a choice of "*admittedly* distorted data over data that the agency

---

[42]*See generally* Jinan Yipin I, 33 CIT at 492 n.45, 496-97, 617 F. Supp. 2d at 1316 n.45, 1319-20 (questioning logic of assumption that, rather than sourcing basic cardboard packing cartons domestically, merchant would purchase cartons that were imported – much less imported by air).

That the values reflected in the import statistics are inflated by the inclusion of freight charges (particularly charges for air freight) is not in dispute.  However, it is not possible to state with any precision the full extent of the distortion attributable to such freight charges, because the record evidence on the matter is simply inconclusive.  *See, e.g.*, Jinan Yipin I, 33 CIT at 496-97, 617 F. Supp. 2d at 1319-20 (critiquing Commerce's efforts to downplay concerns about distortion); Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1313-14 (highlighting fact that "Commerce apparently made no attempt on remand to determine the volume of merchandise reflected in the Indian import statistics that was imported by air, or to otherwise demonstrate that the values reflected in the Indian import statistics are not significantly inflated by the inclusion of air freight costs"); *id.*, 35 CIT at ____, 800 F. Supp. 2d at 1314-15 (faulting agency for failing to "conduct[] any analysis (not even a qualitative analysis, much less a quantitative one) to ascertain the extent of the actual distortion of the import statistics"; noting that import data from Indonesia, Sri Lanka, the Philippines, and Morocco placed on the record by agency in course of first remand fail to "shed any light on the extent of the distortion" attributable to air freight charges included in import statistics).

speculate[d] may be *potentially* distorted." *See* <u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp. 2d at 1315.  In other words, while the record evidence indisputably establishes that the values reflected in the Indian import statistics are (at least to some extent) inflated and thus do not accurately reflect the cardboard packing cartons at issue, there is no record evidence – absolutely none – to indicate that the domestic price quotes are in any way distorted or otherwise inaccurate.

The bottom line is that, to the extent that Commerce has a general policy that privileges the use of import statistics over price quotes due to concerns about the reliability of the latter, the agency's skepticism may well be justified, and – all other things being equal – its policy would be entitled to great weight and would likely carry the day.  *See generally* <u>Jinan Yipin I</u>, 33 CIT at 488, 617 F. Supp. 2d at 1313.  But, given the facts of this specific case, all things are decidedly not equal.[43]

Commerce's determination on the valuation of cardboard packing cartons in *this action* must be grounded in the *evidence* on *this record*.  And the evidence on domestic price quotes *versus* import statistics is not in equipoise.  While neither the Domestic Producers nor Commerce ever

---

[43]The situation would be quite different if the tariff subheading reflected in the import statistics were relatively narrow (and thus relatively "specific" to the input being valued), and if the effect of air freight charges could be reasonably estimated.  Similarly, the situation would be different if there were any evidence at all on the record to undermine the reliability of the price quotes.

Here, however, Commerce itself has admitted that the import statistics include a broad range of products that are very much unlike the basic cardboard packing cartons here.  And Commerce has also conceded that the import statistics are further distorted by air freight charges, though the extent of that distortion has not been established.  In contrast, there is not even a shred of actual record evidence to cast doubt on the reliability of the domestic price quotes.  On these specific facts, Commerce's policy preference for the use of import statistics over price quotes cannot prevail.

adduced even an *iota* of actual evidence to impeach the accuracy and reliability of the domestic price quotes, Commerce itself has candidly and unequivocally conceded that the values reflected in the import statistics are inflated.  *See, e.g.*, First Remand Determination at 46 (admitting that "[the] Indian import statistics do not perfectly represent the inputs of [the Chinese Producers] because the Indian import data include [1] specialty boxes and [2] boxes transported by air"); *id*. at 70 (same).[44]

Under these circumstances, Commerce's decision in the Second Remand Determination to value cardboard packing cartons using the domestic price quotes (rather than the Indian import statistics) is plainly supported by substantial evidence and otherwise in accordance with law. Commerce's decision therefore must be sustained.  *See* Def.'s Response Brief at 15 (noting that "[n]o party objects to the Second Remand Results with respect to Commerce's . . . surrogate value determination[] with respect to cartons," and arguing that "the Court should sustain Commerce's Second Remand Results" on the issue); *id*. at 2 (same).[45]

D.  Surrogate Value for Plastic Jars and Lids

In the Final Results in this case, Commerce valued the plastic jars and lids that are used to package garlic using a surrogate value derived from World Trade Atlas statistics for imports into India under two broad "basket" provisions of the Indian tariff system – specifically, subheading

---

[44]*See also* First Remand Determination at 45 (acknowledging that "the Indian import data . . . are less [product] specific" than the price quotes); *id*. at 70 (conceding "the inclusion of airfreight in the values included within the Indian import data"); Issues and Decision Memorandum at 64 (admitting that "there are many different types of boxes covered by [the Indian import statistics]"); *id*. (acknowledging that Indian import statistics reflect cartons imported by air).

[45]*See also* Def.-Ints.' Brief (offering no comments on any issue other than valuation of raw garlic bulbs); Def.-Ints.' Reply Brief (same); Pls.' Response Brief (same).

3923.3090, a provision covering "[c]arboys, bottles, flasks and similar articles of plastics, [not either specified or included]" (formerly subheading 3923.3000), and subheading 3923.5000, covering "[s]toppers, lids, caps and other closures of plastics." *See* <u>Jinan Yipin I</u>, 33 CIT at 499, 617 F. Supp. 2d at 1321-22; <u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp. 2d at 1279.  As with the Final Results on cardboard packing cartons, the Final Results on plastic jars and lids found the use of Indian import statistics preferable to four domestic Indian price quotes that were submitted by the Chinese Producers, which were obtained from three different Indian vendors in three different cities and are for jars and lids like those used by the Chinese Producers here to pack their peeled garlic.  *See* <u>Jinan Yipin I</u>, 33 CIT at 499-501, 617 F. Supp. 2d at 1322-23; <u>Jinan Yipin II</u>, 35 CIT at ____ & n.62, 800 F. Supp. 2d at 1279-80 & n.62.[46]

In rejecting the domestic price quotes, the Final Results cited concerns about the "public availability" of the price quotes, as well as their "contemporaneity," and their "representativeness."

_____

[46]Although there was some confusion concerning the number of price quotes for plastic jars and lids submitted by the Chinese Producers, the record establishes that there are, in fact, a total of *four* price quotes from *three* Indian vendors, in Delhi, Bangalore, and Mumbai.  *See* <u>Jinan Yipin II</u>, 35 CIT at ____ n.62, ____, ____ n.77, 800 F. Supp. 2d at 1280 n.62, 1284, 1292 n.77.  The four price quotes are dated October 8, 2004, November 6, 2004, and November 22, 2004.  *See id.*, 35 CIT at ____ n.62, 800 F. Supp. 2d at 1280 n.62.  Thus, two of the four price quotes fall clearly within the period of review, and the other two are dated a mere one week and three weeks after the period of review ended.  *See id.*, 35 CIT at ____, 800 F. Supp. 2d at 1284-85.

These price quotes are the exact same price quotes that are also included in the administrative record of the ninth administrative review – that is, the administrative review which immediately preceded the review at issue here, and the review that was at issue in the companion case, <u>Taian Ziyang</u>.  *See* <u>Jinan Yipin II</u>, 35 CIT at ____ n.62, 800 F. Supp. 2d 1280 n.62 (explaining that same four price quotes for plastic jars and lids were placed on records of both ninth administrative review and tenth administrative review); *see generally* <u>Taian Ziyang III</u>, 37 CIT at ____, 918 F. Supp. 2d at 1358-69 (sustaining agency reliance on same four price quotes to value plastic jars and lids in ninth administrative review).

*See* Jinan Yipin I, 33 CIT at 500-01 & n.53, 617 F. Supp. 2d at 1322-23 & n.53; Jinan Yipin II, 35

CIT at ____, 800 F. Supp. 2d at 1280.  Jinan Yipin I analyzed all of the grounds cited in the Final

Results as a basis for rejecting the price quotes, and found each of them wanting.  *See* Jinan Yipin

I, 33 CIT at 499-506, 617 F. Supp. 2d at 1322-27.  Jinan Yipin I acknowledged that "[n]o doubt the[]

points [raised by Commerce in the Final Results] diminish, at least to some degree, the utility of the

domestic Indian jar" price quotes.  *See id.*, 33 CIT at 501 n.53, 617 F. Supp. 2d at 1323 n.53.

However, Jinan Yipin I concluded that the Final Results failed to adequately analyze the relative

merits of the domestic price quotes and the seemingly much more seriously flawed Indian import

statistics on which the Final Results relied, and therefore remanded the issue to Commerce for

further consideration.  *See generally id.*, 33 CIT at 498-506, 617 F. Supp. 2d at 1321-27; *see also*

Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1283-84.

      Much like the First Remand Determination's treatment of cardboard packing cartons

(discussed above), the First Remand Determination's treatment of plastic jars and lids "add[ed]

virtually nothing to this case" concerning the relative merits of the use of the Indian import statistics

*versus* the four domestic price quotes.  Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1284; *see*

*also id.*, 35 CIT at ____, 800 F. Supp. 2d at 1306; *see generally id.*, 35 CIT at ____, 800 F. Supp.

2d at 1284-1307.  Commerce continued to overstate the alleged problems with the domestic quotes

and, at the same time, continued to downplay the obvious (and admitted) problems inherent in the

Indian import statistics on which the agency continued to rely.  *See id*.

      Observing that the First Remand Determination seemingly had once again chosen

"*admittedly distorted* Indian import statistics over *potentially 'perfect'* price quotes," Jinan Yipin

II held that the First Remand Determination failed to adequately explain the agency's determination

that the Indian import statistics constituted the "best available information" for use in calculating

the surrogate value of plastic jars and lids, in light of the admitted infirmities in the import statistics.

*See* Jinan Yipin II, 35 CIT at ____, ____, 800 F. Supp. 2d at 1301-02, 1306.  Jinan Yipin II similarly

criticized Commerce for failing to adequately explain why the Indian import statistics were

preferable to the domestic price quotes, the other source of information on the record.  *See id*., 35

CIT at ____, 800 F. Supp. 2d at 1306.  Jinan Yipin II further held that "[the First Remand

Determination's]  determination that the Indian import statistics constitute the 'best available

information' (as compared to the domestic price quotes) is not supported by substantial evidence in

the administrative record."  *See id*., 35 CIT at ____, 800 F. Supp. 2d at 1306.  The issue was

therefore remanded once again, and – as it had with cardboard packing cartons – Jinan Yipin II

counseled Commerce to use the remand wisely, because a third remand was unlikely.  *See id*., 35

CIT at ____, 800 F. Supp. 2d at 1307.

In its Second Remand Determination, Commerce reversed course (implicitly adopting the

reasoning underpinning Jinan Yipin II, and, in turn, Jinan Yipin I, as Commerce did vis-a-vis the

valuation of cardboard packing cartons), using the four domestic price quotes – rather than the

Indian import statistics – to value plastic jars and lids.  The Second Remand Determination states:

> The Court found [in Jinan Yipin II] that Commerce had chosen "*admittedly distorted*
> Indian import statistics over *potentially* '*perfect*' price quotes."  While [Commerce]
> disagrees with this conclusion, [Commerce] is cognizant of the Court's admonition
> that the [agency] is not likely to "get another bite of the apple on this issue." . . . .
>
> . . . .
>
> Accordingly, . . . [Commerce] has determined, under protest, to use the price quote

> surrogate values provided on the record by the plaintiffs during the underlying
> proceeding for this final remand redetermination.  Using these price quotes, . . . the
> surrogate value used for plastic jars and lids is 26.8750 Rupees per jar.

Second Remand Determination at 23-24 (footnotes omitted); *see also id*. at 1 (stating that Commerce

"has applied, under protest, the price quotes on the record of the underlying review as surrogates to

value . . . plastic jars and lids")[47]; *cf.* Defendant's Response to Comments Regarding

Redetermination Pursuant to Court Remand at 9-11 (April 20, 2012), *filed in* Taian Ziyang Food Co.

v. United States, Court No. 05-00399 (in companion case contesting Commerce's determinations

in administrative review immediately preceding review at issue in this action, which included

parallel challenge to agency's reliance on import statistics *versus* price quotes in surrogate valuation

---

[47]The quoted language from the Second Remand Determination – particularly the phrase "under protest" – can be read as intimating that Jinan Yipin II imposed an outcome or result on Commerce, and ordered the agency to use the domestic price quotes in valuing plastic jars and lids for purposes of the Second Remand Determination.  That is not the case.

In the course of the second remand, Commerce was free to value plastic jars and lids using either the import statistics or the price quotes (or some other data set, if it so desired), provided that the agency properly articulated its rationale and supported its determination with substantial evidence.  *See, e.g.*, Jinan Yipin II, 35 CIT at ____ n.97, 800 F. Supp. 2d at 1306 n.97 (suggesting possibility of further development of record in course of second remand, including, for example, development of any evidence demonstrating that "the inclusion of the more expensive products and the air freight charges have no significant distortive effect on the Indian import statistics," and/or "evidence on the potential for manipulation of the price quotes and the extent to which the price quotes accurately reflect prices throughout the period of review"); *see also* Tung Mung Development Co., 354 F.3d at 1379 (explaining that "the Court of International Trade's remand orders did not compel Commerce to adopt a new policy," where agency was free to "either explain its deviation from 'prior practice' or 'apply a combination rate, consistent with its prior practice'"); *see generally* n.32, *supra* (explaining, in context of analysis of cardboard packing cartons, that – in course of most recent remand – Commerce was free to use import statistics or price quotes (or some other data) to value cardboard packing cartons, provided that agency properly articulated its rationale and supported its determination with substantial evidence; also noting *non sequitur* in Commerce's rationale).

of plastic jars and lids, agency ultimately decided to rely on price quotes (as the agency has done

here), explaining that "the Remand Results are consistent with the Court's holding" in <u>Taian Ziyang</u>

<u>II</u>, and that "[i]n light of the Court's concerns about the import statistics, . . . Commerce reasonably

adopted plaintiffs' approach and used the domestic price quotes").

As outlined below, and as set forth at length and in painstaking detail in <u>Jinan Yipin I</u> and

<u>Jinan Yipin II</u>, the record evidence solidly favors use of the price quotes as surrogate values for

plastic jars and lids. *See* <u>Jinan Yipin I</u>, 33 CIT at 498-506, 617 F. Supp. 2d at 1321-27 (analyzing

merits of domestic price quotes *versus* Indian import statistics for valuation of plastic jars and lids);

<u>Jinan Yipin II</u>, 35 CIT at ____, 800 F. Supp. 2d at 1297-1307 (same).

As discussed above, <u>Jinan Yipin II</u> explained that – of the five criteria set forth in Policy

Bulletin 04.1 – "product specificity" logically must be the most important. *See* <u>Jinan Yipin II</u>, 35

CIT at ____, 800 F. Supp. 2d at 1304.[48]   And it is beyond cavil that, as discussed in <u>Jinan Yipin  I</u>

and <u>Jinan Yipin II</u>, the four domestic price quotes on the record of this proceeding are (in the

parlance of the Policy Bulletin) highly "specific to the input in question" – that is, the plastic jars

and lids actually used by the Chinese Producers here. *See* <u>Jinan Yipin I</u>, 33 CIT at 501, 505-06, 617

F. Supp. 2d at 1323, 1327; <u>Jinan Yipin II</u>, 35 CIT at ____, ____, ____, ____, ____, 800 F. Supp. 2d

at 1279-80, 1282, 1283, 1296, 1303.

As to "contemporaneity," there is – even as an abstract matter of principle – no real basis

for concern, because two of the four price quotes fall squarely within the period of review and the

---

[48]*See generally* n.33, *supra* (discussing extreme examples to illustrate overriding importance
of "product specificity" criterion).

other two are dated one week and three weeks after the period of review ended.  *See* Jinan Yipin II,

35 CIT at ____, 800 F. Supp. 2d at 1284-85.  As to "representativeness," it is true that the price

quotes span a period of just a little less than seven weeks (rather than the full period of review, or

a full year).  *See id.*, 35 CIT at ____ n.62, 800 F. Supp. 2d at 1280 n.62.  However, the policy

considerations that underpin both the contemporaneity and its representativeness criteria go to

whether the proffered pricing information accurately reflects prices for the input (here, plastic jars

and lids) during the period of review.  And the record here is clear on that issue.

        As Jinan Yipin II observed, there is nothing whatsoever on the record of this proceeding to

indicate that prices for plastic jars and lids are subject to any appreciable fluctuation.  *See* Jinan

Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1292-95.[49]  In other words, there is no record evidence

_____

        [49]Review of the record discloses no apparent reason to suppose that plastic jars and lids (any more than cardboard packing cartons) would be susceptible to significant price fluctuations.  *See* n.37, *supra*; *see also* Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1293-95 (questioning reasonableness of Commerce's asserted concerns about volatility in prices for basic plastic jars and lids); Taian Ziyang III, 37 CIT at ____, 918 F. Supp. 2d at 1374 (same, in companion case challenging determinations in administrative review immediately preceding review at issue here, involving exact same four price quotes for plastic jars and lids at issue here).

        It is telling that, as discussed below, although the Domestic Producers placed the Indian import statistics on the record of this proceeding, the Domestic Producers have never affirmatively claimed that the domestic price quotes do not accurately reflect the actual, correct price of basic plastic jars and lids throughout the period of review.  *See* Jinan Yipin II, 35 CIT at ____ n.101, 800 F. Supp. 2d at 1310 n.101.  Moreover, Jinan Yipin II took note of the fact that, notwithstanding its asserted concerns about the contemporaneity and representativeness of the domestic price quotes, Commerce nonetheless "took no action . . . to obtain . . . information to clarify the extent to which the four domestic price quotes in fact reflect 'broad market averages' and are sufficiently representative of prices over 'a substantial period of time' – that is, sufficiently reflective of prices over the one-year period that constitutes the period of review."  *Id.*, 35 CIT at ____, 800 F. Supp. 2d at 1295; Taian Ziyang II, 35 CIT at ____, 783 F. Supp. 2d at 1337 (same, in companion case challenging determinations in administrative review immediately preceding review at issue here, involving exact same four price quotes for plastic jars and lids at issue here).  Similarly, Commerce

that even hints that the price quotes here do not accurately represent prices for plastic jars and lids throughout the relevant period of review.  The concerns about the contemporaneity and representativeness of data that are reflected in Policy Bulletin 04.1 are entirely reasonable, as a theoretical matter.  But, in this particular case, the record evidence on the price quotes for plastic jars and lids does not bear out those concerns.[50]

The record is no less clear on the issue of "public availability."  As discussed above, Commerce's concern about information that is not publicly available is the risk of manipulation.  See section III.C, supra (explaining, in analysis of cardboard packing cartons, that policy basis for "public availability" criterion is agency concern about potential for "manipulation"); Jinan Yipin

----

"took no action to attempt to ascertain the extent to which the prices of basic jars and lids fluctuated during the period of review at issue here, or even the extent to which prices historically have fluctuated over time."  See Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1295.

Absent any concrete evidence (or even some sound reason to believe) that prices for basic plastic jars and lids fluctuate to any significant degree over relatively brief periods of time, the contemporaneity and representativeness of the price quotes are of little import.  Even if the record evidence did establish that prices were subject to some degree of fluctuation, the record is devoid of analysis to indicate that any such price fluctuation would justify resort to the Indian import statistics (in light of the admitted flaws in the import data).  Further, if it were determined that prices were subject to some degree of fluctuation and that adjustment were necessary to avoid recourse to the flawed import statistics, it might well be possible to adjust the price quotes to be essentially fully contemporaneous and representative, using a methodology comparable to that which Commerce used to deflate certain data for use in valuing raw garlic bulbs in the First Remand Determination. See Jinan Yipin II, 35 CIT at ____ n.104, 800 F. Supp. 2d at 1311 n.104.

[50]As discussed above, the wisdom of Commerce's general policy favoring the use of import statistics over price quotes is not at issue here, given the specific facts presented – that is, where the record establishes that the values reflected in the statistics are (at least to some extent) inflated and thus do not accurately reflect the factor of production in question, while, at the same time, there is no record evidence whatsoever to indicate that the price quotes are in any way distorted or otherwise inaccurate.  See generally n.43, supra.

II, 35 CIT at ____, ____, 800 F. Supp. 2d at 1286-87, 1290-91 (same, in analysis of plastic jars and lids); Jinan Yipin I, 33 CIT at 500, 617 F. Supp. 2d at 1322 (same). But the record here includes no actual, affirmative evidence that can be read even to suggest that the price quotes for jars and lids are in any way distorted or are the product of manipulation or collusion. *See* Jinan Yipin II, 35 CIT at ____, ____, 800 F. Supp. 2d at 1286, 1287-91; Jinan Yipin I, 33 CIT at 500, 617 F. Supp. 2d at 1322-23; *see also* Taian Ziyang Food Co. v. United States, 37 CIT ____, ____, 918 F. Supp. 2d 1345, 1374 (2013) ("Taian Ziyang III") (in companion case, involving administrative review immediately preceding review at issue here, and the exact same four price quotes for plastic jars and lids, noting that record is devoid of any suggestion that price quotes are tainted by distortion, manipulation, or collusion).[51]

The record evidence supporting use of the Indian import statistics is not nearly as strong as that favoring the price quotes. True enough, the import statistics are publicly available, as well as

---

[51]The Domestic Producers had a clear incentive to affirmatively challenge the price quotes if the Domestic Producers believed them to be inaccurate. Presumably, if the price quotes did not fairly represent prices throughout the period of review, or if they appeared to be in some way distorted or manipulated, the Domestic Producers would have been the first to say so. It is therefore telling that, although the Domestic Producers placed the Indian import statistics on the record here, they have never sought to present any evidence to cast doubt on the accuracy of the price quotes. Nor have the Domestic Producers ever claimed that the price quotes are in any way distorted or otherwise inaccurate. *See* Jinan Yipin II, 35 CIT at ____ n.71, 800 F. Supp. 2d at 1287 n.71.

Moreover, as Jinan Yipin II observed, the nature of the four domestic price quotes should lay to rest any concerns about the risk of "manipulation." If one were inclined to forge or manipulate price data, presumably one would produce data that were more clearly decisive – in other words, one would generate a greater number of price quotes, and all of those price quotes would be dated within the period of review and would span the full duration of that period. Viewed through this perspective, the seeming flaws in the price quotes are actually indicia of authenticity and reliability. *See* Jinan Yipin II, 35 CIT at ____ n.71, 800 F. Supp. 2d at 1287 n.71.

both contemporaneous and representative.  However, the record on product specificity – the most

important of Commerce's criteria – is a different story entirely.

Like the import statistics that Commerce used to value cardboard packing cartons until the

Second Remand Determination, the import statistics that the Final Results and the First Remand

Determination used to value plastic jars and lids suffer from two critical defects.  The Indian import

statistics for plastic jars and lids are much less product-specific than the domestic price quotes, both

because the import statistics include a very broad range of "specialty" and other plastic products that

bear no resemblance to the simple, basic plastic jars at issue in this case,[52] and because (like the

---

[52]As explained above, the record establishes that – in addition to the sort of simple, basic plastic jars that the Chinese Producers use – the Indian import statistics for "basket" subheadings 3923.3090 and 3923.5000 also capture many different types of more expensive "specialty" and other plastic products.  *See*, *e.g.*, Jinan Yipin I, 33 CIT at 499-500, 617 F. Supp. 2d at 1322 (explaining that import statistics include "'specialty jars' and other 'plastic products completely different from the plastic jars used by the [Chinese Producers] to pack . . . peeled garlic,' such as 'slippers,' 'hairdressing accessories,' 'fibre glass,' and 'disposable plasticware'"); *id*., 33 CIT at 501, 617 F. Supp. 2d at 1323-24 (noting that import statistics are "distorted . . . by 'a myriad of specialty products' that 'are not remotely representative of the plastic jars used by the [Chinese Producers]'"); *id*., 33 CIT at 502, 617 F. Supp. 2d at 1324 (noting that subheading 3923.3090 is "a 'broad, basket' tariff provision which captures an extraordinarily wide range of plastic products, above and beyond the very basic plastic jars that the [Chinese Producers] used to pack garlic"); *id.* (explaining that "data indicate that 'the highest quantity of imports . . . driv[ing] the price of [merchandise classified under HTS subheading 3923.3090] is imported from Italy by L'Oreal India Pvt. and is described as 'hair products'").

There is no dispute that the values reflected in the import statistics are inflated by the inclusion of "specialty" and other plastic products that are very different from (and more elaborate than) the simple, basic plastic jars at issue here.  There is no dispute that the plastic jars and lids that the Chinese Producers use are less expensive (and, in some instances, likely much less expensive) than other plastic products that are included in the import statistics.  However, it is not possible to state with any precision the full extent of the distortion attributable to the other plastic products, because the record evidence on the quantity of such products reflected in the statistics (relative to the quantity of basic plastic jars) is simply inconclusive.  *See generally* Jinan Yipin II, 35 CIT at ____ n.81, 800 F. Supp. 2d at 1295 n.81 (stating that, in light of evidence of distortion of import

import statistics for cardboard packing cartons, discussed above) the import statistics for plastic jars

and lids include charges for air freight.[53]  *See* Jinan Yipin I, 33 CIT at 499, 499-504, 505-06, 617

F. Supp. 2d at 1321, 1322-25, 1327 (discussing inflation attributable to highly diverse group of

products captured by import statistics); *id*., 33 CIT at 499, 501-02, 504-05, 617 F. Supp. 2d at 1321,

1323-24, 1326-27 (discussing inflation attributable to air freight charges); Jinan Yipin II, 35 CIT

---

statistics due to "the inclusion of specialty plastic jars and other more expensive products," "[t]he open questions that remain to be addressed are the extent and the significance of the distortion"); *id*., 35 CIT at ____, 800 F. Supp. 2d at 1296 (noting that First Remand Determination made "no attempt to . . . ascertain the extent to which the values reflected in the Indian import statistics are inflated by the inclusion of more expensive specialty products that bear no resemblance to the basic plastic jars and lids" used by Chinese Producers); *id*., 35 CIT at ____, 800 F. Supp. 2d at 1305 (noting existence of "serious unanswered questions about the extent to which the import statistics are distorted by the inclusion of 'specialty jars' and a wide range of other plastic products that are not comparable to the basic plastic jars and lids at issue"); *see also* Jinan Yipin I, 33 CIT at 504, 617 F. Supp. 2d at 1325 (noting that "Commerce cannot accurately ascertain from the existing record the full *extent* of the distortion attributable to the broad scope of the tariff subheading").

[53]*See generally* Jinan Yipin I, 33 CIT at 505, 617 F. Supp. 2d at 1326-27 (questioning logic of assumption that merchant would purchase cartons that were imported – much less imported by air); Jinan Yipin II, 35 CIT at ____ n.64, 800 F. Supp. 2d at 1283 n.64 (same).

That the values reflected in the import statistics are inflated by the inclusion of freight charges (particularly charges for air freight) is not in dispute.  However, it is not possible to state with any precision the full extent of the distortion attributable to such freight charges, because the record evidence on the matter is simply inconclusive.  *See, e.g.*, Jinan Yipin I, 33 CIT at 504-05, 617 F. Supp. 2d at 1326 (critiquing Commerce's efforts to downplay concerns about distortion); Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1297-98 (highlighting fact that "Commerce made no attempt on remand to ascertain the volume of merchandise reflected in the Indian import statistics that was imported by air, or to otherwise demonstrate that the values reflected in the Indian import statistics are not significantly inflated by the inclusion of air freight costs"); *id*., 35 CIT at ____, ____, 800 F. Supp. 2d at 1298, 1301 (faulting agency for failing to "conduct[] any analysis (not even a qualitative analysis, much less a quantitative one) to ascertain the extent of the *actual* distortion of the import statistics"; noting that import data from Indonesia, Sri Lanka, the Philippines, and Morocco placed on the record by agency in course of first remand fail to "shed any light on the extent of the distortion" attributable to air freight charges included in import statistics).

at ____, ____, ____ & n.81, ____ & n.89, 800 F. Supp. 2d at 1279, 1281-82, 1295-96 & n.81, 1300-01 & n.89 (discussing inflation attributable to highly diverse group of products captured by import statistics); *id.*, 35 CIT at ____, ____, ____ & n.89, 800 F. Supp. 2d at 1282, 1297-98, 1300-01 & n.89 (discussing inflation attributable to air freight charges).

In its First Remand Determination, Commerce flatly admitted that the Indian import statistics reflect inflated values as a surrogate for the plastic jars and lids at issue here, both because the import statistics "include a broad range of products that are different from the plastic jars used to pack garlic," and because the import statistics "include[] products that, unlike those the [Chinese Producers] used, were shipped by air." *See* First Remand Determination at 73; *see also id.* at 50 (same).[54]  As such, the facts here are straightforward, compelling, and uncontroverted.  While the record evidence indisputably establishes that the values reflected in the Indian import statistics are (at least to some extent) inflated and thus do not accurately represent the basic plastic jars and lids at issue, there is no record evidence – absolutely none – to indicate that the domestic price quotes are in any way distorted or otherwise inaccurate.

Jinan Yipin II put it bluntly:   "[I]n contrast to the Indian import statistics (which are admittedly 'imperfect'), there is no affirmative evidence that the domestic price quotes are in any way 'imperfect.'"  *See* Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1301.  Under these

---

[54]*See also* Issues and Decision Memorandum at 66 (noting Chinese Producers' arguments that, due to "basket" nature of the tariff subheadings reflected in Indian import statistics at issue, import statistics include "plastic products such as specialty hair products, slippers, and fiber glass that do not resemble the plastic jars" used to pack garlic, and that Indian import statistics include air freight charges); *id.* at 68-69 (conceding that Indian import statistics include products imported by air).

circumstances, Commerce's decision in the Second Remand Determination to value plastic jars and

lids based on the four domestic price quotes (rather than the Indian import statistics) is clearly

supported by substantial evidence and is otherwise in accordance with law.  That decision thus must

be sustained.  *See* Def.'s Response Brief at 15 (noting that "[n]o party objects to the Second Remand

Results with respect to Commerce's . . . surrogate value determination[] with respect to . . . jars and

lids," and arguing that "the Court should sustain Commerce's Second Remand Results" on the

issue); *id*. at 2 (same).[55]

### IV.  Conclusion

For all the reasons set forth above, Commerce's Second Remand Determination must be

sustained.  Judgment will enter accordingly.

_____
/s/ Delissa A. Ridgway
Delissa A. Ridgway
Judge

Decided:  March 28, 2014
          New York, New York

---

[55]*See also* Def.-Ints.' Brief (limiting arguments to calculation of surrogate value for raw
garlic bulbs); Def.-Ints.' Reply Brief (same); Pls.' Response Brief (same).